No. 23-10319

# In the United States Court of Appeals for the Fifth Circuit

WILLIAM T. MOCK; CHRISTOPHER LEWIS;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation;
MAXIM DEFENSE INDUSTRIES, L.L.C.,

*Plaintiffs-Appellants,*

v.

MERRICK GARLAND, U.S. Attorney General, in his official capacity as
Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES;
STEVE DETTELBACH, in his official capacity as the Director of the
Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Case No. 4:23-cv-00095-O

## APPENDIX IN SUPPORT OF
## PLAINTIFFS-APPELLANTS' OPPOSED EMERGENCY
## MOTION FOR INJUNCTION PENDING APPEAL

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 517-1665
Facsimile: (916) 476-2392
cwi@fpchq.org

Erik S. Jaffe
  *Counsel of Record*
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
ejaffe@schaerr-jaffe.com
jprince@schaerr-jaffe.com

*Counsel for Plaintiffs-Appellants*

## TABLE OF CONTENTS

| DESCRIPTION | APP. RANGE |
|---|---|
| Docket Sheet, U.S. District Court, Northern District of Texas, Fort Worth Division, *William T. Mock, et al. v. Merrick Garland, et al.*, No. 4:23-cv-00095-O, Hon. Judge Reed C. O'Connor | 001-009 |
| First Amended Petition for Judicial Review and Request for Vacatur of Agency Action, and Complaint for Declaratory and Injunctive Relief, Feb. 7, 2023 [Dkt. No. 13] | 010-084 |
| Plaintiffs' Motion and Brief in Support for a Preliminary Injunction or, in the Alternative, for Postponement of the Effective Date of the Final Rule, Feb. 21, 2023 [Dkt. Nos. 33 & 36] | 085-144 |
| Declaration of Brandon Combs, dated Feb. 8, 2023, filed Feb. 21, 2023 [Dkt. No. 36-1] | 145-148 |
| Declaration of David Dahl, dated Feb. 9, 2023, filed Feb. 21, 2023 [Dkt. No. 36-2] | 149-153 |
| Declaration of Christopher Lewis, dated Feb. 8, 2023, filed Feb. 21, 2023 [Dkt. No. 36-3] | 154-156 |
| Declaration of William T. Mock, dated Feb. 10, 2023, filed Feb. 21, 2023 [Dkt. No. 36-4] | 157-160 |
| Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, for Postponement of the Effective Date of the Final Rule, Mar. 10, 2023 [Dkt. No. 37] | 161-222 |
| Plaintiffs' Reply In Support of Their Motion for a Preliminary Injunction or, in the Alternative, for Postponement of the Effective Date of the Final Rule, Mar. 17, 2023 [Dkt. No. 38] | 223-235 |
| Supplemental Declaration of David Dahl, Mar. 17, 2023 [Dkt. No. 38-1] | 236-238 |

# TABLE OF CONTENTS (CONT'D)

| | |
|---|---|
| Opinion & Order on Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, for Postponement of the Effective Date of the Final Rule, Hon. Judge Reed C. O'Connor, Mar. 30, 2023 [Dkt. No. 40] | 239-254 |
| Plaintiffs' Motion for Injunction Pending Appeal & Memorandum in Support, Mar. 30, 2023 [Dkt. Nos. 41 & 42] | 255-283 |
| Notice of Appeal of Plaintiffs from March 30, 2023 Opinion & Order (ECF No. 40) of the Hon. Judge Reed C. O'Connor, Mar. 30, 2023 [Dkt. No. 43] | 284-286 |
| Order Expediting Briefing, Hon. Judge Reed C. O'Connor, Mar. 31, 2023 [Dkt. No. 47] | 287 |
| Defendants' Opposition to Plaintiffs' Motion for an Injunction Pending Appeal, Apr. 12, 2023 [Dkt. No. 49] | 288-307 |
| Plaintiffs' Reply in Support of Their Motion for Injunction Pending Appeal, Apr. 18, 2023 [Dkt. No. 50] | 308-320 |
| Third Declaration of David Dahl, Apr. 18, 2023 [Dkt. No. 50-1] | 321-322 |

APPEAL

# U.S. District Court
## Northern District of Texas (Fort Worth)
## CIVIL DOCKET FOR CASE #: 4:23-cv-00095-O

Mock et al v. Garland et al
Assigned to: Judge Reed C. O'Connor
Case in other court: United States Court of Appeals 5th
              Circuit, 23-10319
Cause: 28:1331 Fed. Question

Date Filed: 01/31/2023
Jury Demand: None
Nature of Suit: 899 Other Statutes:
Administrative Procedure Act/Review
or Appeal of Agency Decision
Jurisdiction: U.S. Government
Defendant

**Plaintiff**

**William T Mock**  represented by  **R Brent Cooper**
Cooper & Scully PC
900 Jackson Street, Suite 100
Dallas, TX 75202
214-712-9501
Fax: 214-712-9540
Email:
brent.cooper@cooperscully.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Benjamin David Passey**
Cooper & Scully PC
900 Jackson Street
Suite 100
Dallas, TX 75202
214-712-9500
Fax: 214-712-9540
Email: ben.passey@cooperscully.com
*ATTORNEY TO BE NOTICED*

**Cody J Wisniewski**
FPC Action Foundation
5550 Painted Mirage Road
Las Vegas, NV 89149
916-378-5785
Fax: 916-476-2392
Email: cwi@fpchq.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Christopher Lewis**                    represented by    **R Brent Cooper**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Benjamin David Passey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Cody J Wisniewski**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Firearms Policy Coalition Inc**        represented by    **R Brent Cooper**
*a nonprofit corporation*                                 (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Benjamin David Passey**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Cody J Wisniewski**
                                                          (See above for address)
                                                          *PRO HAC VICE*
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Maxim Defense Industries, LLC**        represented by    **Cody J Wisniewski**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **R Brent Cooper**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Merrick Garland**                      represented by    **Jody Dale Lowenstein**
*in his official capacity as Attorney*                    US Department of Justice
*General of the United States*                            Civil Division, Federal Programs
                                                          Branch

1100 L Street NW
Washington, DC 20005
202-598-9280
Email: jody.d.lowenstein@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**United States Department of Justice**      represented by   **Jody Dale Lowenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bureau of Alcohol Tobacco Firearms and Explosives**      represented by   **Jody Dale Lowenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Steven Dettelbach**
*in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*      represented by   **Jody Dale Lowenstein**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/31/2023 | 1 | COMPLAINT against All Defendants filed by William T Mock, Firearms Policy Coalition Inc, Christopher Lewis. (Filing fee $402; Receipt number ATXNDC-13481974) Plaintiff will submit summons(es) for issuance. In each Notice of Electronic Filing, the judge assignment is indicated, and a link to the Judges Copy Requirements and Judge Specific Requirements is provided. The court reminds the filer that any required copy of this and future documents must be delivered to the judge, in the manner prescribed, within three business days of filing. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Attachments: # 1 Exhibit(s) Exhibit 1, # 2 Cover Sheet Civil Cover Sheet, # 3 Cover Sheet Supplement Civil Cover Sheet Attachment) (Cooper, R) (Attachment 2 replaced to flatten pdf on 1/31/2023) (mms). Modified on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 2 | Request for Clerk to issue Summons filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock. (Cooper, R) (Main Document 2 replaced to flatten pdf on 1/31/2023) (mms). Modified text on 1/31/2023 (mms). |

**APP.003**

| | | (Entered: 01/31/2023) |
|---|---|---|
| 01/31/2023 | 3 | Request for Clerk to issue Summons filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock. (Cooper, R) (Main Document 3 replaced to flatten pdf on 1/31/2023) (mms). Modified text on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 4 | Request for Clerk to issue Summons filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock. (Cooper, R) (Main Document 4 replaced to flatten pdf on 1/31/2023) (mms). Modified text on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 5 | Request for Clerk to issue Summons filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock. (Cooper, R) (Main Document 5 replaced to flatten pdf on 1/31/2023) (mms). Modified text on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 6 | CERTIFICATE OF INTERESTED PERSONS/DISCLOSURE STATEMENT by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock. (Clerk QC note: No affiliate entered in ECF). (Cooper, R) (Main Document 6 replaced to flatten pdf on 1/31/2023) (mms). Modified text on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 7 | NOTICE of Related Case filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock (Cooper, R) Modified text on 1/31/2023 (mms). (Entered: 01/31/2023) |
| 01/31/2023 | 8 | New Case Notes: A filing fee has been paid. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge (Judge Rutherford). Clerk to provide copy to plaintiff if not received electronically. (mms) (Entered: 01/31/2023) |
| 01/31/2023 | 9 | Summons issued as to Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice, U.S. Attorney, and U.S. Attorney General. (mms) (Entered: 01/31/2023) |
| 01/31/2023 | 10 | New Case Notes: A filing fee has been paid. File to: Judge O Connor. Pursuant to Misc. Order 6, Plaintiff is provided the Notice of Right to Consent to Proceed Before A U.S. Magistrate Judge. Clerk to provide copy to plaintiff if not received electronically. Attorneys are further reminded that, if necessary, they must comply with Local Rule 83.10(a) within 14 days or risk the possible dismissal of this case without prejudice or without further notice. (tjc) (Entered: 01/31/2023) |
| 01/31/2023 | 11 | Application for Admission Pro Hac Vice with Certificate of Good Standing for Attorney Cody J. Wisniewski (Filing fee $100; Receipt number ATXNDC-13483464) filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock (Attachments: # 1 Proposed Order Admission for Pro Hac Vice, # 2 Exhibit(s) Certificate of Good Standing) (Cooper, R) (Main Document 11 replaced on 1/31/2023) (tjc). (Entered: 01/31/2023) |

| 02/01/2023 | 12 | ELECTRONIC ORDER granting 11 Application for Admission Pro Hac Vice of CODY J. WISNIEWSKI. Important Reminder: Unless excused for cause, an attorney who is not an ECF user must register within 14 days of the date the attorney appears in a case pursuant to LR 5.1(f) and LCrR 49.2(g). (Ordered by Judge Reed C. O'Connor on 2/1/2023) (chmb) (Entered: 02/01/2023) |
| --- | --- | --- |
| 02/07/2023 | 13 | AMENDED COMPLAINT *FIRST AMENDED PETITION FOR JUDICIAL REVIEW AND REQUEST FOR VACATUR OF AGENCY ACTION, AND COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF* against All Defendants filed by Firearms Policy Coalition Inc, Christopher Lewis, William T Mock, Maxim Defense Industries, LLC. Unless exempted, attorneys who are not admitted to practice in the Northern District of Texas must seek admission promptly. Forms, instructions, and exemption information may be found at www.txnd.uscourts.gov, or by clicking here: Attorney Information - Bar Membership. If admission requirements are not satisfied within 21 days, the clerk will notify the presiding judge. (Cooper, R) (Entered: 02/07/2023) |
| 02/07/2023 | 14 | AMENDED Certificate of Interested Persons/Disclosure Statement by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock. Amendment to 6 Cert. Of Interested Persons/Disclosure Statement,. . (Cooper, R) Modified on 2/8/2023 (dgt). (Entered: 02/07/2023) |
| 02/09/2023 | 15 | SUMMONS Returned Executed as to Bureau of Alcohol Tobacco Firearms and Explosives ; served on 2/3/2023. (Cooper, R) (Entered: 02/09/2023) |
| 02/09/2023 | 16 | SUMMONS Returned Executed as to Merrick Garland ; served on 2/3/2023. (Cooper, R) (Entered: 02/09/2023) |
| 02/09/2023 | 17 | SUMMONS Returned Executed as to Steven Dettelbach ; served on 2/3/2023. (Cooper, R) (Entered: 02/09/2023) |
| 02/09/2023 | 18 | SUMMONS Returned Executed as to United States Department of Justice ; served on 2/3/2023. (Cooper, R) (Entered: 02/09/2023) |
| 02/09/2023 | 19 | MOTION for Leave to File Brief in Excess of Page Limit filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock (Attachments: # 1 Proposed Order) (Cooper, R) (Entered: 02/09/2023) |
| 02/14/2023 | 20 | ORDER: Before the Court is Plaintiffs' Emergency Motion for Leave to File Brief in Excess of Page Limit (ECF No. 19), filed February 9, 2023. To expedite resolution of the motion, the Court ORDERS that Defendants' Response is due no later than February 21, 2023. Plaintiffs' Reply is due no later than February 23, 2024. Plaintiffs SHALL serve Defendants with notice of this Order no later than February 15, 2023 and inform that Court that it has done so. (Ordered by Judge Reed C. O'Connor on 2/14/2023) (tjc) (Entered: 02/14/2023) |

| 02/15/2023 | 21 | SUMMONS Returned Executed as to Bureau of Alcohol Tobacco Firearms and Explosives ; served on 2/9/2023. (Cooper, R) (Entered: 02/15/2023) |
|---|---|---|
| 02/15/2023 | 22 | SUMMONS Returned Executed as to United States Department of Justice ; served on 2/9/2023. (Cooper, R) (Entered: 02/15/2023) |
| 02/15/2023 | 23 | SUMMONS Returned Executed. (Cooper, R) (Entered: 02/15/2023) |
| 02/15/2023 | 24 | NOTICE of *Compliance of Court Order* re: 20 Order Setting Deadline/Hearing,, filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock (Cooper, R) (Entered: 02/15/2023) |
| 02/17/2023 | 25 | NOTICE of Attorney Appearance by Jody Dale Lowenstein on behalf of Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice. (Filer confirms contact info in ECF is current.) (Lowenstein, Jody) (Entered: 02/17/2023) |
| 02/17/2023 | 26 | MOTION to Enter Proposed Briefing Schedule filed by Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice (Attachments: # 1 Proposed Order) (Lowenstein, Jody) (Entered: 02/17/2023) |
| 02/20/2023 | 27 | SUMMONS Returned Executed as to Bureau of Alcohol Tobacco Firearms and Explosives ; served on 2/10/2023. (Cooper, R) (Entered: 02/20/2023) |
| 02/20/2023 | 28 | SUMMONS Returned Executed as to Steven Dettelbach ; served on 2/9/2023. (Cooper, R) (Entered: 02/20/2023) |
| 02/20/2023 | 29 | SUMMONS Returned Executed as to Merrick Garland ; served on 2/10/2023. (Cooper, R) (Entered: 02/20/2023) |
| 02/20/2023 | 30 | SUMMONS Returned Executed as to Steven Dettelbach; served on 2/9/2023. (Cooper, R) Modified on 2/21/2023 (dgt). (Entered: 02/20/2023) |
| 02/20/2023 | 31 | SUMMONS Returned Executed as to Merrick Garland ; served on 2/9/2023. (Cooper, R) (Entered: 02/20/2023) |
| 02/21/2023 | 32 | ORDER granting 26 the parties' motion and ORDERS the parties to comply with the following briefing schedule: On or before February 21, 2023, Plaintiffs will file their motion for preliminary relief; On or before March 10, 2023, Defendants will file their response to Plaintiffs motion; On or before March 17, 2023, Plaintiffs may file a reply in support of their motion. Both parties MAY file an initial brief that is at most 45 pages. Accordingly, the briefing schedule entered by this Court's Order of February 14, 2023 (ECF No. 20 ), expediting responses to Plaintiff's motion for overlength briefing is thereby VACATED and the related motion (ECF No. 19 ) is moot. (Ordered by Judge Reed C. O'Connor on 2/21/2023) (tjc) (Entered: 02/21/2023) |
| 02/21/2023 | 33 | MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* filed by William T Mock, Christopher Lewis, Maxim Defense Industries, LLC, and Firearms Policy Coalition, Inc. (Attachments: # 1 Proposed Order) (Cooper, R) Modified filers on 2/22/2023 |

| | | (mmw). (Entered: 02/21/2023) |
|---|---|---|
| 02/21/2023 | 34 | ***PLEASE DISREGARD PER ATTORNEY, PLEASE SEE DOC 36 *** Brief/Memorandum in Support filed by William T Mock re 33 MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* (Cooper, R) Modified on 2/22/2023 (sre). (Entered: 02/21/2023) |
| 02/21/2023 | 35 | ***PLEASE DISREGARD PER ATTORNEY, PLEASE SEE DOC 36 *** Brief/Memorandum in Support filed by William T Mock re 33 MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* (Attachments: # 1 Declaration(s), # 2 Declaration(s), # 3 Declaration(s), # 4 Declaration(s)) (Cooper, R) Modified on 2/22/2023 (sre). (Entered: 02/21/2023) |
| 02/21/2023 | 36 | Brief/Memorandum in Support filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock re 33 MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* (Attachments: # 1 Declaration(s) Brandon Combs, # 2 Declaration(s) David Dahl, # 3 Declaration(s) Christopher Lewis, # 4 Declaration(s) William T. Mock) (Cooper, R) (Entered: 02/21/2023) |
| 03/10/2023 | 37 | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice re: 33 MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* (Lowenstein, Jody) (Entered: 03/10/2023) |
| 03/17/2023 | 38 | REPLY filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock re: 33 MOTION for Injunction *or, in the Alternative, for Postponement of the Effective Date of the Final Rule* (Attachments: # 1 Declaration(s) Supplemental Declaration of David Dahl) (Wisniewski, Cody) (Entered: 03/17/2023) |
| 03/27/2023 | 39 | Unopposed Motion for Extension of Time to File Answer filed by Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice with Brief/Memorandum in Support. (Attachments: # 1 Proposed Order) (Lowenstein, Jody) (Entered: 03/27/2023) |
| 03/30/2023 | 40 | OPINION & ORDER ON 33 PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE: Having considered the parties' briefing and applicable law, the Court holds that Plaintiffs have not carried their burden to demonstrate their substantial likelihood of success on the merits of any of their claims and therefore DENIES 33 Plaintiffs' motion for preliminary injunctive relief or, in the alternative, for postponement of the Final Rules effective date. (Ordered by Judge Reed C. O'Connor on 3/30/2023) (tjc) (Entered: 03/30/2023) |
| 03/30/2023 | 41 | MOTION for Injunction *Pending Appeal* filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock (Attachments: # 1 Proposed Order)Attorney Cody J Wisniewski added to party Maxim Defense Industries, LLC(pty:pla) (Wisniewski, Cody) (Entered: |

| | | |
|---|---|---|
| | | 03/30/2023) |
| 03/30/2023 | 42 | Brief/Memorandum in Support filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock re 41 MOTION for Injunction *Pending Appeal* (Wisniewski, Cody) (Entered: 03/30/2023) |
| 03/30/2023 | 43 | NOTICE OF INTERLOCUTORY APPEAL as to 40 Memorandum Opinion and Order,, to the Fifth Circuit by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock. Filing fee $505, receipt number BTXNDC-13629611. T.O. form to appellant electronically at Transcript Order Form or US Mail as appropriate. Copy of NOA to be sent US Mail to parties not electronically noticed. IMPORTANT ACTION REQUIRED: Provide an electronic copy of any exhibit you offered during a hearing or trial that was admitted into evidence to the clerk of the district court within 14 days of the date of this notice. Copies must be transmitted as PDF attachments through ECF by all ECF Users or delivered to the clerk on a CD by all non-ECF Users. See detailed instructions here. (Exception: This requirement does not apply to a pro se prisoner litigant.) Please note that if original exhibits are in your possession, you must maintain them through final disposition of the case. (Wisniewski, Cody) (Entered: 03/31/2023) |
| 03/31/2023 | 44 | USCA Case Number 23-10319 in United States Court of Appeals 5th Circuit for 43 Notice of Appeal, filed by Christopher Lewis, William T Mock, Firearms Policy Coalition Inc, Maxim Defense Industries, LLC. (tle) (Entered: 03/31/2023) |
| 03/31/2023 | 45 | ORDER granting in part 39 Motion for Extension of Time to File Answer. Having considered the motion and noting it is unopposed, the Court GRANTS the motion in part. Defendants' Answer shall be filed no later than April 28, 2023. (Ordered by Judge Reed C. O'Connor on 3/31/2023) (tjc) (Entered: 03/31/2023) |
| 03/31/2023 | 46 | MEET AND CONFER ORDER REQUIRING SCHEDULING CONFERENCE AND REPORT FOR CONTENTS OF SCHEDULING ORDER: Proposed Scheduling Order due by 4/28/2023. Lead counsel for each party (or a designee attorney with appropriate authority) and any unrepresented party (except for a prisoner litigant proceeding pro se) shall confer (the "Scheduling Conference") as soon as practicable, but in any event no later than April 14, 2023. As a result of the Scheduling Conference, counsel shall prepare and submit a Report Regarding Contents of Scheduling Order ("Joint Report"). The Joint Report shall also include a status report on settlement negotiations but shall not disclose settlement figures. The Joint Report, which shall be filed on or before April 28, 2023. (Ordered by Judge Reed C. O'Connor on 3/31/2023) (tjc) (Entered: 03/31/2023) |
| 03/31/2023 | 47 | ORDER expediting briefing on Plaintiffs' 41 Motion for Injunction Pending Appeal. (Ordered by Judge Reed C. O'Connor on 3/31/2023) (chmb) (Entered: 03/31/2023) |

**APP.008**

| 04/11/2023 | 48 | Transcript Order Form: re 43 Notice of Appeal, transcript not requested Reminder: If the transcript is ordered for an appeal, Appellant must also file a copy of the order form with the appeals court. (Wisniewski, Cody) (Entered: 04/11/2023) |
|---|---|---|
| 04/12/2023 | 49 | RESPONSE filed by Bureau of Alcohol Tobacco Firearms and Explosives, Steven Dettelbach, Merrick Garland, United States Department of Justice re: 41 MOTION for Injunction *Pending Appeal* (Lowenstein, Jody) (Entered: 04/12/2023) |
| 04/18/2023 | 50 | REPLY filed by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock re: 41 MOTION for Injunction *Pending Appeal* (Attachments: # 1 Declaration(s) Third Declaration of David Dahl) (Wisniewski, Cody) (Entered: 04/18/2023) |
| 04/20/2023 | | Record on Appeal for USCA5 23-10319 (related to 43 appeal): Record consisting of: 1 ECF electronic record on appeal (eROA) is certified,. **PLEASE NOTE THE FOLLOWING:** Licensed attorneys must have filed an appearance in the USCA5 case and be registered for electronic filing in the USCA5 to access the paginated eROA in the USCA5 ECF system. (Take these steps immediately if you have not already done so. Once you have filed the notice of appearance and/or USCA5 ECF registration, it may take up to 3 business days for the circuit to notify the district clerk that we may grant you access to the eROA in the USCA5 ECF system.) To access the paginated record, log in to the USCA5 ECF system, and under the Utilities menu, select Electronic Record on Appeal. Pro se litigants may request a copy of the record by contacting the appeals deputy in advance to arrange delivery. (tle) (Entered: 04/20/2023) |
| 04/28/2023 | 51 | Proposal for contents of scheduling and discovery order *(Joint Report)* by Firearms Policy Coalition Inc, Christopher Lewis, Maxim Defense Industries, LLC, William T Mock. (Wisniewski, Cody) (Entered: 04/28/2023) |
| 05/01/2023 | 52 | SCHEDULING ORDER: Before the Court is the parties' Joint Report Regarding Contents of Scheduling Order (ECF No. 51 ), filed April 28, 2023. The dispute involves claims of various violations of the Administrative Procedure Act (APA), 5 U.S.C. § 706, and the U.S. Constitution. Having considered the parties' positions and noting that the dispute shall be resolved on dispositive crossmotions without trial (See Order Specific Dates). (Ordered by Judge Reed C. O'Connor on 5/1/2023) (tjc) (Entered: 05/01/2023) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

## FIRST AMENDED PETITION FOR JUDICIAL REVIEW
## AND REQUEST FOR VACATUR OF AGENCY ACTION, AND
## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC; and Firearms Policy Coalition, Inc., file this Petition for Judicial Review of Agency Action and Request for Vacatur of Agency Action, and Complaint for Declaratory and Injunctive Relief, against Defendants Merrick Garland, Attorney General of the United States, in his official capacity; the United States Department

**APP.010**

of Justice; Steven Dettelbach, Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in his official capacity; and the Bureau of Alcohol, Tobacco, Firearms and Explosives, and state the following:

## INTRODUCTION

1.      This lawsuit challenges, *inter alia*, the *Factoring Criteria for Firearms with Attached Stabilizing Braces* ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023),[1] promulgated by the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF," collectively "Agencies") to regulate "braced pistols" as "short-barreled rifles." In so doing, for the reasons set forth herein, the Agencies violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*, and the United States Constitution.

2.      Even if the Final Rule does not violate the APA and is allowed to stand, the Agencies' National Firearms Act ("NFA"), 26 U.S.C. § 5801, *et seq.*, laws, regulations, policies, and enforcement practices with respect to "braced pistols" that the Agencies' have classified as "short-barreled rifles" violate the Second Amendment. Plaintiffs thus further seek declaratory and injunctive relief to secure their constitutionally protected right to keep and bear arms in the absence of vacatur of the Final Rule.

---

[1]      The Final Rule is available at: https://www.federalregister.gov/d/2023-01001.

**APP.011**

## PARTIES

3.     Plaintiff William T. Mock is a United States citizen who lives in Weatherford, Texas within Parker County. He lawfully owns at least one braced pistol that will be subject to heightened legal requirements as a short-barreled rifle under the Agencies' Final Rule. Mr. Mock also has plans to purchase at least one more braced pistol within the next three to four months to use for lawful purposes including self-defense and target shooting, but for the additional requirements imposed by the Final Rule, including the heightened requirements under the NFA. Should the Final Rule stand, Mr. Mock would comply with its terms and register his firearm as a short-barreled rifle, but for the fact that the NFA process and requirements violate Mr. Mock's Second Amendment protected right to keep and bear arms by subjecting Mr. Mock to the NFA's application burdens, delays, and severe restrictions on the lawful possession and use of the firearm that Mr. Mock has already passed a background check pursuant to federal law to possess, absent any historical analogue. Mr. Mock is a member of Plaintiff FPC.

4.     Plaintiff Christopher Lewis is a United States citizen who lives in Aledo, Texas, within Parker County. Mr. Lewis lawfully owns at least one braced pistol that he purchased from an FFL in accordance with federal law that will newly be treated as a short-barreled rifle under the Agencies' Final Rule. Mr. Lewis has plans to purchase at least one more braced pistol within the next three to four months

APP.012

to use for lawful purposes including self-defense and target shooting, but for the additional requirements imposed by the Final Rule, including the heightened requirements under the NFA. Should the Final Rule stand, Mr. Lewis would comply with its terms and register his firearm as a short-barreled rifle, but for the fact that the NFA process and requirements violate Mr. Lewis's Second Amendment protected right to keep and bear arms by subjecting Mr. Lewis to the NFA's application burdens, delays, and severe restrictions on the lawful possession and use of the firearm that Mr. Lewis has already passed a background check pursuant to federal law to possess, absent any historical analogue. Mr. Lewis is a member of Plaintiff FPC.

5.     Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") is a firearms and firearms accessories manufacturer and retailer in good standing, registered in Florida, and based in St. Cloud, Minnesota. Maxim Defense has had sales within this district. Maxim Defense specializes in the manufacture and sale of stabilizing braces as well as braced pistols. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, while braced pistols comprised about 74% of its annual firearm sales in 2022. Maxim Defense has established a reputation and customer base for its stabilizing braces and its braced pistols (not for stocks nor short-barreled rifles). The Final Rule's new requirements, and its effective destruction of the stabilizing brace and braced pistol market, will

**APP.013**

negatively impact Maxim Defense and may even put Maxim Defense out of business. At minimum, these new requirements will cost Maxim Defense a significant amount of monetary expenditures, including changes in business model, changes in product offerings, changes in and loss of staff, product loss, increased compliance costs, and a loss of customers. The Final Rule specifies that "[a]pproximately 4 manufacturers of 'stabilizing braces' will be significantly affected by more than 10 percent of their revenue," which includes Maxim Defense. Final Rule at 6,572. Further, the Final Rule notes that "Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell 'stabilizing braces[,]'" which again includes Maxim Defense, but is also dramatically lower than the actual costs and losses Maxim Defense will suffer as a result of the Final Rule. *Id*. Maxim Defense brings this action on behalf of itself and its customers. Maxim Defense is a member of Plaintiff FPC.

6.     Plaintiff Firearms Policy Coalition, Inc. ("FPC"), is a nonprofit organization incorporated under the laws of Delaware with its principal place of business in Clark County, Nevada, and members across the country. FPC's purposes include defending and promoting the People's rights—especially but not limited to First and Second Amendment protected rights—and advancing individual liberty and restoring freedom. FPC serves its members and the public through legislative advocacy, grassroots advocacy, litigation and legal efforts, research, education,

**APP.014**

outreach, and other programs. FPC represents its members and supporters—who include gun owners, individuals who wish to acquire firearms and ammunition, individuals who wish to manufacture their own personal use firearms, licensed firearm retailers, shooting ranges, trainers and educators, and others—and brings this action on behalf its members and supporters who possess all the indicia of membership. Plaintiffs Mock, Lewis, and Maxim Defense are members of FPC.

7.      Plaintiffs Mock and Lewis (collectively, "Individual Plaintiffs") have standing because they lawfully possess firearms that will likely subject them to potential criminal liability or to costly and burdensome requirements under the Final Rule. *See Va. v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 377 (5th Cir. 2022).

8.      Similarly, Plaintiff Maxim Defense has standing because the Final Rule will directly and negatively impact its business, which consists of selling stabilizing braces and braced pistols, both of which are newly regulated and/or negatively impacted by the Final Rule. Such economic harms confer standing to challenge the government actions that cause them. *See Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 377 (5th Cir. 2021); *Tex. Ent. Ass'n, Inc. v. Hegar*, 10 F.4th 495, 504 (5th Cir. 2021). Moreover, Plaintiff Maxim Defense has standing to assert the rights of its customers. *See Craig v. Boren*, 429 U.S. 190, 192–97 (1976).

**APP.015**

9.     Plaintiff FPC has standing to bring this action because it meets the requirements for organizational standing: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). First, as mentioned above, several of FPC's individual members, including Plaintiffs Mock and Lewis, have standing to challenge the Final Rule in their own right because they lawfully possess firearms that will likely subject them to potential criminal liability or to costly and burdensome requirements under the Final Rule. Such threatened consequences under the Final Rule suffice to confer standing on both as individuals. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Moreover, FPC's manufacturer and retailer members, including Plaintiff Maxim Defense, are also injured by the Final Rule by being subjected to non-recoverable compliance cost and lost revenue, up to and including loss of the entire business, which suffices to confer standing on them as a business. Second, this action seeks to protect lawful gun owners from unlawful action by the Agencies, including the violation and chilling of FPC's members' constitutionally protected rights, which is germane to FPC's mission of protecting the legal right to armed self-defense. Finally, FPC's claims in this action do not require participation of its individual members, since FPC seeks vacatur

**APP.016**

alongside "declaratory and injunctive relief" based on a legal theory that does not depend on "individualized proof." *Hunt*, 432 U.S. at 344; *see also Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. V. Brock*, 477 U.S. 274, 287 (1986).

10.     For all Plaintiffs, vacatur of the Final Rule would remedy the harms that flow therefrom. Indeed, in this Circuit, for APA violations that are unlawful, the default—and appropriate—remedy is vacatur. *See Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859–60 (5th Cir. 2022) ("'The ordinary practice is to vacate unlawful agency action.") (quoting *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019)). For example, "nearly every logical-outgrowth violation leads to vacatur." Nicholas Bagley, *Remedial Restraint in Administrative Law*, 117 COLUM. L. REV. 253, 275 (2017). Alternatively, if the Final Rule were to stand, declaratory and injunctive relief declaring the "short-barreled rifle" restrictions under the NFA unconstitutional and enjoining the Agencies from enforcing the same would remedy the harms that flow from the Final Rule and the NFA.

11.     Defendant Merrick Garland is the United States Attorney General. As the Attorney General, Defendant Garland leads DOJ. DOJ oversees ATF—the agency charged with enforcing the Gun Control Act ("GCA"), 18 U.S.C. § 921, *et*

**APP.017**

*seq.*, the NFA, and other federal firearm laws. Attorney General Garland is sued in his official capacity.

12.    Defendant United States Department of Justice is a federal agency located at 950 Pennsylvania Avenue, NW, Washington, D.C., 20530.

13.    Defendant Steve Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives. ATF is charged by Congress with enforcing the GCA, the NFA, and other federal firearms laws. Director Dettelbach is sued in his official capacity.

14.    Defendant the Bureau of Alcohol, Tobacco, Firearms and Explosives is a federal agency located at 99 New York Avenue, NE, Washington, D.C., 20226.

## JURISDICTION AND VENUE

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, because Plaintiffs' claims arise under federal law.

16.    This Court also has jurisdiction pursuant to 5 U.S.C. § 701, *et seq.*, because Plaintiffs' claims arise under the APA.

17.    The APA gives courts jurisdiction to "hold unlawful and set aside" agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)–(B). Indeed, the APA creates a "basic

**APP.018**

presumption of judicial review." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2567 (2019).

18.    This Court also has jurisdiction to grant preliminary relief pursuant to the APA. 5 U.S.C. § 705 ("[T]he reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.").

19.    This Court has jurisdiction to grant the declaratory relief sought, pursuant to 28 U.S.C. § 2201, and additional relief pursuant to 28 U.S.C. § 2202.

20.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1)(B) and (C) because Plaintiffs Mock and Lewis reside in this district; because Plaintiff Maxim Defense has had sales in this district; and because Plaintiff FPC has members (including Mock and Lewis) that reside—and whose rights are primarily being curtailed—in this district.

## STATEMENT OF FACTS

### I.    Historical Background

21.    When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *N.Y. State Rifle & Pistol*

**APP.019**

*Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022) (internal quotation and citation omitted). As relevant to this case, historical practice commonly included the use of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, even before the Founding, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to stabilize the pistol more effectively.[2] Similarly, when a gunowner wanted additional stability, pre-Founding pistols could be, and sometimes were, equipped with shoulder stocks.[3]

22.     Stabilizing braces are analogous to their Founding Era predecessors in that they allow gunowners to customize pistols to facilitate easier and more accurate one-handed shooting. The Final Rule makes what has been an unregulated historical practice for centuries nearly impossible for those individuals with a stabilizing brace.

23.     That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not

---

[2]     *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

[3]     *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

**APP.020**

in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'Arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)).

## II.    Legal Background

### A.    National Firearms Act and Gun Control Act

24.    In 1934, Congress enacted the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq.*, and "imposed a tax on the making and transfer of firearms defined by the Act, as well as a special (occupational) tax on persons and entities engaged in the business of importing, manufacturing, and dealing in NFA firearms."[4] "Firearms subject to the 1934 Act included [short barreled] shotguns and rifles . . ., certain firearms described as 'any other weapons,' machine guns, and firearm mufflers and silencers."[5] The NFA specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

25.    Individuals seeking to engage in the purchase or manufacture of firearms as defined by the NFA are required to file an application, pay a tax, identify

---

[4]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).

[5]    *Id.*

**APP.021**

the firearm, identify themselves by providing, among other things, fingerprints and a photograph, and obtain prior approval from ATF. 26 U.S.C. § 5822.

26.    The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of the arms that fall within its purview. Indeed, those were the very purposes of the NFA; a point the Agencies concede: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[6]

27.    Congress then passed the GCA in 1968, which "amended the NFA definitions of 'firearm'" in a number of ways.[7]

28.    As Congress defined it in the GCA, and as it has stood since 1968, "[t]he term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

---

[6]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).

[7]    *Id.*

**APP.022**

29.     The GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."

30.     The GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision within its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4).

31.     The GCA defines the term "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

32.     Under federal law, it is "unlawful . . . for any person . . . except a licensed importer, licensed manufacturer, or licensed dealer to engage in the business of importing, manufacturing, or dealing in firearms, or in the course of such

**APP.023**

business to ship, transport, or receive any firearm in interstate or foreign commerce[.]" 18 U.S.C. § 922(a)(1)(A).

33.    Violations of the GCA can carry criminal penalties, including fines and up to five years' imprisonment. 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both.").

34.    Violations of the NFA's strict requirements carry even harsher punishments, including fines and imprisonment up to ten years. 26 U.S.C. § 5871 ("Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be imprisoned not more than ten years, or both."). Further, firearms "involved in any violation" of the NFA "subject to seizure and forfeiture," *Id.* § 5872.

**B.    Congress's Delegation to the ATF**

35.    The Attorney General has the authority to *enforce* the GCA and NFA, but lacks the authority to fill gaps or legislate. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); 26 U.S.C. § 7805(a) ("[T]he Secretary shall prescribe all needful rules and regulations for the enforcement of this title[.]").

**APP.024**

36.    "The Attorney General has directed the Director of [ATF] to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both the GCA and NFA. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021), *cert. denied*, 143 S. Ct. 83 (2022) (White, J., writing in support of affirming) (quoting 28 C.F.R. § 0.130).

### C.    ATF's Prior Classifications

37.    ATF maintains guides and images to convey and illustrate its treatment and classification of certain firearms and non-firearms for purposes of applying the provisions of the NFA and GCA.

38.    ATF has previously given contradictory and arbitrary guidance to questions of whether stabilizing braces transform a pistol into a rifle.

39.    On November 8, 2012, an FFL submitted the first forearm "stabilizing brace" to ATF asking if the addition of the prototype device to a heavy pistol, such as an AR-type pistol, would change that type of pistol's classification under federal firearms laws. The submitter described the "brace" device as designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, as these weapons can be "difficult to control with the one handed precision stance." Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012). The stabilizing brace

**APP.025**

was designed to help disabled shooters with firing heavy pistols; it was not designed, made, nor intended to be fired from the shoulder.

40.     ATF's Firearms and Ammunition Technology Division ("FATD") found that attaching the brace would not alter the classification of the pistol or other firearm. Letter from ATF #2013-0172 (Nov. 26, 2012).

41.     That was not the end of ATF's inquiry into classification of stabilizing braces though, and over the next few years, ATF received and answered additional inquiries about a variety of braces. In a March 2014 letter, for example, FATD noted that it classifies firearms based on the "physical design characteristics," and that, while functionality indicates the intended design, it is not the sole criterion for determining the classification of a weapon. Letter from ATF #301737 (Mar. 5, 2014). FATD advised that it does not classify weapons based on how a particular individual uses a weapon and that merely firing an AR-type pistol from the shoulder did not reclassify it as a short-barreled rifle. *Id.* FATD further mentioned that some "brace" designs, such as the Sig Stability Brace, had not been classified as a shoulder stock and that, therefore, using those braces improperly would not constitute a design change or change the classification of the weapon. *Id*.

42.     Then, in an October 2014 letter, ATF momentarily reversed its position, stating that actions such as concealment on the person or the subjective use of a device as a shoulder stock, rather than the objective design criteria, *could* transform

**APP.026**

the weapon's classification. Letter from ATF #302492 (Oct. 28, 2014). ATF

confusingly summarized this position in a January 2015 Open Letter, stating:

> ATF hereby confirms that if used as designed—to assist shooters in stabilizing a handgun while shooting with a single hand—the device is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm. However, ATF has received numerous inquiries regarding alternate uses for this device, including use as a shoulder stock. Because the NFA defines both rifle and shotgun to include any "weapon designed or *redesigned*, made or *remade,* and *intended to be fired from the shoulder*," any person who *redesigns* a stabilizing brace for use as a shoulder stock makes a NFA firearm when attached to a pistol with a rifled barrel under 16 inches in length or a handgun with a smooth bore under 18 inches in length.

Max M. Kingery, Acting Chief, FATD, *Open Letter on the Redesign of "Stabilizing*

*Braces"*, ATF (Jan. 6, 2015).[8]

43.    Later still, in a March 2017 letter, ATF reiterated that "stabilizing

braces are perfectly legal accessories for large handguns or pistols" but that, "when

employed as a shoulder stock with a firearm with a barrel less than 16 inches in

length, the result would be making an unregistered NFA firearm." Letter from

Marvin G. Richardson, Assistant Director of ATF (Mar. 21, 2017).[9] In that letter,

ATF formally and fully repudiated any interpretation of its prior letters that "h[e]ld

that incidental, sporadic, or situational 'use' of an arm-brace . . . equipped firearm

---

[8]    https://content.govdelivery.com/accounts/USATF/bulletins/ea3937
[9]    https://vpc.org/wp-content/uploads/2019/08/Pistol-brace-ATF-letter-March-21-2017.pdf

**APP.027**

from a firing position at or near the shoulder was sufficient to constitute 'redesign.'"
*Id.* at 3.

44.     Based on these public statements and others issued by ATF, millions of
law-abiding individuals have purchased stabilizing braces and braced pistols.
Hundreds of firearm manufacturers produced pistols with stabilizing braces and
several manufacturers of stabilizing braces were founded and exist today to meet the
demand. Thousands of retailers have sold stabilizing braces and braced pistols.

45.     On June 16, 2020, seven members of the House of Representatives
wrote to DOJ and ATF leaders expressing a "deep[] concern[]" about ATF's
"practice of relying on arbitrary, non-public standards to promulgate general
firearms policy hidden from public scrutiny and awareness." Letter from Matthew
Gaetz, United States Representative, *et al.*, to William Barr, Attorney General, and
Regina Lombardo, Acting Director, ATF (June 16, 2020).[10]

46.     In response, on June 10, 2021, the Agencies published in the Federal
Register a Notice of Proposed Rulemaking titled, "Factoring Criteria for Firearms
with Attached 'Stabilizing Braces,'" proposing changes to the definition of "rifle"
in 27 CFR 478.11 and 479.11 to purportedly clarify when attaching a stabilizing
brace will result in reclassifying a pistol as a "rifle." *Factoring Criteria for Firearms*

---

[10]     https://gaetz.house.gov/sites/gaetz.house.gov/files/wysiwyg_uploaded/For%20Web%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%20DOJ-ATF%20pistol%20brace%20letter%20final.pdf

**APP.028**

*with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).

47.    The Proposed Rule included factors on a new, proposed worksheet, "ATF Worksheet 4999," that the Agencies proposed ATF rely on when making firearms classifications. That worksheet proposed assigning points to various criteria as an indicator of whether the "brace" device is suitable for shouldering and whether the firearm overall is designed and intended to be fired from the shoulder, thus purportedly rendering it a "rifle" and not a "pistol" or "handgun."

48.    Though that worksheet was far from perfect, it did provide objective measurement criteria for determining if a particular stabilizing brace has a "shoulder-fired design" that would be subject to the NFA and GCA. *See* Proposed Rule at 30,830–31. Among the considerations included in Worksheet 4999, for example, were whether the stabilizing brace included a secondary grip (indicating two-handed fire), whether the brace weighed more than 120 ounces, and whether the brace had been modified for shouldering or had the cuff of the brace removed. Proposed Rule at 30,834. In each section of the worksheet, if a brace equipped firearm failed to meet the requirements or received too many points, then the inquiry would end. *See* Proposed Rule at 30,830–31.

**APP.029**

### D.        Campaign Statements, Announcement, and Rulemaking Process

49.      Before President Biden took office, one of his campaign pillars was an amorphous plan to combat "gun violence."

50.      Once elected, President Biden "urged Congress to swiftly pass gun control laws[.]"[11] When Congress did not act to the Biden Administration's liking, President Biden instead called upon the Agencies to dramatically expand their interpretation of the congressionally defined term "rifle" to accomplish the legislative agenda Congress itself declined to adopt.

51.      The Final Rule, inspired by the Biden Administration's promises, seeks to end run Congress and place restrictions on the ability of peaceable Americans to add minor modifications to their pistols.

### E.        The Final Rule

52.      On January 31, 2023, the Agencies published the Final Rule in the Federal Register. Final Rule at 6,478.

53.      Despite the length of the Final Rule, in effect, it amends two definitions of "rifle" contained in the Code of Federal Regulations—one pursuant to the GCA and one pursuant to the NFA. 27 C.F.R. §§ 478.11, 479.11.

---

[11]     *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

**APP.030**

54.     Prior to the changes implemented by the Final Rule on January 31, 2023, 27 C.F.R. § 478.11 defined "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder, and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." There were no subsections. This definition is identical to the definition of "rifle" established by Congress in the GCA. *See* 18 U.S.C. § 921(a)(7).

55.     Prior to the changes implemented by the Final Rule on January 31, 2023, 27 C.F.R. § 479.11 defined "rifle" as "[a] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." There were no subsections. This definition is identical to the definition of "rifle" established by Congress in the NFA. 26 U.S.C. § 5845(c).

56.     As a result of the Final Rule, both 27 C.F.R. §§ 478.11 and 479.11 add two new subsections to the definition "rifle" as follows:

(1) For purposes of this definition, the term "designed or redesigned, made or remade, and intended to be fired from the shoulder" shall include a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.,* a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder,

**APP.031**

provided other factors, as described in paragraph (2), indicate that the weapon is designed, made, and intended to be fired from the shoulder.

(2) When a weapon provides surface area that allows the weapon to be fired from the shoulder, the following factors shall also be considered in determining whether the weapon is designed, made, and intended to be fired from the shoulder:

> (i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

> (iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

> (iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

> (v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

> (vi) Information demonstrating the likely use of the weapon in the general community.

Final Rule at 6,574–75.

57.   The congressionally established definitions of "rifle" in the GCA and

NFA remain unchanged. *See* 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c).

23

**APP.032**

58.    The Final Rule went into effect immediately upon publication. Final Rule at 6,480 ("This revised definition . . . is immediately effective.") (citation omitted).

59.    The Agencies, "in exercising [their] enforcement discretion, . . . provide[] affected persons options that they can choose from by May 31, 2023 to comply" with the Final Rule. *Id.* These options include: (1) registration of the firearm as an NFA item, (2) "modifying affected weapons to remove them from the definition of a short-barreled rifle," (3) "destroying the firearm," or (4) "surrendering the firearm to law enforcement." *Id.* at 6,481. If an individual does not comply, they would be in violation of the NFA and subject to felony charges that bear fines, up to 10 years' imprisonment, and forfeiture of the firearm.

60.    These "affected persons" include Plaintiffs Mock and Lewis, as well as many of Plaintiff Maxim Defense's customers and Plaintiff FPC's other individual members.

61.    The Final Rule does not provide any grace period for individuals seeking to purchase pistols with stabilizing braces attached if they meet the Agencies' new definition of "rifle" and have a barrel of less than 16-inches in length, absent complying with the NFA-mandated process. Final Rule at 6,481 ("Notwithstanding the 120-day compliance period, discussed above, the rule is immediately effective in that the Department may seek to enforce the NFA's

**APP.033**

requirements with respect to any new making or new transfer of a weapon with an attached 'stabilizing brace' that constitutes a short-barreled rifle under the NFA.").

62.    The Final Rule does not provide any grace period for manufacturers or producers, which are now prohibited from transferring or manufacturing pistols with stabilizing braces attached if they meet the Agencies' new definition of "rifle" and have a barrel of less than 16-inches in length, absent complying with the NFA-mandated process. *Id.*

63.    The affected manufacturers and producers include Plaintiff Maxim Defense and many of Plaintiff FPC's other manufacturer and producer members.

## FACTS COMMON TO ALL CLAIMS

64.    The Executive Branch is not Congress. Congress maintains "All legislative Powers," U.S. CONST. ART. I, § 1, and the president and his subordinate agencies may neither enact nor legislatively "interpret" statutes to advance desired outcomes not provided for in a law as passed by Congress.

65.    Despite this fundamental tenet of the separation of powers, President Biden has both expressed and advanced his plan to expand federal firearm regulations regardless of whether Congress concurs, in direct contravention of the constitutional limits on his Executive authority.[12]

---

[12]    THE WHITE HOUSE, https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/04/08/remarks-by-president-biden-on-gun-violence-prevention/ (last visited Jan.

**APP.034**

66.     The Final Rule not only greatly departs from the Proposed Rule, but misconstrues the NFA and GCA; ignores the congressional purpose conveyed by the text of the NFA and GCA; and defies long-standing agency application of those statutes by redefining what constitutes a "short-barreled rifle," which application millions of Americans have relied on in acquiring braced pistols.

67.     The Final Rule unlawfully abandons the centerpiece of the Proposed Rule: a worksheet setting forth objective criteria for identifying "rifles," "short-barreled rifles," and "firearms" for purposes of various federal laws. Instead, the Final Rule adopts a six-factor "balancing" test that relies on far more subjective considerations in defining these terms. Nothing in the Agencies' notice of proposed rulemaking telegraphed that such a change was being contemplated, and thus the public was not given adequate opportunity to comment on the criteria that the Agencies ultimately adopted. This discrepancy alone warrants vacatur of the Final Rule.

68.     Beyond the bait-and-switch, the Final Rule violates the APA, the statutory authority granted to the Agencies by Congress, and the United States Constitution in many other ways.

---

30, 2023) ("I asked the Attorney General and his team to identify for me immediate, concrete actions I could [] take now without having to go through the Congress.").

**APP.035**

69.     The Agencies claim that by providing surface area which *can* be used to facilitate shoulder firing, the stabilizing brace transforms the pistol or handgun into a rifle. And yet, Congress is presumed to include and exclude language knowingly and intentionally, and merely making it more possible to fire from the shoulder does not negate the fact that the weapon is still both *designed* to be fired with one hand and conveniently *capable* of being fired with one hand, nor does it change the fact that it is a "pistol or revolver" and thus exempt from regulation under the NFA.

70.     That is how such language would have more naturally been understood by legislators and the public when it was adopted. And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver."

71.     The Final Rule defies the plain language of the GCA and NFA and longstanding agency application and enforcement, all of which support the fact that a stabilizing brace does not transform a pistol into a rifle. Agency application and enforcement that millions of peaceable individuals and business have relied on in structuring and conducting their personal and business practices.

**APP.036**

72.    In the process, the Final Rule announces new criteria for what constitutes a "rifle" and a "short-barreled rifle" under the Gun Control Act ("GCA"), *see* 18 U.S.C. § 921(a)(7), (8), and a "firearm" under the National Firearms Act ("NFA"), *see* 26 U.S.C. § 5845(a)(3)–(4); 18 U.S.C. § 921(a)(8). These redefinitions of statutory terms have tangible consequences.

73.    The GCA makes it unlawful for any person—other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector—to transport in interstate or foreign commerce any "short-barreled rifle" except as authorized by the Attorney General; and further makes it unlawful for any federal firearms licensee to sell or deliver a "short-barreled rifle" to any person except as authorized by the Attorney General. 18 U.S.C. § 922 (a)(4), (b)(4).

74.    Firearms falling under the purview of the NFA, including a "short-barreled rifle," must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm, 26 U.S.C. § 5841; require approval by the Attorney General before their transfer or making, 26 U.S.C. §§ 5812, 5822; and are subject to transfer and making taxes, 26 U.S.C. §§ 5811, 5821. Additionally, any person engaged in the business of importing, manufacturing, or dealing NFA firearms must register with the Attorney General and pay a special occupational tax. 26 U.S.C. §§ 5801, 5802.

**APP.037**

75.    If the NFA applies to a particular firearm, that firearm is heavily regulated. 26 U.S.C. § 5861 (enumerating what acts are prohibited with respect to an NFA firearm). Anyone who engages in any of the prohibited acts faces a fine and up to ten years in prison. 26 U.S.C. § 5871.

76.    Additionally, the Final Rule is void for vagueness because it assesses, in an undefined multi-factor balancing test, both "objective design features and other factors," the latter of which are frequently subjective. *See, e.g.*, Final Rule at 6,478, 6,479, 6,500. Included in these other factors, confusingly, are actions by third parties, which—of course—may not be knowable or known to the end user. Final Rule at 6,512–13. For example, other factors include the "manufacturer's direct and indirect marketing or promotional materials." Final Rule at 6,552.

77.    The inclusion of marketing and promotional materials not only raises concerns with vagueness and fair warning to any given owner of a stabilizing brace, it also raises First Amendment concerns from imposing liability on the manufacturer and customers based on speech.

78.    The void for vagueness test is particularly stringent where the vagueness can chill the exercise of core constitutionally protected rights, such as those protected by the First and Second Amendments. *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974).

**APP.038**

79.     And this Final Rule itself is especially vague given the possibility that gun owners could be found to have "constructive possession" of a short-barreled rifle simply by owning a handgun and anything which could function as a brace and has enough surface area that *could* be pressed against a shoulder. Speculative and hypothetical combinations of a constitutionally protected handgun and an unknown set of other items, along with the other unknowable criteria that cause a gun owner to run afoul of this new reinterpretation of the law, leaves gun owners with no meaningful way to know if, overnight, they have become felons.

80.     Moreover, given the range of objects that could *potentially* qualify as stabilizing braces, this chills possession of handguns in any home with a variety of other objects, thus violating *District of Columbia v. Heller*. *See* 554 U.S. at 576.

81.     Lastly, as the Agencies themselves acknowledge, braced pistols are exceedingly common today, numbering at least 3 million by the Agencies' own estimate (although the actual number is likely higher, which a full review of the record in this case may reveal). Final Rule at 6,560. By prohibiting Plaintiffs from possessing, selling, and purchasing popular braced pistols absent NFA registration, the Final Rule directly infringes Plaintiffs' ability to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. AMEND. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at

**APP.039**

2126. The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding individuals possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned nor subjected to heightened regulation, beyond the standard background check, absent some historical analogue, which does not exist here.

82.    The Agencies' Final Rule defies the APA, other federal statutes, and the United States Constitution. Accordingly, the vacatur, declaratory, injunctive, and other relief Plaintiffs request is necessary to prevent the implementation and enforcement of this unconstitutional, illegal regulation that will directly impact the current and longstanding personal and business practices of Plaintiffs, including Plaintiff FPC's individual and business members, and many other similarly situated individuals and businesses.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE APA
### 5 U.S.C. § 706
(Regulation Exceeding the Agencies' Statutory Jurisdiction and Authority)

83.    Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

84.    Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in

**APP.040**

excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]"

85.    If an agency's regulation is not consistent with a statutory definition established by Congress, the agency has gone outside the bounds of its authority since it derives its authority from Congress. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation.").

86.    "An administrative agency's authority is necessarily derived from the statute it administers and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted." *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489 (5th Cir. 2014); *see West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("Agencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line.").

87.    The "traditional tools of construction," include "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *see United States v. Bittner*, 19 F.4th 734, 749 (5th Cir. 2021) (the Fifth Circuit considers "[t]he text, structure, history, and purpose of the relevant statutory and regulatory provisions" in its layered approach to statutory interpretation); *J&J Sports Prods., Inc. v.*

**APP.041**

*Mandell Family Ventures, LLC*, 751 F.3d 346, 352 (5th Cir. 2015) (considering "the plain meaning of [the statute] and the statutory framework" in its statutory interpretation analysis).

88.   "When interpreting a statute, we begin with the text." *Bittner*, 19 F.4th at 743.

89.   "[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992).

90.   The traditional tools do not include *Chevron* deference here, because the statute is unambiguous, and even if it were, the Fifth Circuit does not apply *Chevron* deference to interpretations of statutes carrying criminal penalties. *Cargill v. Garland*, No. 20-51016, 2023 WL 119435, at *14 (5th Cir. Jan. 6, 2023) (*en banc*).

91.   The GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger."

92.   The GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall

**APP.042**

length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision in its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4).

93.    And the GCA defines the term "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

94.    Under traditional canons of construction, a "pistol or revolver" thus cannot be a "rifle."

95.    Congress granted the Agencies the limited authority to regulate short-barreled rifles more stringently that pistols under the NFA. SBRs, as a specific, congressionally defined category of firearms, are presently subject to the enhanced requirements of the NFA; pistols, including those with stabilizing braces, are not.

96.    But the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . . , indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480. Among these six factors are such subjective

**APP.043**

criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,574–75.

97.     None of this can overcome the plain meaning of the text of the law, which clearly differentiates "pistols or revolvers" from "rifles."

98.     Here, the Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the fact that braced pistols do not meet the statutory definition of "rifle" established by Congress.

99.     The Final Rule purports to establish a regulation to "guide" the Agencies' administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of any reasonable definition of "rifle" and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress.

100.    The Agencies are attempting to regulate weapon parts Congress explicitly left out of the statute and impose felony charges for violations thereof. *See* 26 U.S.C. § 5871 ("Any person who violates or fails to comply with any provision of this chapter shall, upon conviction, be fined not more than $10,000, or be

**APP.044**

imprisoned not more than ten years, or both."). Further, firearms "involved in any violation" of the NFA "subject to seizure and forfeiture." *Id.* § 5872.

101.   The Final Rule thus exceeds the Agencies' congressionally mandated jurisdiction and authority.

**COUNT II**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
(Failure to Observe Legally Required Procedures)

102.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

103.   Under 5 U.S.C. § 706(2)(D), "[t]he reviewing court shall . . . hold unlawful and set aside any action, findings, and conclusions found to be . . . without observance of procedure required by law[.]"

104.   The APA's rulemaking requirements include a mandate for federal agencies to provide the public with a meaningful opportunity to comment on the elements of a rule and the materials that form the basis for the rule. *See*, *e.g.*, 5 U.S.C. § 553(c); *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995) ("The purpose of the notice and comment requirement is to provide for meaningful public participation in the rule-making process.").

105.   The Administrative Procedure Act ("APA") provides that, whenever an agency undertakes to promulgate, amend, or repeal a regulation, it must first issue a "notice of proposed rule making . . . in the Federal Register"—which must include,

**APP.045**

among other information, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). Even if a "final rule d[oes] not amount to a complete turnaround from the [proposed rule]," the notice of proposed rulemaking is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021).

106. Here, the centerpiece of the Agencies' Proposed Rule was Worksheet 4999 ("Worksheet"), which would have allocated points to firearms with certain objective characteristics; a score of at least 4 would have meant that a gun qualified as a "rifle" (and as a "short-barreled rifle" if the attached barrel is also less than 16 inches) under the GCA or NFA. *See* Exhibit 1, reproduced below:

**APP.046**

**U.S. DEPARTMENT OF JUSTICE**

BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

**FACTORING CRITERIA FOR RIFLED BARREL WEAPONS WITH
ACCESSORIES\* commonly referred to as "STABILIZING BRACES"**

**SUMMARY:** This chart lists the factors ATF considers when evaluating a firearm with an accessory (commonly referred to as a "stabilizing braces") for classification under the National Firearms Act (NFA) or the Gun Control Act (GCA).

NOTE:    The Bureau of Alcohol, Tobacco, Firearms and Explosives reserves the right to preclude classification as a pistol with a "stabilizing braces" for any firearm that achieves an apparent qualifying score but is an attempt to make a "short-barreled rifle" and circumvent the GCA or NFA.

\*As used in this worksheet, the term "accessory" is intended as a general term to describe the marketing of items commonly known as "stabilizing braces" and does not affect any ATF determinations whether such items when attached to a handgun are, in fact, "accessories" not necessary for the operation of the handgun, but which enhance its usefulness or effectiveness, or whether they are component parts necessary to properly operate a weapon, such as a rifle.  Furthermore, use of that term does not affect any determinations whether such items are "defense articles" under the Arms Export Control Act. Please direct all inquiries as to possible liability for the firearms and ammunition excise tax, 26 U.S.C. sections 4181-4182 to the United States Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau (TTB).

| Weapon: | | | Explanation: |
|---|---|---|---|
| Manufacturer/Model | | | |
| **SECTION I - PREREQUISITES** | | | [Suitability of "Brace" use] |
| 1. The weapon must weigh at least 64 ounces. | | | * Weighed with magazine - unloaded / accessories removed |
| 2. The weapon must have an overall length between 12 and 26 inches. | | | * Length measured with all non-operational accessories removed |
| Weapon must meet both Prerequisites in order to proceed to Section II. | | | |
| INDIVIDUAL CHARACTERISTICS | POINT VALUE | POINT SUB TOTAL | |

| SECTION II - Accessory Characteristics | | [Determination of use as a "Brace" vs. Stock] |
|---|---|---|
| | | |
| **ACCESSORY DESIGN** | | |
| Not based on a known shoulder stock design | 0 | |
| Incorporates shoulder stock design feature(s) | 1 | |
| Based on a known shoulder stock design | 2 | |
| | | |
| **REAR SURFACE AREA** | | |
| Device incorporates features to prevent use as a shouldering device | 0 | |
| Minimized Rear Surface lacking features to discourage shouldering | 1 | |
| Rear Surface useful for shouldering the firearm | 2 | |
| Material added to increase Rear Surface for shouldering | 3 | |
| | | |
| **ADJUSTABILITY** | | |
| Non-adjustable, fixed design | 0 | |
| Adjustable or telescoping attachment designed for shouldering | 2 | |
| | | |
| **STABILIZING SUPPORT** | | |
| Counterbalance Design - Non-Folding | 0 | |
| Counterbalance Design that Folds creating Rear Contact Surface | 1 | |
| OR: | | |
| "Fin- type" design WITH Arm Strap | 0 | |
| "Fin- type" design WITHOUT Arm Strap | 2 | |
| OR: | | |
| "Cuff-type" design that FULLY wraps around arm | 0 | |
| "Cuff-type" design that PARTIALLY wraps around arm | 1 | |
| "Cuff-type" design that FAILS to wrap around arm | 2 | |
| "Split-stock" configuration not designed to wrap around shooter's arm | 3 | |
| SECTION II SCORE ACHIEVED: | | |
| Section II Must Score LESS than 4 in order to proceed to Section III | SCORE | |
| | | ATF WORKSHEET 4999 (5330.5) (5-21) |

**APP.047**

| SECTION III - Configuration of Weapon | | [Determination if weapon is shoulder fired] |
|---|---|---|
| **LENGTH OF PULL** - w/Accessory in Rear most "Locked Position" | | * Measured from the center of the trigger to the center of the |
| Less than 10-1/2 Inches | 0 | shoulder device / "stabilizing brace" |
| 10-1/2 but under 11-1/2 Inches | 1 | |
| 11-1/2 but under 12-1/2 Inches | 2 | |
| 12-1/2 but under 13-1/2 Inches | 3 | |
| 13-1/2 Inches and Over | 4 | |
| | | |
| **ATTACHMENT METHOD** | | |
| Standard AR-type Pistol Buffer Tube (6-6-1/2 Inches) | 0 | |
| AR-type Pistol Buffer Tube with Adjustment Notches (KAK-type) | 1 | |
| Adjustable Rifle Buffer Tube | 1 | |
| Adjustable PDW-type guide rails | 1 | |
| Extended AR-type Pistol Buffer Tube | 2 | |
| Inclusion of Folding Adapter extending length of pull | 2 | |
| Use of "Spacers" to extend length of pull | 2 | |
| Modified shoulder stock with rear replaced by "stabilizing brace" | 3 | |
| Attachment method creates an unusable aim-point (slant) | 3 | |
| | | |
| **"STABILIZING BRACE" MODIFICATIONS / CONFIGURATION** | | |
| "Cuff-type" or "fin-type" design with strap too short to function | 2 | |
| "Cuff-type" or "fin-type" design with strap made out of elastic material | 2 | |
| "Fin-type" lacking an arm strap | 2 | |
| "Cuff-type" design with strap **REMOVED** | 4 | |
| "Brace" accessory modified for shouldering | 4 | |
| Modified Shoulder Stock (originally a Shoulder Stock) | 4 | |
| | | |
| **PERIPHERAL ACCESSORIES** | | |
| Presence of a Hand Stop | 2 | |
| Presence of a Secondary Grip (indicating two-handed fire) | 4 | |
| Presence of Rifle-type Back-up / Flip-up Sights / Or no sights | 1 | |
| Presence of Reflex Sight with FTS Magnifier w/ Limited Eye-Relief | 2 | |
| Presence of a Sight/Scope with Eye Relief Incompatible with one-handed fire | 4 | |
| Presence of a bipod / monopod | 2 | |
| Weapon as configured weighing more than 120 ounces | 4 | * Weighed with magazine - unloaded |
| | | |
| **SECTION III SCORE ACHIEVED:** *(A SCORE OF 4 POINTS OR MORE INDICATES A SHOULDER-FIRED DESIGN)* | SCORE | |
| **CLASSIFICATION:** | | *Rifle or "Braced" Handgun* ATF WORKSHEET 4999 (5330.5) (5-21) |

107.   The Proposed Rule explained:

Worksheet 4999 *is necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations. . . . The ATF Worksheet 4999 will provide the public and the firearms industry with a detailed methodology for ensuring legal compliance. By using ATF Worksheet 4999, ATF is ensuring uniform consideration and application of these criteria when evaluating firearm samples with attached 'stabilizing braces.'

Proposed Rule at 30,826–01, 30,829 (emphasis added).

**APP.048**

108.    The Final Rule, by contrast, significantly departs from the Proposed Rule. The Final Rule completely scraps "the Worksheet 4999 and its point system." Final Rule at 6,480. Instead, the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480, 6,574–75. Among these six factors are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." *Id*. Importantly, however, nothing in the Final Rule or the Agencies' accompanying explanation thereof makes clear how these various factors are weighted, weighed, or how many of the six need to be met for a firearm to qualify as a "rifle."

109.    In announcing the Final Rule, the Agencies remarked that, among the comments received on its Proposed Rule, "[t]here was general dissatisfaction with the proposed Worksheet 4999." Final Rule at 6,510. "[N]umerous commenters

**APP.049**

critiqued the factoring criteria, claiming they were either arbitrary or too complicated
to understand . . . commenters questioned whether the worksheet could provide
uniform consideration and application because it contains ambiguous terms that are
subject to interpretation and no measurable standards for many of the criteria." Final
Rule at 6,513. The Agencies "agree[d] with commenters that the factoring criteria
with a point system as proposed in Worksheet 4999 were not easily understood or
applied," and "that some of the terms from the . . . worksheet were ambiguous and
subject to interpretation." *Id*. The Agencies "concluded the proposed Worksheet
4999 [wa]s unworkable." *Id*. Instead, the Agencies adopted the six-factor test set
forth in Final Rule, explaining that "the objective design features adopted in this rule
provide a more definitive method to determine when a firearm is designed, made,
and intended to be fired from the shoulder." *Id*.

110.   The Agencies' abandonment of Worksheet 4999 in favor of six-factor
"balancing" test violates the APA's requirement that notice be given of a proposed
regulation's substance so that the public may comment on the proposal. An agency's
"notice must adequately frame the subjects for discussion such that the affected party
should have anticipated the agency's final course in light of the initial notice."
*Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).
Here, nothing in the Proposed Rule or the Agencies' accompanying explanation
thereof "gave [any] indication that [the agency] was contemplating a potential

**APP.050**

change" as drastic as scrapping the entire point-based worksheet regime that formed the centerpiece of the Proposed Rule. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1376 (Fed. Cir. 2017).

111. On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations.'" Proposed Rule at 30,826–01, 30,829 (emphasis added). Having read such language in the Agencies' Proposed Rule, commenters could not have reasonably foreseen that the Final Rule would adopt what appears to be a balancing-type test based on six factors that, if anything, are *more* subjective than those of the Worksheet—such as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,480, 6,574–75.

112. Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon Worksheet 4999, or the worksheet approach entirely; indeed, the word "worksheet" did not appear in that section. The closest this section of the Proposed Rule came to addressing the issue

**APP.051**

was in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be considered." Proposed Rule at 30,826–01, 30,850. These issues are quite different from that of whether the Worksheet system should be scrapped altogether. Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

113.   Further reinforcing the point that the Agencies' Proposed Rule differed substantially from its Final Rule, the Agencies more than doubled its estimate of the Rule's economic impact on affected societal groups (namely the manufacturers, dealers, and owners of firearms). The Proposed Rule estimated the cost of the rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, *see* Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, *see* Final Rule at 6,573, Tbl. 2. Such a drastic change in the "estimated financial impact of [an agency's] proposal . . . supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

**APP.052**

114.   Due to the substantial discrepancy between the Agencies' Proposed Rule and its Final Rule, the public were denied the chance to comment on the substance of the latter. That denial violates the APA and warrants vacatur of the Final Rule. *See CSX Transp.*, 584 F.3d at 1083; *Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 63 (D.C. Cir. 2012).

## COUNT III
## VIOLATION OF THE APA
## 5 U.S.C. § 706
(Arbitrary, Capricious, and Not in Accordance with Law)

115.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

116.   Under 5 U.S.C. § 706(2)(A), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" The Final Rule is arbitrary, capricious, and not in accordance with law.

117.   The APA requires federal agencies, including Defendants, to (a) give general notice of proposed rulemaking in the Federal Register and thereafter (b) "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." 5 U.S.C. § 553(c).

118.   An agency action is not reasonable if the agency "entirely failed to consider an important aspect of the problem[.]" *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**APP.053**

119.  "An agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).

120.  "An agency need not respond to every comment, but it must respond in a reasoned manner to the comments received, to explain how the agency resolved any significant problems raised by the comments." *Action on Smoking & Health v. C.A.B.*, 699 F.2d 1209, 1216 (D.C. Cir.), supplemented, 713 F.2d 795 (D.C. Cir. 1983) (internal quotations omitted).

121.  The House and Senate reports with regard to this provision state that "the agency must analyze and consider all relevant matter presented." S. Rep. No. 752, 796 Cong., 1st Sess. 15 (Nov. 19,1945); H. Rep. No. 1980, 79th Cong., 1st Sess. 25 (May 3,1946) "[Public] participation . . . in the rule-making process is essential in order to permit administrative agencies to inform themselves. . . ." Report submitted by Pat McCarran, Chairman, U.S. Senate Committee on the Judiciary, Administrative Procedure Act, Legislative History 1944–46, 79th Cong. (July 26,1946).

122.  "[I]t is 'arbitrary or capricious' for an agency not to take into account all relevant factors in making its determination." *Hanly v. Mitchell*, 460 F.2d 640, 648 (2d Cir. 1972).

**APP.054**

123.   Courts have recognized the importance of the public comment process, which is designed to prevent a person from being required to resort to, or be adversely affected by, significant rulemaking without having the opportunity to participate in that rulemaking. *See Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir. 2001); *Ober v. U.S. Environmental Protection Agency*, 84 F.3d 304, 312–15 (9th Cir. 1996); *Idaho Farm Bureau Fed'n*, 58 F.3d at 1401–06; *Wilderness Society v. Rey*, 180 F. Supp. 2d 1141, 1143 (D. Mont. 2002).

124.   In addressing comments to the Proposed Rule, the Agencies did not address the various ways in which the Final Rule will harm disabled individuals seeking to exercise their Second Amendment protected rights. From the beginning, stabilizing braces have been enormously helpful to those with physical disabilities. And while the Final Rule takes pains to explain that it would not violate the Americans with Disabilities Act, because it allegedly does not deny a benefit or access to a program, its focus on the narrow legal issue of the ADA instead of the overall impact on physically disabled individuals gives lip service to the statutory rights of disabled Americans without actually considering how they will be directly impacted by the Rule, including the Final Rule's impact on their Second Amendment protected rights.

125.   Moreover, the Final Rule fails to adequately consider the Supreme Court's opinions in *Heller*, *Caetano,* and *Bruen*. In promulgating a Final Rule that

**APP.055**

directly impacts constitutionally protected firearms that are in common use, the Agencies should have engaged in the court-mandated text and history analysis. Instead, the Final Rule merely pays lip service to *Bruen*.

126.   Based on information and belief, a full review of the record in this case will evidence that the Agencies failed to adequately consider comments that demonstrate that the Agencies' estimate of affected firearms in circulation is drastically low and thus the Agencies fail to adequately consider the full extent of the Final Rule's effect on the public and the firearms industry writ large.

127.   Based on information and belief, a full review of the record in this case will evidence that the Agencies failed to adequately consider comments that demonstrate that the Agencies' estimate of the financial impact on businesses is fatally low, and thus the Agencies fail to adequately consider the full extent of the Final Rule's effect on certain regulated businesses, including but not limited to Plaintiff Maxim Defense and Plaintiff FPC's other manufacturer and retailer members.

**COUNT IV**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUION**
**U.S. CONST. AMEND. I**
(Abridgment of Free Speech)

128.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

**APP.056**

129.   Under   the   First   Amendment,   "Congress   shall   make   no
law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I.

130.   The Final Rule chills the exercise of protected speech by threatening to
reclassify a "pistol" or "handgun" as a "rifle" if the manufacturer, or another even a
third party, speaks or publishes materials in such a manner that violates the newly
established factor test. For example, some factors to be evaluated include the
"manufacturer's direct and indirect marketing and promotional materials." Final
Rule at 6,574–75.

131.   Regulations that chill or compel speech, like prohibitions on speech,
"abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St.
Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents
government from proscribing speech . . . because of disapproval of the ideas
expressed.")

132.   And "'the First Amendment goes beyond protection of the press and
the self-expression of individuals to prohibit government from limiting the stock of
information from which members of the public may draw.'" *Turner v. Driver*, 848
F.3d 678, 688 (5th Cir. 2017) (quoting *First Nat'l Bank of Boston v. Bellotti*, 435
U.S. 765, 783 (1978)); *In re Tam*, 808 F.3d 1321, 1339 (Fed. Cir. 2015), as corrected
(Feb. 11, 2016), *aff'd sub nom. Matal v. Tam*, 137 S. Ct. 1744 (2017) (applying strict

**APP.057**

scrutiny to a content-based regulation that significantly chills private speech, even though it did not ban speech).

133.  This warrants strict scrutiny, which the regulation cannot pass. "We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any 'realistic possibility that official suppression of ideas is afoot.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 182 (2015) (Kagan, J., concurring) (quoting *Davenport v. Wash. Ed. Ass'n*, 551 U.S. 177, 189 (1995)).

134.  Additionally, the government is prohibited from regulating speech based on the speaker and on the content. *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("Speech restrictions based on the identity of the speaker are all too often simply a means to control content.").

135.  "Speaker-based laws run the risk that 'the state has left unburdened those speakers whose messages are in accord with its own views.'" *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 580 (2011)); *Citizens United*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

136.  And this regulation not only targets certain speakers, but also the content of their speech. "[T]he First Amendment stands against attempts to disfavor

**APP.058**

certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340; *Heller v. City of El Paso*, 861 Fed. Appx. 836, 839 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. at 163).

137.    While Agencies may attempt to argue that the Final Rule is not intended to chill speech, that does not save it. "A regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose." *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)).

138.    And it must still pass strict scrutiny. "Content based restrictions on protected First Amendment expression are presumptively unconstitutional and subject to strict scrutiny . . . . 'Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed.'" *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 509 (5th Cir. 2021) (quoting *Reed v. Town of Gilbert*, 576 U.S. at 163).

139.    The Final Rule, in so far as it allows the Director to consider "[t]he manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," chills the speech of a specific type of speakers: manufacturers.

**APP.059**

140.   The Final Rule, in so far as it allows the Director to consider "[i]nformation demonstrating the likely use of the weapon in the general community," chills speech based on the content.

141.   The Final Rule implicates both content and speaker-based restrictions and cannot pass the demanding test for strict scrutiny.

## COUNT V
## VIOLATION OF THE APA
## 5 U.S.C. § 706
## VIOLATION OF THE U.S. CONSTITUTION
## U.S. CONST. AMEND. V
(Void for Vagueness)

142.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

143.   "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. AMEND. V.

144.   Agency regulations bear the "'force and effect of law.'" *Perez*, 575 U.S. at 96 (quoting *Chrysler Corp.*, 441 U.S. at 302–03).

145.   Thus, agency regulations are subject to the same constitutional limits on vagueness as is legislation. *See FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253, 254–55 (2012) (indicating that the void for vagueness doctrine applies to agency regulations).

**APP.060**

146.   "A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980).

147.   The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019); *accord Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018).

148.   A law must provide "'fair notice' of the conduct a statute proscribes," in order to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions*, 138 S. Ct. at 1212; *see Fox Television Stations, Inc.*, 567 U.S. at 253 (judicial vagueness inquiries ensure that regulated parties know what is required of them and that enforcement of the law will not be arbitrary and discriminatory).

149.   This clarity requirement is even more robust when a law bears criminal consequences. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws.*"); cf. Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982). ("The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe.").

**APP.061**

150.  Courts also require greater clarity in a law that "threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499; *Goguen*, 415 U.S. at 572–73.

151.  The Final Rule uses a vague and undefinable factor-test, incorporating both "objective design features and other factors" which are presumably subjective. Final Rule at 6,480, 6,574–75. And this even includes actions by third parties, not necessarily knowable to the end user, such as the "manufacturer's direct and indirect marketing and promotional materials." *Id*. This is unduly vague for both the manufacturers, who are exercising their First Amendment protected rights, and firearm owners, exercising their Second Amendment protected rights.

152.  The void for vagueness test is particularly stringent where the vagueness can chill exercise of constitutionally protected rights, such as rights protected under the First and Second Amendments.

153.  And this is particularly vague given the possibility of "constructive possession" of a short-barreled rifle by owning a handgun and anything which could function as a brace and has enough surface area that *could* be pressed against a shoulder, combined with other unknowable criteria, that would run afoul of this new re-interpretation of the law.

154.  Indeed, given the range of objects that could qualify, this significantly chills possessions of handguns in any home with a variety of other objects, thus

**APP.062**

violating *Heller*, 554 U.S. at 576. And this vagueness is particularly egregious because the NFA and GCA are criminal statutes.

155.   The GCA imposes heavy consequences—up to five years in prison and/or the imposition of criminal fines—for willful violations. 18 U.S.C. § 924(a)(1)(D). And the NFA provides for significant fines and up to 10 years in prison. 26 U.S.C. § 5871.

156.   Both the NFA and GCA concern constitutionally protected Arms, and impact individual's exercise of their constitutionally protected right to keep and bear arms.

157.   The law is thus unduly vague and would violate the void for vagueness doctrine even in a normal case. But it is particularly troublesome here, because it imposes criminal penalties and chills exercise of constitutionally protected rights. Because it is unconstitutional, it also violates the APA. *See* 5 U.S.C. § 706(2)(B).

**COUNT VI**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. ART. I**
(Separation of Powers & The Delegation Doctrine)

158.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

159.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

**APP.063**

160.   Article I, Section 3 of the U.S. Constitution directs that the president "shall take Care that the Laws be faithfully executed[.]"

161.   A "fundamental precept" of "another strand of [] separation-of-powers jurisprudence, the delegation doctrine," "is that the lawmaking function belongs to Congress, U.S. CONST. ART. I, § 1, and may not be conveyed to another branch or entity." *Loving v. United States*, 517 U.S. 748, 758 (1996).

162.   "Even before the birth of this country, separation of powers was known to be a defense against tyranny," and "it remains a basic principle of our constitutional scheme that one branch of the Government may not intrude upon the central prerogatives of another." *Id.* at 756–57.

163.   "'The fundamental precept of the delegation doctrine is that the lawmaking function belongs to Congress[.]'" *Brackeen v. Haaland*, 994 F.3d 249, 420 (5th Cir. 2021) (quoting *Loving*, 517 U.S. at 758).

164.   As the Fifth Circuit has noted, "the Constitution's first substantive word" places all lawmaking power in Congress and therefore "Congress's statutes define the scope of agencies' power." *Forrest Gen Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019).

165.   Government actions, including agency rules, "are 'legislative' if they have 'the purpose and effect of altering the legal rights, duties, and relations of

**APP.064**

persons . . . outside the legislative branch.'" *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022) (quoting *INS v. Chada*, 462 U.S. 919, 952 (1983)).

166.   Congress may not "abdicate or [] transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schecter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935).

167.   Neither the president nor his subordinates, therefore, may exercise, Congress' legislative power to declare entirely "what circumstances . . . should be forbidden" by law. *Panama Refining Co. v. Ryan*, 293 U.S. 388, 418–19 (1935).

168.   The Final Rule, by re-writing and significantly expanding the definition of "rifle," exercised legislative powers.

169.   A violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B).

170.   Thus, agencies violate the APA by exercising legislative powers.

171.   The agency's claim it is acting within delegated authority is false because it is not a reasonable construction of statutory terms.

172.   The Supreme Court has "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

**APP.065**

173.    Agencies, therefore, "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011); *id.* ("'Ambiguity is a creature not of definitional possibilities but of statutory context.'") (quoting *Brown v. Gardner*, 513 U.S. 115, 118 (1994)).

174.    Further, an agency cannot create implicit questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)).

175.    Delegation must be express; courts cannot "presume that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), as revised (Aug. 4, 2020).

176.    Congress cannot delegate authority to an agency absent an "intelligible principle" to guide and limit the delegation. *See Jarkesy*, 34 F.4th at 460–61 (citing *Mistretta v. United States*, 276 U.S. 394, 409 (1989)).

**APP.066**

177.   There was no delegation to the Agencies to more broadly define "rifle" to exceed the limits of their congressionally established authority, nor is there any intelligible principle by which such authority could have been delegated.

178.   The Final Rule is therefore unconstitutional under the non-delegation doctrine, and thus was passed in violation of the APA.

179.   Even if there were valid delegation, this may be unconstitutional because the regulation carries criminal penalties. As the Fifth Circuit noted, "the question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, No. 20-51016, 2023 WL 119435, at *19 (*en banc*).

180.   The Final Rule is not merely a regulatory change that allows the Agencies to enforce the NFA and GCA. The Final Rule would give the Agencies new power over new items that are not contemplated nor regulated under federal law. This rulemaking constitutes an executive branch agency making new law, bearing potential criminal penalties, in violation of the Delegation Doctrine as established by the structure of the U.S. Constitution and elucidated by the U.S. Supreme Court.

**APP.067**

## COUNT VII
## VIOLATION OF THE APA
## 5 U.S.C. § 706
## VIOLATION OF THE U.S. CONSTITUTION
## U.S. CONST. ART. II
(Violation of the Take Care Clause)

181.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

182.   Article I, Section 1 of the U.S. Constitution provides: "All legislative Powers herein granted shall be vested in a Congress of the United States."

183.   Article I, Section 7, Clauses 2 and 3 of the U.S. Constitution require that "Every Bill" shall be passed by both the House of Representatives and the Senate and signed by the President "before it [may] become a Law."

184.   Article II, Section 3 of the U.S. Constitution directs that the President "shall take Care that the Laws be faithfully executed[.]"

185.   A violation of the Constitution is always a violation of the APA. *See* 5 U.S.C. § 706(2)(B).

186.   "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952).

187.   The Executive Branch cannot create new policies to be enforced with the force of federal law in the guise of enforcing a congressional enactment. *Id.* at 587–88 ("The President's order does not direct that a congressional policy be

**APP.068**

executed in a manner prescribed by Congress—it directs that a presidential policy be executed in a manner prescribed by the President."); s*ee Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838) (rejecting the notion that "the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution").

188.   "[W]here Congress pass[es] a law for the guidance and government of the executive, in m[a]tters properly concerning the executive department, it belongs to the President to take care that this law be faithfully executed[.]" *Kendall*, 37 U.S. 524 at (1838).

189.   "The Supreme Court has also invoked the Take Care Clause as the textual source of the President's duty to abide by and enforce the laws enacted by Congress—that is, as the instantiation of the President's duty to respect legislative supremacy and not to act c*ontra legem*." Jack Goldsmith & John F. Manning, *The Protean Take Care Clause*, 164 U. PA. L. REV. 1835, 1848 (2016).

190.   "Separate opinions by members of the *Youngstown* majority expressed a like sentiment about the Take Care Clause—that it obliges the President to respect the means and ends of statutory policy power specified by Congress. In his famous concurrence, Justice Jackson wrote that the clause confers on the President 'a governmental authority that reaches so far as there is law,' thereby

**APP.069**

'signify[ing] . . . that ours is a government of laws, not of men, and that we submit ourselves to rulers only if under rules.'" *Id.* at 1849–50.

191.  "To similar effect, Justice Frankfurter quoted Justice Holmes for the proposition that '[t]he duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power.' Likewise, in Justice Douglas's words, any authority conferred by the clause 'starts and ends with the laws Congress has enacted.'" *Id.* at 1850.

192.  The Final Rule is not a faithful execution of congressionally enacted law. Instead, it is an executive-created law offered under the guise of enforcing the NFA and GCA. But it is not truly based on a reasonable reading of any ambiguous passage in the text of either law. The Final Rule violates the prohibition on the Executive of making law and violates the President's duty to ensure the laws are faithfully executed. And because the Final Rule violates the Constitution, it was not legitimately passed under the APA.

**COUNT VIII**
**VIOLATION OF THE APA**
**5 U.S.C. § 706**
**VIOLATION OF THE U.S. CONSTITUTION**
**U.S. CONST. AMEND. II**
(Violation of the Right to Keep and Bear Arms—Chilling Effect)

193.  Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

**APP.070**

194.    The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

195.    A violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B).

196.    When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Bruen*, 142 S. Ct. at 2127 (internal quotation and citation omitted).

197.    As relevant to this case, historical practice commonly included the use of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, even before the Founding, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to more effectively stabilize the pistol.[13] Similarly, when a gunowner wanted additional stability, pre-

---

[13]    *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

**APP.071**

Founding pistols could even be equipped with shoulder stocks.[14] The Agencies' laws, regulations, policies, and enforcement practices challenged herein would make such historical practice nearly impossible, and certainly a risk with respect to criminal liability, for those individuals.

198.    That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano*, 577 U.S. at 411–12).

199.    The Second Amendment protects the right to possess handguns in the home. *Heller*, 554 U.S. at 576.

200.    Because the Defendants' Final Rule uses a nebulous multi-factor test, the Agencies could essentially declare any item that could feasibly be attached to a pistol a "stabilizing brace," thereby converting the pistol into a rifle under the

---

[14]    *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

**APP.072**

Agencies' new definitions. Thus, virtually anyone possessing a handgun and any variety of objects could be charged with constructive possession of an unregistered short-barreled rifle. Constructive possession, without proper NFA registration, bears significant fines and prison time, alongside forfeiture of the firearm. In effect, because the Final Rule operates as a discretionary conversion of some pistols into rifles when possessed with unknown objects, it will chill the exercise of individual's Second Amendment protected right to own and possess a handgun in the home for self-defense, the direct issue in *Heller*.

201.  The "braced pistol" Arms regulated and restricted by the Agencies, like all other non-automatic firearms, fire only one round for each pull of the trigger. They are not machine guns. *Staples*, 511 U.S. at 602 n.1.

202.  The "braced pistol" Arms regulated and restricted by the Agencies are particularly suited for self-defense, especially but not limited to in the home. And their length also allows for safe transportation, including in a hiking pack, an ATV, or a boat, and for use in temporary dwellings, such as a tent or an RV.

203.  The stabilizing brace on a "braced pistol" also allows the accompanying firearm to be better fitted to and handled by an individual shooter, thereby enhancing the ability of an individual to use the firearm safely and effectively.

**APP.073**

204.   Pistols, including those with and without a brace device, are common arms "in common use" and cannot be banned or restricted as they are under the Agencies' NFA-based laws, regulations, policies, and their enforcement thereof.

205.   If the Arms subject to the Final Rule are indeed "braced pistols," the Final Rule, alongside Agencies' laws, regulations, policies, and their enforcement thereof, chills and otherwise suppresses and restricts the unalienable and fundamental Second Amendment protected rights of millions of Americans, including Plaintiffs, Plaintiff Maxim's customers, and Plaintiff FPC's members, and thus violates the Second Amendment.

## COUNT IX
## VIOLATION OF THE U.S. CONSTITUTION
### U.S. CONST. AMEND. II
(Violation of the Right to Keep and Bear Arms—The NFA)

206.   Plaintiffs incorporate the preceding paragraphs by reference as if fully set forth herein.

207.   In the alternative, if the Final Rule is allowed to stand, the Agencies' laws, regulations, policies, and their enforcement of the NFA's requirements as to "braced pistols" or "short-barreled rifles"[15] violate the Second Amendment.

---

[15]   Plaintiffs maintain that the firearms at issue under the Final Rule are pistols with stabilizing braces and not short-barreled rifles. If, however, the Final Rule stands, then the Agencies will retroactively and prospectively treat most, if not all, pistols with stabilizing braces as if they are and always were "short-barreled rifles." Thus, for the purposes of this count, Plaintiffs refer to the items at issue as "'braced pistols' or 'short-barreled rifles.'"

**APP.074**

208.   The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. AMEND. II.

209.   The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of common, constitutionally protected arms. Indeed, those were the very purposes of the NFA; a point ATF concedes: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[16]

210.   The government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). But that is what the Agencies' laws, regulations, policies, and enforcement practices do. The NFA fee operates as a charge for the privilege of exercising a fundamental right. As such, the NFA is unconstitutional for this reason alone.

211.   On information and belief, the Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission

---

[16]     *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Jan. 30, 2023).

**APP.075**

to take possession of constitutionally protected arms in common use for lawful purposes.

212.    Plaintiffs have already been subject to and passed a background check, and they have at all times been and remain law-abiding individuals who have a constitutionally protected, pre-existing right to keep and bear arms for lawful purposes.

213.    By imposing and enforcing the NFA's costs and delays on the acquisition and lawful use of common firearms, the Agencies violate the rights of Individual Plaintiffs, Plaintiff Maxim's customers, and Plaintiff FPC's members.

214.    Moreover, by imposing and enforcing the NFA's restrictions on possession, travel with, and use of regulated arms by law-abiding individuals, the Agencies violate the rights of Individual Plaintiffs, of Plaintiff Maxim's customers, and Plaintiff FPC's members.

215.    When reviewing a regulation of "Arms," whatever the context, it is important to start by recognizing that the "People" have a right to keep and bear arms, and that any regulation burdening that right must be measured against historical practices and understandings. "[I]t has always been widely understood that the Second Amendment . . . codified a *pre-existing* right." *Bruen*, 142 S. Ct. at 2127 (internal quotation and citation omitted).

**APP.076**

216.   As relevant to this case, and as previously stated, historical practice commonly included the use of pistols with large grips,[17] and pistols equipped with shoulder stocks[18]—the latter of which would, on information and belief, qualify as a "short-barreled rifle" under the Final Rule. The Agencies' laws, regulations, policies, and enforcement practices challenged herein would thus make that historical practice nearly impossible, and certainly a risk with respect to criminal liability.

217.   That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop. "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582; *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano*, 577 U.S. at 411–12).

---

[17]   *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.

[18]   *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

**APP.077**

218.   By prohibiting Plaintiffs from possessing, selling, and purchasing popular "braced pistols" or "short-barreled rifles," absent NFA registration, the Final Rule directly infringes Plaintiffs' ability to "keep and bear Arms" within the meaning of the Second Amendment's text. U.S. CONST. AMEND. II. As a result, "[t]o justify its regulation, the government . . . must demonstrate that the regulation is consistent with this Nation's tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.

219.   Non-automatic firearms, including but not limited to single-shot, bolt action, lever action, pump action, and semiautomatic firearms, "traditionally have been widely accepted as lawful possessions." *Staples v. United States*, 511 U.S. 600, 612 (1994) (so categorizing an AR-15 semiautomatic rifle).

220.   There is no constitutionally relevant difference between a "braced pistol" or "short-barreled rifle" and a common pistol, shotgun, and rifle. While some exterior physical attributes may differ—the number and/or location of stocks/grips, different barrel lengths, etc.—they are, in all relevant respects, the same.

221.   Indeed, they are all common firearms that insert cartridges into a firing chamber, burn powder to expel projectiles through barrels, and are functionally non-automatic in nature. They are all common firearms that have the same cyclical rate of fire: one round fired per pull of the trigger pull until ammunition is exhausted or the firearm or feeding device malfunctions. They are common due to their

**APP.078**

overwhelming popularity among law-abiding gun owners. And they are all common under a jurisdictional analysis.

222.   "Braced pistols" or "short-barreled rifles," like rifles with folding and telescoping stocks, increase the likelihood of successful home defense by permitting safe storage of defense instruments in accessible spaces and making the rifle maneuverable in confined spaces.

223.   Moreover, as of 2012, while "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States," *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)), according to the ATF's own report, "Firearms Commerce in the United States – Annual Statistical Update 2021," there were 532,725 registered short-barreled rifles possessed throughout the fifty United States as of May 2021. *Firearms Commerce in the United States – Annual Statistical Update 2021*, ATF, 15–17 Ex. 8.[19]

224.   On information and belief, due to high consumer demand for short-barreled rifles and more efficient ATF electronic application forms, there are more than 532,725 registered short-barreled rifles possessed for lawful purposes in the United States today.

---

[19]    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report.

**APP.079**

225.   Additionally, if the Agencies are correct and the braced pistols owned by law-abiding individuals are actually short-barreled rifles, then, based on the Agencies' estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final Rule at 6,560.

226.   This Court's task, under Supreme Court precedent, is therefore a simple one: it must merely determine whether these weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). Thus, a firearm that is in common use for lawful purposes, by definition, does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. *Bruen*, 142 S. Ct. at 2143.The Agencies' laws, regulations, and policies, and their enforcement thereof, are individually and collectively a ban and/or restriction on a type of arm and as such, the Court must assess whether it violates the test set forth by the Supreme Court in *Heller*, *Caetano*, and *Bruen*.

227.   The arms regulated and restricted as "braced pistols" or "short-barreled rifles" are not both dangerous *and* unusual.

228.   "Braced pistols" or "short-barreled rifles" are common arms "in common use" and cannot be banned or restricted as they are under the Agencies' NFA-based laws, regulations, and policies, and their enforcement thereof.

**APP.080**

229.   Moreover, even Arms that are not "in common use" cannot be banned so long as they are no more dangerous than arms that are in common use.

230.   If the arms subject to the Final Rule are "short-barreled rifles," the Agencies' laws, regulations, policies, and their enforcement thereof, violate the Second Amendment.

231.   The Agencies' "short-barreled rifle" and "braced pistol" laws, regulations, and policies, and their enforcement thereof, have no support in the constitutionally relevant history and tradition of firearm ownership regulations.

232.   By subjecting common firearms and their law-abiding possessors to the extraordinary and burdensome requirements of, and restrictions under, the NFA, the Agencies' laws, regulations, and enforcement practices violate the Second Amendment.

233.   The firearms at issue in this case are the sorts of bearable arms in common use for lawful purposes that law-abiding individuals possess at home by the millions. They are, therefore, neither dangerous nor unusual and they cannot be banned, nor can they be regulated outside of text and history of the Second Amendment.

* * *

**APP.081**

234.    Only one of two things can be true. If the firearms at issue in the Final
Rule are "pistols" or "handguns," then the Agencies' are acting outside their
authority in treating them as "rifles," (Count I) and have violated several provisions
of the APA (Counts II–III) and the United States Constitution (Counts IV-VIII) in
promulgating the Final Rule. Alternatively, if the firearms at issue in the Final Rule
are "short-barreled rifles," then those rifles are commonly possessed by law-abiding
individuals for lawful purposes, the Agencies' have admitted they are in common
use, and, under the Supreme Court's own analysis, those rifles cannot be regulated
outside of the Founding Era's history of acceptable regulation and their modern
analogues. As relevant here, the NFA's heightened requirements applying to "short-
barreled rifles" have no basis in history and the Agencies' cannot point to an
analogous historical regulation to justify their modern law, thus rendering the NFA's
regulation of commonly owned "short-barreled rifles" by law-abiding individuals
for lawful purposes unconstitutional (Count IX).

**APP.082**

**PRAYER FOR RELIEF**

Plaintiffs request the following relief from this Honorable Court:

1.  Holding unlawful and setting aside the Final Rule;

2.  Vacatur of the Final Rule;

3.  Alternatively, or additionally, postponing the effective date of the Final Rule;

4.  Issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing and/or implementing the Final Rule;

5.  In the alternative, declaring that the Final Rule with respect to "short-barreled rifles" and Defendants' "short-barreled rifle" laws, regulations, and policies, and their enforcement thereof, violate the Second Amendment;

6.  In the alternative, issuing preliminary and permanent injunctive relief enjoining Defendants from enforcing or implementing the National Firearms Act against common rifles with a barrel length of less than 16 inches;

7.  Awarding Plaintiffs the costs of this action and reasonable attorney's fees; and

8.  Awarding Plaintiffs such other legal and equitable relief as is just and appropriate.

Respectfully submitted,

*/s/R. Brent Cooper*
R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
ben.passey@cooperscully.com

**APP.083**

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, Texas 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.084**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, *Plaintiffs*, v. MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, *Defendants*. | Civil Action No. 4:23-cv-00095-O |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR,**
**IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE**
**EFFECTIVE DATE OF THE FINAL RULE**

Pursuant to Federal Rule of Civil Procedure 65, Northern District of Texas Local Civil Rule 7.1, and 5 U.S.C. § 705, Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC ("Maxim Defense"); and Firearms Policy Coalition, Inc. ("FPC"), through their undersigned counsel, move this honorable Court for a preliminary injunction prohibiting Defendants and their officers, agents, servants, and employees from implementing and enforcing the provisions established and amended by the Department of Justice and Bureau of Alcohol, Tobacco, Firearms, and Explosives' Final Rule entitled *Factoring Criteria for Firearms with Attached 'Stabilizing Braces,'* 88 Fed. Reg. 6,478 (Jan. 31, 2023), or, in the alternative, for an order postponing the effective date of the same.

**APP.085**

In support of this Motion, Plaintiffs concurrently file a Brief in Support of Plaintiffs' Motion for Preliminary Injunction along with supporting documentation pursuant to Northern District of Texas Local Civil Rule 7.1(d).

Plaintiffs' counsel has conferred with counsel for Defendants, who oppose the relief requested herein. In conferring with Defendants' counsel, Plaintiffs' counsel also requested that Defendants voluntarily postpone the effect date of the Final Rule pursuant to 5 U.S.C. § 705, to avoid the need for this Motion. 5 U.S.C. § 705. ("When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."). Defendants' counsel indicated Defendants would not voluntarily postpone the effective date.

As noted in Plaintiffs' prior motion, Plaintiffs have sought to move this matter along as quickly as possible without resorting to *ex parte* relief, for the benefit of the Court and all parties. Accordingly, Plaintiffs and Defendants have agreed, with this Court's approval, to brief this matter on an expedited basis, with Defendants' response due no later than March 10, 2023, and Plaintiffs' reply due no later than March 17, 2023. ECF No. 32. Additionally, Plaintiffs do not request oral argument on this motion for the sole purpose of further expediting its consideration, but Plaintiffs are available if the Court believes it would aid in its decision.

DATED this 21st day of February, 2023.

Respectfully submitted,

 */s/R. Brent Cooper*
R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

**APP.086**

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.087**

## CERTIFICATE OF SERVICE

I hereby certify that, on February 21, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.


    */s/R. Brent Cooper*
R. Brent Cooper
COOPER & SCULLY, P.C.


## CERTIFICATE OF CONFERENCE

I hereby certify that, on February 7, 8, and 9, 2023, Plaintiffs' counsel, Cody J. Wisniewski conferred with Defendants' counsel, Jody Lowenstein, Michael Drezner, and Faith Lowry with the U.S. Department of Justice, Civil Division, via email and telephone, who stated that Defendants oppose the relief request in this Motion.


/s/ *Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.088**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>       *Plaintiffs*,<br><br> v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>       *Defendants*. | Civil Action No. 4:23-cv-00095-O |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY
INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE
EFFECTIVE DATE OF THE FINAL RULE**

**APP.089**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS .............................................................................. 3

I.    THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT ...................... 3

II.    THE FINAL RULE REDEFINES VARIOUS HANDGUNS AND BRACED HANDGUNS AS SHORT-BARRELED RIFLES AND HAS AN UNLAWFUL AND UNNECESSARILY EXPEDITED EFFECTIVE DATE .................................. 5

    A.    The Biden Administration................................................................ 5

    B.    ATF's Previous Classification of Stabilizing Braces........................... 6

    C.    The Final Rule................................................................................. 8

III.    THE ADMINISTRATIVE PROCEDURE ACT ........................................... 9

STANDARD.................................................................................................... 10

ARGUMENT ................................................................................................... 11

I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS ................... 11

    A.    The Final Rule Violates the United States Constitution ...................... 11

        1.    The Final Rule Infringes on the Right to Keep and Bear Arms............... 11

        2.    The Final Rule Violates the First Amendment ......................... 15

        3.    The Final Rule is Void for Vagueness ...................................... 19

    B.    The Final Rule Violates the Constitution's Structural Protections ...................... 22

    C.    The Final Rule Violates Multiple Provisions of the APA .................. 25

        1.    The Final Rule Exceeds the Agencies' Statutory Jurisdiction and Authority .................................. 25

        2.    The Final Rule was not a Logical Outgrowth of the Proposed Rule ........ 29

    D.    Alternatively, if the Final Rule is Upheld, then the Agencies' Regulation of Commonly owned Braced Pistols or Short-Barreled Rifles under the National Firearms Act violates the Second Amendment.................................. 33

II.    PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF preliminary RELIEF IS NOT GRANTED .................................. 36

III.    PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC—AND AN INJUNCTION WOULD LIKELY BENEFIT THE PUBLIC ....... 39

IV.    THE COURT SHOULD ENTIRELY ENJOIN ENFORCEMENT OF THE FINAL RULE OR, IN THE ALTERNATIVE, POSTPONE ITS EFFECTIVE DATE.............. 41

CONCLUSION.................................................................................. 45

<b>APP.090</b>

# TABLE OF AUTHORITIES

**Case**     **Page(s)**

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*,
  141 S. Ct. 2485 (2021) ................................................................................. 37

*Allina Health Servs. v. Sebelius*,
  746 F.3d 1102 (D.C. Cir. 2014) .................................................................... 33

*Ark. Writers' Project, Inc. v. Ragland*,
  481 U.S. 221 (1987) ..................................................................................... 18

*Ashcroft v. Am. C.L. Union*,
  542 U.S. 656 (2004) ..................................................................................... 40

*BST Holdings, LLC v. OSHA*,
  17 F.4th 604 (5th Cir. 2021) ........................................................................ 36

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016) ............................................................................... 12, 34

*Califano v. Yamasaki*,
  442 U.S. 682 (1979) ..................................................................................... 42

*Calix v. Lynch*,
  784 F.3d 1000 (5th Cir. 2015) ..................................................................... 23

*Cargill v. Garland*,
  57 F.4th 447 (5th Cir. 2023) ................................................................... 25, 26

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ..................................................................................... 24

*Chocolate Mfrs. Ass'n of U.S. v. Block*,
  755 F.2d 1098 (4th Cir. 1985) ..................................................................... 32

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ............................................................................... 18, 19

*City of Dallas, Texas v. Hall*,
  2008 WL 11350041 (N.D. Tex. July 28, 2008) ........................................... 41

*City of El Cenizo v. Texas*,
  890 F.3d 164 (5th Cir. 2018) ....................................................................... 11

**APP.091**

*Colorado v. EPA*,
   989 F.3d 874 (10th Cir. 2021) ................................................................ 11

*Conn. Nat'l Bank v. Germain*,
   503 U.S. 249 (1992) ............................................................................. 26

*Contender Farms, L.L.P. v U.S. Dep't of Agric.*,
   779 F.3d 258 (5th Cir. 2015) ................................................................ 23

*Cook Cnty. v. Wolf*,
   962 F.3d 208 (7th Cir. 2020) ................................................................ 11

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) ........................................................... 32

*District of Columbia v. Heller*,
   554 U.S. 570 (2008) ............................................. 12, 13, 15, 33, 34

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................. 36

*Envtl. Integrity Project v. EPA*,
   425 F.3d 992 (D.C. Cir. 2005) ............................................................. 10

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ............................................................................. 19

*Franciscan All., Inc. v. Burwell*,
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................................ 42

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
   968 F.3d 454 (5th Cir. 2020) ................................................................ 23

*Gun Owners of Am. v. Garland*,
   19 F.4th 890 (6th Cir. 2021) ................................................................. 4

*Heller v. City of El Paso*,
   861 Fed. Appx. 836 (5th Cir. 2021) ..................................................... 19

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
   14 F.4th 322 (4th Cir. 2021) ................................................................ 41

*Huawei Techs. USA, Inc., v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ........................................................... 29, 31

**APP.092**

*In re Tam*,
    808 F.3d 1321 (Fed. Cir. 2015) ........................................................................ 16

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1997) ....................................................................... 40, 41

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ............................................................................ 36

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ..................................................................................... 26

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) ......................................................................................... 29

*Loving v. United States*,
    517 U.S. 748 (1996) ......................................................................................... 23

*Luis v. United States,*
    578 U.S. 5 (2016) ............................................................................................. 12

*Moore v. Hannon Food Serv. Inc.*,
    317 F.3d 489 (5th Cir. 2003) ............................................................................ 23

*Murdock v. Pennsylvania.*,
    319 U.S. 105 (1943) ......................................................................................... 35

*N. Carolina State Conf. of the NAACP v. Raymond*,
    981 F.3d 295 (4th Cir. 2020) ............................................................................ 39

*N. Mariana Islands v. United States*,
    686 F. Supp. 2d 7 (D.D.C. 2009) ..................................................................... 40

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ............................................................ 11, 12, 33, 34, 35

*Nat'l Fed'n of Indep. Bus. v. Perez*,
    No. 16-cv-00066, 2016 WL 3766121 (N.D. Tex. June 27, 2016) ................ 42, 43

*Nat'l Inst. of Family and Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ..................................................................................... 18

*Ne. Md. Waste Disposal Auth. v. EPA*,
    358 F.3d 936 (D.C. Cir. 2004) ..................................................................... 29, 31

**APP.093**

*Nevada v. U.S. Dep't of Labor,*
  218 F. Supp. 3d 520 (E.D. Tex. 2016)............................................................. 42

*Nken v. Holder,*
  556 U.S. 418 (2009) ......................................................................................... 40

*People v. Yanna,*
  824 N.W.2d 241(Mich. Ct. App. 2012)........................................................... 34

*Perez v. Mortgage Bankers Ass'n,*
  575 U.S. 92 (2015) ........................................................................................... 10

*Peyton v. Reynolds Assocs.,*
  955 F.2d 247 (4th Cir. 1992) ........................................................................... 25

*Porter v. Califano,*
  592 F.2d 770 (5th Cir. 1979) ........................................................................... 10

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ......................................................................................... 16

*Reed v. Town of Gilbert, Ariz.,*
  576 U.S. 155 (2015) ......................................................................................... 16

*SD Voice v. Noem,*
  987 F.3d 1186 (8th Cir. 2021) ......................................................................... 41

*Sector Colls. & Univs. v. Duncan,*
  681 F.3d 427 (D.C. Cir. 2012).......................................................................... 32

*Serv. Emps. Int'l Union, Local 5 v. City of,*
  595 F.3d 588 (5th Cir. 2010) ........................................................................... 18

*Sessions v. Dimaya,*
  138 S. Ct. 1204 (2018) ..................................................................................... 19

*Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning,*
  620 F.2d 516 (5th Cir. 1980) ........................................................................... 19

*Siemens USA Holdings Inc v. Geisenberger,*
  17 F.4th 393 (3d Cir. 2021) ............................................................................. 36

*Small Refiner Lead v. EPA,*
  705 F.2d 500 (1983) ......................................................................................... 32

**APP.094**

*Smith v. Goguen,*
    415 U.S. 566 (1974) ...................................................................................... 20

*Tex. Entm't Ass'n, Inc. v. Hegar,*
    10 F. 4th 495 (5th Cir. 2021) ..................................................................... 16

*Tex. Pipeline Ass'n v. FERC,*
    661 F.3d 258 (5th Cir. 2011) ..................................................................... 23

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ..................................................................... 37

*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................................... 43

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ..................................................................... 43

*Thunder Basin Coal Co. v. Reich,*
    510 U.S. 200 (1992) ...................................................................................... 37

*Turner v. Driver,*
    848 F.3d 678 (5th Cir. 2017) ..................................................................... 16

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
    513 U.S. 18 (1994) ........................................................................................ 41

*United States v. Bittner,*
    19 F.4th 734 (5th Cir. 2021) ..................................................................... 26

*United States v. Davis,*
    139 S. Ct. 2319 (2019) ........................................................................ 19, 20

*United States v. One TRW, Model M14, 7.62 Caliber Rifle,*
    441 F.3d 416 (6th Cir. 2006) ..................................................................... 15

*United States v. Transocean Deepwater Drilling, Inc.,*
    767 F.3d 485 (5th Cir. 2014) ..................................................................... 25

*Util. Air Reg. Grp. v. EPA,*
    573 U.S. 302 (2014) ...................................................................................... 23

*VanDerStok v. Garland,*
    __ F. Supp. 3d __, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ............... 36

**APP.095**

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ........................................................................ 20

*Wages and White Lion Invs., LLC v. FDA*,
   16 F.4th 1130 (5th Cir. 2021) ....................................................... 37

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) .................................................................. 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...................................................................... 22

**Statutes**                             **Page(s)**

5 U.S.C. § 551 ..................................................................................... 9

5 U.S.C. § 551(5) .............................................................................. 10

5 U.S.C. § 553(b) .............................................................................. 29

5 U.S.C. § 553(d) .............................................................................. 45

5 U.S.C. § 702 ................................................................................... 10

5 U.S.C. § 705 ................................................................................... 42

5 U.S.C. § 706 ................................................................................... 42

5 U.S.C. § 706(2)(B) ......................................................................... 10

5 U.S.C. § 706(2)(C) .................................................................. 10, 26

5 U.S.C. § 706(2)(D) ......................................................................... 10

18 U.S.C. § 921 ................................................................................... 3

18 U.S.C. § 921(a)(3) .......................................................................... 3

18 U.S.C. § 921(a)(7) ............................................................... 4, 24, 26

18 U.S.C. § 921(a)(8) ............................................................... 4, 24, 26

18 U.S.C. § 921(a)(30) .................................................................. 3, 26

18 U.S.C. § 921(a)(30)(A) ................................................................. 24

18 U.S.C. § 924(a)(1)(D) ............................................................ 22, 29

**APP.096**

18 U.S.C. § 926(a) ........................................................................... 4

26 U.S.C. § 5845(c) .................................................................... 4, 26

26 U.S.C. § 5845(e) .................................................................... 4, 27

26 U.S.C. § 5871 ............................................................................ 22

26 U.S.C. § 7801(a)(2)(A) .............................................................. 4

26 U.S.C. §§ 5845(a)(3)-(4) ....................................................... 4, 26

U.S. Const. Amend. I .................................................................... 16

U.S. Const. Amend. II ................................................................... 11

U.S. Const. Amend. V ................................................................... 19

U.S. Const. Art. I .......................................................................... 22

U.S. Const. Art. I § 1 .................................................................... 22

U.S. Const. Art. I, § 3 ................................................................... 22

U.S. Const. Art. III, § 1 ................................................................ 43

## Regulations                                                       Page(s)

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces*,
    88 Fed. Reg. 6 (Jan. 31, 2023) .................................................. 5

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Proposed Rule"),
    86 Fed. Reg. 30 (June 10, 2021) ............................................... 8

## Other Authorities                                                 Page(s)

Black's Law Dictionary 560 (Bryan A. Garner ed., 11th ed. 2019) ....................................... 27

*Biden Considers executive actions on guns, calls on Congress to pass weapons ban*,
    Reuters (Mar. 23, 2021) ........................................................ 5

Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*,
    54 St. Mary's L.J., at 16 (Apr. 11, 2022) .............................. 14

Letter from ATF #2013-0172 (Nov. 26, 2012) ............................ 6

**APP.097**

Letter from ATF #302492 (Oct. 28, 2014) ............................................................... 7

S. Rep. No. 90-1097 (1968), *as reprinted in* 1968 U.S.C.C.A.N. 2112 ........................................ 3

MERRIAM-WEBSTER.COM DICTIONARY ........................................................... 27

Mila Sohoni, *The Power to Vacate a Rule*,
    88 GEO. WASH. L. REV. 1121 (2020) ........................................................... 42

NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) ........................... 27

**APP.098**

## INTRODUCTION

Handguns and pistols are commonly owned by law-abiding individuals for lawful purposes and are protected by the Second Amendment. Stabilizing braces, which attach to many handguns and pistols to improve stability and control when firing with one hand, were designed to help gun owners with disabilities and have been adopted by millions of gun owners. Federal law treats handguns and pistols, including those with stabilizing braces, differently from rifles—that is, until recently. On January 31, 2023, the Department of Justice ("DOJ") and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") (collectively, "Agencies"), published a rule redefining "rifles" and expanding the more regulated category of "short-barreled rifles" in a way that now includes a large, indeterminate class of braced pistols and even many handguns and pistols lacking a brace that could, alone or with a brace, be rested against and fired from the shoulder.

The Agencies' new regulatory definitions go beyond the statutory definitions of "rifle," severely burden the Second Amendment protected rights of law-abiding individuals who desire or need stabilizing braces to assist then in holding and firing handguns, are unconstitutionally vague, and suffer from many other legal infirmities. And the onerous obligations and restrictions imposed by these regulations severely burden the rights of law-abiding firearms manufacturers and retailers who are required to immediately comply with a series of onerous regulations that will impose non-recoverable costs and significant burdens on their businesses.

Because the Agencies have acted beyond their statutory authority, failed to abide by the rulemaking requirements of the Administrative Procedure Act ("APA"), and imposed new regulatory directives that violate the United States Constitution, Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC ("Maxim Defense"); and Firearms Policy Coalition, Inc. ("FPC") move this Court for a preliminary injunction, asking this Court to enjoin

**APP.099**

Defendants from implementing and enforcing the Final Rule in its entirety, or, alternatively, to delay the effective date of the Final Rule under the APA until this case reaches final judgment.

Absent a preliminary injunction, Maxim Defense and FPC's other corporate members will continue to face irreparable injury because the Final Rule requires immediate compliance, preventing those entities from, *inter alia*, continuing to sell braced pistols as pistols, which has been the case for a decade, on pain of criminal liability. Such requirements, and the loss of business that has and will continue to result, not to mention the infringement on the constitutionally protected rights of Maxim Defense and its customers, cannot adequately be compensated after the fact. Similarly, while there is a short grace period for individuals to comply, at the close of that period, Plaintiffs Mock and Lewis, along with FPC's other individual members too will have to destroy, dispose of, modify, or register otherwise lawful and protected firearms and braces, or to satisfy onerous regulatory burdens as to a broad, and indeed indeterminate, category of handguns to the great detriment of their constitutionally protected right to armed self-defense. Moreover, individuals, including Plaintiffs, are already subject to ongoing injuries due to the constitutional violations of the Final Rule.

Given the Final Rule's breadth, the only way to afford Plaintiffs protection to mitigate the harm suffered is to enjoin the Agencies' enforcement of the Final Rule. Because the items at issue must be sold, purchased, and transferred through the existing federal background check system for firearms, the only way to ensure Plaintiffs are not further damaged by the Final Rule is to offer protection to every party in the chain from the manufacturer to the end purchaser. An injunction of this nature would maintain the status quo that has been in place for a decade and imposes no harm on the Agencies.

**APP.100**

## STATEMENT OF FACTS

### I.    THE NATIONAL FIREARMS ACT AND THE GUN CONTROL ACT

Congress enacted the National Firearms Act ("NFA") of 1934 "[t]o provide for the taxation

of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or

other disposal of such weapons, and to restrict importation and regulate transportation thereof."

Ch. 757, 48 Stat. 1236 (1934). "Firearms subject to the 1934 Act included [short barreled] shotguns

and rifles . . . , certain firearms described as 'any other weapons,' machine guns, and firearm

mufflers and silencers."[1]

Congress then enacted the Gun Control Act ("GCA") in 1968, which amended the NFA

and established a four-part definition of what constitutes a "firearm." *See* 18 U.S.C. § 921, *et seq.*

"The term 'firearm' means (A) any weapon (including a starter gun) which will or is designed to

or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or

receiver of any such weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive

device. Such term does not include an antique firearm." 18 U.S.C. § 921(a)(3).

The GCA defines "handgun" as "(A) a firearm which has a short stock and is designed to

be held and fired by the use of a single hand; and (B) any combination of parts from which a

firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The GCA

definition superseded the previous federal definition where "any part or parts of such a weapon

[were] included. It [was] [] found that it [was] impractical to have controls over each small part of

a firearm. Thus, the revised definition substitute[d] only the major parts of the firearm (that is,

frame or receiver) for the words 'any part or parts.'" S. Rep. No. 90-1097 (1968), *as reprinted in*

---

[1]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Feb. 21, 2023).

**APP.101**

1968 U.S.C.C.A.N. 2112, 2200. The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e).

As for rifles, the NFA defines a "rifle" as "[a] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge." 26 U.S.C. § 5845(c). Likewise, the GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7). The GCA defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision. 26 U.S.C. §§ 5845(a)(3)-(4).

Congress delegated the Attorney General authority to enforce both the NFA and GCA. *See* 26 U.S.C. § 7801(a)(2)(A) ("The administration and enforcement of the following provisions of this title shall be performed by or under the supervision of the Attorney General[.]"); *and* 18 U.S.C. § 926(a) ("The Attorney General may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter[.]"). The Attorney General then delegated this power to the ATF "to administer, enforce, and exercise the functions and powers of the Attorney General with respect to" both statutes. *Gun Owners of Am. v. Garland*, 19 F.4th 890, 897 (6th Cir. 2021). As demonstrated below, that authority is narrowly confined to the "Execution" of the NFA and GCA and does not encompass the authority to redefine or expand their terms or restrictions. At all

**APP.102**

times, that authority is subject to constitutional restrictions as well as the ancient doctrine of the

rule of lenity given the criminal penalties that accompany most violations of the NFA and GCA.

## II.    THE FINAL RULE REDEFINES VARIOUS HANDGUNS AND BRACED HANDGUNS AS SHORT-BARRELED RIFLES AND HAS AN UNLAWFUL AND UNNECESSARILY EXPEDITED EFFECTIVE DATE

On January 31, 2023, the Agencies published a Final Rule titled "Factoring Criteria for

Firearms with Attached 'Stabilizing Braces.'" 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Final Rule").[2]

The Final Rule took effect "immediately . . . in that the Department may seek to enforce the NFA's

requirements with respect to any new making or new transfer of a weapon with an attached

'stabilizing brace[,]'" Final Rule at 6,481; but allows individuals until May 31, 2023, to destroy,

dispose of, modify, or register existing braced pistols, *id.* at 6,498. The Final Rule reflects the

ongoing hostility of the Biden Administration towards lawful and constitutionally protected

firearm ownership. It embodies a strategy of regulating first and hoping that review is sufficiently

delayed, thus functionally suppressing the rights of gun owners and manufacturers while litigation

drags out in an end-run around Congress and the Constitution. And it shows a capricious lack of

concern for clarity, certainty, or legal authority while chilling lawful gun ownership and sales.

### A.    The Biden Administration

Before President Biden took office, one of his campaign pillars was an amorphous plan to

combat "gun violence." Once elected, President Biden "urged Congress to swiftly pass gun control

laws[.]"[3] When Congress did not act to the Biden Administration's liking, President Biden instead

directed the Agencies to dramatically expand their interpretation of the congressionally defined

term "rifle" to accomplish the legislative agenda Congress declined to adopt. The Final Rule,

---

[2]    The Final Rule is available at: https://www.federalregister.gov/d/2023-01001.

[3]    *Biden Considers executive actions on guns, calls on Congress to pass weapons ban*, REUTERS (Mar. 23, 2021), https://www.reuters.com/article/usa-guns-idINKBN2BG0A5.

**APP.103**

inspired by the Biden Administration's promises, seeks to end run Congress and place restrictions on the ability of peaceable Americans to add minor modifications to their pistols and even to possess lawful firearms themselves to the extent they are or can be so modified.

### B.    ATF's Previous Classification of Stabilizing Braces

Prior ATF regulations and guidance largely understood federal firearms law to permit a broad range of stabilizing braces and handguns with substantial grips that, while designed to facilitate firing with one hand, *could* be fired from the shoulder.

On November 8, 2012, an FFL submitted the first forearm "stabilizing brace" to ATF asking if the addition of their prototype device to a heavy pistol, such as an AR-type pistol, would change that type of pistol's classification under federal firearms laws. The submitter described the brace device as designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, as these weapons can be "difficult to control with the one handed precision stance." Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012). The stabilizing brace was not designed nor intended to be fired from the shoulder. ATF's Firearms and Ammunition Technology Division ("FATD") found that attaching the brace would not alter the classification of the pistol or other firearms. Letter from ATF #2013-0172 (Nov. 26, 2012).

Over the next few years, ATF received and answered additional inquiries about several braces. In a March 2014 letter, for example, FATD noted that it classifies firearms based on the "physical design characteristics," and that, while functionality indicates the intended design, it is not the sole criterion for determining a weapon's classification. Letter from ATF #301737 (Mar. 5, 2014). FATD advised that it does not classify weapons based on how a particular individual uses a weapon and that firing an AR-type pistol from the shoulder did not reclassify it as a short-barreled rifle. *Id.* FATD further noted that some brace designs had not been classified as a shoulder

**APP.104**

stock and, therefore, using those braces improperly would not constitute a design change or change the classification of the weapon. *Id.*

Then, in an October 2014 letter, ATF momentarily reversed its position, stating that actions such as concealment on the person or use of a device as a shoulder stock, rather than the objective design criteria, *could* transform the weapon's classification. Letter from ATF #302492 (Oct. 28, 2014). ATF confusingly summarized this position in a January 2015 Open Letter stating:

> ATF hereby confirms that if used as designed—to assist shooters in stabilizing a handgun while shooting with a single hand—the device is not considered a shoulder stock and therefore may be attached to a handgun without making a NFA firearm. However, ATF has received numerous inquiries regarding alternate uses for this device, including use as a shoulder stock. Because the NFA defines both rifle and shotgun to include any "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder," any person who redesigns a stabilizing brace for use as a shoulder stock makes a NFA firearm when attached to a pistol with a rifled barrel under 16 inches in length or a handgun with a smooth bore under 18 inches in length.

Max M. Kingery, Acting Chief, FATD, *Open Letter on the Redesign of "Stabilizing Braces,"* ATF (Jan. 6, 2015).[4]

Later still, in a March 2017 letter, ATF reiterated that "stabilizing braces are perfectly legal accessories for large handguns or pistols" but that, "when employed as a shoulder stock with a firearm with a barrel less than 16 inches in length, the result would be making an unregistered NFA firearm." Letter from Marvin G. Richardson, Assistant Director of ATF (Mar. 21, 2017).[5] In that letter, ATF formally repudiated any interpretation of its prior letters that "h[e]ld that incidental, sporadic, or situational 'use' of an arm-brace … equipped firearm from a firing position at or near the shoulder was sufficient to constitute 'redesign.'" *Id.* at 3.

---

[4]    https://content.govdelivery.com/accounts/USATF/bulletins/ea3937
[5]    https://vpc.org/wp-content/uploads/2019/08/Pistol-brace-ATF-letter-March-21-2017.pdf.

**APP.105**

On June 10, 2021, the Agencies' published a Notice of Proposed Rulemaking planning changes to the definition of "rifle" in 27 CFR 478.11 and 479.11 to 'clarify' when attaching a stabilizing brace would transmute a "pistol" into "rifle." *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).[6] The Proposed Rule included factors on a new, proposed worksheet, "ATF Worksheet 4999," that the Agencies proposed ATF rely on when making firearms classifications. Worksheet 4999 proposed assigning points to various criteria as an indicator of whether the "brace" device is suitable for shouldering and whether the firearm overall is capable of being fired from the shoulder, thus purportedly rendering it a "rifle." Though Worksheet 4999 was far from perfect, it provided objective measurement criteria for determining whether a particular firearm with stabilizing brace has a "shoulder-fired design" that would be subject to the NFA. Among the considerations, for example, were whether the firearm included a secondary grip (indicating two-handed fire), whether the firearm weighed more than 120 ounces, and whether the brace had been modified for shouldering or had the cuff of the brace removed.

### C.    The Final Rule

The Final Rule was published on January 31, 2023, and replaces the Agencies' prior application of federal law with a subjective and undefined multi-factor balancing test, without providing any mechanism for weighing the factors. The Agencies claim that by providing surface area which *can* be used to facilitate shoulder firing, based on their vague multi-factor test, a stabilizing brace remakes a handgun into a rifle. Final Rule at 6,503. The Final Rule, however, ignores the statutory definitions of exempt and lawful handguns and pistols—weapons both

---

[6]    The Proposed Rule is available at: https://www.federalregister.gov/d/2021-12176.

**APP.106**

*designed* to fire with one hand and conveniently *capable* of being fired with one hand—by regulating handguns that *may* be fired from the shoulder under the NFA.

The Final Rule is not saved merely because the Agencies have now adopted various factors, of uncertain weight and priority, to determine whether a handgun (with or without a brace) is supposedly designed to be fired from the shoulder. Many of those factors are not merely arbitrary but are also subjective and indeterminate. The factors are:

> (i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

> (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

> (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

> (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

> (vi) information demonstrating the likely use of the weapon in the general community

Final Rule at 6,480. This vague regulation harms Plaintiffs. Declaration of William T. Mock ("Mock Decl.") ¶ 11; Declaration of Christopher Lewis ("Lewis Decl.") ¶ 10; Declaration of David Dahl ("Dahl Decl.") ¶¶ 17–19; Declaration of Brandon Combs ("Combs Decl.") ¶¶ 9–12.

## III.    THE ADMINISTRATIVE PROCEDURE ACT

The Administrative Procedure Act ("APA"), among other things, sets forth specific requirements for Executive Branch agencies to follow for those agencies to establish or amend federal regulations. *See* 5 U.S.C. § 551, *et seq.* Individuals and entities can challenge an agency's

**APP.107**

rulemaking to ensure it complies with the APA in federal court. 5 U.S.C. § 702. Rulemaking is an "agency process for formulating, amending, or repealing a rule[,]" 5 U.S.C. § 551(5), and there are two types of rules—non-legislative and legislative. "Rules issued through the notice-and-comment process are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (citation omitted).

There are several ways an agency can violate the APA, as relevant here. *First*, a violation of the Constitution is always a violation of the APA. 5 U.S.C. § 706(2)(B). *Second*, courts must set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). "The intent of Congress in 5 U.S.C. § 706(2)(B) was that courts should make an independent assessment of a citizen's claim of constitutional right when reviewing agency decision-making." *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979). *Third*, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" 5 U.S.C. § 706(2)(C). *Finally*, a reviewing court shall "hold unlawful and set aside agency action" promulgated "without observance of procedure required by law." 5 U.S.C. § 706(2)(D). To comply with the notice and comment requirements of the APA, "an agency's proposed rule and its final rule may differ only insofar as the latter is a 'logical outgrowth' of the former." *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

## STANDARD

To obtain a preliminary injunction, "the applicants must show (1) a substantial likelihood that they will prevail on the merits, (2) a substantial threat that they will suffer irreparable injury if the injunction is not granted, (3) their substantial injury outweighs the threatened harm to the party whom they seek to enjoin, and (4) granting the preliminary injunction will not disserve the

**APP.108**

public." *City of El Cenizo v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). "These four factors also determine when a court should grant a stay of agency action under section 705 of the APA." *Colorado v. EPA*, 989 F.3d 874, 883 (10th Cir. 2021); *accord Cook Cnty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).

## ARGUMENT

The Final Rule threatens Plaintiffs' livelihoods and liberty, and a preliminary injunction is needed to protect them from its unconstitutional and unlawful requirements. Plaintiffs are likely to prevail on the merits and will be irreparably harmed absent an injunction. Further, because of the significant harms that will flow to lawful gun owners, manufacturers, and distributors if the Final Rule is allowed to stand, the merged public interest and balance of the equities favor an injunction. Plaintiffs request that this Court enter an injunction against the Final Rule or, at a minimum, postpone its effective date until 120 days after this Court decides this case on the merits.

## I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

The Final Rule violates Plaintiffs' constitutionally protected rights, was adopted contrary to the Constitution's structure, and violates multiple provisions of the APA. Plaintiffs are thus likely to succeed on the merits.

### A.    The Final Rule Violates the United States Constitution

#### 1.    The Final Rule Infringes on the Right to Keep and Bear Arms

The Final Rule impermissibly infringes on the "right of the people to keep and bear Arms[.]" U.S. CONST. AMEND. II. When determining whether a firearm regulation violates the Second Amendment, courts consider the "text, as informed by history." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2127 (2022).

**APP.109**

The Supreme Court has explained that "[j]ust as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see Bruen*, 142 S. Ct. at 2132 ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)). "[A]ll instruments that constitute bearable arms," are presumptively protected. *Bruen*, 142 S. Ct. at 2143. This protection extends not just to braced pistols, but to the braces themselves. *See Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in judgment) (constitutional protections "implicitly protect those closely related acts necessary to their exercise"). And although ordinarily that presumption could only be overcome by the government "demonstrating that [the challenged law] is consistent with the Nation's historical tradition of firearm regulation," in the case of the Final Rule's regulation of a category of Arms like this one, the Supreme Court has already done the necessary historical work and concluded that, in light of "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" arms that are "in common use at the time" are protected and cannot be regulated outside of historical tradition. *Id.* at 2130.

In *Caetano*, Justice Alito explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. at 420 (2016) (Alito, J., concurring) (cleaned up). And when analyzing an "assault weapons" ban, Justice Thomas said "the ban is thus highly suspect because it broadly prohibits common semiautomatic firearms used for lawful purposes. Roughly five million Americans own AR-style semiautomatic rifles." *Friedman v. City of Highland Park*, 577 U.S.

**APP.110**

1039 (2015) (Thomas, J., dissenting from the denial of certiorari). In both cases the touchstone for "common use" was ownership. In light of this standard, the Final Rule violates the principles established by the Supreme Court in its cases.

First, despite predicating the Final Rule on braced pistols being "unusual weapons[,]" Final Rule at 6,481, the Agencies concede they are anything but.[7] They admit "the variety of available 'stabilizing braces' or similar 'brace' devices and pistols equipped with 'braces' has grown significantly" since 2012. *Id.* at 6,479. And they do not dispute comments that there are "millions of 'braces' in use[,]" *id.* at 6,566, or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons[,]" *id.* at 6,556. Supreme Court precedent makes clear that when firearms are "in common use at the [present] time," they cannot be banned. *Heller*, 554 U.S. at 627. Thus, the entire test is largely conceded.

Second, even if the Agencies maintain, despite *Heller*, *Caetano*, and *Bruen*, that the historical work is not done here and point to other historical justifications for the Final Rule, there is no historical practice of regulating gunsmithing. To the contrary, the pre-existing right and historical practice regarding pistols and handguns long encompassed the practice of gunsmithing—the production and modification of firearms by private individuals. The act of self-manufacturing, repairing, and improving weapons at home is not novel—in fact, this tradition pre-dates our Founding and helped secure America's freedom in the Revolutionary War.[8] "Privately made

---

[7]     The Agencies do not even attempt to back up their argument they are "primarily weapons of war and have no appropriate sporting use or use for personal protection." Final Rule at 6,499 (quotation omitted). The Agencies do not list a single example of military use, and the widespread civilian use that the Agencies do acknowledge speaks to the contrary.

[8]     During the Revolutionary War, "[t]o sustain themselves against a large and well-supplied British military throughout the eight-year war, the Americans relied on gunsmiths, individuals with knowhow from working on their own arms, and Americans who were willing to learn the art of arms manufacturing." Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35, 16 (Apr. 11, 2022).

**APP.111**

firearms have been in existence since the first ignition system was developed close to 500 years ago, in the 1400s."[9]

The act of individuals self-manufacturing and repairing or improving firearms for personal, lawful uses is a tradition steeped in our natural right to self-defense.[10] And historical practice commonly included the use and modification of pistols with large grips, which had enough surface area they could theoretically be fired from the shoulder, as well as the actual addition of stocks to pistols. For example, highly angled dragoon pistols included large grips that assisted the shooter with firing by allowing the shooter to stabilize the pistol more effectively.[11] Similarly, when a gun owner wanted greater stability, pre-Founding pistols could even be equipped with shoulder stocks.[12] Stabilizing braces are analogous to their Founding Era predecessors in that they allow gun owners to modify pistols to facilitate easier and more accurate one-handed shooting. The Final Rule makes what has been an unregulated historical practice nearly impossible for those individuals with a stabilizing brace. That technology and manufacturing have evolved since the Founding does not alter the fundamental constitutional backdrop.

Third, the Final Rule's vague language threatens owners of even unbraced pistols if they possess any items that might allow the handgun to be fired from the shoulder, chilling exercise of

---

[9]    Senate Judiciary Subcommittee Hearing on Gun Violence Prevention, *Stop Gun Violence: Ghost Guns* 4 (May 11, 2021) (testimony of Ashley Hlebinsky), https://tinyurl.com/3z4anbjb.
[10]    Greenlee, *American Tradition of Self-Made Arms*, at 1 ("[T]he tradition of building arms for personal use is deeply rooted in American history, and [] there is no tradition of regulating self-built arms.")
[11]    *A Rare French & Indian War – American Revolutionary War Period British Military Pattern 1738 Heavy Dragoon Flintlock Pistol, Jordan, 1746*, TORTUGA TRADING, https://tortugatrading.com/products/copy-of-a-rare-french-and-indian-war-american-revolutionary-war-period-british-military-pattern-1738-heavy-dragoon-flintlock-pistol-tower-1738.
[12]    *Lot 3249: Silver Inlaid Kuchenreiter Flintlock Pistol with Stock Flintlock Pistol with Stock*, ROCK ISLAND AUCTION COMPANY, https://www.rockislandauction.com/detail/59/3249/silver-inlaid-kuchenreiter-flintlock-pistol-with-stock.

**APP.112**

the Second Amendment protected right to possess handguns in the home for self-defense. *Heller*, 554 U.S. at 576. This is because an individual could be charged with constructive possession of a short-barreled rifle if their handgun *could* be combined with any number of objects that the Agencies now considers to show that the pistol is designed to be fired from the shoulder, based on the Agencies' subjective, undefined criteria. *See* Final Rule at 6,574–75; *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 421 (6th Cir. 2006) (collecting cases on constructive possession of machine guns as violating the NFA). Creating and attaching a device that facilitates firing from the shoulder is so simple—requiring at most some glue, wood, and some woodworking skills—that virtually anyone can constructively possess a braced pistol. *Id.* at 422–24 (ease of creation supports constructive possession charge).[13]

Because the Final Rule regulates firearms in common use, has no support in the history and tradition of firearm ownership regulations, and because it constitutes an impermissible chilling of Plaintiffs', including Maxim Defense's customers and FPC's members' Second Amendment protected rights, the Final Rule violates the Second Amendment and, thus, the APA.

## 2.    The Final Rule Violates the First Amendment

The Final Rule also violates Plaintiffs', including Maxim Defense's customers' and FPC's members' First Amendment protected rights by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling speech.

---

[13]    This is no hypothetical—ATF has a decades-long practice of employing constructive possession arguments to short-barreled rifles and shotguns. For instance, a Florida man was charged with possession—and sale—of a short-barreled rifle for selling a pistol along with an unattached stock and vertical foregrip. *See* Joshua Prince, *Florida Man Arrested For Constructive Possession of an SBR* (Sept. 1 2009), https://blog.princelaw.com/2009/9/1/florida-man-arrested-for-constructive-possession-of-an-sbr/; Naples Daily News, *Craig's List crime: Naples man charged with trying to sell short-barreled rifle* (Aug. 29 2009), https://archive.naplesnews.com/news/crime/craigs-list-crime-naples-man-charged-with-trying-to-sell-short-barreled-rifle-ep-397076593-343746452.html/.

**APP.113**

Under the First Amendment, "Congress shall make no law . . . abridging the freedom of speech[.]" U.S. CONST. AMEND. I. Regulations that chill or compel speech, like outright prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."). The Fifth Circuit has recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Turner v. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (cleaned up). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *accord id.* at 182 (Kagan, J., concurring) ("We apply strict scrutiny to facially content-based regulations of speech, in keeping with the rationales just described, when there is any realistic possibility that official suppression of ideas is afoot." (cleaned up)). This is so even if the regulation merely chills the exercise of Free Speech rights. *In re Tam*, 808 F.3d 1321, 1339 (Fed. Cir. 2015), as corrected (Feb. 11, 2016), aff'd sub nom. *Matal v. Tam*, 137 S. Ct. 1744 (2017). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Tex. Entm't Ass'n, Inc. v. Hegar*, 10 F. 4th 495, 509 (5th Cir. 2021) (quoting *Reed*, 576 U.S. at 163).

The Final Rule chills the exercise of protected speech by threatening to reclassify pistols as rifles if the manufacturer, or another entity, speaks or publishes materials in a way that runs afoul of the Agencies' newly established, indefinite, factor test. For example, to determine whether a firearm is "designed, made, and intended to be fired from the shoulder," ATF will now evaluate

16

**APP.114**

the "manufacturer's direct and indirect marketing and promotional materials" and "[i]nformation demonstrating the likely use of the weapon in the general community." Final Rule at 6,480. But the treatment of any statements is left entirely to the discretion of the Agencies, without any knowable or predictable limitation. If the marketing material indicates a pistol has a "large grip for easy handling," will that be enough to infer illegal potential for shoulder firing? What about a "stable brace with secure and comfortable attachment points"? It matters not that those statements each have an innocuous and perfectly lawful interpretation if the Agencies 'decide' to balance the factors otherwise. Worse, the Agencies have empowered themselves to make the same determination if an unrelated and unknown third party makes statements that could also be construed to indicate an item *could* facilitate shoulder firing. Such uncertainty will force manufacturers, and the public writ large, to be doubly cautious with anything they say about protected arms, and even avoid speaking altogether, lest the Agencies come after them based on the content of their speech having somehow converted a lawful handgun into a short-barreled rifle.

Because the Final Rule considers certain types of speech of manufacturers and third parties when deciding whether a particular object is a now-regulated brace, it chills speech based on content and is subject to strict scrutiny, which it fails. There is no compelling interest at stake— the Agencies have permitted stabilizing braces and braced pistols for over a decade and have shown no overwhelming need to regulate them now.[14] And the Final Rule is far from the least restrictive means of addressing any concerns the Agencies might have—indeed, the Proposed

---

[14]   The Agencies justified this expanded regulation by noting braced pistols were used in two specific crimes along with a vague statement that ATF "traced numerous firearms equipped with a 'stabilizing brace' in connection with crimes in recent years[.]" Final Rule at 6,508. But identifying some small number of crimes where braced pistols were used, when millions of braced pistols are in circulation, does not support the Agencies' assertions that braced pistols pose "a greater risk to public safety as 'gangster-type' weapons of an especially unusual and dangerous nature." *Id.* at 6,566.

**APP.115**

Rule's Worksheet 4999 was more narrowly tailored. But more obviously, the Agencies could have avoided speech concerns altogether by removing the speech component of the multifactor test, relying instead on objective physical aspects of a firearm or brace. That manufacturers and purchasers will instead be subject to the vagaries of the Agencies' interpretation of marketing statements, some of which many purchasers may not even have seen or heard, confirms that the Final Rule will chill far more speech than necessary to address any supposed government interests.

Nor can the Final Rule be saved if the Government argues that it did not mean to chill speech when it passed the Final Rule. "A regulatory scheme that requires the government to 'examine the content of the message that is conveyed' is content-based regardless of its motivating purpose." *Serv. Emps. Int'l Union, Local 5 v. City of Hous.*, 595 F.3d 588, 596 (5th Cir. 2010) (quoting *Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 230 (1987)).

The government is also prohibited from regulating speech "based on the identity of the speaker." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the state has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Family and Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up); *Citizens United*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others."). As the Supreme Court has consistently explained, "the First Amendment stands against attempts to disfavor" not only certain "viewpoints," but also certain "subjects." *Citizens United*, 558 U.S. at 340; *accord Heller v. City of El Paso*, 861 Fed. Appx. 836, 839 (5th Cir. 2021). The Final Rule decrees that "manufacturers' direct and indirect marketing and promotional materials" will be considered in some unknowable way. Final Rule at 6,511. It could also feasibly include any speech on other manufacturers' products—perhaps the comparison helps the manufacturer market its own.

**APP.116**

And it could include speech on braces in the abstract. Thus, the Final Rule discourages any speech whatsoever by manufacturers, lest it lead to the Agencies suddenly declaring their products to be short-barreled rifles and their customers to be felons. By targeting the speech of manufacturers in its attempt to regulate stabilizing bracers, ATF thus violates this prohibition too.

Because the Final Rule is both a content- and speaker-based restriction on speech that cannot pass strict scrutiny, it violates the First Amendment, and, thus, the APA.

### 3.    The Final Rule is Void for Vagueness

The many questions related to enforcement above also acutely demonstrate that the Final Rule is unconstitutionally vague in violation of the Due Process Clause. U.S. CONST. AMEND. V.

The void for vagueness doctrine is grounded in principles of fair notice. "A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application." *Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980). The "doctrine prohibiting the enforcement of vague laws rests on the twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). A law must provide "'fair notice' of the conduct a statute proscribes" to "guard[] against arbitrary or discriminatory law enforcement[.]"*Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Clarity is even more necessary when a law bears criminal consequences. *See Davis*, 139 S. Ct. at 2323 ("Only the people's elected representatives in Congress have the power to write new federal criminal laws*.")*; *cf. Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982) ("The [Supreme] Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). And that already heightened clarity requirement is further heightened when

**APP.117**

interpreting laws that "threaten[] to inhibit the exercise of constitutionally protected rights." *Vill. of Hoffman Estates*, 455 U.S. at 499; *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974).

The Final Rule provides no meaningful clarity on what constitutes a stabilizing brace or what other items may convert a pistol into a rifle under the Final Rule's discretion-laden and unconstitutionally vague factor test. Instead, the newly adopted undefinable factor test incorporates both "objective design features" and "other factors," the latter of which are inherently subjective. Final Rule at 6,500. Worse, included in the "other factors" are actions by third parties not necessarily knowable to the end user, such as the "manufacturer's direct and indirect marketing and promotional materials." *Id.* at 6,480. At least the manufacturers' statements could be tracked, but worse yet, the Final Rule also considers "[i]nformation demonstrating the likely use of the weapon in the general community[,]" thus criminalizing gun owners based on actions of a mass of unknown, unaffiliated, and uncontrollable third parties. *Id.*

But even the "objective" factors provide no useful guidance. For instance, "[w]hether the weapon has a weight or length consistent with the weight or length of similarly designed rifles" would favor treating numerous unbraced pistols as rifles. *Id.* A common Kalashnikov pistol, the Draco, has a standard barrel length of 10.5" and weighs about 6.3 pounds, while a common Kalashnikov rifle, the AKS-74, has a standard barrel length of around 16.3" and weighs about 6.5 pounds.[15] The Final Rule says nothing about how the Agencies will reconcile the fact that, while the weight of these two firearms is similar, the length is significantly different. Which is more important? Do they cancel each other out? Likewise, "[w]hether the weapon has a length of pull, . . . consistent with similarly designed rifles" is uselessly vague as it fails to address when the

---

[15]    https://www.rkguns.com/century-arms-draco-7-62x39mm-semi-automatic-30rd-10-5-pistol-hg4257-n.html  (last visited Feb. 21, 2023); https://modernfirearms.net/en/assault-rifles/russia-assault-rifles/ak-74-ak74m-eng/  (last visited Feb. 21, 2023).

**APP.118**

Agencies would consider a rifle "similarly designed." Final Rule at 6,480. For an AR pistol, would "similarly designed" rifles be all rifles of the same caliber or just other full-length AR-style rifles? The Agencies give no answer and instead include a useless table of measurements of a variety of rifles, *id.* at 6,514–18, that the Agencies admit "are not themselves determinative," *id.* at 6,518.

"Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed" is perhaps the worst factor, *id.*, as it means every time the owner changes the sights or scope on their firearm, they might be unwittingly manufacturing a short-barreled rifle. And it makes ATF guidance useless, as even if a given brace with a given pistol was ruled to be a pistol, this could be changed by any variation in sights. This unduly vague standard fails to provide clarity to either manufacturers or to firearm owners attempting to lawfully exercise their Second Amendment protected rights.

As mentioned, the void-for-vagueness test is particularly stringent where the vagueness can chill the exercise of constitutionally protected rights, such as rights under the First and Second Amendments. As discussed above, the Final Rule does just that. Moreover, its already vague provisions are made even more confusing given the possibility that the Agencies will consider gun owners to be in "constructive possession" of a short-barreled rifle by owning a handgun and anything that *could* be pressed against a shoulder when firing. Couple the possibility of constructive possession with other unknowable criteria, and the Agencies have a perfect recipe for selective enforcement of a regulation whose violation could result in upwards of ten years in prison. 26 U.S.C. § 5871 (violation of the NFA); 18 U.S.C. § 924(a)(1)(D) (violation of the GCA). Further, the Agencies could target and arrest any manufacturer of braces or pistols at will, given the subjective nature of the individual factors and how they are subjectively balanced. Not even clearing a design with ATF before manufacturing it would save them; the Agencies could always

**APP.119**

claim that even if the design had not changed, the "indirect marketing or promotional materials" had—magically—created a short-barreled rifle. And these myriad vagueness concerns are amplified further by the fact that regulated parties stand to lose their FFLs—and their entire businesses—if they misunderstand, and thus fail to comply with the Final Rule's requirements. And even owners of explicitly approved pistol-and-brace combinations would always need to fear that some new marketing material or information "in the general community" had transformed it into a short-barreled rifle. That fear then further harms brace manufacturers by chilling sales.

Even in a normal case, then, the Final Rule is vague. But it is particularly troublesome here because it imposes criminal penalties and chills the exercise of constitutionally protected rights.

## B.    The Final Rule Violates the Constitution's Structural Protections

Beyond violating the constitutionally protected rights of gun owners, manufacturers, and retailers alike, the Final Rule also violates the Constitution's structural protections.

The power to craft legislation and create law rests solely with Congress. *See* U.S. CONST. Art. I, § 1. On the other hand, the President, and by extension the Executive Branch agencies under his purview, "shall take Care that the Laws be faithfully executed." U.S. CONST. Art. I, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996).

The Supreme Court has repeatedly "reaffirm[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Reg. Grp. v. EPA*, 573 U.S. 302, 328 (2014). As the Fifth Circuit has explained,

**APP.120**

this limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011). If agencies are given authority to create legislative rules, that authority requires "a *clear delegation*" from Congress. *West Virginia v. EPA*, 142 S. Ct. 2587, 2616 (2022) (emphasis added).

The clear-delegation rule refutes the idea that agencies can answer questions "left unresolved" in a statute, "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv. Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Indeed, it forbids courts from "presume[ing] that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with Chevron and quite likely with the Constitution as well." *Contender Farms, L.L.P. v U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020), as revised (Aug. 4, 2020).

Applying those principles here, the Final Rule is an unreasonable construction of statutory terms and a clear example of the Agencies unlawfully creating law. Indeed, through the Final Rule, the Agencies rewrote the definition of rifle to include firearms neither designed nor intended to be fired from the shoulder. And they did so without any delegated authority to so broadly re-define what constitutes a rifle that it encompasses NFA-exempted pistols and handguns.

Starting with the statutory text, the law defines a "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). This incorporates the statutory definition of "rifle,"

**APP.121**

which is "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder . . ." 18 U.S.C. § 921(a)(7). In contrast, a "handgun" is "a firearm which has a short stock and is designed to be held and fired by the use of a single hand[.]" 18 U.S.C. § 921(a)(30)(A). This is not the sort of ambiguous language that would indicate "Congress has delegated policy-making responsibilities" to the Agencies. *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1984). And the Final Rule's new factor analysis is not only detached from the ultimate question of whether the weapon is designed to be fired from the shoulder or from a hand, it actively ignores it. For example, although one identified factor is "weight . . . consistent with the weight . . . of similarly designed rifles," Final Rule at 6,480; weight may be similar for a large caliber handgun as for a similar caliber rifle and is irrelevant to the question of shoulder-firing in any event.[16] The factors in the Final Rule thus are unrelated to the statute's language.

As if the departure from the statute were not enough, the Final Rule is also constitutionally infirm because it carries the possibility of criminal penalties. As the Fifth Circuit has recognized, "the question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (*en banc*). And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of

---

[16]    For example, the Magnum Research BFR revolver in .30-30 Winchester weighs 5.5 pounds when loaded. *See* Bill Battles, *Magnum Research BFR .30-30 Win. Bisley Revolver*, ON-TARGET MAGAZINE (Nov. 2017), https://www.ontargetmagazine.com/2017/11/magnum-research-bfr-30-30-win-bisley-revolver/3/ (last visited Feb. 21, 2023).

**APP.122**

"pistol or revolver" even if this Court were to conclude that the statutory definition of a "firearm" or a "rifle" were ambiguous enough to include a braced pistol. *Cargill*, 57 F.4th at 469–71.

In short, the Final Rule creates new law, gives the Agencies new power over new items not regulated by statute, and carries the possibility of criminal sanctions. For these reasons, it exceeds executive authority and violates the Delegation Doctrine and the Take Care Clause.

## C.    The Final Rule Violates Multiple Provisions of the APA

### 1.    The Final Rule Exceeds the Agencies' Statutory Jurisdiction and Authority

The Final Rule exceeds the Agencies' statutory authority because the definitions of "rifle," "handgun," and similar terms in the NFA and GCA are clear enough that authority to interpret them was not delegated to the Agencies, and even if it were, the definitions used in the Final Rule are incompatible with those used in the statutes.

Under 5 U.S.C. § 706(2)(c), "[t]he reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right[.]" If an agency's regulation is "inconsistent with the [statute's] plain language," the agency exceeds its authority, *Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992), which "is necessarily derived from the statute . . . and may not be exercised in a manner that is inconsistent with the administrative structure that Congress has enacted," *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 489 (5th Cir. 2014).

Like any statute, a statute authorizing regulations is to be interpreted with the "traditional tools of construction," which include "text, structure, history, and purpose." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019); *accord United States v. Bittner*, 19 F.4th 734, 749 (5th Cir. 2021). The traditional tools do not include *Chevron* deference here, because the Fifth Circuit does not apply *Chevron* to interpretations of statutes carrying criminal penalties. *Cargill*, 57 F.4th at 466–67.

**APP.123**

"When interpreting a statute, we begin with the text." *Bittner*, 19 F.4th at 743; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). ("[I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."); *Cargill,* 57 F.4th at 460–61 (a statute should be interpreted according to "the plain language" with the aid of "grammar" and "context [which] is a primary determinant of meaning.") (cleaned up). Turning to the text, the GCA defines a "rifle" as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire only a single projectile through a rifled bore for each single pull of the trigger." 18 U.S.C. § 921(a)(7). The NFA includes a nearly identical definition. 26 U.S.C. § 5845(c). And the GCA defines "short-barreled rifle" as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). The NFA includes a nearly identical provision in its definition of "firearm." 26 U.S.C. §§ 5845(a)(3)–(4). Finally, the GCA defines "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30). The NFA does not have a similar definition, and specifically exempts "a pistol or a revolver having a rifled bore" from its coverage. 26 U.S.C. § 5845(e). Under plain meaning, a "pistol or revolver" thus cannot be a "rifle."

The Agencies are granted the limited authority to regulate short-barreled rifles more stringently than pistols. Short-barreled rifles, as a specific, congressionally defined category of firearms, are subject to the heightened requirements imposed by the NFA; pistols, including those

**APP.124**

with stabilizing braces, are not. But the Final Rule "amends the definition of 'rifle' under 27 CFR 478.11 and 479.11" to include "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that *allows* the weapon to be fired from the shoulder, provided other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480 (emphasis added). But these six factors, either individually or in their uncertain and arbitrary combination, do not actually "indicate" that a particular firearm is "designed, made, and intended to be fired from the shoulder."

Black's Law Dictionary defines "design" as "[a] plan or scheme [or a] [p]urpose or intention combined with a plan." BLACK'S LAW DICTIONARY 560 (Bryan A. Garner ed., 11th ed. 2019). It defines "intend" as "[t]o have in mind a fixed purpose to reach a desired objective; to have as one's purpose[.]" *Id.* at 964. Merriam-Webster's Dictionary defines "designed" as "to create, fashion, execute, or construct according to plan," "to conceive and plan out in the mind," "to have as a purpose," and "to devise for a specific function or end." *Design*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/design (last visited Feb. 21, 2023). It defined "intended" as "expected to be such in the future." *Intended*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/intended (last visited Feb. 21, 2023).

And these definitions are nothing new. An 1828 version of Webster's Dictionary defined "design," in relevant part as "[t]o plan; to form an outline or representation of any thing[,]" and "[t]o purpose or intend[.]" 1 NOAH WEBSTER, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated). It also defined "intend" as "[t]o mean; to design; to purpose, that is, to stretch or to set forward in mind." *Id*.

27

**APP.125**

The plain meaning of the NFA and GCA do not encompass subjective statements from a manufacturer or unknown third parties, nor do they include discretionary, undefined factors to assess the *possible* function of a firearm. The NFA and GCA do not allow for the regulation of a firearm that *can* or *may be* fired from the shoulder, or even one that *actually is* fired from the shoulder *unless* that firearm was designed and intended to be fired from the shoulder. This is not a narrow reading of the statutes—it is a plain reading of the statutes' text.

Instead, the Agencies ignore design and intent—in other words, the plain text of the NFA and GCA—in favor of subjective and undefined criteria that the Agencies' may consider and give unspecified weight to, thus potentially classifying any number of pistols as if they were rifles, often without notice to the owners or manufacturers. Among these six factors are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." Final Rule at 6,480.

As discussed above in relation to the separation of powers, none of this can overcome the plain meaning of the text, which differentiates "pistols or revolvers" from "rifles." Here, the Agencies exceed their authority by regulatorily treating pistols as if they were rifles, despite the fact that braced pistols do not meet the statutory definition of a rifle established by Congress. The Final Rule purports to establish a regulation to "guide" the Agencies' administration of the NFA and GCA, but instead regulates new items Congress explicitly left out of any reasonable definition of rifle and would grant the Agencies new, additional authority in excess of that proposed, considered, debated, or passed by Congress. The Agencies are attempting to regulate firearms and

**APP.126**

firearm parts that Congress explicitly left out of the statute and impose felony charges for violations. *See* 18 U.S.C. § 924(a)(1)(D) ("[W]hoever . . . willfully violates any other provision of this chapter, shall be fined under this title, imprisoned not more than five years, or both."). The Final Rule thus exceeds the Agencies' congressionally established jurisdiction and authority.

### 2.     The Final Rule was not a Logical Outgrowth of the Proposed Rule

Because the Final Rule differed from the Proposed Rule in a significant way that was unpredictable from the Proposed Rule and public comments, the Agencies promulgated the Final Rule, without providing it for additional public comment, in violation of the APA.

The APA provides that, whenever an agency plans to promulgate, amend, or repeal a regulation, it must first issue a "notice of proposed rule making … in the Federal Register"—which must include, among other information, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed. The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007)(cleaned up). An agency's "notice [of proposed rulemaking] must adequately frame the subjects for discussion such that [an] affected party should have anticipated the agency's final course," *Huawei Techs. USA, Inc., v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up); and reasonably could "have filed [its] comments on the subject during the notice-and-comment period[,]" *Ne. Md. Waste Disposal Auth. v. EPA*, 358 F.3d 936, 952 (D.C. Cir. 2004). In this case, given the substantial discrepancy between the Agencies' Proposed Rule and their Final Rule, the public (including Plaintiffs) were denied the chance to comment on the substance of the latter.

The centerpiece of the Agencies' Proposed Rule was Worksheet 4999, which would have allocated points to firearms with certain objective characteristics. *See* Exhibit 1 to Plaintiff's Petition for Judicial Review, ECF No. 1-1. The Proposed Rule explained that "Worksheet 4999 is

**APP.127**

*necessary to enforce the law consistently* considering the diversity of firearm designs and configuration" because "will provide the public and the firearms industry with a detailed methodology for ensuring legal compliance." Final Rule at 30,826–01, 30,829 (emphasis added).

The Final Rule, by contrast, completely scraps "Worksheet 4999 and its point system." Final Rule at 6,480. Instead, the Final Rule "amends the definition of 'rifle' under 27 C.F.R. §§ 478.11" and 479.11 as "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided the other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." Final Rule at 6,480, 6,574–75. Among these six "other factors" are such subjective criteria as "whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles," "whether the weapon has a length of pull . . . that is consistent with similarly designed rifles," "the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon," and "information demonstrating the likely use of the weapon in the general community." *Id.* Nothing in the Final Rule or the Agencies' accompanying explanation thereof makes clear how these various factors are weighed, or how many factors need to be met to qualify as a "rifle."

In announcing the Final Rule, the Agencies remarked that, among the comments received on the Proposed Rule, "[t]here was general dissatisfaction with the proposed Worksheet 4999." *Id.* at 6,510. The Agencies "agree[d] with commenters that the factoring criteria with a point system as proposed in the Worksheet 4999 were not easily understood or applied," and "that some of the terms from the . . . worksheet were ambiguous and subject to interpretation." *Id.* at 6,513. The Agencies "concluded the proposed Worksheet 4999 [wa]s unworkable" and instead adopted the six-factor test. *Id.*

**APP.128**

The Agencies' abandonment of the Worksheet in favor of a "balancing" test violates the APA's requirement that notice be given of a proposed regulation's substance so that the public may comment on the proposal. An agency's "notice [of proposed rulemaking] must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice," *Huawei Techs.*, 2 F.4th at 447 (cleaned up), "and thus reasonably should have filed [its] comments on the subject during the notice-and-comment period." *Ne. Md. Waste Disposal Auth.*, 358 F.3d at 952 (quotation omitted). Here, nothing in the Proposed Rule or the Agencies' accompanying explanation "gave [any] indication that [the agency] was contemplating a potential change" as drastic as scrapping the entire point-based Worksheet regime that formed the centerpiece of the Proposed Rule. On the contrary, the Proposed Rule explained that "[t]he ATF Worksheet 4999 is *necessary to enforce the law consistently*, considering the diversity of firearm designs and configurations.'" Proposed Rule at 30,826–01, 30,829 (emphasis added). Having read such language, commenters could not have reasonably foreseen that the Final Rule would cast aside the Worksheet that the Agencies had deemed "necessary" in favor of a balancing-type test based on six factors that, if anything, seem *more* subjective than those of the Worksheet.

It may be true, as the Agencies' explanation accompanying the Final Rule states, that commenters criticized various aspects of the Proposed Rule's Worksheet. But "[a]n agency . . . does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985). Moreover, in the section of the Proposed Rule entitled, "Comments Sought," the Agencies gave no hint that it might abandon the Worksheet and never even used the word "worksheet." The closest this section came to addressing the issue was

in asking for comments on whether "ATF [had] selected the most appropriate criteria for determining whether a stabilizing brace has made a firearm subject to the NFA," and whether "commenters ha[d] additional criteria that should be considered." Proposed Rule at 30,826–01, 30,850. But whether the Worksheet model should be scrapped altogether is an entirely different issue. "Agency notice must describe the range of alternatives being considered with reasonable specificity." *Small Refiner Lead v. EPA*, 705 F.2d 500, 549 (1983).

Even if the Final Rule had "not amount[ed] to a complete turnaround" from the Proposed Rule, it was still inadequate because it did not "indicate[] that [the Agencies were] contemplating [the] particular change[.]" *See CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081–82 (D.C. Cir. 2009); *see also Ass'n of Priv. Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 462 (D.C. Cir. 2012). Realistically, there was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *See CSX Transp.*, 584 F.3d at 1082 (cleaned up).

The Worksheet was not the only major and unpredictable difference. Further highlighting the substantial differences between the Proposed Rule and the Final Rule is the fact that, in issuing the latter, the Agencies more than doubled the estimate they had reported in the Proposed Rule of the Rule's economic impact on affected societal groups—namely, the manufacturers, dealers, and owners of firearms (such as Plaintiffs in this case). The Proposed Rule estimated the cost of the Rule over a ten-year period at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate, *see* Proposed Rule at 30,826–01, 30,845 Tbl. 2; the explanation of the Final Rule, by contrast, put the corresponding figures at $242.4 million and $263.6 million, respectively, *see* Final Rule at 6,573 Tbl. 2. Such a substantial change in the "estimated financial impact of [an

**APP.130**

agency's] proposal … supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

Due to the substantial discrepancy between the Proposed Rule and the Final Rule, the public was denied the chance to comment on the Final Rule's substance and thus the Final Rule violated the APA.

### D.    Alternatively, if the Final Rule is Upheld, then the Agencies' Regulation of Commonly owned Braced Pistols or Short-Barreled Rifles under the National Firearms Act violates the Second Amendment

If this Court determines it is likely that the Final Rule will stand, then Plaintiffs are likely to win on their claim that the Final Rule and the NFA are thus unconstitutional given they regulate commonly owned and possessed—and constitutionally protected—braced pistols or short-barreled rifles[17] more stringently than allowed for based on the text and history of the Second Amendment.

In interpreting "Arms," the Supreme Court explained that "[j]ust as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to *all instruments that constitute bearable arms*." *Heller*, 554 U.S. at 582 (citations omitted); *see also Bruen*, 142 S. Ct. at 2132. The Second Amendment's text unquestionably extends to braced pistols or short-barreled rifles.

Moreover, as noted above, the required historical work has already been done here. *See* Argument, Section I(A)(1). In *Heller*, the Supreme Court held that the Second Amendment protected the right to "keep and bear" "those [Arms] 'in common use at the time.'" *Heller*, 554 U.S. at 627. "That limitation is fairly supported by the historical tradition of prohibiting the

---

[17]    Plaintiffs maintain that the firearms at issue under the Final Rule are pistols with stabilizing braces and not short-barreled rifles. If, however, the Final Rule stands, then the Agencies will retroactively and prospectively treat most, if not all, pistols with stabilizing braces as if they are and always were "short-barreled rifles." Thus, for the purposes of this count, Plaintiffs refer to the items at issue as "braced pistols or short-barreled rifles."

**APP.131**

carrying of 'dangerous and unusual weapons.'" *Id*. This Court's task is therefore a simple one: it must merely determine whether these weapons are "dangerous and unusual." "[T]his is a conjunctive test: A weapon may not be banned unless it is *both* dangerous *and* unusual." *Caetano*, 577 U.S. at 417 (Alito, J., concurring). A firearm that is in common use for lawful purposes, by definition, does not fall within this category and cannot be regulated outside of the historical scope of regulation allowable under the Second Amendment. *Bruen*, 142 S. Ct. at 2143.

There can be no question that braced pistols or short-barreled rifles are in common use, and thus not both "dangerous *and* unusual." As of 2012, "[h]undreds of thousands of Tasers and stun guns ha[d] been sold to private citizens" who "may lawfully possess them in 45 States." *Caetano*, 577 U.S. at 420 (Alito, J., concurring) (quoting *People v. Yanna*, 824 N.W.2d 241, 245 (Mich. Ct. App. 2012)). Those hundreds of thousands of stun guns were deemed to constitute "in common use" in *Caetano*. Here, according to the ATF's own report, there were 532,725 registered short-barreled rifles possessed throughout the country as of May 2021. *Firearms Commerce in the United States – Annual Statistical Update 2021*, ATF, 15–17 Ex. 8.[18] Due to high consumer demand for short-barreled rifles and more efficient electronic application forms, there are likely more than that registered today. Moreover, if the Agencies are correct and braced pistols are actually short-barreled rifles, then, based on the Agencies' own estimate, there are at least 3 million more short-barreled rifles that are owned by law-abiding individuals for lawful purposes. *See* Final Rule at 6,560. Just as hundreds of thousands of stun guns constitute "in common use" in *Caetano*, millions of braced pistols or short-barreled rifles should be considered to constitute "in common use" here. Notably, the Agencies do not dispute comments that there are "millions of 'braces' in

---

[18]    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report.

**APP.132**

use[,]" Final Rule at 6,566, or that braced pistols are "commonly used by millions of law-abiding Americans for various reasons[,]" Final Rule at 6,556.

Even if the Agencies argue that historical work is not done here, despite *Heller*, *Caetano*, and *Bruen*, the burden is still on the Agencies to demonstrate that their laws and regulations are sufficiently analogous to an allowable historical regulation of Arms at the time of the ratification of the Second Amendment. *See Bruen*, 142 S. Ct. at 2130. But here, the Agencies cannot. The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of common, constitutionally protected Arms. Indeed, the ATF concedes that was the purpose of the NFA: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[19] And yet, the government "may not impose a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943). But that is exactly what the NFA does. The NFA fee operates as a charge for the privilege of exercising a fundamental right. As such, the NFA is unconstitutional for this reason alone. Additionally, the Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission to take possession of the firearms at issue. By imposing and enforcing the NFA's costs and delays on the acquisition and lawful use of common firearms, and by imposing and enforcing the NFA's restrictions on possession, travel with, and use of regulated arms by law-abiding individuals, the Agencies violate Plaintiffs' rights including Maxim Defense's customers and FPC's members.

---

[19]     *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Feb. 21, 2023).

**APP.133**

And importantly, the Agencies cannot point to a single historical analogue that allows them to impose these NFA requirements, including an additional background check, registration, fingerprinting, a tax, travel restrictions, storage restrictions, or any of the NFA's other heightened requirements on the acquisition and possession of commonly owned firearms. Absent any such historical antecedent, the Agencies' enforcement of the NFA with respect to commonly owned, constitutionally protected braced pistols or short-barreled rifles violates the Second Amendment.

## II.  PLAINTIFFS WILL SUFFER IRREPARABLE INJURY IF PRELIMINARY RELIEF IS NOT GRANTED

Plaintiffs will suffer irreparable harm if the Final Rule is not enjoined or delayed. "[H]arm is irreparable" "where there is no adequate remedy at law, such as . . . damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). For starters, the impairment of constitutional freedoms like those addressed above, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 374–75 (1976) (citation omitted). But the harm may also be financial—like the burdens that the Final Rule will impose on Plaintiffs Mock, Lewis, and Maxim Defense—or it may take the form of the loss of freedom resulting from a choice between compliance with an unlawful mandate and incurring stiff penalties—the sort of "choice" that the Final Rule would force upon Plaintiffs Mock, Lewis, and FPC's members. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021); *Siemens USA Holdings Inc v. Geisenberger*, 17 F.4th 393, 410 n.22 (3d Cir. 2021); *VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *5 (N.D. Tex. Oct. 1, 2022) ("A showing of irreparable harm" may be based on "deprivations of constitutional or procedural rights," an agency's "action in excess of statutory authority," or "APA violations[.]"). "Indeed, 'complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs,'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1992) (Scalia, J.,

**APP.134**

concurring in part)), since "federal agencies" such as DOJ and ATF "generally enjoy sovereign immunity for any . . . damages," *Wages and White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). In sum, Plaintiffs' "lack of a 'guarantee of eventual recovery'" for the threated harms described earlier make those "harm[s] . . . irreparable." *Id.* (quoting *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 141 S. Ct. 2485, 2489 (2021)).

The Final Rule directly, severely, and irreparably impacts Plaintiff  Maxim Defense's business, which consists in substantial part of selling items targeted by the Final Rule. Dahl Decl. ¶¶ 6–7, 11. Maxim Defense's stabilizing braces are designed, manufactured, and intended to allow individuals to fire large and heavy pistols better and more safely by stabilizing the pistol on the operator's forearm. Dahl Decl. ¶ 6. Maxim Defense is the second largest stabilizing brace manufacturer in the United States. Dahl Decl. ¶ 7. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales, and braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales. Dahl Decl. ¶ 6. Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those that are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms. Dahl Decl. ¶ 7. Should nothing change, Maxim Defense will lose the ability to operate as a business and be stripped of the goodwill that it has developed over the course of the last decade as a manufacturer of stabilizing braces and braced pistols. Dahl Decl. ¶ 11.

Due to the Final Rule, Maxim Defense has already seen a huge decline in sales. Dahl Decl. ¶¶ 10–13. Absent an injunction, Maxim Defense anticipates that it could lose more than $6 million in sales after one month and will continue to lose millions of dollars over the next few months. Dahl Decl. ¶ 12. These harms are far from speculative—Maxim Defense has pending orders for

**APP.135**

hundreds of thousands of dollars' worth of product it can no longer transfer to buyers because of the Final Rule. Dahl Decl. ¶ 13. It also has manufacturing orders for thousands of braces that are being canceled because of the Final Rule and more than $1 million of materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purposes. Dahl Decl. ¶ 13. As Maxim Defense loses revenue from its inability to sell its braced pistol, it will also lose the ability to continue to employ as much as 50% of its current staff. Dahl Decl. ¶ 14. It has already parted ways with three full-time and one part-time employees because of the loss of revenue from the impact of the Final Rule. Dahl Decl. ¶ 14. Maxim Defense anticipates more layoffs will have to occur within 30 days if it does not receive relief from the Final Rule. Dahl Decl. ¶ 14.

Similarly, Plaintiffs Mock and Lewis currently lawfully possess firearms that will likely subject them either to potential criminal liability or to costly and burdensome requirements under the Final Rule. *See* Mock Decl. ¶¶ 5–11; Lewis Decl. ¶¶ 5–10.[20] If the Final Rule is not enjoined, they will be required to subject themselves to NFA *registration* requirements including purchasing and submitting passport photos and fingerprints, which costs are unrecoverable, and will be required to disclose sensitive personal information. *See* Mock Decl. ¶¶ 6–9; Lewis Decl. ¶ 5–8. Once registered, their constitutionally protected firearms will be forever included on a national registry—without any legal mechanism allowing them to unregister their firearms. Further, they will be subjected to numerous delays imposed by the Agencies that will, among other things, burden their ability to travel interstate with their constitutionally protected firearm and leave them in a state of limbo—having given evidence to the Agencies of possession of what the Agencies classify as a short-barreled rifle but without the legally required NFA Tax Stamp. *See* Mock Decl.

---

[20]    Paradoxically, among the burdens that come from compliance are the need to submit a background check for property they already own and passed a background check to purchase. *See* Mock Decl. ¶ 7; Lewis Decl. ¶ 6.

**APP.136**

¶ 6–9; Lewis Decl. ¶ 5–8. And, for the first time, they will be exposed to greater criminal liability for even an accidental violation of federal firearm laws because of the impact of the NFA. *See* Mock Decl. ¶ 7–9; Lewis Decl. ¶ 6–8. Faced with these regulatory requirements and the possibility of criminal liability, they and others will simply avoid engaging in constitutionally protected activities such as keeping braced pistols they purchased in reliance of the Agencies' prior interpretations or even purchasing a new braced pistol, both activities which implicate the Second Amendment's protection on the right to keep and bear arms for self-defense in the home.[21]

Plaintiff FPC's members will sustain irreparable injury in the absence of preliminary relief as well, since many of its members (including Mock and Lewis) lawfully possess firearms that will likely subject them either to potential criminal liability or to costly burdensome requirements under the Final Rule and many of its corporate members (including Maxim Defense) will be negatively impacted in their inability to continue what have been lawful business practices for the past decade. *See* Combs Decl. ¶ 3–10; *N. Carolina State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 311 n.9 (4th Cir. 2020).

## III. PLAINTIFFS' INJURY OUTWEIGHS ANY HARM TO DEFENDANTS OR THE PUBLIC—AND AN INJUNCTION WOULD LIKELY BENEFIT THE PUBLIC

Finally, the injury Plaintiffs and other gun owners and manufacturers would face if they were subject to the law outweighs any harm to the Agencies or the general public.

The factors of "harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both the actual infringement on constitutionally protected rights and a chilling effect on their exercise

---

[21]    Moreover, as discussed in detail above, due to the vague nature of the Final Rule discussed above, neither Individual Plaintiffs nor FPC's members can know exactly how to comply with the Final Rule by the current effective date.

**APP.137**

constitute "extraordinary harm." *Ashcroft v. Am. C.L. Union*, 542 U.S. 656, 670–71 (2004). Moreover, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997).

Here, Plaintiffs face "extraordinary harm" in the form of violations of, and a chilling effect on, the exercise of their rights as protected by the First, Second, and Fifth Amendments. Thus, Individual Plaintiffs, Maxim Defense's customers, and FPC's members all have a strong interest that justifies granting an injunction.

In addition, as fully demonstrated above, manufacturers and retailers, such as Plaintiff Maxim Defense will continue to be seriously harmed by the Final Rule not only because they are a regulated entity, but also because of the harms the Final Rule imposes on their customers, similar to those of Individual Plaintiffs. The market for braced pistols and pistol braces will not simply shift into compliance—the industry will more likely die. The purpose of braced pistols and stabilizing braces is to provide stabilization for heavy or long pistols, not to acquire a short-barreled rifles subject to the NFA.

Plaintiffs' interests further weigh in favor of an injunction because their interests merge with those of the public. *Nken*, 556 U.S. at 435. And the public, given its strong interest in ensuring government agencies follow the law, has an interest in an injunction. *N. Mariana Islands*, 686 F. Supp. 2d at 21; *Jacksonville Port Auth. v. Adams*, 556 F.2d at 58–59. Furthermore, the "constitutional interests implicated and the short timeframe in which to challenge the restrictions mean there is a strong public interest in this precedent" that would accompany the order. *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 14 F.4th 322, 327 (4th Cir. 2021) (subsequent history omitted). In such circumstances, the public benefits from a chance to have this

**APP.138**

Court address the issue on the merits, because "[j]udicial precedents are . . . valuable to the legal community as a whole." *Id.* at 327 (quoting *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 25-26 (1994)); *see also SD Voice v. Noem,* 987 F.3d 1186, 1190-91 (8th Cir. 2021) (reasoning that protection of constitutional rights serves public interest).

The Agencies, on the other hand, will not suffer significant harm by maintenance of the decade-long status quo regarding what constitutes a "rifle" while this Court considers the merits of the Final Rule. The Agencies have not identified any substantial harm, much less "extraordinary harm," that would result from an injunction. Indeed, the Final Rule itself contains a delay in enforcement. Final Rule at 6,553 ("The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties."). Granting a preliminary injunction during the pendency of this litigation serves the public interest by allowing the Court to provide clarity on the validity of the Final Rule while "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008).

## IV.    THE COURT SHOULD ENTIRELY ENJOIN ENFORCEMENT OF THE FINAL RULE OR, IN THE ALTERNATIVE, POSTPONE ITS EFFECTIVE DATE

The APA empowers this Court to "issue *all necessary and appropriate process* to *postpone the effective date of an agency action* or *to preserve status or rights* pending conclusion of the review proceedings[,]" 5 U.S.C. § 705 (emphases added); and to "hold unlawful and set aside agency action, findings, and conclusions[.]" 5 U.S.C. § 706. The plain language of these sections indicates the APA empowers a court to enter relief against the unlawful agency action itself. The purpose of section 705 is not just to preserve the rights of the parties before the court, but to "preserve status *or* rights," and it empowers a court to "postpone the effective date of an agency

**APP.139**

action," both of which apply to the full breadth of an agency action. *Id.* And if this Court has the final authority to set aside a rule completely, which it does pursuant to section 706, it follows that this Court has the authority to preliminarily enjoin a rule to the same extent. *See* Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1126 (2020).

In APA cases, "'the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.'" *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 533–34 (E.D. Tex. 2016) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)). "Where a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate." *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 16-cv-00066, 2016 WL 3766121, at *46 (N.D. Tex. June 27, 2016) (citation omitted); *see Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695 (N.D. Tex. 2016) ("A nationwide injunction is appropriate when a party brings a facial challenge to an agency action under the APA.").

In *Nevada v. United States Department of Labor*, for example, the Eastern District of Texas reviewed a final rule issued by the Department of Labor that sought to "modernize and streamline the existing overtime regulations for executive, administrative, and professional employees." 218 F. Supp. 3d at 524. After determining that the rule likely exceeded the scope of defendants' authority, predominately because it departed from the plain meaning of the authorizing statute, the court turned to the scope of the injunction. *Id.* at 527–33. It explained that the Final Rule applies "to all states," so that harm will "extend[] nationwide" if the injunction does not protect everyone, regardless of their location. *Id.* at 534.

Broadly applicable injunctions have also been granted in this District where an agency's final rule has general applicability nationwide and the court has determined the rule is likely unlawful. *See Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016); *Nat'l Fed'n of*

**APP.140**

*Indep. Bus.*, 2016 WL 3766121 at *46. The Fifth Circuit has approved this practice, specifically in the context of preliminary injunctions issued pursuant to APA challenges. *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[T]he Constitution vests the District Court with 'the judicial Power of the United States.' That power is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.") (quoting U.S. CONST. Art. III, § 1).

Plaintiffs do not argue that broad injunctions are appropriate in all contexts. But given the nationwide scope of the harm, such an injunction is appropriate—and indeed necessary—here to afford Plaintiffs relief. First, as demonstrated above, the Final Rule violates the Constitution and thus threatens everyone who has or would like braced pistols, meaning that, even with a narrow injunction in place, Plaintiffs cannot engage in activities that they would have been free to with others before the Final Rule such as transfer their braced pistols to individuals or FFLs not subject to the injunction's protections or to purchase new braced pistols.

Second, an injunction limited to Maxim Defense will not afford Maxim Defense any practical relief. Because the braced pistols would remain firearms, just not NFA items, Maxim Defense is still required to follow all applicable federal laws in the sale and transfer of those items. That includes transferring its braced pistols to dealers, retailers, wholesalers, and other third parties across the United States. Dahl Decl. ¶¶ 9–10. If only Maxim Defense is covered by an injunction, then as soon as it attempts to transfer a braced pistol to another FFL, that FFL would immediately be in possession of an unregistered short-barreled rifle, since that FFL would not be covered under a narrow injunction, and that FFL would then be exposed to civil and criminal liability. Moreover, it is unlikely that FFL could even legally receive the item since it would be transferred off Maxim Defense's FFL records as a pistol but would have to be received by the other FFL as a short-

**APP.141**

barreled rifle.[22] And, of course, an FFL that does not have an ATF issued Special Occupational Tax license cannot receive a transferred NFA item. The next step in the purchase chain presents the same problem. Even if an injunction extends to Maxim Defense *and* its customers, the intermediate FFL would still be prohibited from transferring an NFA item to an individual purchaser without complying with the NFA's requirements, including submitting an ATF Form 4 and waiting to transfer the item until it was approved. Maxim Defense's ability to continue selling the items at issue here cannot be revived by an injunction simply extending to Maxim Defense and its customers, because of the expansive number of third parties necessarily involved in a firearm transaction. The requirements of federal firearms law similarly hinder Individual Plaintiffs. Indeed, because of the necessary involvement of third parties, even if both Maxim Defense and the Individual Plaintiffs were covered by an injunction, Individual Plaintiffs still would not be able to purchase a braced pistol directly from Maxim Defense.

And, of course, Individual Plaintiffs and Maxim Defense are representative of FPC's many other members across the United States, all of whom would have standing to bring this suit in their own right and are equally impacted and injured by the Final Rule. FPC brings this suit on behalf of those members to vindicate its members' constitutionally and statutorily protected rights, which are directly germane to FPC's mission. And, finally, FPC's members individual participation in this suit is not necessary, given this Court can afford the full scope of relief necessary to protect their rights and mitigate their injuries pursuant to the APA.

At the very least, this Court should delay the Final Rule's effective date to preserve the status quo during the pendency of this litigation. If this Court does delay the effective date of the

---

[22]     Another issue is that non-NFA items can be listed on an FFL's books as multi-caliber, whereas NFA items must have an associated caliber.

**APP.142**

Final Rule, then Plaintiffs request that order postpone the effective date until 120 days after this Court issues a final judgment and mandate, thereby allowing this Court to address the merits of this case and any appeals to be resolved. And, should the Agencies prevail, it would give individuals and businesses adequate time to comply with the upheld rule.

The relief Plaintiffs request is expansive, but the Agencies have brought this on themselves. It is the Agencies that decided to transmute the status of braced pistols by decree, that unlawfully sought to make the Final Rule immediately applicable,[23] that decided to retroactively change their decade-long position and treat all braced pistols as if they are and have always been short-barreled rifles, that chose to violate the constitutionally protected rights of at least 1.5 million Americans, and that failed to abide by their legal obligations under the APA. To prevent the suffering and irreparable injury that will immediately befall lawful gun owners, businesses, and manufacturers, the Agencies must be prevented from enforcing the Final Rule in its entirety or be delayed from implementing the Final Rule and its reclassification of braced pistols until 120 days after a final judgment and mandate is issued by this Court.

## CONCLUSION

For these reasons, Plaintiffs ask this Court to enjoin the Agencies' enforcement of the Final Rule in its entirety or, alternatively, to postpone the effective date of the Final Rule until a decision can be reached on the merits and this Court issues a final judgment.

---

[23]    *See* 5 U.S.C. § 553(d) ("The required publication or service of a substantive rule shall be made not less than 30 days before its effective date[.]").

**APP.143**

Respectfully submitted,

*/s/ R. Brent Cooper*
R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.144**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK; *et al.*,<br><br>                     *Plaintiffs*,<br><br>   v.<br><br>MERRICK GARLAND, in his official<br>capacity as Attorney General of the United States;<br>*et al.*,<br><br>                   *Defendants*. | Civil Action No. 4:23-cv-00095-O |

<u>**DECLARATION OF BRANDON COMBS**</u>

I, Brandon Combs, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.     I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.     I am the founder and president of Firearms Policy Coalition, Inc. ("FPC") and have held that position since FPC was founded in 2014. As FPC's president, I am duly authorized to act on behalf of the organization. As FPC's president, I oversee and sometimes participate directly in FPC's various operations, programs, communications, and legal efforts.

3.     FPC is a nonstock, nonprofit organization incorporated under the laws of Delaware. FPC is tax exempt under section 501(c)(4) of the Internal Revenue Code. FPC's principal place of business is in Clark County, Nevada.

4.     FPC's purpose is to create a world of maximal human liberty, advocate for individual liberties, restore freedom, and defend important rights—especially, but not limited to, those protected under the First, Second, Fifth, and Fourteenth Amendments to the United States

**APP.145**

Constitution. FPC promotes sound public policy that is consistent with natural rights. FPC also promotes liberty-supporting culture and engagement. FPC helps its members and individuals throughout the United States through its activities including protecting, defending, and advancing the means and methods by which the People of the United States may exercise their right to keep and bear arms, such as but not limited to the acquisition, construction, collection, transportation, exhibition, carry, care, use, and disposition of arms for all lawful purposes. FPC's mission is available to its members and the public on FPC's website. *See About FPC*, FIREARMS POLICY COALITION (last visited Feb. 8, 2023).[1]

5.    FPC accomplishes its mission, serves its members, and serves the public through various programs including but not limited to legislative and regulatory advocacy, grassroots advocacy, litigation and legal efforts, criminal defense of individuals prosecuted under unconstitutional laws, research, education, outreach, and other programs.

6.    FPC's legal program is designed to "bring cases that protect [FPC's members'] rights and property, restore individual liberty, and help us achieve our purpose to create a world of maximal human liberty." *About FPC Law*, FIREARMS POLICY COALITION (last visited Feb. 8, 2023).[2]

7.    FPC brought this lawsuit on behalf of itself and its members across the United States in a representative capacity. FPC has hundreds of thousands of members across the country—members that expect and rely upon FPC to file lawsuits such as this to vindicate their constitutionally and statutorily protected rights, as well as the structural protections of our constitutional form of government.

---

[1]    www.firearmspolicy.org/about.
[2]    www.firearmspolicy.org/legal.

**APP.146**

8.      Individuals can join FPC on its website at www.firearmspolicy.org/join. FPC also has "Constitutional Alliance" commercial members that partner with FPC to directly support the ongoing efforts of FPC to protect individual rights. More about Constitution Alliance members can be found at www.firearmspolicy.org/alliance. FPC members typically receive a membership kit that includes a letter of thanks, a membership card, and sometimes other items upon joining.

9.      FPC's membership includes numerous individuals and businesses, including Plaintiffs Christopher Lewis, William T. Mock, Maxim Defense Industries, LLC, and others who are impacted by the Final Rule's regulation on the manufacture, purchase, possession, and sale of the braced pistols and stabilizing braces at issue in this litigation. FPC's individual members, including Plaintiffs Mock and Lewis, are also negatively impacted by the false "choice" given to them by the Agencies in complying with the Agencies' unconstitutional and unlawful Final Rule or potentially facing felony charges, imprisonment, or a loss or destruction of their constitutionally protected property. They are also prohibited from buying additional braced pistols absent the NFA's onerous and restrictive requirements.

10.     FPC's commercial members, including Plaintiff Maxim Defense, have had their business practices upended, will suffer extreme losses and lost profits, and several may be put out of business entirely.

11.     Some of FPC's members would participate in a lawsuit such as this, but fear retribution from the federal or their state and/or local government.

12.     FPC's members and similarly situated members of the public have contacted FPC about the impact and scope of the Final Rule, asking questions regarding issues such as the effect of possession of unattached stabilizing braces, what items may or may not be deemed by the Agencies to convert a pistol into a short-barreled rifle, the impact of the Final Rule in states that

**APP.147**

prohibit the possession of short-barreled rifles, and more. FPC's members have expressed a concern not just with the impact of and penalties associated with the Final Rule, but with their inability to understand the full effect of the Final Rule.

DATED this 8th day of February, 2023.

Brandon Combs
President
Firearms Policy Coalition, Inc.

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

WILLIAM T. MOCK; *et al.*,

                           *Plaintiffs*,

    v.

MERRICK GARLAND, in his official
capacity as Attorney General of the United States;
*et al.*,

                          *Defendants*.

Civil Action No. 4:23-cv-00095-O

## <u>DECLARATION OF DAVID DAHL</u>

I, David Dahl, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.     I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.     I am the Chief Operating Officer and Executive Vice President of Manufacturing of Maxim Defense Industries, LLC ("Maxim Defense") and have held those positions since 2018 I have worked for Maxim Defense, in some capacity, since 2015.

3.     Maxim Defense brings this action on behalf of itself and its customers.

4.     Maxim Defense is a member of Firearms Policy Coalition.

5.     Maxim Defense is a firearms and firearms accessories manufacturer and retailer in good standing, registered in the State of Florida, and based in St. Cloud, Minnesota. Maxim Defense has had sales within the Northern District of Texas, including within this Division.

6.     Maxim Defense specializes in the manufacture and sale of the stabilizing braces and pistols equipped with stabilizing braces ("braced pistols") that are at issue in this lawsuit.

**APP.149**

Maxim Defense's stabilizing braces are designed, manufactured, and intended to allow individuals to fire large and heavy pistols better and more safely by stabilizing the pistol on the operator's forearm. Stabilizing braces comprised about 59% of Maxim Defense's annual non-firearm sales in 2022, which made up over $5 million in sales. Braced pistols comprised about 74% of its annual firearm sales in 2022, which also made up over $5 million in sales.

7.  Maxim Defense has established a reputation and customer base for its stabilizing braces and its braced pistols. Maxim Defense is the second largest stabilizing brace manufacturer in the United States. Maxim Defense's reputation extends to the veteran and Tier 1/special operations community, including those that are disabled and rely on Maxim Defense's braces and braced pistols to safely operate their firearms.

8.  While Maxim Defense has more recently begun manufacturing and selling rifle stocks and short-barreled rifles, those products are not what Maxim Defense is known for and are not as significant to its business as its braced pistols and stabilizing braces.

9.  Maxim Defense sells its products in a number of ways. First, as to its stabilizing braces, Maxim Defense sells those products direct to consumers on its website, to OEM firearm manufacturers that use Maxim Defense's stabilizing brace on those manufacturer's firearms, and to various dealers, distributors, and retailers across the United States. Due to the effect of the Final Rule, all of those sales have declined dramatically. Several of those customers have also cancelled their orders, including at least one order for 2,000 stabilizing braces.

10.  As to its braced pistols, Maxim Defense follows and complies with all relevant federal law. Prior to the publication of the Final Rule, Maxim Defense sold its braced pistols directly to consumers online, but required the firearm to be shipped and legally transferred to a Federal Firearms Licensee ("FFL") that would then legally transfer the firearm to the consumer

**APP.150**

after conducting the required federal background check. Maxim Defense also previously sold its braced pistols to dealers, distributors, and other licensed FFL retailers so that those retailers could then carry and sell Maxim Defense's products. Due to the nature of firearms laws in the United States, what may be recorded as a single 'transaction' originating with Maxim Defense, also necessarily involves multiple third parties. Each party that handles the transaction, from beginning to end, of a Maxim Defense braced pistol to the ultimate end user is necessary due to federal and state law, is required for Maxim Defense to engage in its business practices, and will be independently harmed absent those sales. Maxim Defense has ceased all sales of its braced pistols since January 31, 2023. Maxim Defense has several outstanding orders that have been canceled or are being held due to the impact of the Final Rule.

11.     The Final Rule's new requirements, and its effective destruction of the stabilizing brace and braced pistol market, has and will continue to directly, severely, and irreparably impact Maxim Defense's business. Should nothing change, Maxim Defense will lose the ability to operate as a business and be stripped of the goodwill that it has developed over the course of the last decade as a manufacturer of pistol braces and braced pistols. At minimum, these new requirements will cost Maxim Defense a significant amount of monetary expenditures, including changes in business model, changes in product offerings, changes in and loss of staff, product loss, increased compliance costs, and a loss of customers.

12.     Absent an injunction, Maxim Defense anticipates that it could lose more than $6 million in sales after one month and will continue to lose millions of dollars over the next few months. To add insult to the injury of direct pecuniary loss, this Final Rule was released when Maxim Defense generally establishes most of its sales contracts and orders for the year—during a series of Q1 industry, dealer, distributor, and retailer shows.

**APP.151**

13.     The harms to Maxim Defense are far from speculative—Maxim Defense has pending orders for hundreds of thousands of dollars' worth of product that it can no longer transfer to the buyers because of the Final Rule. Maxim Defense also has manufacturing orders for thousands of braces that are even now being canceled because of the Final Rule and more than $1 million in materials that it purchased in anticipation of its sales in 2023 that it can no longer use for their intended purpose. Due to the Final Rule, Maxim Defense has already seen a huge decline in sales overall.

14.     As Maxim Defense loses revenue from its inability to sell its braced pistol, it will also lose the ability to continue to employ as much as 50% of its current staff. Just this week, Maxim Defense will be parting ways with three full-time and one part-time employees because of the loss of revenue from the Final Rule. Maxim Defense anticipates more layoffs will have to occur within 30 days if it does not receive relief from the effect of the Final Rule.

15.     The Final Rule specifies that "[a]pproximately 4 manufacturers of 'stabilizing braces' will be significantly affected by more than 10 percent of their revenue," which includes Maxim Defense. Final Rule at 6,572.

16.     Further, the Final Rule notes that "Type 7 FFLs may also experience a range of costs from $738 to $13,344, to an unknown loss of revenue due to the inability to sell 'stabilizing braces[,]'" which again includes Maxim Defense, but is also dramatically lower than the actual costs and losses Maxim Defense will suffer because of the Final Rule.

17.     Maxim Defense closely follows and ensures it follows all regulations applicable to its business. Based upon classification letters issued by the ATF, guidance readily available on the ATF's website, and my understanding of federal law, none of the braced pistols sold by Maxim

**APP.152**

Defense are "rifles" under federal law nor were they considered such until the publication of the Final Rule on January 31, 2023.

18.     It is also my understanding that the Final Rule has fundamentally changed and expanded the Agencies' application of the definition of "rifle," potentially making each of the ATF's relevant classification determinations as to stabilizing braces now inapplicable.

19.     Because the Agencies' purported to make the Final Rule effective immediately upon publication in the Federal Register, Maxim Defense has been forced to comply with the terms of the Final Rule, whether the Agencies' have to authority to make the rule effective immediately or not, for fear of legal liability and criminal prosecution. As a result, the negative impacts to Maxim Defense; its employees; its OEM customers; its FFL, distributor, and retail partners; and its individual customers has been immediate, and Maxim Defense could be put out of business in a matter of months.

DATED this  9  th day of February, 2023.

David Dahl
COO/EVP of Manufacturing
Maxim Defense Industries, LLC

**APP.153**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 4:23-cv-00095-O |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; *et al.*, | |
| *Defendants*. | |

## DECLARATION OF CHRISTOPHER LEWIS

I, Christopher Lewis, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.      I am over 18 years of age and am competent to testify to the matters contained herein.

2.      I am a U.S. Citizen who resides in Aledo, Texas within Parker County.

3.      I am a member of Firearms Policy Coalition, Inc.

4.      I am not prohibited from possessing firearms under federal or state law. I have purchased at least one firearm through a Federal Firearms Licensee ("FFL"), undergoing and passing the required federal background check.

5.      I currently possess at least one braced pistol that will newly be treated as a short-barreled rifle under the Agencies' Final Rule—a Sig Sauer MPX pistol chambered in 9mm with a telescoping brace—which I purchased through an FFL without need to undergo the NFA's heightened requirements, including an ATF Form 4. I use this firearm for lawful purposes, including but not limited to general self-defense, self-defense in my home, and target shooting.

**APP.154**

6.      I wish and have plans to continue to purchase braced pistols in the future to own and use for lawful purposes, such as general self-defense, self-defense in my home and target shooting. I have specific plans to purchase at least one additional braced pistol within the next three to four months, so long as such purchase would not subject me to any civil or criminal fines or penalties and could be purchased without submitting to the heightened requirements of the NFA, including but not limited to an ATF Form 1 or 4, the cost of acquiring and providing passport photos (about $17 locally) and fingerprints (about $50 locally) per item, the additional disclosure of personal information, the inclusion of my constitutionally protected firearm on a national registry, the delays imposed by the ATF and other federal agencies in administering the NFA, and more. The NFA process the Final Rule seeks to require for braced pistols imposes additional and heightened compliance requirements over top of that normally required for pistols under the GCA, requires me to incur additional costs (including the costs and time associated with acquiring passport photographs and fingerprinting for each registered item), exposes me to greater criminal liability for even an accidental violation, requires me to pass an additional background check for constitutionally protected property that I already own and have already passed a background check to purchase, and more. I have also traveled out of state with my braced pistol, and have plans to do so again, but for the effect of the Final Rule.

7.      I do not wish to register my current firearm as an NFA item for the same reasons, with the understanding that the Agencies have waived the $200 fee requirement for 120 days.

8.      I wish to continue to own and purchase braced pistols because they are an efficient and effective tool for self- and home-defense, due to their configuration, size, and weight. I also believe that I have the individual right to buy and possess braced pistols, absent the NFA process.

**APP.155**

9.      The Final Rule at issue in this case will prohibit me from engaging in an activity that I have already engaged in and wish to, have the right to, and have concrete plans to continue to engage in and thus will detrimentally impact me. The Final Rule at issue also fundamentally alters the legal landscape that I have relied on to conduct and plan my personal practices. Lastly, the Final Rule prohibits me from exercising my Second Amendment protected rights, by prohibiting me from possessing my braced pistol in my home for self-defense, or at minimum, chills the exercise of my rights by insufficiently establishing what pistols I may possesses when considered in constructive possession with other items the ATF may classify as a stock or other item capable of converting my pistol into a rifle.

10.     Moreover, due to the vague nature of the Final Rule, I cannot know exactly how to comply with the Final Rule by the current effective date, including whether I could remove the brace on my pistol, but keep possession of both, and remain in compliance with the Agencies' new regulations; whether my pistol would still be classified as a "short-barreled rifle" because of the Agencies' new regulations even absent the brace; or what attachments I can or cannot have on my pistol before it becomes classified as a "short-barreled rifle" under the Agencies' new regulations.

DATED this the ___th day of February, 2023.

_____
Christopher Lewis

**APP.156**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 4:23-cv-00095-O |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; *et al.*, | |
| *Defendants*. | |

<u>**DECLARATION OF WILLIAM T. MOCK**</u>

I, William T. Mock, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.    I am over 18 years of age and am competent to testify to the matters contained herein.

2.    I am a U.S. Citizen who resides in Weatherford, Texas within Parker County.

3.    I am a member of Firearms Policy Coalition, Inc.

4.    I am not prohibited from possessing firearms under federal or state law. I have purchased at least one firearm through a Federal Firearms Licensee ("FFL"), undergoing and passing the required federal background check.

5.    I worked as a professional gunsmith for 14 years, from 2008 through 2022. I was also previously an NRA certified instructor, although I have voluntarily let that certification lapse. I currently hold a Texas License to Carry Permit, which I have held since the day I turned 21.

6.    I currently possess at least one braced pistol that will newly be treated as a short-barreled rifle under the Agencies' Final Rule—a AR-style pistol with an SB Tactical SBA3 brace

**APP.157**

and an 11.3" barrel—which I assembled without need to undergo the NFA's heightened requirements, including an ATF Form 1. I use this firearm for lawful purposes, including but not limited to general self-defense, self-defense in the home, and target shooting.

7.     I wish and have plans to continue to purchase braced pistols in the future to own and use for lawful purposes, such as general self-defense, self-defense in my home and target shooting. I have specific plans to purchase at least one additional braced pistol within the next three to four months, so long as such purchase would not subject me to any civil or criminal fines or penalties and could be purchased without submitting to the heightened requirements of the NFA, including but not limited to an ATF Form 1 or 4, the cost of acquiring and providing passport photos (about $17) and fingerprints (about $50) per item, the additional disclosure of personal information, the inclusion of my constitutionally protected firearm on a national registry, the delays imposed by the ATF and other federal agencies in administering the NFA, and more. The NFA process the Final Rule seeks to require for braced pistols imposes additional and heightened compliance requirements over top of that normally required for pistols under the GCA, requires me to incur additional costs (including the costs and time associated with acquiring passport photographs and fingerprinting for each registered item), exposes me to greater criminal liability for even an accidental violation, requires me to pass an additional background check for constitutionally protected property that I already own and have already passed a background check to purchase, and more. I have also traveled out of state with my braced pistol, and have plans to do so again, but for the effect of the Final Rule.

8.     I do not wish to register my current firearm as an NFA item for the same reasons, with the understanding that the Agencies have waived the $200 fee requirement for 120 days.

**APP.158**

9.      I wish to continue to own and purchase braced pistols because they are an efficient and effective tool for self- and home-defense, due to their configuration, size, and weight. I also believe that I have the individual right to buy and possess braced pistols, absent the NFA process.

10.     The Final Rule at issue in this case will prohibit me from engaging in an activity that I have already engaged in and wish to, have the right to, and have concrete plans to continue to engage in and thus will detrimentally impact me. The Final Rule at issue also fundamentally alters the legal landscape that I have relied on to conduct and plan my personal practices. Lastly, the Final Rule prohibits me from exercising my Second Amendment protected rights, by prohibiting me from possessing my braced pistol in my home for self-defense, or at minimum, chills the exercise of my rights by insufficiently establishing what pistols I may possesses when considered in constructive possession with other items the ATF may classify as a stock or other item capable of converting my pistol into a rifle.

11.     Moreover, due to the vague nature of the Final Rule, I cannot know exactly how to comply with the Final Rule by the current effective date, including whether I could remove the brace on my pistol, but keep possession of both, and remain in compliance with the Agencies' new regulations; whether my pistol would still be classified as a "short-barreled rifle" because of the Agencies' new regulations even absent the brace; or what attachments I can or cannot have on my pistol before it becomes classified as a "short-barreled rifle" under the Agencies' new regulations.

**APP.159**

DATED this the _10_ th day of February, 2023.


_William T Mock_
_____
                                   William T. Mock

**APP.160**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

WILLIAM T. MOCK, *et al.*,

     *Plaintiffs,*

    v.

MERRICK B. GARLAND, *et al.*,

     *Defendants.*

Civil Action No. 4:23-cv-95-O

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE,
FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE**

**APP.161**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

I.   Statutory and Regulatory Background ..........................................................................2

II.  ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with
     "Stabilizing Braces" ......................................................................................................4

III. The Rule ........................................................................................................................7

IV.  This Lawsuit ................................................................................................................10

LEGAL STANDARDS ......................................................................................................11

ARGUMENT ......................................................................................................................11

I.   Plaintiffs are unlikely to succeed on the merits of their claims ..................................11

     A.   The Rule is a valid exercise of ATF's statutorily delegated authority and
          comports with the relevant statutory provisions .................................................11

     B.   Notice and comment was not required, and in any event, the Rule is a logical
          outgrowth of the proposed rule. .........................................................................19

     C.   Neither the Rule nor the NFA infringes Second Amendment rights. ...................22

          1.   Firearm braces are not bearable arms protected by the Second
               Amendment. .................................................................................................23

          2.   Registration of short-barreled rifles does not implicate the Second
               Amendment. .................................................................................................24

          3.   Short-barreled rifles are dangerous and unusual weapons that are not
               protected by the Second Amendment .........................................................25

          4.   Historical tradition of regulation supports the Rule and the NFA. .................27

     D.   The Rule does not violate the Constitution's structural protections. ...................31

          1.   The NFA does not violate the non-delegation doctrine ................................31

          2.   The Rule does not violate the Take Care Clause ...........................................32

          3.   The rule of lenity does not bar ATF's interpretation ...................................33

     E.   The Rule is not void for vagueness ......................................................................34

i

**APP.162**

F.      The Rule does not implicate the First Amendment. ................................................37

II.     Plaintiffs will not suffer irreparable harm absent preliminary relief..............................39

III.    The equities and the public interest weigh against a preliminary injunction. ...............42

IV.     In all events, the specific forms of relief that Plaintiffs seek are improper. ................43

CONCLUSION ...............................................................................................................................45

**APP.163**

# TABLE OF AUTHORITIES

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
    722 F.3d 1229 (10th Cir. 2013)........................................................36–37

*Aposhian v. Barr,*
    374 F. Supp. 3d 1145 (D. Utah 2019)..........................................................13

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022)........................................................................44

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board,*
    627 F.3d 547 (5th Cir. 2010)........................................................................42

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.,*
    515 U.S. 687 (1995)......................................................................................34

*BASF Wyandotte Corp. v. Costle,*
    598 F.2d 637 (1st Cir. 1979)........................................................................21

*Bennett v. Spear,*
    520 U.S. 154 (1997)......................................................................................12

*Bezet v. United States,*
    714 F. App'x 336 (5th Cir. 2017)..........................................................24, 30

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016)......................................................................................26

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir. 2023)..................................................................31, 34

*Cargill v. Barr,*
    502 F. Supp. 3d 1163 (W.D. Tex. 2020)......................................................31

*Castro v. City of Grand Prairie,*
    2021 WL 1530303 (N.D. Tex. Apr. 19, 2021)............................................40

*Catawba Cnty. v. EPA,*
    571 F.3d 20 (2009)........................................................................................37

*Chacon v. Granata,*
    515 F.2d 922 (5th Cir. 1975)........................................................................40

*Chem. Mfrs. Ass'n v. EPA,*
    870 F.2d 177 (5th Cir. 1989)........................................................................20

**APP.164**

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC,*
   142 S. Ct. 1464 (2022) ................................................................................39

*City of Columbus v. Trump,*
   453 F. Supp. 3d 770 (D. Md. 2020) ..........................................................33

*Ctr. for Biological Diversity v. Regan,*
   597 F. Supp. 3d 173 (D.D.C. 2022) ..........................................................45

*Daniels Health Sciences v. Vascular Health Sciences,*
   710 F.3d 579 (5th Cir. 2013) ....................................................................40

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...........................................................................23, 25

*Doe I v. Landry,*
   909 F.3d 99 (5th Cir. 2018) ......................................................................39

*Duarte v. City of Lewisville,*
   136 F. Supp. 3d 752 (E.D. Tex. 2015) ......................................................40

*Flight Training Int'l, Inc. v. FAA,*
   58 F.4th 234 (5th Cir. 2023) .....................................................................19

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) .........................................................................43-44

*Gonzales v. Oregon,*
   546 U.S. 243 (2006) ..................................................................................13

*Google, Inc. v. Hood,*
   822 F.3d 212 (5th Cir. 2016) ....................................................................40

*Guedes v. ATF,*
   356 F. Supp. 3d 109 (D.D.C. 2019) ..........................................................13

*Gun Owners of Am., Inc. v. Garland,*
   19 F.4th 890 (6th Cir. 2021) .....................................................................14

*Gundy v. United States,*
   139 S. Ct. 2116 (2019) ..............................................................................32

*Hardy v. Panola Cnty. Sheriff's Dep't,*
   2007 WL 496339 ......................................................................................38

*Haynie v. Harris,*
   658 F. App'x 834 (9th Cir. 2016) .............................................................31

**APP.165**

*Holland Am. Ins. Co. v. Succession of Roy*,
   777 F.2d 992 (5th Cir. 1985) ............................................................................41

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ..........................................................23, 25, 26, 27

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ..............................................................................20

*Huddleston v. United States*,
   415 U.S. 814 (1974) .............................................................................................3

*In re Lothian Oil, Inc.*,
   508 F. App'x 352 (5th Cir. 2013) ....................................................................18

*John Doe Co. v. CFPB*,
   849 F.3d 1129 (D.C. Cir. 2017) ......................................................................40

*Kanarr Corp. v. United States*,
   188 Ct. Cl. 1051 (1969) .............................................................................15–16, 18

*Kelly Servs., Inc. v. Creative Harbor, LLC*,
   846 F.3d 857 (6th Cir. 2017) ...........................................................................17

*King of the Mountain Sports, Inc. v. Chrysler, Corp.*,
   185 F.3d 1084 (10th Cir. 1999) .......................................................................37

*Kolender v. Lawson*,
   461 U.S. 352 (1983) ..........................................................................................35

*Kooritzky v. Reich*,
   17 F.3d 1509 (D.C. Cir. 1994) ........................................................................21

*Lane v. Holder*,
   703 F.3d 668 (4th Cir. 2012) ...........................................................................24

*Las Ams. Immigrant Advoc. Ctr. v. Biden*,
   571 F. Supp. 3d 1173 (D. Or. 2021) ...............................................................33

*League of Women Voters of the U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) .............................................................................40

*Lomont v. O'Neill*,
   285 F.3d 9 (D.C. Cir. 2002) ...............................................................................2

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) ............................................................................44

**APP.166**

*Madsen v. Women's Health Ctr., Inc.,*
    512 U.S. 753 (1994) ................................................................................. 44

*Maracich v. Spears,*
    570 U.S. 48 (2013) ................................................................................... 33

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................................. 11

*Memphis A. Philip Randolph Inst. v. Hargett,*
    978 F.3d 378 (6th Cir. 2020) ............................................................... 39–40

*Mid Continent Nail Corp. v. United States,*
    846 F.3d 1364 (Fed. Cir. 2017) .............................................................. 21

*Mississippi v. Johnson,*
    71 U.S. 475 (1867) ................................................................................... 33

*Mistretta v. United States,*
    488 U.S. 361 (1989) .............................................................................. 31, 32

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ................................................................................... 14

*Muscarello v. U.S.,*
    524 U.S. 125 (1998) ................................................................................. 33

*N.Y. City Transit Auth. v. Beazer,*
    440 U.S. 568 (1979) ................................................................................. 11

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022) ................................................................. 23, 25, 28, 29

*Nat'l Nutritional Foods Ass'n v. Mathews,*
    557 F.2d 325 (2d Cir. 1977) .................................................................... 17

*Nat'l Rifle Ass'n v. Brady,*
    914 F.2d 475 (4th Cir. 1990) ................................................................... 13

*Nicopure Labs, LLC v. FDA,*
    944 F.3d 267 (D.C. Cir. 2019) ............................................................... 38

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................. 43

*Or. Firearms Fed'n, Inc. v. Brown,*
    2022 WL 17454829 (D. Or. Dec. 6, 2022) .............................................. 25

**APP.167**

*Patterson v. Rawlings,*
    287 F. Supp. 3d 632 (N.D. Tex. 2018)................................................................38

*PDK Lab'ys Inc. v. DEA,*
    438 F.3d 1184 (D.C. Cir. 2006)................................................................36

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)................................................................19

*Posters 'N' Things, Ltd. v. United States,*
    511 U.S. 513 (1994)................................................17, 18, 36

*Raicevic v. Fieldwood Energy, LLC,*
    2020 WL 6325550 n.1 (5th Cir. 2020)................................................................37

*Robinson v. Sessions,*
    721 F. App'x 20 (2d Cir. 2018)................................................................31

*Romag Fasteners, Inc. v. Fossil, Inc.,*
    140 S. Ct. 1492 (2020)................................................................19

*Rural & Migrant Ministry v. EPA,*
    565 F. Supp. 3d 578 (S.D.N.Y. 2020)................................................................45

*Safety-Kleen Corp. v. EPA,*
    1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) ................................45

*Sampson v. Murray,*
    415 U.S. 61 (1974)................................................................41

*Serv. Emps. Int'l Union, Loc. 5 v. City of Houston,*
    595 F.3d 588 (5th Cir. 2010)................................................................39

*Sheffield v. Bush,*
    604 F. Supp. 3d 586 (S.D. Tex. 2022)................................................................41

*Sig Sauer, Inc. v. Brandon,*
    826 F.3d 598 (1st Cir. 2016)................................................................17

*Sipes v. United States,*
    321 F.2d 174 (8th Cir. 1963),
    *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968)................18

*Sorenson v. Sec'y of Treasury,*
    475 U.S. 851 (1986)................................................................45

*South Terminal Corp. v. EPA,*
    504 F.2d 646 (1st Cir. 1974)................................................................21

**APP.168**

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ...................................................................................................12

*Tenth Street Residential Ass'n v. City of Dallas,*
    968 F.3d 492 (5th Cir. 2020) .....................................................................................42

*Tex. Democratic Party v. Abbott,*
    961 F.3d 389 (5th Cir. 2020) .....................................................................................35

*Tex. State LULAC v. Elfant,*
    52 F.4th 248 (5th Cir. 2022) ......................................................................................38

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ......................................................................................41

*Texas v. EPA,*
    389 F. Supp. 3d 497 (S.D. Tex. 2019) ......................................................................20

*Texas v. EPA,*
    983 F.3d 826 (5th Cir. 2020) .....................................................................................36

*Texas v. Johnson,*
    491 U.S. 397 (1989) ...................................................................................................39

*Thompson/Ctr. Arms Co. v. Baker,*
    686 F. Supp. 38 (D.N.H. 1988) .................................................................................41

*Touby v. United States,*
    500 U.S. 160 (1991) ...................................................................................................31

*Trump v. Hawaii,*
    138 S. Ct. 2392 (2018) ...............................................................................................44

*U.S. v. Davis,*
    139 S. Ct. 2319 (2019) ...............................................................................................33

*Un. Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.,*
    828 F.2d 314 (5th Cir. 1987) .....................................................................................22

*United States v. Al-Azhari,*
    2020 WL 7334512 (M.D. Fla. Dec. 14, 2020) ..........................................................23

*United States v. Brooks,*
    681 F.3d 678 (5th Cir. 2012) .....................................................................................34

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018) ............................................................................23, 26

**APP.169**

*United States v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ................................................................................26

*United States v. Golding,*
   332 F.3d 838 (5th Cir. 2003) .....................................................................................26

*United States v. Gonzalez,*
   2011 WL 5288727 (D. Utah Nov. 2, 2011) ...............................................................26

*United States v. Hasson,*
   2019 WL 4573424 (D. Md. Sept. 20, 2019) .........................................................23, 24

*United States v. Hayes,*
   555 U.S. 415 (2009) ..................................................................................................16

*United States v. Henry,*
   688 F.3d 637 (9th Cir. 2012) .....................................................................................30

*United States v. Howard,*
   766 F.3d 414 (5th Cir. 2014) .....................................................................................35

*United States v. Majid,*
   2010 WL 5129297 (N.D. Ohio Dec. 10, 2010) .........................................................26

*United States v. Mazurie,*
   419 U.S. 544 (1975) ..................................................................................................34

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) ............................................................................16, 18

*United States v. Santoro,*
   242 F. App'x 627 (11th Cir. 2007) .............................................................................15

*United States v. Schuhmann,*
   963 F.2d 381 (9th Cir. 1992) .....................................................................................18

*United States v. Syverson,*
   90 F.3d 227 (7th Cir. 1996) .......................................................................................17

*United States v. Thompson/Center Arms Co.,*
   504 U.S. 505 (1992) .......................................................................................2–3, 13, 15

*United States v. Williams,*
   553 U.S. 285 (2008) ..................................................................................................36

*United States v. Zeidman,*
   444 F.2d 1051 (7th Cir. 1971) ...................................................................................15

**APP.170**

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
   455 U.S. 489 (1982) ...................................................................................35, 36

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ............................................................................................36

*West Virginia v. EPA,*
   142 S. Ct. 2587 (2022) ......................................................................................31

*Westfall v. Miller,*
   77 F.3d 868 (5th Cir. 1996) ..............................................................................24

*Whitaker v. Thompson,*
   353 F.3d 947 (D.C. Cir. 2004) .........................................................................38

*White v. Carlucci,*
   862 F.2d 1209 (5th Cir. 1989) ..........................................................................40

*Whitman v. Am. Trucking Ass'ns,*
   531 U.S. 457 (2001) ...........................................................................................32

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ...............................................................................................11

*Wis. Gas. Co. v. FERC,*
   758 F.2d 669 (D.C. Cir. 1985) .........................................................................40

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ...........................................................................................33

**Federal Statutes**

5 U.S.C. § 553 .........................................................................................................45

5 U.S.C. § 706 .........................................................................................................44

18 U.S.C. §§ 921–931 .............................................................................................3

18 U.S.C. § 921 ...............................................................................................*passim*

18 U.S.C. § 922 .......................................................................................................3

18 U.S.C. § 923 .......................................................................................................3

18 U.S.C. § 926 ..................................................................................................4, 12

26 U.S.C. §§ 5801–5872 ........................................................................................2

26 U.S.C. § 5801 .....................................................................................................3

**APP.171**

26 U.S.C. § 5802 .................................................................................................3

26 U.S.C. § 5811 ............................................................................................3, 32

26 U.S.C. § 5812 ............................................................................................3, 32

26 U.S.C. § 5821 ............................................................................................3, 32

26 U.S.C. § 5822 ............................................................................................3, 32

26 U.S.C. § 5841 .........................................................................................1, 3, 32

26 U.S.C. § 5845 ..........................................................................................*passim*

26 U.S.C. § 7421 ...............................................................................................41

26 U.S.C. § 7422 ...............................................................................................41

26 U.S.C. § 7801 ............................................................................................4, 12

26 U.S.C. § 7805 ..................................................................................4, 12, 13, 32

## State Statutes

Ala. Code § 13A-11-63 ........................................................................................27

Alaska Stat. Ann § 11.61.200 ...............................................................................27

Ariz. Rev. Stat. Ann. § 13-3101 ...........................................................................27

Cal. Penal Code § 16590 ......................................................................................27

Colo. Rev. Stat. Ann. § 18-12-102 ........................................................................27

D.C. Code Ann. § 7-2502.02 .................................................................................27

Fla. Stat. Ann. § 790.221 .....................................................................................27

Ga. Code Ann § 16-11-121 ...................................................................................27

Ga. Code Ann § 16-11-122 ...................................................................................27

Haw. Rev. Stat. Ann. § 134-8 ...............................................................................27

Iowa Code Ann § 724.1C .....................................................................................27

La. Stat. Ann. § 40:1785 ......................................................................................27

Md. Code Ann., Pub. Safety § 5-203 .....................................................................27

APP.172

Mich. Comp. Laws Ann. § 750.224b ..................................................................27

Mo. Ann. Stat. § 571.020 ...............................................................................27

Mont. Code Ann. § 45-8-340 .........................................................................27

N.C. Gen. Stat. Ann. § 14-288.8 ....................................................................27

N.D. Cent. Code Ann. § 62.1-02-03 ...............................................................27

Neb. Rev. Stat. Ann. § 28-1203 .....................................................................27

Nev. Rev. Stat. Ann. § 202.275 ......................................................................27

Ohio Rev. Code Ann. § 2923.17 ....................................................................27

Okla. Stat. Ann. tit. 21, § 1289.18 ................................................................27

Or. Rev. Stat. Ann. § 166.272 .......................................................................27

S.C. Code Ann. § 16-23-250 ..........................................................................27

Tex. Penal Code Ann. § 46.05 .......................................................................27

Va. Code Ann. § 18.2-303.1 ..........................................................................27

Wash. Rev. Code Ann. § 9.41.190 .................................................................27

Wis. Stat. Ann. § 941.28 ................................................................................27

## Legislative Materials

H.R. Rep. No. 83-1337 (1954) .................................................................2, 16

## Regulations

27 C.F.R. part 478 .....................................................................................4, 12

27 C.F.R. § 478.11 .....................................................................................8, 14

27 C.F.R. part 479 .....................................................................................4, 12

27 C.F.R. § 479.11 .....................................................................................8, 14

28 C.F.R. § 0.130 .......................................................................................4, 12

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
86 Fed. Reg. 30,826 (June 10, 2021) ................................................8, 20, 21

**APP.173**

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
88 Fed. Reg. 6,478 (Jan. 31, 2023) ..................................................................*passim*

*Objective Factors for Classifying Weapons with "Stabilizing Braces,"*
85 Fed. Reg. 82,516 (Dec. 18, 2020) ..........................................................8

*Objective Factors for Classifying Weapons With "Stabilizing Braces"; Withdrawal of Guidance,*
85 Fed. Reg. 86,948 (Dec. 31, 2020) ..........................................................8

**Other Authorities**

2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822
(1823) ..............................................................................................................29

15 The Public Records of the Colony of Connecticut 191 (1890) ....................29

1775-1776 Mass. Acts 18 ..............................................................................28

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191
(*codified at* Ark. Code. Ann. ch. 48 § 1498 (1894)) ....................................29

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 ............................................28

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25
(*codified at* 1879 Tex. Crim. Stat. 24) ........................................................29

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352 ......................................29

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27 ..........................29

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412 ..................29

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57 ......................................29

Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39 ......................................28

Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175 ............................................28

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210
(*codified at* Kan. Gen. Stat. § 1003 (1901)) ................................................29

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ..............29

An Act About Powder Money,
1759-1776 N.H. Laws 63 ..............................................................................29

"An Act for the better regulating of the Militia of this Province,"
1747, McCord, *Statutes at Large,* 9:647 ......................................................28

**APP.174**

An Act to License the Carrying of Fowling Pieces and other Fire-Arms,
    1870 Haw. Sess. Laws 26......................................................................................................29

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this
    State, § 1, 1890 S.C. Acts 653 .........................................................................................29

Colonial Laws of Massachusetts Reprinted from the Edition of 1672 (1890).........................29

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27...........................................................29

IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).............................16

Joseph Abram Walker, The Revised Code of Alabama 169 § 10,
    (Reid & Screws, State Printers, 1867)..............................................................................29

Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807
    (1807)..............................................................................................................................28

Laws of the State of Maine 546 (1830).................................................................................28

Laws of the State of New Hampshire; with the Constitutions of the United States and of the
    State Prefixed 277 (1830) ...............................................................................................29

*NFA Handbook* (Apr. 2009),
    https://perma.cc/P3NL-G35G .........................................................................................4

*Records of the Colony of Rhode Island and Providence Plantations, In New England,* 2:196
    (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857)...................28

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34.............................................................29

Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early
    America: The Legal Context of the Second Amendment,"
    25 Law & Hist. Rev. 139 (2007).....................................................................................28

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51
    (James T. Mitchell & Henry Flanders comps. 1911)........................................................29

**APP.175**

## INTRODUCTION

For nearly a century, Congress has regulated the possession, manufacture, and distribution of short-barreled rifles, weapons that it determined were especially dangerous. Federal law defines the term "rifle" to mean any rifle-bored weapon that, *inter alia*, is "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). If a "rifle" has a barrel shorter than 16 inches in length, it is a short-barreled rifle under the National Firearms Act ("NFA") and the Gun Control Act ("GCA"), 26 U.S.C. § 5841; 18 U.S.C. § 921(a)(8), and is subject to certain registration and taxation requirements, among other federal controls.

Over the last decade, firearms manufacturers have marketed devices widely referred to as "stabilizing braces." These devices are generally designed to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock. Though "stabilizing braces" are frequently advertised to wrap around or brace against a shooter's forearm to assist with one-handed firing, manufacturers often design them to resemble common shoulder stocks and market them so that they may be used to convert pistols into shoulder-fired weapons. The result has been the widespread circumvention of Congress's longstanding requirements for the manufacture and possession of short-barreled rifles.

In 2021, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") took action to ensure that short-barreled rifles constructed with a "stabilizing brace" are registered and taxed pursuant to statutory requirements. After publishing a notice of proposed rulemaking and receiving public comments, ATF promulgated a rule, *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule"). Consistent with the statutory text, the Rule clarified that the statutory definition of "rifle" can include, under certain circumstances, a weapon equipped with a "stabilizing brace" or similar device. And to provide the regulated community with necessary guidance, the Rule also outlined the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired from

1

**APP.176**

the shoulder, such that it constitutes a "rifle" within the meaning of the NFA and the GCA.

Plaintiffs seek to preliminarily enjoin the Rule's enforcement but fail to show any of the prerequisites to obtain that extraordinary relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. Congress empowered and obligated ATF to determine whether and when "brace"-equipped weapons become "rifles," as defined under federal law, and the Rule comports with the relevant statutory provisions and complies with the Administrative Procedure Act ("APA"). Moreover, the modest registration requirements that federal law impose do not violate the Second Amendment and, in any event, the right to bear arms does not protect the use of firearm modifications to evade federal firearms laws. Nor does the Rule suffer from any other constitutional defect. And merits aside, Plaintiffs will not suffer irreparable harm absent preliminary relief, and the requested injunction would undermine the public interest. The Court should therefore deny Plaintiffs' motion.

## BACKGROUND

### I.    Statutory and Regulatory Background

**1.** The National Firearms Act of 1934, as amended, 26 U.S.C. §§ 5801–5872, the first major federal statute to regulate firearms, imposed various requirements on persons possessing or engaged in the business of selling certain types of firearms and other weapons. Seeking to curtail the criminal misuse of firearms, *see Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002), the NFA targeted particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). To that end, the Act defined eight categories of "firearms" that fall under its purview. *See* 26 U.S.C. § 5845(a)(1)–(8).

Among the "firearms" the NFA regulates are weapons commonly referred to as short-barreled rifles— *i.e.,* "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4); *United States v. Thompson/Center Arms Co.*, 504 U.S.

**APP.177**

505, 517 (1992) (plurality op.) ("[The NFA's] regulation of short-barreled rifle" targets "a concealable weapon" "likely to be used for criminal purposes.").[1] The Act defines "rifle" to mean any

> weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger . . . .

26 U.S.C. § 5845(c). These short-barreled rifles must be registered in the National Firearms Registration and Transfer Record to a person entitled to possess the firearm. *Id.* § 5841. They also are subject to making and transfer taxes, *id.* §§ 5811, 5821, and must be approved by the Attorney General before they are made or transferred, *id.* §§ 5812, 5822. Moreover, any person engaged in the business of importing, manufacturing, or dealing in NFA firearms must register with the Attorney General and pay a special occupational tax (or "SOT"). *Id.* §§ 5801, 5802.

**2.** In 1968, Congress enacted the Gun Control Act, as amended, 18 U.S.C. §§ 921–931, to comprehensively regulate the manufacture and distribution of firearms and ammunition. Acknowledging the inadequacy of federal controls over "the widespread traffic in firearms," and motivated by concerns that "the ease with which firearms could be obtained" had "contributed significantly to the prevalence of lawlessness and violent crime" in the country, *Huddleston v. United States*, 415 U.S. 814, 824 (1974), the GCA increased federal controls for persons engaging in the business of importing, manufacturing, or dealing in firearms. *See, e.g.,* 18 U.S.C. §§ 922–923.

Among these were specific controls on the interstate transport of "short-barreled rifles" and the obligation of Federal Firearms Licensees ("FFL") to receive approval from the Attorney General before their sale. *Id.* § 922(a)(4), (b)(4). The Act defined "short-barreled rifle" to mean any "rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by

---

[1] The NFA's definition of "firearm" also includes machineguns and short-barreled shotguns, as well as several items that would not be considered "firearms" in ordinary parlance, such as silencers, rockets, and grenades. 26 U.S.C. § 5845(a).

**APP.178**

alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." *Id.* § 921(a)(8). The GCA's definition of "rifle" mirrored the NFA's. *Id.* § 921(a)(7).

**3.** Congress has vested in the Attorney General the authority to prescribe rules and regulations to administer and enforce the NFA and the GCA. *See* 18 U.S.C. § 926(a); 26 U.S.C. §§ 7801(a)(2)(A), 7805(a). The Attorney General has delegated that responsibility to ATF, *see* 28 C.F.R. § 0.130, which has promulgated regulations implementing both statutory schemes, *see* 27 C.F.R. parts 478, 479.

Although not statutorily required, ATF encourages manufacturers and members of the public to submit weapons or other devices to ATF for a classification of whether the weapon or device qualifies as a "firearm" under the NFA. *NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. The classification process enables ATF to provide manufacturers and individual possessors with "the agency's official position concerning the status of [a] firearm[] under Federal firearms laws." *Id.* § 7.2.4, 7.2.4.1. ATF has made clear, however, that "classifications are subject to change if later determined to be erroneous or impacted by subsequent changes in the law or regulations." *Id.* § 7.2.4.1.

## II. ATF's Pre-Rule Classifications of, and Guidance Regarding, Firearms Equipped with "Stabilizing Braces"

In the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices. 88 Fed. Reg. at 6,482. Manufacturers often design these devices to attach to the rear end of a heavy pistol made with a rifle receiver but no buttstock—*e.g.*, a pistol variant of an AR- or AK-type rifle. *Id.* at 6,518; *Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles* ("Commercial Guidance"), https://perma.cc/BK6C-BRGQ (providing images of weapons configured with common "brace" devices). And though manufacturers have nominally claimed that "brace" devices are meant to attach to or stabilize against a shooter's forearm, "stabilizing braces" often replicate characteristics of a shoulder stock and are frequently marketed by manufacturers and used by individual possessors to enable a shooter to shoulder a firearm. 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47. To determine whether a particular weapon equipped with a

4

**APP.179**

"stabilizing brace" falls within the statutory definition of a short-barreled rifle, 26 U.S.C. § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), ATF looks to the statute to determine, *inter alia*, whether the weapon, as configured, is "designed or redesigned, made or remade, and intended to be fired from the shoulder," and therefore a "rifle" under the terms of the statute, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).



Figures 1 & 2: Comparing heavy pistols equipped with a "stabilizing brace" (top) to firearms equipped with a commercial shoulder stock (bottom). *See* 88 Fed. Reg. at 6,494.

ATF first encountered this type of device in 2012, when it received a classification request regarding a prototype of a "forearm brace" designed to slip onto an AR-15-type pistol's buffer tube. 88 Fed. Reg. at 6,482. The device's design was modest, constructed of foam-type rubber flaps and two Velcro straps. According to the requester, the device was designed to assist individuals with limited strength or mobility due to a disability with single-handed firing of a heavy pistol. *Id.* Based on its evaluation of the materials submitted, ATF concluded that the particular "brace" device, when configured with a pistol, would not convert that firearm into a weapon designed or intended to be fired from the shoulder and would not alter the weapon's classification. *Id.* at 6,483. ATF did not publicly explain, however, the criteria it applied in reaching that conclusion.

Over the next several years, ATF received an increasing number of classification requests for weapons equipped with new types of "stabilizing braces" of varying designs. *Id.* at 6,479. But unlike the 2012 prototype, these newer "brace" designs began to include characteristics common to shoulder stocks. *Id.* at 6,479; *see also, e.g., id.* at 6,529 (comparing two "stabilizing braces" to similarly designed

**APP.180**

shoulder stocks); *id.* at 6,528 (noting that a manufacturer listed a "stabilizing brace" as a firearm's "stock type"); *id.* at 6,503, 6,547. Given their stock-like function and design, ATF soon became aware that some "stabilizing braces" were being widely marketed by manufacturers and used by individual possessors to fire weapons from the shoulder. *See, e.g., id.* at 6,479, 6,503 & n.87, 6,505, 6,527, 6,546–47. Accordingly, as early as 2014, ATF had classified multiple weapons configured with different "brace" devices as short-barreled rifles subject to the NFA. *Id.* at 6,484.

Yet the agency's early classification letters did not apply a standard set of criteria to determine whether a firearm equipped with a "brace" device was designed, made, and intended to be fired from the shoulder, resulting in inconsistent (and occasionally incorrect) guidance on how a "brace" device might affect a weapon's classification under the NFA and the GCA. *Id.* at 6,501–02. For example, some early classification letters (and a 2015 Open Letter) suggested that whether a weapon was a short-barreled rifle depended (at least in part) on an individual's actual, intended, or incidental use of the "stabilizing brace," as either a device assisting single-handed fire or shoulder fire. *Id.* at 6,484, 6,487–88. ATF also occasionally focused on the "brace" device itself, considering whether it had been "classified as a shoulder stock," *id.* at 6,484 n.26, or whether it *could* be used for single-handed fire, *id.* at 6,501. But during this same period, the agency also had explained in some classification letters that a weapon's classification is "based on [its] physical design characteristics," *id.* at 6,502 n.81, and classified several "brace"-equipped weapons as short-barreled rifles after considering, *e.g.,* whether the "brace" device served any purpose other than to extend the rear surface to enable shouldering, *id.* at 6,485, or whether the device created a "length of pull" akin to a shoulder-fired weapon, *id.* at 6,489.

Recognizing the inconsistencies in its early attempts to classify these novel "brace"-equipped weapons, ATF began to revisit its guidance and analytical framework. In 2017, the agency corrected its prior guidance that "incidental" shouldering could alter a weapon's classification, explaining that a classification depends principally on a weapon's physical configuration and not on a shooter's

**APP.181**

incidental use of the firearm. *Id.* at 6,491. In 2018, ATF informed classification requestors that, to properly evaluate how a "brace" device affects a weapon's classification, the agency would need to examine the overall configuration of the weapon with the "brace" device attached. *Id.* at 6,492.

By mid-2020, ATF's classification letters reflected a focused analysis of the weapon's objective design features to determine whether it was designed, made, and intended to be fired from the shoulder, as instructed by the statutory definition of a "rifle." For example, in May 2020, ATF received a classification request from SB Tactical for an AR-type pistol equipped with the SBA3 "brace" device. *Id.* at 6,493 (providing images of the submission). ATF determined that the weapon, as configured with the SBA3, was a short-barreled rifle because it possessed objective design features characteristic of weapons designed and intended to be fired from the shoulder—*e.g.*, the SBA3's similar form and function to known shoulder stocks; the SBA3's hardened rear surface area; the utilization of an AR-type receiver extension, which allowed the SBA3 to extend rearward; and the firearm's length of pull, which enabled useful shoulder fire. *Id.* A month later, ATF classified another submitted heavy pistol equipped with a "stabilizing brace" as a short-barreled rifle after applying the same analytical framework. *Id.* at 6,493–94 (providing images of the submission compared to a rifle marketed by the same company). Notably, neither manufacturer sued to challenge these classifications.

## III.    The Rule

**1.** By late 2020, although ATF had correctly focused its analysis of whether a weapon is designed, made, and intended to be fired from the shoulder on the weapon's objective design features, the agency acknowledged that inconsistencies in its early classification letters and guidance had confused the regulated community. *Id.* at 6,496. Adding to the confusion, manufacturers were labeling "brace" devices as "ATF compliant" without having submitted the particular device for classification. *Id.* at 6,492. Even more problematic, the agency continued to observe that manufacturers were widely marketing and members of the public were widely using "brace" devices to create short-barreled rifles

**APP.182**

without complying with NFA requirements, *id.*, which Congress had aimed at preventing the criminal and violent use of uniquely dangerous and concealable weapons, *supra* p. 2.

In March 2021, a 21-year-old individual armed with an AR-type pistol equipped with a "stabilizing brace" opened fire at a supermarket in Boulder, Colorado, killing ten people, including an on-duty police officer. This shooting came on the heels of another mass shooting in Dayton, Ohio, in which a 24-year-old individual similarly armed with an AR-type pistol equipped with a "stabilizing brace" killed nine people and injured 17 others within approximately 30 seconds from firing the first shot.[2] In both instances, the shooters reportedly used the "brace" devices attached to their rifle-variant pistols as shoulder stocks. 88 Fed. Reg. at 6,495.

**2.** In light of its pre-existing concerns, as well as these violent crimes evincing the exact harms that Congress sought to prevent when it enacted the NFA, ATF determined that it was necessary to clarify how it evaluates the classifications of weapons equipped with "stabilizing braces." *Id.* The agency therefore published a notice of proposed rulemaking ("NPRM") in June 2021, proposing amendments to 27 C.F.R. §§ 478.11 and 479.11 regarding the meaning of the term "rifle," as used in the NFA and the GCA. 86 Fed. Reg. 30,826.[3] The NPRM also proposed publishing the criteria that ATF evaluates when determining whether a weapon submitted for classification is designed, made, and intended to be fired from the shoulder, including weapons equipped with "stabilizing braces" or other similar attachments. *Id.* The notice elicited over 230,000 public comments. 88 Fed. Reg. at 6,497.

ATF announced the rule on January 13, 2023, and it was published in the Federal Register on January 31, 2023, 88 Fed. Reg. at 6,478. The Rule, which reflects careful consideration of the voluminous comments from the public, *id.* at 6,497–69, contains the following key provisions:

---

[2] CNN, *10 killed in Colorado grocery store shooting*, https://perma.cc/HG5S-3NAF; USA Today, *Dayton shooter used a modified gun that may have exploited a legal loophole*, https://perma.cc/89XK-SNVR.

[3] In December 2020, ATF published a notice of proposed rulemaking, *Objective Factors for Classifying Weapons with "Stabilizing Braces,"* 85 Fed. Reg. 82,516, but withdrew it weeks later, 85 Fed. Reg. 86,948.

**APP.183**

*Definition of the statutory term "rifle."* The Rule amended regulations issued under the NFA and the GCA that address the statutory definition of "rifle," as proposed in the NPRM. *Id.* at 6,569. The amended regulations clarify that, in ATF's view, the statutory phrase "designed, redesigned, made or remade, and intended to be fired from the shoulder" includes any weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that provides surface area allowing the weapon to be fired from the shoulder, provided that other factors indicate that the weapon is designed, made, and intended to be fired from the shoulder. *Id.* The other factors—which the NPRM discussed and were the subject of public comment, *id.* at 6,511–6,513—are:

(i)    whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii)   whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

(iii)  whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(iv)   whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(v)    the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi)   information demonstrating the likely use of the weapon in the general community.

*Id.* at 6,569–70.

*Options for persons who may possess unregistered short-barreled rifles.* The Rule also outlined several options for persons currently possessing short-barreled rifles equipped with "stabilizing braces," including individual possessors, FFLs, and certain governmental entities. *Id.* at 6,570–71. For example,

**APP.184**

an individual who was an unlicensed possessor of a "brace"-equipped short-barreled rifle before the

Rule was published has until May 31, 2023, to come into compliance with the NFA by:

> (i)   filing the necessary ATF form to register the firearm in the National Firearms
>       Registration and Transfer Record by May 31, 2023;
>
> (ii)  removing the firearm from the definition of "short-barreled rifle," 26 U.S.C.
>       § 5845(a)(3), (4); 18 U.S.C. § 921(a)(8), by either (a) removing the short barrel and
>       attaching a 16-inch or longer rifled barrel to the firearm, or (b) permanently
>       removing and disposing of or altering the "brace" device so that it cannot be
>       reattached to the weapon;
>
> (iii) turning the firearm into a local ATF office; or
>
> (iv)  destroying the firearm, per ATF's published instructions.

*Id.* at 6,570.

 *Tax-forbearance provisions.* Under the Rule, ATF is forbearing certain NFA tax obligations for

persons who possessed short-barreled rifles equipped with "stabilizing braces" prior to the Rule's

publication. *Id.* at 6,571. Individual possessors, for instance, will not be subject to the $200 making tax

so long as they file the necessary ATF registration form by May 31, 2023. *Id.*

 *Rescission of prior classifications.* As a final matter, given that not all prior classification letters

issued by ATF reflected the correct understanding of the statutory definition of "rifle," the Rule

rescinded all of ATF's prior classifications of firearms equipped with "stabilizing braces." *Id.* at 6,480.

These classifications are therefore no longer valid or authoritative. *Id.* at 6,569.[4]

## IV.   This Lawsuit

 Plaintiffs—a firearms advocacy association, a firearms manufacturer, and two individuals who

possess pistols equipped with "stabilizing braces"—filed this lawsuit on January 31, 2023, claiming,

---

[4] ATF also issued additional guidance in conjunction with the Rule's announcement, including (i) answers to frequently asked questions regarding the Rule, (ii) registration guidance, and (iii) a non-exhaustive list of commercially available firearms and common weapon platforms equipped with "stabilizing braces" that ATF has determined are short-barreled rifles under the NFA and the GCA. *See* ATF, *Factoring Criteria for Firearms with Attached "Stabilizing Braces,"* https://perma.cc/MRR9-ZBJ2.

**APP.185**

*inter alia*, that the Rule is unconstitutional and otherwise violates the APA. Am. Compl. ¶¶ 83–234, ECF No. 13. Three weeks later, they moved to preliminarily enjoin ATF from enforcing the Rule or, in the alternative, to postpone its effective date. ECF No. 33.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To justify this "drastic remedy," a plaintiff must make a "*clear showing*" that (1) it has a substantial likelihood of success on the merits; (2) it will suffer irreparable harm without the requested injunction; (3) the balance of equities tips in its favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). This same four-part test governs relief under § 705. *Dist. of Columbia v. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (D.D.C. 2020).

## ARGUMENT

I.    **Plaintiffs are unlikely to succeed on the merits of their claims.**

    A.    **The Rule is a valid exercise of ATF's statutorily delegated authority and comports with the relevant statutory provisions.**

Plaintiffs claim that ATF lacked authority to promulgate the Rule because Congress did not delegate to the Executive Branch the authority to interpret the statutory definition of "rifle," and if it did, the Rule's interpretation of that term is "incompatible" with the NFA and the GCA. Mot. at 25, ECF No. 36. But the Rule fits squarely within ATF's delegated authority and correctly construes the relevant statutory provisions. Plaintiffs' arguments, on the other hand, rest largely on bare assertions that, in any event, are contrary to basic principles of statutory construction.[5]

**1.** As a threshold matter, a facial APA challenge to the Rule is ill-suited for redressing Plaintiffs' alleged injuries. One would expect Plaintiffs to bring concrete challenges to ATF's actual classifications of the *particular* "brace"-equipped weapons that they possess or manufacture. After all,

---

[5] Before reaching Plaintiffs' constitutional challenges to the Rule, the Court should first address their other contentions. *See, e.g.*, *N.Y. City Transit Auth. v. Beazer*, 440 U.S. 568, 582 (1979).

**APP.186**

Plaintiffs' alleged injuries stem from whether *their* weapons are short-barreled rifles subject to NFA and GCA controls. But no Plaintiff brings a legal claim to have the Court resolve whether its particular weapons are properly classified as "short-barreled rifles" under 26 U.S.C. § 5845(a)(3), (a)(4) or 18 U.S.C. § 921(a)(8). In fact, the record is devoid of any facts that would allow this Court to independently assess the classification of any Plaintiff's "brace"-equipped weapon under the terms of the statute. That omission is telling: if the Court were to conclude that a Plaintiff was in possession of a short-barreled rifle within the meaning of the NFA, any purported "injury" to the Plaintiff would not be traceable to the Rule at all, but would instead stem solely from the statute—as the Rule is purely interpretive. Indeed, though Plaintiffs raise abstract challenges to the Rule, it is the statute—not the Rule—that would impose the relevant obligations on Plaintiffs. For purposes of this motion, then, Plaintiffs have failed to demonstrate standing to facially challenge the Rule. *Cf. Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("[A]n injury" must be "fairly traceable to the challenged conduct.").[6]

**2.** But setting that aside, ATF possesses clear authority to interpret provisions within the NFA and the GCA, including terms used within the statutory definition of "rifle." Congress charged the Attorney General with the NFA's "administration and enforcement," 26 U.S.C. § 7801(a)(1), (a)(2)(A), providing that the Attorney General "shall prescribe all needful rules and regulations" to that end, *id.* § 7805(a); *see also id.* § 7801(a)(2)(A). Similarly, Congress delegated to the Attorney General the authority to prescribe any "such rules and regulations as are necessary to carry out" the GCA's provisions. 18 U.S.C. § 926(a). In turn, the Attorney General has delegated the responsibility for administering and enforcing both statutes to the Director of ATF. 28 C.F.R. § 0.130(a).

Pursuant to that delegated authority, ATF has long promulgated rules and regulations implementing both statutory schemes. 27 C.F.R. parts 478, 479. Like any executive actor charged with

---

[6] It is similarly unclear that a challenge to the Rule in the abstract is a challenge of final agency action under the APA. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997) (holding that final agency action must be one by which "rights or obligations have been determined").

**APP.187**

enforcing a statute, the agency has found it necessary to issue rules interpreting terms used in the NFA and the GCA. *See Gonzales v. Oregon*, 546 U.S. 243, 255 (2006) ("Executive actors often must interpret" statutes "Congress has charged them with enforcing and implementing."). The agency's interpretive authority is well established. *Guedes v. ATF*, 356 F. Supp. 3d 109, 129 n.3 (D.D.C. 2019) (noting "ATF's clear authority to interpret" the NFA's definitions); *accord Aposhian v. Barr*, 374 F. Supp. 3d 1145, 1150–51 (D. Utah 2019). Indeed, ATF has maintained regulations for decades that clarify the meaning of statutory terms that Congress did not fully define. *See* 88 Fed. Reg. at 6,500 (collecting examples). And consistent with this longstanding practice, ATF issued the Rule to clarify the meaning and proper application of another definitional phrase: "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).

The need for this Rule cannot be gainsaid. 26 U.S.C. § 7805(a); *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990) ("[Section 926] confers [a] measure of discretion" to ATF "to determine what regulations are in fact 'necessary.'"). Federal law regulates the possession, manufacture, and distribution of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *Thompson/Center*, 504 U.S. at 517. A short-barreled rifle is statutorily defined as, *inter alia*, "a rifle having one or more barrels less than [16] inches in length." 18 U.S.C. § 921(a)(8); 26 U.S.C. § 5845(a)(3). Both the NFA and the GCA further defined the term "rifle" to include all weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). But Congress shed no further light on the meaning of this clause, nor did it explain how to determine if this definition is met.

Then the "stabilizing brace" arrived and quickly proliferated. As explained, *supra* p. 5–6, over the last decade, ATF has received numerous classification requests for weapons equipped with various types of "brace" devices, as the need for ATF to determine these weapons' classifications was clear to manufacturers from the start. While "stabilizing braces" are purportedly meant to assist single-handed

13

**APP.188**

fire by resting against a shooter's forearm, many of these devices closely resemble common shoulder stocks and incorporate design features tailored for shouldering a weapon. 88 Fed. Reg. at 6,479, 6,503, 6,528, 6,547. Indeed, when a heavy pistol is configured with a "stabilizing brace," it is often hard to tell the firearm apart from weapons marketed explicitly as short-barreled rifles. *Id.* at 6,493–94, 6,529; *FINAL RULE 2021R-08F*, at 12–13, https://perma.cc/W6ZW-8FUL (providing three visual comparisons). Given their stock-like designs and function, manufacturers have designed (and even explicitly marketed) various "brace" devices to convert heavy pistols into shoulder-fired weapons, and individual possessors have widely used these devices for that purpose, 88 Fed. Reg. at 6,479, 6,527–29, 6,544–47—including two individuals who recently used "braced"-equipped firearms to carry out mass shootings. The result has been the widespread circumvention of NFA and GCA controls.

It is against this backdrop that ATF initiated the rulemaking at issue. *See Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) ("[A]n agency must be given ample latitude to 'adapt [its] rules and policies to the demands of changing circumstances.'" (citation omitted)). After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations, 27 C.F.R. §§ 478.11, 479.11, to provide a consistent, predictable framework for applying to this class of weapons Congress's definition of "rifles," *i.e.*, weapons that are, *inter alia*, "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). The Rule explains that a weapon equipped with a "stabilizing brace" may, under certain circumstances, be a "rifle" under that statutory definition. 88 Fed. Reg. at 6,569. And to provide the regulated community with necessary guidance, the Rule outlines the relevant criteria that ATF considers when determining whether a particular weapon configured with a "brace" device is designed, made, and intended to be fired the shoulder. *Id.* at 6,569–70. As the Rule explains, *id.* at 6,513–43, ATF's expertise and years of experience in classifying "brace"-equipped weapons informs these criteria. *Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 908 (6th Cir. 2021). The Rule

**APP.189**

therefore rests on ATF's well-established authority and is consistent with its longstanding practice of issuing rules to clarify its understanding of the meaning and proper application of statutory terms.

**3.** Still, Plaintiffs contend that the Rule is "incompatible" with the statutory definition of "rifle," because no pistol equipped with a "stabilizing brace" can meet that definition. Mot. at 25, 28. But Plaintiffs marshal no evidence or serious interpretive analysis to support that categorical claim. At any rate, their arguments do not comport with the statute's text or purpose, prior judicial constructions, or any canon of construction that they invoke. The Rule, on the other hand, reaches the correct conclusion: that a pistol equipped with a "stabilizing brace" can be a "rifle," and thus a short-barreled rifle, within the meaning of the NFA and the GCA.

Plaintiffs begin by suggesting that, if a "brace"-equipped weapon is created from a *pistol*, it cannot be a "rifle" under § 5845(c) and § 921(a)(7). *E.g.*, Mot. at 26, 28. But that argument not only ignores that these statutory provisions' use the broad and inclusive term "weapon," but also conflicts with the Supreme Court's decision in *Thompson/Center*. There, the Court explained that packaging a .22 caliber pistol with a carbine kit and a rifle stock brings the firearm "within the 'intended to be fired from the shoulder' language contained in the [NFA's] definition of rifle." 504 U.S. at 513 n.6 (citation omitted); *accord id.* at 523 (White, J., dissenting); *id.* at 525 (Stevens, J., dissenting). Lower courts have likewise applied that same reasoning. *E.g.*, *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir. 1971); *United States v. Santoro*, 242 F. App'x 627, 630 (11th Cir. 2007). As these decisions acknowledge, it is immaterial under the plain language of § 5845(c) and § 921(a)(7) whether a "rifle" is made or designed by starting with a pistol (or any other rifle-bored weapon) as a component part, so long as the ultimate "weapon" has been configured to be designed, made, and intended to be fired from the shoulder.[7]

---

[7] That is why even those weapons whose "characteristics are so different from what is commonly considered a 'rifle'" can "fit[] the letter and spirit" of the statutory definition. *See, e.g.*, *Kanarr Corp. v. United States*, 188 Ct. Cl. 1051, 1055–58 (1969) (grenade launcher); *United States v. Rose*, 695 F.2d 1356, 1357–58 (10th Cir. 1982) (Uzis with collapsible stocks). The NFA's legislative history also supports

**APP.190**

Plaintiffs next argue that the Rule "ignore[s]" the "design and intent" of a weapon, and instead adopts an analytical framework that evaluates "subjective criteria" that are unrelated to the statutory definition of a "rifle." Mot. at 28. But they are wrong on several scores. As the Rule explains, to properly apply the statutory definition of "rifle," ATF considers a particular weapon's *objective* design features, in addition to a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. In this particular context, where the record shows that manufacturers' descriptions of "brace"-equipped weapons are often at odds with the weapons' design features and common use, *id.* at 6,479, 6,503 & n.87, 6,505, 6,527–29, 6,546–47, this objective approach is especially sensible.

While a manufacturer's description of a weapon may be relevant in determining whether it is designed, made, and intended to be fired from the shoulder, relying solely on that description would (i) frustrate Congress's purpose in enacting the NFA and the GCA, (ii) lead to absurd results, and (iii) permit manufacturers to circumvent the law by nominally describing the intended use one way (as not a short-barreled rifle) and then designing and marketing the weapon as one. *Id.* at 6,544; *see also United States v. Hayes*, 555 U.S. 415, 426–27 (2009) (rejecting an interpretation that "would frustrate Congress' manifest purpose" and mean the statute was a dead letter in many applications). Indeed, if a weapon's classification turned entirely on the manufacturer's description, any manufacturer of a short-barreled rifle could easily skirt the NFA entirely by, *e.g.*, labeling the rifle as a non-shoulder-fired weapon, or by etching into the stock "this firearm is not to be shoulder fired." But surely, Congress did not intend the NFA to be so toothless, as the Rule explains. 88 Fed. Reg. at 6,544.

---

this understanding. When Congress enacted the statutory definition of "rifle" in 1954, a House committee report confirmed that the definition was intended to replace reliance on "ordinarily accepted definitions" in determining whether a particular weapon is an NFA "rifle." H.R. Rep. No. 83-1337, at A395. ATF also has long recognized that pistols can be modified to fall within the NFA's definition of "rifle." *See, e.g.*, IRS, Rev. Rul. 61–45, 1961-1 C.B. 663, 1961 WL 12798 (Jan. 1, 1961).

**APP.191**

Courts have agreed in similar contexts. For example, in *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), the First Circuit held that ATF properly considered the objective design features of a particular product to determine whether it "was 'intended only for use'" in making a silencer—*i.e.*, an NFA "firearm." 826 F.3d at 601–02; *see also, e.g.*, *United States v. Syverson*, 90 F.3d 227, 232–33 (7th Cir. 1996) (looking to objective design features to make a similar determination under the NFA). The court found no reason to conclude that an objective approach to discerning intent (as opposed to relying solely on a manufacturer's stated intent) was prohibited under the NFA. *Sig Sauer*, 826 F.3d at 602. Indeed, foreshadowing ATF's analysis in the Rule, the court found it "hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record—such as a part's design features—indicates is not actually an intended one." *Id.* For that reason, the court noted that an objective approach to discerning intent—like ATF's approach—"is a very familiar one in the law," *id.* at 601, as recognized in analogous contexts, *e.g.*, *Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513, 517–22 (1994) (adopting an objective construction of the phrase "primarily intended . . . for use").[8]

And, aside from a weapon's objective design features, ATF also considers other evidence of the weapon's intended use. These include, *inter alia*, the "manufacturer's own marketing materials," "indirect marketing or promotional materials" from accessory makers and sellers, and other information indicating the general community's likely use of a particular weapon, if it evinces the manufacturer's intent with regard to that weapon. 88 Fed. Reg. at 6,544. Courts have long relied on this type of evidence as well to discern intent in numerous contexts. *See, e.g.*, *Posters 'N' Things*, 511 U.S. at 521 n.11 (noting that "the likely use of customers generally" can be relevant to determining whether an item is "primarily intended" for a specific "use"). Plaintiffs' suggestion that ATF considers

---

[8] *See also, e.g.*, *Nat'l Nutritional Foods Ass'n v. Mathews*, 557 F.2d 325, 334 (2d Cir. 1977); *Kelly Servs., Inc. v. Creative Harbor, LLC*, 846 F.3d 857, 864 (6th Cir. 2017).

**APP.192**

"subjective criteria" that is unrelated to the "design and intent" of a weapon, Mot. at 28, thus misconstrues the *objective* nature of the evidence that ATF considers and the reason it is evaluated: to determine whether a weapon is designed, made, and intended to be fired from the shoulder, *see* 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7).[9]

Finally, Plaintiffs appear to suggest that a weapon equipped with a "stabilizing brace" cannot be a "rifle" if designed to be conveniently fired with one hand. Mot. at 8–9. But the fact that a particular "brace"-equipped pistol may be designed to *also* allow effective single-handed fire is not dispositive of whether the weapon is designed, made, and intended to be fired from the shoulder. 88 Fed. Reg. at 6,501. Many litigants have argued that the definition of "rifle" should be limited only to weapons designed and intended to fire *exclusively* from the shoulder. Yet courts have roundly and rightly rejected that atextual reading of the statute. *E.g.*, *Rose*, 695 F.2d at 1357–58; *United States v. Schuhmann*, 963 F.2d 381 (9th Cir. 1992); *Sipes v. United States*, 321 F.2d 174, 178 (8th Cir. 1963) ("That" a weapon "could be fired elsewhere than from the shoulder makes it no less a rifle within the statutory definition."), *overruled on other grounds by Haynes v. United States*, 390 U.S. 85 (1968); *Kanarr*, 188 Ct. Cl. at 1056–57.

As the Rule explains, the plain language of the statute compels the conclusion that a pistol equipped with a "stabilizing brace" that it is designed, made, and intended to be fired from the shoulder is a "rifle," regardless of whether it includes design features—*e.g.*, an arm slot or Velcro straps—that also might permit effective single-handed firing. 88 Fed. Reg. at 6,501. The opposite conclusion would inject into the definition of "rifle" an "exclusive use" limitation that is nowhere found in the statutory text. *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1495 (2020) ("Nor does this Court usually read into statutes words that aren't there."). Moreover, Congress indicated in the

---

[9] Plaintiffs remark in passing that the Rule's criteria do not indicate whether a particular "brace"-equipped weapon is designed and intended to be fired from the shoulder. Mot. at 27. But Plaintiffs develop no argument and marshal no evidence to support that conclusory assertion. *See In re Lothian Oil, Inc.*, 508 F. App'x 352, 357 (5th Cir. 2013) ("[U]ndeveloped arguments are rightly ignored.").

**APP.193**

same provision how to impose such a limitation by defining a "silencer" to include a "part *intended only for use* in [the] assembly or fabrication" of a firearm silencer or muffler. 26 U.S.C. § 5845(a)(7) (emphasis added) (cross-referencing 18 U.S.C. § 921(a)(25)); *Romag Fasteners*, 140 S. Ct. at 1495 (noting that courts should be "doubly careful" not to read words into statutes when Congress used "the term in question elsewhere in the very same" provision). But Congress chose to define "rifle" to mean a weapon designed, made, and intended to be fired from the shoulder, irrespective of alternate use.

### B.   Notice and comment was not required, and in any event, the Rule is a logical outgrowth of the proposed rule.

Plaintiffs contend that the final rule is not a "logical outgrowth" of the proposed rule, in violation of the APA. Mot. at 29. Plaintiffs' arguments fail because (1) the Rule is not subject to notice-and-comment requirements, and (2) the Rule is a reasonable outgrowth of the proposed rule.

First, although Plaintiffs assume notice and comment was required here, "[n]ot all 'rules' must be issued through the notice-and-comment process." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). Specifically, the notice-and-comment requirement does not apply to interpretive rules. *Id.* Interpretive rules are "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers," *id.* at 97 (citation omitted), and "explain what an agency thinks a statute or regulation actually says," *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023). An interpretive rule "may be called 'substantive,' in the sense that it is neither procedural nor a mere policy statement if it is binding on the rights and obligations of private persons. But such a rule will still be exempt from notice and comment if all that it does is interpret existing, substantive law." *Id.* at 241 n.5 (citations omitted) (cleaned up). Further, that a rule reverses an agency's previous interpretation of a statute does not make it legislative. *Id.* at 241 n.6.

The Rule is interpretive: it merely advises the public of ATF's interpretation of the NFA and the GCA. It repeatedly states that it "does not impose any new legal obligations" and, instead, "merely conveys more clearly to the public the objective design features and other factors that indicate a

**APP.194**

weapon is in fact a firearm or short-barreled rifle under the relevant statutes." 88 Fed. Reg. at 6,478; *id.* at 6,569 ("The final regulatory text for the definition of 'rifle' reflects the best interpretation of the relevant statutory provisions."). That ATF still sought public comment to give "notice and opportunity to comment," to "reduce[] vagueness concerns," *id.* at 6,552, does not mean it was required to do so. And because notice and comment was unnecessary, Plaintiffs cannot show a legal violation for not following that process's specific requirements. *See Texas v. EPA*, 389 F. Supp. 3d 497, 504 (S.D. Tex. 2019) ("notice-and-comment requirement" includes "logical outgrowth" test).

Regardless, the Rule is a logical outgrowth of ATF's proposed rule. A rule satisfies the logical outgrowth requirement if the proposed rule "adequately frame[s] the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (citations omitted). This standard is satisfied if the NPRM "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, an agency is not required to "specifically identify every precise proposal which [it might] ultimately adopt as a final rule." *Id.*

The NPRM fairly apprised the public of the subjects and issues ATF was considering. Indeed, the NPRM and the Rule both make clear that ATF contemplated and ultimately decided to amend the regulatory definition of rifle. *Compare* NPRM, 86 Fed. Reg. at 30,826 ("[DOJ] proposes amending [ATF] regulations to clarify when a rifle is 'intended to be fired from the shoulder.' [DOJ] proposes factors ATF considers when evaluating firearms equipped with a purported 'stabilizing brace' to determine whether these weapons would be considered a 'rifle' or 'short-barreled rifle' under the [GCA or NFA].") *with* 88 Fed. Reg. 6,478 ("[DOJ] is amending the regulations . . . to clarify when a rifle is designed, made, and intended to be fired from the shoulder" and the Rule sets forth "objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes"); *cf. Kooritzky v. Reich*, 17 F.3d 1509, 1513 (D.C. Cir. 1994) (proposed

20

**APP.195**

rulemaking violated § 553 when it "contain[ed] nothing, not the merest hint, to suggest" it would amend a regulation). Courts have upheld significantly more drastic changes from the NPRM to the final rule. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1374 (Fed. Cir. 2017) ("Courts applying the logical outgrowth doctrine have also permitted agencies to drop critical elements of proposed rules even if a resulting final rule effectively abandons an agency's initial proposal."); *BASF Wyandotte Corp. v. Costle*, 598 F.2d 637, 644 (1st Cir. 1979) (upholding change from proposal of industry subcategories subject to different standards to final rule applying uniform standard to entire industry).

Further, although the Rule did not adopt Worksheet 4999's precise point system, the NPRM provided interested persons fair notice that ATF was considering a factor-based approach and notice of those factors. The NPRM proposed amending the regulatory definition of rifle to consider "objective design features and characteristics that indicate that the firearm is designed to be fired from the shoulder, as indicated on ATF Worksheet 4999"—an aim nearly identical to the final rule. 86 Fed. Reg. at 30,829. And the Worksheet set forth "[f]actoring [c]riteria," just like the final rule. *Id.* at 30,830. Indeed, contrary to Plaintiffs' suggestion, the Rule's balancing test is not "contrary to [ATF's] original proposal," Mot. at 32, but akin to an unweighted variation of the Worksheet's approach. *See S. Terminal Corp. v. EPA*, 504 F.2d 646, 658 (1st Cir. 1974) (upholding "substantial" changes "in character with the original scheme" and "foreshadowed in proposals and comments" during rulemaking).

Perhaps most critically, "[a]ll of the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480; *see also id.* at 6,513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet[.]"); *id.* at 6,494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'"); *id.* at 6,480, 6,569. Indeed, ATF addressed public comments regarding the Worksheet's factors that the Rule ultimately adopted, indicating that the NPRM notified interested

21

**APP.196**

persons that the final rule might consider these factors. *E.g., id.* at 6,514–21 (weight and length comments); *id.* at 6,521–31, 6,537–41 (rear surface area comments); *id.* at 6,533–37 (length of pull comments); *id.* at 6,541–43 (sights and scope comments); *see United Steelworkers of Am., AFL-CIO-CLC v. Schuylkill Metals Corp.*, 828 F.2d 314, 318 (5th Cir. 1987) ("The comments received reflected such an understanding and provided additional support for the broad final rule; the NPRM was sufficiently descriptive of the subjects and issues involved that interested parties offered informed criticism and comments." (cleaned up)).[10] And the changes made between the NPRM and the Rule evince a careful, considered process based on the comments received, not a logical outgrowth problem. The Rule explains that ATF weighed comments "regarding the complexity in understanding the proposed Worksheet 4999 and [its] methodology," and it decided "not [to] adopt" the Worksheet "and its point system," and instead, "based on [public] comments," ATF "took the relevant criteria discussed in the NPRM" and "incorporated them into the rule's revised definitions of rifle." 88 Fed. Reg. 6,480. Thus, even if notice and comment had been required, the Rule satisfies the logical outgrowth requirement.

### C.     Neither the Rule nor the NFA infringe Second Amendment rights.

Plaintiffs likewise fail to demonstrate any likelihood of success on the merits of their Second Amendment challenges to the Rule and the NFA. Mot. at 11–15, 33–36. *First*, "stabilizing braces" are not "bearable arms," and thus Plaintiffs lack a Second Amendment right to use them. *Second*, the NFA's basic registration requirements do not implicate the right to bear arms. *Third*, short-barreled rifles are dangerous and unusual weapons that do not enjoy Second Amendment protections. *Fourth*, and finally, even if the Rule and the NFA implicated the right to bear arms, they are supported by a robust history and tradition of firearm regulations.

---

[10] Plaintiffs suggest, without citation to authority, that a significant change in anticipated costs could "support[] [the] conclusion" that there is a logical outgrowth problem, Mot. at 32–33 (citation omitted), but standing alone, that observation does nothing to advance Plaintiffs' arguments, given the paucity of substantive logical outgrowth issues in the Rule.

1. Firearm braces are not bearable arms protected by the Second Amendment.

Under *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Second Amendment extends only to "instruments that constitute bearable arms." *Id.* at 582; *Hollis v. Lynch*, 827 F.3d 436, 447 (5th Cir. 2016). Indeed, "[a]n instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an 'Arm.'" *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (cleaned up); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2132 (2022). Consistent with this requirement, *Heller* explained that the historical understanding of the term "arm" covers "[w]eapons of offence or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." 554 U.S. at 581.

Because the Second Amendment protects only the right to use "bearable arms," laws that regulate the use of firearm "accessories" or "attachments" do not generally impinge on that right. For instance, the NFA requires registration and payment of a $200 tax—the same requirements for a short-barreled rifle—when making a firearm equipped with a "silencer."[11] Courts have uniformly held that because a "silencer is a firearm accessory . . . it can't be a 'bearable arm' protected by the Second Amendment." *Cox*, 906 F.3d at 1186; *accord United States v. Al-Azhari*, 2020 WL 7334512, at *3 (M.D. Fla. Dec. 14, 2020). Indeed, "a silencer cannot, on its own, cause any harm, and it is not useful independent of its attachment to a firearm," and "a firearm remains an effective weapon without a silencer" attached. *United States v. Hasson*, 2019 WL 4573424, at *4–5 (D. Md. Sept. 20, 2019) (collecting cases). "Stabilizing braces" fall outside the scope of the Second Amendment for the same reasons. These devices are not weapons or arms and serve no useful purpose except as attachments to firearms. While Plaintiffs may wish to use a "brace" to "improve the usage of a firearm," they appear to admit that their firearms remain effective without any "brace" attached. Lewis Decl. ¶ 10,

---

[11] "Silencer" is defined as, *inter alia*, "any device for silencing, muffling, or diminishing the report of a portable firearm." 18 U.S.C. § 921(a)(25).

**APP.198**

ECF No. 36-3; Mock Decl. ¶ 11, ECF No. 36-4 (conceding that each could "remove the brace on my pistol[]"). Attaching a "brace" to a weapon is thus "not protected by the Second Amendment." *See Hasson*, 2019 WL 4573424, at *5. Plaintiffs' Second Amendment claim fails for this reason alone.

2. Registration of short-barreled rifles does not implicate the Second Amendment.

The Rule does not ban any firearms; rather the NFA (and thus the Rule) permits possession of short-barreled rifles upon registration with, and approval by, ATF. Although Plaintiffs raise a Second Amendment claim, Mot. at 11, they fail to explain what requirement of the NFA or the Rule is unconstitutional. In fact, Plaintiffs concede that they may lawfully possess their firearms if they "register" them as short-barreled rifles and receive ATF's approval.[12] Am. Compl. ¶¶ 4–5. Mock and Lewis also are not subject to any tax (which they don't dispute). Plaintiffs are thus left to argue that the registration process's burden and delay impinges their Second Amendment rights. *Id.* ¶ 4.

But routine firearm registration procedures, like those required here, do not offend the right to bear arms. As the Fifth Circuit has explained, requirements that are part and parcel of the NFA (*e.g.*, being "photographed and fingerprinted") implicate no legally protected interest, but are "merely 'additional costs and logistical hurdles' that all citizens" must bear "under a government." *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *accord Lane v. Holder*, 703 F.3d 668, 672–73 (4th Cir. 2012) (finding no injury from "additional costs and logistical hurdles" in purchasing handguns, and distinguishing laws imposing "minor inconveniences" from those effecting "an absolute deprivation" of the right to bear arms).

Indeed, Justice Kavanaugh reiterated in *Bruen* that 43 states employ concealed-carry licensing regimes that may demand "objective licensing requirements," like "fingerprinting, a background

---

[12] Plaintiffs do not allege that any future application would be denied, and indeed such a speculative allegation would not establish constitutional injury. The Fifth Circuit has repeatedly held that concern regarding future denial of a firearm certification or registration is insufficient to demonstrate Article III standing. *See Westfall v. Miller*, 77 F.3d 868, 872 (5th Cir. 1996); *Bezet*, 714 F. App'x at 340.

**APP.199**

check, a mental health records check," none of which violates the Second Amendment. 142 S. Ct. at 2162 (Kavanaugh, J., concurring). And the Court took pains to note this point, as well. *Id.* at 2138 n. 9 (explaining that "nothing in our analysis should be interpreted to suggest the unconstitutionality" of these licensing regimes). Likewise, the NFA's registration procedures (*e.g.*, fingerprinting and background checks) pose no constitutional problem under *Bruen. See, e.g., Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (upholding under *Bruen* a state firearms permit requirement that includes a "background check, fingerprinting, a mental health check," etc.).

Nor can Plaintiffs show the extraordinary circumstances left open by the Court in *Bruen*, in which otherwise constitutional licensing may still infringe on the Second Amendment because of "lengthy wait times" or "exorbitant fees" that effectively "deny ordinary citizens their right to public carry." 142 S. Ct. at 2138 n.9. The length of time required for registration here is irrelevant to Plaintiffs' Second Amendment claim, because if Plaintiffs submit their applications on or before May 31, 2023, they may retain possession of their firearms until they receive ATF's response on the application. 88 Fed. Reg. at 6,559. Moreover, the Rule imposes no tax on Plaintiffs if their applications are timely filed. Plaintiffs thus fail to demonstrate why registration offends the Second Amendment.

### 3. Short-barreled rifles are dangerous and unusual weapons that are not protected by the Second Amendment.

The Rule does not implicate the Second Amendment for another reason: there is no right to bear dangerous and unusual arms like short-barreled rifles. *Heller*, 554 U.S. at 625 (explaining that the Second Amendment, as historically understood, does not protect "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns").

The Fifth Circuit in *Hollis* outlined the proper analysis for determining when a weapon (a machinegun, in that case) is "dangerous and unusual" and thus unprotected by the Second Amendment. 827 F.3d at 451. In evaluating dangerousness, the court looked to Circuit precedent holding that the unlawful possession of a machinegun constitutes a crime of violence for purposes of

**APP.200**

a sentence enhancement. *Id.* at 449. That same precedent explains that the same conclusion applies to all NFA firearms, including short-barreled rifles. *United States v. Golding*, 332 F.3d 838, 843 (5th Cir. 2003). The court also relied on decisions from other courts holding that machineguns are dangerous weapons outside the Second Amendment's ambit. 827 F.3d at 448. As with machineguns, courts have uniformly agreed that the inherent dangerousness of short-barreled rifles places them beyond constitutional protections. *E.g.*, *Cox*, 906 F.3d at 1185; *see also* 88 Fed. Reg. at 6,499 (noting that short-barreled rifles "are dangerous and unusual due to both their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy")[13]

*Hollis* also analyzed what it means for a firearm to be "unusual." On this score, the court looked to Justice Alito's concurrence in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), which suggested that the evaluation involves, at the very least, looking to the "absolute number" of weapons at issue "*plus*" the number of states where the firearm "may be lawfully possessed." *Hollis*, 827 F.3d at 449–50. Plaintiffs simply stop at the first step of this analysis, arguing that the number of short-barreled rifles in use precludes their classification as "unusual." Mot. at 12. Not so. Even generously assuming that there are now approximately 3.6 million short-barreled rifles in the United States (641,000 previously registered short-barreled rifles and 3 million with "stabilizing braces"), that falls far short of the numbers in *Hollis.* 827 F.3d at 449–50 (comparing numbers of machine guns to "50 million large-capacity magazines" in use, or the "more than 8 million AR- and AK-platform semi-automatic rifles"). Moreover, *Hollis* also recognized that "[p]ercentage analysis may also be relevant," in evaluating the relevant proportion of firearms. *Id.* at 450. Conservatively estimating that there are 400

---

[13] *E.g.*, *United States v. Gilbert,* 286 F. App'x 383, 386 (9th Cir. 2008); *United States v. Gonzalez,* 2011 WL 5288727, at *5 (D. Utah Nov. 2, 2011); *United States v. Majid*, 2010 WL 5129297, at *1 (N.D. Ohio Dec. 10, 2010).

**APP.201**

million civilian-owned firearms in the United States,[14] the number of short-barreled rifles is less than

one percent of this amount (0.9%). Where, as here, the relative number and percentage of firearms at

issue is "quite low," *Hollis*, 827 F.3d at 450, there is little question that the weapon at issue is unusual.

Additionally, *Hollis* rejected the argument that the "number [of firearms] by itself was

sufficient" to determine "usualness." *Id.* The court also looked to the number of states where

machineguns could be "lawfully possessed," including states that banned them entirely and states that

banned them unless possessed legally "under federal law." *Id.* With 34 states prohibiting machinegun

possession, the court found this to be further support that machineguns are unusual. *Id.* There are a

similar number of state laws concerning possession of short-barreled rifles: at least four states ban

them entirely, and 24 states ban them unless NFA registered.[15] Like in *Hollis*, these laws further show

that short-barreled rifles are unusual and outside the Second Amendment's protections.

4.    Historical tradition of regulation supports the Rule and the NFA.

While the Rule does not implicate the Second Amendment, even if it did, the Rule and the

NFA are constitutional because they rest upon centuries of similar taxation and registration

requirements. Where a regulation affects the Second Amendment, the Government may justify the

regulation "by demonstrating that it is consistent with the Nation's historical tradition of firearm

regulation." *Bruen*, 142 S. Ct. at 2130. The Government may do so by pointing to "a well-established

---

[14] Washington Post, *There are More Guns than People in the United States, According to a New Study of Global Firearm Ownership*, https://perma.cc/LNE7-8TZQ. The number is likely far higher than 400 million, as consumers have purchased nearly 20 million firearms *per year* in recent years. Forbes, *U.S. Bought Almost 20 Million Guns Last Year—Second-Highest Year On Record*, https://perma.cc/TVS8-NNVW.
[15] *See* Cal. Penal Code § 16590; D.C. Code Ann. § 7-2502.02; Haw. Rev. Stat. Ann. § 134-8.; Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, 16-11-121(4); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); S.C. Code Ann. § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

**APP.202**

and representative historical *analogue*." *Id.* at 2133. To be analogous, historical and modern firearms regulations must be "relevantly similar"—*i.e.*, they impose a "comparable burden" on the right of armed self-defense that is "comparatively justified." *Id.* at 2132–33. But there need not be "a historical *twin*." *Id.* This analysis can be "nuanced," particularly in cases implicating "dramatic technological changes," where it is important to remember that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied" those living in 1791 or 1868. *Id.* at 2132.

From colonial times, state and local governments have routinely exercised their authority to regulate the possession and manufacture of firearms, through taxation, registration, licensing, and similar requirements. Indeed, colonial and early state governments regularly sought to gather information regarding firearm ownership in their jurisdiction. As early as 1631, Virginia required a regular survey of people in the colony and "also of arms and munition," and door-to-door surveys of firearms were authorized in Rhode Island in 1667, South Carolina in 1747, and New Jersey in 1781.[16] Similarly, militia members in Massachusetts (1775) were required to have their firearms inspected, with an official record documenting all such inspections, and New York (1778) imposed similar requirements.[17] In 1805, Massachusetts required that all musket and pistol barrels manufactured in the state and offered for sale be "proved" (inspected and marked by designated individuals) upon payment of a fee, to insure their safe condition, and Maine enacted similar requirements in 1821.[18] Licenses or inspection were also required in certain states to export or sell gunpowder (akin to modern

---

[16] Act of Mar. 2, 1631, act LVI, 1631 Va. Acts 175; *Records of the Colony of Rhode Island and Providence Plantations, In New England,* 2:196 (John Russell Bartlett, ed., Providence: A. Crawford Greene and Brother vol. 2, 1857); "An Act for the better regulating of the Militia of this Province," 1747, McCord, *Statutes at Large,* 9:647; Act of Jan. 8, 1781, ch. XII, § 13, 1781 N.J. Laws 39, 43. *See also* Robert H. Churchill, "Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment," 25 Law & Hist. Rev. 139, 161-62 (2007) (discussing the colonial militia practice of surveying firearms owned by members of the community).
[17] 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65.
[18] Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, 259-61 (1807); Laws of the State of Maine 546 (1830).

**APP.203**

ammunition), such as in Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820).[19] South Carolina authorized the issuance of licenses for the sale of pistols (1890).[20] And personal firearm licenses for sporting purposes were required in Hawaii (1870) and Wyoming (1899).[21]

Further, while Mock and Lewis are exempt from the NFA's tax, it is supported by multiple historical statutes. In 1759, for instance, New Hampshire required that certain ships pay a tax of money or gunpowder.[22] Taxes on firearms specifically were also common through the 19th century. Indeed, taxes were specifically levied on pistols, and in certain cases other firearms, in Alabama (1867), Mississippi (1844, 1867), North Carolina (1857), and Georgia (1866).[23]

Taken together, these laws reflect an unbroken historical tradition of American firearm regulation "relevantly similar" to that required by the NFA. *See Bruen*, 142 S. Ct. at 2133. Like colonial and state laws in the 17th, 18th, and 19th centuries, the NFA and its corresponding regulations seek to raise revenue through taxation, regulate but do not prohibit firearm ownership, and gather information on firearms and their owners in a given jurisdiction. Thus, any modest burden imposed

---

[19] Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830).

[20] An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653. Arkansas (1881) prohibited the sale or exchange of most pistols. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)). Other states also enacted prohibitions or other restrictions on the carrying of pistols. *See* Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231.

[21] An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

[22] An Act About Powder Money, 1759-1776 N.H. Laws 63; Pennsylvania similarly imposed a taxation, testing, and grading regime for all gunpowder to be sold in Philadelphia. *See* The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911).

[23] Joseph Abram Walker, The Revised Code of Alabama 169 § 10, (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

**APP.204**

by the NFA's regulations is certainly "comparable" and "comparably justified" to the numerous historical laws listed above.

Likely anticipating a historical record supporting the NFA's taxation and registration scheme, Plaintiffs argue that "there is no historical practice of regulating gunsmithing," meaning "the production and modification of firearms by private individuals." Mot. at 13. Plaintiffs seem to contend that because the modification of firearms was "an unregulated historical practice," *id.* at 14, the Second Amendment prohibits any regulation of pistols with attached "stabilizing braces." Plaintiffs' claim is refuted by the historical record summarized above, which shows numerous examples of direct regulation on firearm manufacture, such as through "proving" certain firearm barrels, or via surveys and taxation on various types of firearms, regardless of their provenance. Nor is the Government required to cite historical regulations on certain types of firearms from the 18th century, like pistols that had "add[ed]" stocks, which Plaintiffs apparently located on private, on-line auction websites. *Id.* at 14 & nn.11–12. The Second Amendment permits taxation and registration of firearms generally, and that authority may be properly exercised with respect to short-barreled rifles.

Plaintiffs' argument reduces to the contention that the Second Amendment bars any regulation concerning the modification or "improv[ements]" of firearms. *Id.* at 14. But if that were correct, the Second Amendment would prohibit the Government from regulating the use of similar firearm attachments like silencers, which have been uniformly held to fall outside constitutional protections. *Supra* p. 23. Similarly, modifying a firearm to convert it to an automatic machinegun is "gunsmithing" that does not enjoy Second Amendment protection. *Bezet*, 714 F. App'x at 338 (rejecting Second Amendment claim where plaintiff sought to "convert a semiautomatic pistol" into an automatic rifle); *accord United States v. Henry*, 688 F.3d 637, 639 (9th Cir. 2012). So, too, with "stabilizing braces."

In a final swing, Plaintiffs argue that, because "an individual" could have constructive possession of a short-barreled rifle in certain circumstances, the Rule "chill[s]" their exercise of Second

**APP.205**

Amendment rights to possess handguns. Mot. at. 15. But Plaintiffs do not aver that they are prevented or otherwise "chilled" from exercising their Second Amendment rights because they fear that they could be found to have constructive possession of a short-barreled rifle. Rather, Mock and Lewis tacitly concede that their firearms are short-barreled rifles under the Rule's analysis. Am Compl. ¶¶ 3–4 (stating they would "register" their firearms "as short-barreled rifle[s]" but for their belief that this requirement is unconstitutional). And "unsubstantiated fears of a speculative harm or a 'chill' on Second Amendment activity are insufficient to confer standing." *Robinson v. Sessions*, 721 F. App'x 20, 23 n.2 (2d Cir. 2018); *accord Haynie v. Harris*, 658 F. App'x 834, 836 (9th Cir. 2016).

### D.     The Rule does not violate the Constitution's structural protections.

1.     The NFA does not violate the non-delegation doctrine.

Plaintiffs argue that ATF "re-define[d]" what is a rifle without authority to do so, in violation of the "clear-delegation" rule. Mot. at 22–23. This argument fails for two reasons. First, because the Rule merely clarifies the meaning of a statutory term—and is not an exercise of legislative rulemaking authority—there cannot be a delegation concern at issue here, and *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022), is inapposite. *See Touby v. United States*, 500 U.S. 160, 164–65 (1991) (explaining that the nondelegation doctrine is a constitutional limitation on the delegation of "legislative power").[24]

And second, the NFA's delegation of authority fits comfortably within the bounds of constitutionally permissible delegations. Congress may lawfully delegate decision-making authority if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). A delegation is "constitutionally sufficient if Congress clearly delineates [1] the general policy, [2] the public agency which is to apply it, and [3] the boundaries of this delegated

---

[24] Even if the Rule were legislative, numerous courts have found that the express delegations in the NFA and GCA permit legislative rulemaking. *Cargill v. Barr*, 502 F. Supp. 3d 1163, 1186 (W.D. Tex. 2020) (collecting cases), *overruled on other grounds Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023) (en banc).

**APP.206**

authority." *Id.* at 372–73 (citation omitted). This standard is so deferential that the Supreme Court has struck down congressional delegations only twice—both in 1935—and only because "Congress had failed to articulate *any* policy or standard" to confine discretion. *Gundy v. United States*, 139 S. Ct. 2116, 2129 (2019) (citation omitted). Since then, the Supreme Court has repeatedly upheld Congress's ability to delegate authority under broad standards. *Id.* (collecting cases).

In light of this longstanding precedent, the NFA reflects an intelligible principle that falls well within permissible bounds. As explained, the NFA sets forth a policy: the enforcement of specific federal controls (*e.g.*, registration; taxation) for eight categories of highly dangerous and concealable weapons to curtail their criminal misuse. *E.g.*, 26 U.S.C. §§ 5811–12, 5821–22, 5841, 5845(a). The statute authorizes the Attorney General to issue rules and regulations to ensure those controls are enforced in that narrow context. *Id.* at § 7805(a). By delineating the type of weapons that are subject to its requirements, the NFA establishes a clear boundary for the Executive Branch's actions and compares favorably to other congressional delegations that have been sustained against challenges under the nondelegation doctrine. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474–75 (2001).

2.    The Rule does not violate the Take Care Clause.

Plaintiffs also argue that the Rule violates Article II's Take Care Clause. Mot. at 22, 25, referring more broadly to the separation of powers. This argument lacks merit. As an initial matter, this "constitutional" claim is nothing more than Plaintiffs' statutory objections dressed up in constitutional garb, and thus fails for the same reasons. *Supra* pp. 15–19. In any event, ATF promulgated the Rule based on authority that Congress delegated to the Executive Branch to issue necessary rules for the enforcement of the NFA's and the GCA's provisions. *Supra* pp. 12–13. Whether ATF's exercise of delegated authority "faithfully executed" these statutory schemes is a question "beyond the purview of the courts," and entertaining a Take Care challenge "would essentially open the doors to an undisciplined and unguided review process for all decisions made by

32

**APP.207**

the Executive Department." *Las Ams. Immigrant Advoc. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1181 (D. Or. 2021) (finding no private right of action under the Take Care Clause); *City of Columbus v. Trump*, 453 F. Supp. 3d 770, 803 (D. Md. 2020) (rejecting claim for injunctive and declaratory relief under the Take Care Clause where it would require "court supervision over the performance of duty by the executive branch"); *accord Mississippi v. Johnson,* 71 U.S. 475, 498–99 (1867).[25]

       3.      The rule of lenity does not bar ATF's interpretation.

Plaintiffs next contend that the rule is "constitutionally infirm because it carries the possibilities of criminal penalties," invoking the rule of lenity. Mot. at 24. That rule is a principle of statutory construction, however, providing that ambiguities within "a criminal statute should be resolved in the defendant's favor." *U.S. v. Davis*, 139 S. Ct. 2319, 2333 (2019). It applies only where, "after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended." *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (citation omitted). But the statutory provisions at issue here contain no grievous ambiguity for the rule of lenity to resolve, and Plaintiffs argue nothing to the contrary. *Muscarello v. U.S.*, 524 U.S. 125, 138 (1998) ("[S]ome statutory ambiguity . . . is not sufficient to warrant the application of [the] rule, for most statutes are ambiguous to some degree."). As already explained, *supra* pp. 15–19, traditional tools of statutory construction firmly support the Rule's application of the statutory definition of "rifle" to weapons equipped with "stabilizing braces" where such weapons are designed, made, and intended to be fired from the shoulder.[26]

---

[25] Plaintiffs' reliance on *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), is completely misplaced. In *Youngstown*, the President concededly acted outside congressionally delegated authority and thus sought to justify his actions by reference to his inherent Article II powers. 343 U.S. at 585–87. By contrast, ATF acted here pursuant to authority that Congress's expressly delegated to the Executive Branch. *Supra* pp. 12–13.

[26] Plaintiffs' citation to *Cargill* does not advance their argument. There, the court determined that the definition of "machinegun" under 26 U.S.C. § 5845(b) was "plain" and "unambiguous," *see* 57 F.4th at 451, 464, thus obviating any need to resort to the rule of lenity. But the court nonetheless proceeded

Because lenity is properly invoked only as a fail-safe, when a criminal defendant might otherwise be convicted under a grievously ambiguous statute, it has no application here, as a first line of attack against a final agency rule. *See Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995) (lenity not standard for "facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement."). To the extent Plaintiffs seek to challenge the application of one the Rule's factors to a particular firearm, that claim should be considered in the context of an APA challenge, not a broad constitutional challenge to the Rule. *See* Mot. at 24 n.16.

### E.    The Rule is not void for vagueness.

Plaintiffs also challenge the Rule as void for vagueness. *Id.* at 19–22. As an initial matter, it is "well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand." *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (citations omitted); *accord United States v. Mazurie*, 419 U.S. 544, 550 (1975). To begin, Plaintiffs' claim that the Rule involves the First Amendment at all is specious: the Rule sets forth factors for determining whether a weapon is a short-barreled rifle—nowhere does it "target speech based on its communicative content," as Plaintiffs suggest. Mot. at 16; *see infra* pp. 38–39. And Plaintiffs' vagueness challenge cannot fairly be read to challenge vagueness related to speech. *Id.* at 20–22. Therefore, Plaintiffs' argument fails, if for no other reason, because it is a facial vagueness challenge to the Rule in the abstract, as opposed to an as-applied challenge to the facts of their case.

Regardless, the Rule is not unconstitutionally vague. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citations omitted); *accord*

---

to discuss how lenity would apply assuming that § 5845(b) was so ambiguous as to "provide [no] meaningful guidance" and to require the court to "'guess' at its definitive meaning." *Id.* at 469. But as already explained, no such grievous ambiguity exists in the statutory provisions relevant to this case.

**APP.209**

*United States v. Howard*, 766 F.3d 414, 428 (5th Cir. 2014). "A statute is unconstitutionally vague if it does not give a person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (citations omitted).

The Rule provides regulated parties with ample opportunity to understand ATF's view of what the NFA requires and prohibits, and it is clearer and provides more notice than ATF's previous classification system. Prior to the Rule, ATF had not uniformly classified "brace"-equipped weapons or even adopted a framework for classifying such weapons; instead, ATF issued varied classification determinations for particular weapons, classifying some as short-barreled rifles and others as not. *Supra* pp. 5–7. By contrast, the Rule adopts a consistent, predictable framework for classification: ATF first considers whether a weapon provides surface area allowing it to be shoulder fired, and then weighs six additional factors to determine whether the weapon is designed, made, and intended to be fired from the shoulder. *Supra* p. 9. The Rule also specifies that persons currently possessing unregistered short-barreled rifles equipped with stabilizing braces have until May 31, 2023, to comply with the NFA by registering, modifying, relinquishing, or destroying the weapon. *Supra* p. 10.

In connection with the Rule, ATF has issued interim guidance to provide additional clarity. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982) (directing courts to "consider any limiting construction" an "agency has proffered" that may clarify a provision challenged as void for vagueness). ATF's guidance identifies firearm-brace combinations it will consider short-barreled rifles. *See* Commercial Guidance; *Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, https://perma.cc/JZB3-9CUY. ATF is also drafting and reviewing individual classification letters that it will send directly to manufacturers to notify them of how ATF has formally classified their weapons. Further, in the event of any confusion, an individual may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. 6552; *see also Vill. of Hoffman Ests.*, 455 U.S. at 498 (relaxing vagueness test when party may clarify a regulation's meaning "by its

**APP.210**

own inquiry"). Simply put, ATF has gone beyond what the Constitution requires to ensure regulated parties understand how the Rule affects them, and voiding the Rule would only undermine the "principles of fair notice," Mot. at 19, underlying the vagueness doctrine.

Plaintiffs unsuccessfully try to challenge the Rule as vague by picking apart various pieces of it. *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) ("[P]erfect clarity and precise guidance have never been required."). For instance, Plaintiffs contend that some of the Rule's factors are "inherently subjective," such as "the manufacturer's direct and indirect marketing promotional materials indicating the intended use of the weapon," or "information demonstrating the likely use of the weapon in the general community." Mot. at 20; 88 Fed. Reg. 6,569–70. But these factors do not reflect the types of "wholly subjective judgments" courts have struck down as unconstitutionally vague—such as whether conduct is "annoying" or "indecent"—and courts regularly pass on similar questions of use and intent. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Posters 'N' Things*, 511 U.S. at 521 n.11.

Plaintiffs also challenge the Rule's objective factors because the Rule does not delineate precisely how they operate in connection with one another. Mot. at 20–21. This demand for granular explication far exceeds what the law requires. Agencies and courts routinely rely on unweighted multi-factor tests without raising constitutional concern, and Plaintiffs cite no authority requiring an agency's analysis to be tied to specific weights or quantified requirements. *See Texas v. EPA*, 983 F.3d 826, 839–40 (5th Cir. 2020) (upholding an agency's use of "a multi-factor balancing test" that included no "numeric thresholds"); *PDK Lab'ys Inc. v. DEA*, 438 F.3d 1184, 1194 (D.C. Cir. 2006) ("Agencies routinely employ multi-factor standards when discharging their statutory duties, and we have never hesitated to uphold their decisions when adequately explained."); *see also, e.g.*, *1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1239 (10th Cir. 2013); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999); *Raicevic v. Fieldwood Energy, LLC*, 2020 WL 6325550 at *3 n.1 (5th

**APP.211**

Cir. 2020). Indeed, multi-factor agency analysis "must simply define and explain the criteria" applied, *Catawba Cnty. v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009), which the Rule does in exacting detail.

The rest of Plaintiffs' arguments are similarly unpersuasive. *See* Mot. at 21–22. For instance, Plaintiffs make much of the factor considering whether a weapon is equipped with sights or a scope that require the weapon to be fired from the shoulder—speculating that "every time [an] owner changes the sights or scope on their firearm, they might be unwittingly manufacturing a short-barreled rifle," *id.* at 21—but they ignore that this factor is, of course, just one to be considered in the totality and not itself determinative. Likewise, Plaintiffs cite no authority or evidence to support their speculation regarding constructive possession and selective enforcement. Unsupported speculation regarding how ATF *might* enforce the NFA in the future is insufficient to void the Rule, particularly when the intent Plaintiffs impute to ATF is belied by the regulatory history and the agency's stated purpose in issuing the Rule. 88 Fed. Reg. at 6,478 ("Nothing in this rule bans 'stabilizing braces' or" their use on pistols. "Instead, this rule *merely conveys more clearly to the public* the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes." (emphasis added)). Moreover, as previously explained, the Rule represents a more predictable approach to enforcement (not less), ATF is issuing specific classification determinations to manufacturers, and individuals may request classification determinations to clarify any uncertainty.

### F.   The Rule does not implicate the First Amendment.

Plaintiffs next assert that the Rule violates the First Amendment, but this claim fails for a host of reasons. As an initial matter, to assess a plaintiff's standing for a claim of "chilled" speech, a court should ask "(1) whether the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest; (2) whether that conduct is arguably proscribed by the challenged policy; and (3) whether the threat of future enforcement is substantial." *Tex. State LULAC v. Elfant*, 52 F.4th 248, 256 (5th Cir. 2022). Plaintiffs satisfy none of these requirements.

**APP.212**

First, while Plaintiffs generally aver that the Rule "chills" certain speech of "manufacturers and third parties," neither their motion nor complaint alleges that *Plaintiffs'* speech has been or will be imminently chilled. Mot. at 17. Where, as here, plaintiffs fail to demonstrate that their speech rights are actually affected by the challenged Government action, they lack standing to bring a First Amendment claim. *E.g.*, *Patterson v. Rawlings*, 287 F. Supp. 3d 632, 641 (N.D. Tex. 2018); *Hardy v. Panola Cnty. Sheriff's Dep't*, 2007 WL 496339, at *2 n.1 (N.D. Miss. Feb. 12, 2007).

Next, Plaintiffs cannot show an intent to engage in conduct "arguably proscribed" or regulated by the Rule. *Elfant*, 52 F.4th at 256. The Rule neither proscribes nor regulates any speech. Even where certain marketing materials indicate that a weapon is intended to be fired from the shoulder, the Rule does not prohibit or otherwise regulate this commercial speech. Rather, the marketing materials simply inform ATF's decision as to how to classify the firearm at issue. Plaintiffs thus cannot demonstrate that the Rule "arguably prohibits Plaintiffs' [speech] activities," as required to establish a First Amendment violation. *Id.* Indeed, the First Amendment is not offended by the Government's "use of a product's marketing and labeling to discern to which regulatory regime a product is subject." *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282–83 (D.C. Cir. 2019); *see also, e.g., id.* (holding that "the FDA may rely on e-cigarette labeling and other marketing claims in order to subject e-cigarettes to appropriate regulation"); *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004).[27]

Thus, Plaintiffs lack standing to raise a First Amendment claim. But even assuming standing, the Rule would deserve intermediate, not strict, scrutiny, as Plaintiffs contend. Mot. at 16. Strict scrutiny generally applies to "[a] law *directed* at the communicative nature of conduct," *Texas v. Johnson*,

---

[27] Plaintiffs also fail to show that the "the threat of future enforcement is substantial" as a result of their speech activities. *Elfant*, 52 F.4th at 256. This factor is nonsensical when applied to a context where no speech is banned or regulated. At most, Plaintiffs aver that the Rule creates "uncertainty" as to the precise content of marketing materials that could contribute to a determination that a firearm is a short-barreled rifle. Mot. at 17. But such "uncertainty" is not a First Amendment matter.

**APP.213**

491 U.S. 397, 406 (1989) (citation omitted), whereas intermediate scrutiny applies where the regulation of commerce effects "incidental" burdens on speech. *Doe I v. Landry*, 909 F.3d 99, 108 (5th Cir. 2018).[28]

As explained above, Plaintiffs have failed to show that the Rule affects their speech in any way, and there are no cognizable allegations that it has burdened speech at all, even indirectly. Assuming for argument's sake that the Rule affects some expression, any burden would be purely incidental to ATF's classification of a given firearm.[29] In this circumstance, the Government need only show that the Rule "is narrowly tailored to serve substantial governmental interests"; in other words, that it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Landry*, 909 F.3d at 108 (citation omitted). ATF is charged with enforcing the NFA, and has a substantial interest in the statute's proper application. And the Rule explains in detail why its factors represent a substantial improvement over the status quo, in terms of consistency and accuracy in firearms classifications. Thus, because the Rule promotes an important Government interest (and does so far more effectively than the status quo), the First Amendment is not violated.

## II.　Plaintiffs will not suffer irreparable harm absent preliminary relief.

Plaintiffs have also failed to show that they are likely to suffer irreparable harm, an "'indispensable' requirement for a preliminary injunction." *See Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) (citation omitted). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical," *Duarte v. City of Lewisville*, 136 F. Supp. 3d 752, 791

---

[28] Contrary to Plaintiffs' claim that any examination of a message gives rise to a content-based speech restriction, Mot. at 18, the Supreme Court has recently rejected "the view that any examination of speech or expression inherently triggers heightened First Amendment concern. Rather, it is regulations that discriminate based on 'the topic discussed or the idea or message expressed' that are content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1474 (2022). Again, the Rule does not regulate any speech, let alone discriminate against certain speech on account of its topic.
[29] Nor does the Rule somehow impermissibly restrict speech "based on the identity of the speaker." Mot. at 18 (citation omitted). As Plaintiffs concede, *id.* at 28, the Rule requires consideration of both manufacturer "marketing and promotional materials" and "information demonstrating the likely use of the weapon in the general community." 88 Fed. Reg. at 6512. The latter includes third party magazine articles, advertisements, and reviews that exhibit the use of certain "braces." *Id.* at 6545–48.

**APP.214**

(E.D. Tex. 2015) (citation omitted), and must be "so imminent that there is a clear and present need for equitable relief to prevent" it, *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (citation omitted); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). A plaintiff cannot make this showing with "unsubstantiated and conclusory assertions," *John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), but must substantiate any claim of irreparable injury with "independent proof, or no injunction may issue," *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). In addition, a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin." *Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).

<u>*Mock and Lewis.*</u> Mock and Lewis tie much of their alleged irreparable harm to their constitutional claims. But they have shown no likelihood of success on those claims, and their conclusory allegations cannot give rise to a cognizable injury. *Supra* pp. 22–31. A preliminary injunction is inappropriate "unless the party seeking it can demonstrate that '[constitutional] interests are either threatened or in fact being impaired at the time relief is sought.'" *Google, Inc. v. Hood*, 822 F.3d 212, 227–28 (5th Cir. 2016) (citation omitted). The mere "invocation of the [Constitution] cannot substitute for" a plaintiff's obligation to show "the presence of an imminent, non-speculative irreparable injury" that will occur absent preliminary relief. *Id.* at 228; *see also Daniels Health Sciences v. Vascular Health Sci.*, 710 F.3d 579, 585 (5th Cir. 2013) (explaining that mere speculation or conclusory allegations are insufficient to show irreparable harm). Courts have thus routinely declined to find irreparable harm based solely on a plaintiff's allegation that his constitutional rights have been violated. *E.g.*, *Castro v. City of Grand Prairie*, 2021 WL 1530303, at *2 (N.D. Tex. Apr. 19, 2021) (Lindsay, J.) (holding that a plaintiff's allegations that he had "suffered irreparable harm, including the loss of his constitutional rights," was "conclusory and insufficient to satisfy his burden as the movant" to show irreparable harm); *Sheffield v. Bush*, 604 F. Supp. 3d 586, 609 (S.D. Tex. 2022).

**APP.215**

The speculative and conclusory nature of Mock's and Lewis's alleged injury should the Rule remain in effect is further confirmed by the fact that the consequences for possessing a short-barreled rifle are provided by the NFA—not the Rule. *Supra* pp. 11–12. Thus, enjoining the Rule would not obviate the need to register a qualifying weapon pursuant to the NFA.

Nor would any NFA tax obligations constitute irreparable harm. As an initial matter, the Rule provides tax forbearance to those with existing qualifying weapons who submit their applications during the compliance period. But even if Mock and Lewis were required to pay a tax to possess their weapons during the pendency of this suit, they would be able to request and/or sue for a refund if the Rule was later invalidated. 26 U.S.C. § 7422. This "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Lastly, to the extent Mock and Lewis seek to preemptively avoid payment of a tax, the Anti-Injunction Act bars such a suit and provides that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." 26 U.S.C. § 7421(a); *see also Thompson/Ctr. Arms Co. v. Baker*, 686 F. Supp. 38, 41–42 (D.N.H. 1988) (Anti-Injunction Act bars challenges to firearm classification).

Finally, the fear of criminal prosecution does not constitute irreparable harm because the cost of complying with the NFA is *de minimis*, and such fears are not well-founded. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985); *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam). And as stated, the criminal penalties associated with failure to register a qualifying weapon flow from the NFA, not from the Rule.

*Maxim Defense.* Maxim Defense's claims of irreparable harm likewise fail. Although Maxim Defense argues that the Rule is costing it millions of dollars in revenue, the evidence used to support these allegations is insufficient to carry Maxim Defense's burden to demonstrate that concrete, imminent harm is likely to occur in absent an injunction. For example, although Maxim Defense

**APP.216**

argues that it ceased sales of its "braced" pistols on January 31, 2023, it does not explain why. In fact, Maxim concedes that it sells numerous weapons that require NFA registration. Dahl Decl. ¶ 10, ECF No. 36-2; *see also* https://perma.cc/J5E5-CD2N (advertising rifles, short-barreled rifle receivers, and other rifle accessories for sale). And although Plaintiffs allege that Maxim Defense will incur monetary expenditures, they do not project how much those costs are, so it is not possible to assess whether those costs are truly "significant." *Id.* ¶ 11. Lastly, although Maxim Defense "anticipates that it *could* lose more than $6 million in sales after one month," the mere possibility of loss cannot establish imminent, irreparable harm. *Id.* ¶ 12.

*FPC.* FPC's alleged irreparable harm is derivative of its members', including Mock, Lewis, and Maxim Defense, and fails for the same reasons. Mot. at 39. Further, Plaintiffs offer no basis to infer that each FPC member is suffering an Article III injury, much less that each member faces irreparable harm absent injunctive relief, as would be separately required to extend an injunction to FPC's entire membership. *See Tenth Street Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) ("Associational standing requires that the individual members of the group each have standing . . . ."). Also, any claim challenging the Rule requires a fact-intensive inquiry of a particular weapon configuration, *supra* pp. 11–12, requiring the participation of individual members and thwarting associational standing. *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Board*, 627 F.3d 547, 552 (5th Cir. 2010). FPC has thus not carried its burden to show its right to seek injunctive relief on behalf of its members, and it does not attempt to establish any concrete, non-speculative irreparable harm on its own. No injunction should issue in FPC's favor or that of its broader membership.

## III.   The equities and the public interest weigh against a preliminary injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt

decidedly against the issuance of a preliminary injunction here.

In particular, the Rule benefits public safety. Congress passed the NFA for the express purpose of regulating firearms, like short-barreled rifles, that it determined posed a greater risk to public safety because of their unusual and dangerous nature. 88 Fed. Reg. at 6,566. The Rule enhances public safety by clarifying and supporting the enforcement of NFA controls that Congress designed to address these risks. *Id.* Plaintiffs' request to enjoin the Rule would, conversely, decrease public safety by facilitating widespread circumvention of these controls. Any harm to Plaintiffs in complying with the NFA is, by comparison, minimal.

In addition, the Rule serves the public interest by providing regulated parties with greater clarity. ATF initiated the rulemaking process, in part, because the prior system of *ad hoc* classification determinations, at times, resulted in inconsistent classifications of "brace"-equipped pistols. The 98-page Rule, however, thoroughly explains ATF's uniform approach. Further, ATF has also published interim guidance identifying pistol-"brace" combinations likely to be considered short-barreled rifles under the Rule and will issue classification letters directly to manufacturers. *Supra* pp. 35–36. And the Rule provides that "an individual may contact ATF to receive a [classification] determination." 88 Fed. Reg. 6,481. Thus, the public interest is better served by the Rule than by its absence.

## IV.    In all events, the specific forms of relief that Plaintiffs seek are improper.

**1.** Although preliminary relief is unjustified here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged, cognizable injuries. Because this Court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). And consistent with traditional equity principles, "injunctive relief should be no more burdensome" to Defendants "than necessary to provide complete relief to the

**APP.218**

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted).[30]

Plaintiffs ask this Court to grant them far more "expansive" relief, however, by preliminarily enjoining ATF's "enforcement" of the Rule nationwide, against Plaintiffs and non-parties alike. Mot. at 41–45.[31] No such relief is warranted or appropriate. Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring) *see also DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring) (lamenting the "asymmetric" effects of nationwide injunctions on "the government's hope of implementing any new policy"). Further, the Rule is subject to litigation in at least seven other cases in six different federal districts,[32] underscoring why this Court should not attempt to decide its legality for all parties nationwide—particularly on a motion brought by only four Plaintiffs. *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (explaining that "[p]rinciples of judicial restraint" counsel against granting relief to non-parties—particularly where, as here, "[o]ther courts are considering these same issues" at the same time); *see also Arizona v. Biden*, 40 F.4th 375, 395–98 (6th Cir. 2022) (Sutton, C.J., concurring).

**2.** Plaintiffs' alternative request that the Court postpone the Rule's effective date under § 705 fails for a separate reason: While § 705 authorizes courts in some circumstances to delay the effective

---

[30] Plaintiffs conflate this Court's equitable authority to issue a preliminary injunction with the authority granted under 5 U.S.C. § 706 to "set aside agency action." Mot. at 41–42.

[31] Plaintiffs suggest that a nationwide preliminary injunction is necessary to protect Maxim Defense from the alleged economic injuries that could result from reduced sales. Mot. at 43–44. But they offer no persuasive reason why this Court should grant relief to non-parties that will never purchase a weapon from or engage in business with Maxim Defense. Courts are well-equipped to draw reasonably detailed preliminary-injunction orders that protect a plaintiff from irreparable harm without having to issue an unnecessary and ill-fitting injunction that exceeds its constitutional and equitable authority.

[32] *See Britto v. ATF*, No. 2:23-cv-19 (N.D. Tex.); *Colon v. ATF*, No. 8:23-cv-223 (M.D. Fla.); *Firearms Regulatory Accountability Coalition, Inc. v. Garland*, No. 1:23-cv-24 (D.N.D.); *Miller v. Garland*, No. 1:23-cv-195 (E.D. Va.); *Second Amendment Found. v. ATF*, No. 3:21-cv-116 (N.D. Tex.); *Texas v. ATF*, No. 6:23-cv-13 (S.D. Tex.); *Watterson v. ATF*, No. 4:23-cv-80 (E.D. Tex.).

**APP.219**

date of an agency action, it cannot be used where, as here, the agency action has already taken effect. *See Rural & Migrant Ministry v. EPA*, 565 F. Supp. 3d 578, 605 (S.D.N.Y. 2020) ("Section 705 . . . specifically permits a court, *in advance of the effective date* of a regulation, . . . to postpone the effective date of an agency action.'" (emphasis added)). Courts construing § 705 have routinely interpreted the phrase "postpone the effective date" of an agency action to authorize the postponement of "the effective date of a *not yet effective rule*[] pending judicial review," but not suspension of a rule that is already in effect. *E.g.*, *Safety-Kleen Corp. v. EPA*, 1996 U.S. App. LEXIS 2324, at *2–3 (D.C. Cir. Jan. 19, 1996) (emphasis added); *Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173, 204 (D.D.C. 2022) (collecting cases). Although these cases address an agency's decision to "postpone the effective date," § 705 uses identical language when referring to "the reviewing court . . . postpon[ing] the effective date of an agency action." It therefore must be presumed that the identical phrases in the first and second sentences of § 705 were intended to carry the same meaning. *Sorenson v. Sec'y of Treasury*, 475 U.S. 851, 860 (1986). And the plain language of § 705 reinforces this conclusion. "The word 'postpone' means 'to put off to a later time,' or to 'defer.'" *Ctr. for Biological Diversity*, 597 F. Supp. 3d at 205. "But, once a rule has taken effect," a court "can no longer 'put off' the effective date." *See id.*

Here, the Rule went into effect on January 31, 2023, 88 Fed. Reg. at 6,478, and it is thus too late to postpone an effective date that has already passed. And contrary to what Plaintiffs suggest, Mot. at 45 n.23, nothing prevented ATF from making the Rule immediately effective. The Rule's amendment to the regulatory definition of "rifle" is a quintessential interpretive rule, and its provision of options for affected persons are mere "general statements of policy." *Supra* pp. 19–20. The APA's requirement that a "substantive rule" go into effect no sooner than 30 days from publication is therefore inapplicable. 5 U.S.C. § 553(d)(2) (exempting "interpretive rules and statements of policy").

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for preliminary relief.

**APP.220**

Dated: March 10, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
FAITH E. LOWRY (TX Bar No. 24099560)
TAYLOR PITZ (CA Bar No. 332080)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendants*

**APP.221**

### CERTIFICATE OF SERVICE

On March 10, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice

**APP.222**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE**

**APP.223**

The Agencies' Response to Plaintiffs' Motion is nothing of the sort. Instead of rebutting Plaintiffs' actual arguments, the Agencies manufacture their own version of Plaintiffs' Motion. Despite the Agencies' strawmen, it remains evident that Plaintiffs are likely to succeed in this matter, are irreparably injured, and that the balance of interests weighs in favor of an injunction.

## I.    THE FINAL RULE IS A SUBSTANTIVE RULE, NOT AN INTERPRETIVE RULE

As an initial matter, the Agencies, in several instances, attempt to lessen their burden and mitigate the impact of the Final Rule by claiming it is an interpretive rule, and not a substantive or legislative rule. But the Agencies characterization is flawed.

*First*, the Agencies engaged in a years' long notice and comment period to promulgate the Final Rule. *See* Proposed Rule, 86 Fed. Reg. 30,826 (June 10, 2021). If the Final Rule is merely interpretive, and not subject to notice and comment requirements, the Agencies fail to explain why they engaged in that process at all.

*Second*, the Final Rule is a "binding" substantive rule that creates new "rights and obligations." *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd* 577 U.S. 1101 (2016). The Final Rule is a "substantive change in existing law or policy," *Texas v. United States*, 86 F. Supp. 3d 591, 670 (S.D. Tex. 2015), evidenced by the fact that the Final Rule changes the legal status of at least 3 million firearms, the legal process on how corporations may sell, and how individuals may acquire those Arms. Final Rule, 88 Fed. Reg. 6,478, 6,478–81 (Jan. 31, 2023). And it imposes additional requirements on the possession, storage, and transportation of those Arms once acquired. *Id*. The Agencies' claim that the Final Rule "does not impose any new legal obligations," is thus misplaced. *Compare Defendants' Opposition to Plaintiffs' Motion* ("Feds' Resp."), ECF No. 37, at 19 (quoted) *with id.* at 14 ("After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations . . . .") (citation omitted).

**APP.224**

## II.     PLAINTIFFS ARE LIKELY TO PREVAIL ON THE MERITS

### A.     The Agencies' Arguments in Favor of Constitutionality are Unavailing[1]

#### 1.     The Final Rule Infringes on Plaintiffs' Right to Keep and Bear Arms

The Agencies' Response *assumes* the firearms at issue are rifles, *see* Feds' Br. at 22–31, and blends Plaintiffs' challenge to the Final Rule based on braced pistols and Plaintiffs' alternative claim, if the Final Rule is upheld, into a single argument, *cf. Plaintiffs' Brief in Support* ("Pls. Br."), ECF No. 36, at 11–15, 33–36. The Agencies' arguments as to *pistols* are unavailing.

*First*, braced pistols are in common use. The Agencies admit there are (at least) 3 million lawfully possessed braced pistols. Final Rule at 6,560.[2] In *Caetano v. Massachusetts*, Justice Alito explained that the "relevant statistic is that hundreds of thousands of Tasers and stun guns have been sold to private citizens, who it appears may lawfully possess them in 45 states." 577 U.S. 411, 420 (2016) (Alito, J., concurring) (cleaned up). [3] Justice Alito cited a party brief acknowledging that "'approximately 200,000 civilians owned stun guns' as of 2009." *Id*. Considering "the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons,'" arms "in common use at the time" are protected and cannot be regulated outside of historical tradition, *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022), 3 million braced pistols are "in common use" and garner the same protection, *see* Pls. Br. at 11–15.

---

[1] Plaintiffs' rest on their First Amendment argument as articulated in their Preliminary Injunction Brief, along with any other arguments not specifically addressed herein. *See* Pls. Br. at 15–19.

[2] That number is likely higher. *See Handguns, Stabilizing Braces, and Related Components*, CONGRESSIONAL RESEARCH SERVICE, https://bit.ly/3yKPSlt (Apr. 19, 2021).

[3] The Agencies attempt to make this "common use" test a conjunctive test rather than alternative one. *See* Feds' Resp. at 26. *Bruen* does not support a determination that firearms must be common in number *and* common in jurisdiction. *See Bruen*, 142 S. Ct. at 2143. In so far as *Hollis* controls, it is overruled, in relevant part, by *Bruen*. *See United States v. Rahimi*, __ F.4th __, 2023 WL 2317796, at *3 (5th Cir. 2023) ("Bruen clearly 'fundamentally change[d]' our analysis . . . rendering our prior precedent obsolete.") (citation omitted). Even if the Agencies were correct, *braced pistols* are common in both regards. *Cf.* Feds' Br at 23–31.

**APP.225**

Even if this Court goes further, each case the Agencies cite was decided before *Bruen*, and addresses NFA items, not pistols. Feds' Br. at 23. Specifically, *Hollis v. Lynch* addressed "175,977 pre–1986 civilian-owned machineguns" that are heavily regulated across the United States, 827 F.3d 436, 449–50 (5th Cir. 2016); not millions of pistols that are broadly legal across the country.

*Second*, a tax on the exercise of a constitutionally protected right, required registration of firearms, a prohibition on travel, and heightened criminal liability all implicate the Second Amendment. *See* Pls. Br. at 11–15, 33–36; Declaration of William T. Mock ("Mock Decl."), ECF No. 36-4, ¶¶ 7–8, 10–11; Declaration of Christopher Lewis ("Lewis Decl."), ECF No. 36-3, ¶¶ 6–7, 9–10. Moreover, because a braced pistol is *not* a rifle under the plain meaning of the NFA and GCA, the Final Rule unconstitutionally limits Plaintiffs'—including Maxim Defense's customers and FPC's members'—constitutionally protected right to possess a pistol in the home. Pls. Br. at 11–14; 25–29. The Agencies have not met their burden in establishing that such regulation is historically permissible. *See Bruen*, 142 S. Ct. at 2130. The only historical statutes the Agencies offer to support are four states that levied taxes "on pistols, and in certain [unspecified] cases other firearms" during the 19th century.[4] Feds. Br. at 29. But both *Heller* and *Bruen* make clear that a few outlier laws are inadequate. *See District of Columbia v. Heller*, 554 U.S. 570, 632 (2008); *Bruen*, 142 S. Ct. at 2142. And these outlier laws from the late 19th century are too modern to benefit the government. *See Bruen*, 142 S. Ct. at 2154, 2154 n.28.

Also, because the Final Rule is unclear and overly broad, it also unconstitutionally chills the exercise of Plaintiffs'—including Maxim Defense's customers' and FPC's members'—constitutionally protected right to possess a pistol because individuals will be dissuaded from exercising their rights for fear of criminal prosecution for constructively possessing a short-

---

[4] If this Court deems the other statutes relevant here, Plaintiffs address those in Section II(C).

**APP.226**

barreled rifle if they possess a pistol and anything that *may* be able to be attached to it to convert it into a rifle under the Final Rule. Pls. Br. at 14–15; Mock Decl. ¶ 11; Lewis Decl. ¶ 10.[5]

*Third*, the other cases the Agencies cite are distinguishable. *Bezet v. United States* was a *pro se* challenge brought by an individual who sought to convert a semiautomatic pistol into a fully automatic silenced rifle. 714 F. App'x 336, 338 (5th Cir. 2017). Neither machineguns nor silencers are at issue here. *Lane v. Holder* addressed the prohibition on Washington D.C. residents acquiring handguns directly from states and was dismissed for want of standing. 703 F.3d 668, 670 (4th Cir. 2012). Interstate transfer is not at issue here and any discussion as to the propriety of the government's regulations is out-of-circuit *dicta*. Last, the Agencies cannot draw a line between Justice Kavanaugh's discussion of a license to carry a firearm concealed in public and the ability of an individual to possess a pistol in the home for self-defense, the most basic understanding of the Second Amendment's protections. *Compare* Feds' Br. at 24–25, *with Heller*, 554 U.S. at 630.[6]

## 2. The Agencies' Final Rule is Unconstitutional for Several Reasons

Plaintiffs limit their Reply to addressing specific flaws with the Agencies' Response as to the Final Rule's constitutionality. *First*, Plaintiffs never argue that *the NFA* violates the non-delegation doctrine. *See* Feds' Br. at 31–32. Plaintiffs argue *the Final Rule*, and the federal regulations that it amends, exceeds any congressionally delegated authority. Pls. Br. 25–29.

---

[5] The Agencies incorrectly assert that Plaintiffs "do not aver" that they are chilled from exercising their Second Amendment protected rights, Feds' Br. at 31; but both Mock and Lewis *specifically* state as much. Mock Decl. ¶ 11; Lewis Decl. ¶ 10.

[6] The Agencies' argument that stabilizing braces do not enjoy any protection mistakes Supreme Court precedent. "Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern *instruments* that *facilitate* armed self-defense." *Bruen*, 142 S. Ct. at 2132 (emphases added) (citation omitted). Stabilizing braces *facilitate* armed self-defense for millions of Americans that use them on self-defense tools, including those that cannot operate large and heavy pistols but for their braces.

**APP.227**

*Second*, while Plaintiffs agree that the statutes are unambiguous, Fed's Br. at 33—insofar as they unambiguously prevent the Agencies from promulgating the Final Rule—should this Court find ambiguity, that ambiguity cannot be resolved in favor of the Agencies. *See Cargill v. Garland*, 57 F.4th 447, 464–65 (5th Cir. 2023) (*en banc*).

*Third*, the Agencies' response to Plaintiffs' example demonstrating the vagueness of the Final Rule further underscores Plaintiffs' point. The Agencies argue that their test is not wholly subjective, and that the Final Rule provides fair notice, Feds' Br. at 34–36, but immediately argue that Plaintiffs' argument as to sights and scopes is unavailing because "this factor is, of course, just one to be considered in the totality and not itself determinative," Feds' Br. at 37.

### B.    The Plaintiffs Are Likely to Succeed on Their Claims that the Final Rule Violates Multiple Provisions of the APA

### 1.    The Final Rule Exceeds the Agencies' Jurisdiction and Authority

Plaintiffs do not argue the Agencies cannot issue rules, *contra* Feds' Br. at 12–13, but that the Final Rule is broader than any congressionally-delegated authority and regulates NFA-exempt items, Pls. Br. at 25–29. The Agencies incorrectly assert "Plaintiffs begin by suggesting that, if a "brace"-equipped weapon is created from a *pistol*, it cannot be a "rifle" under § 5845(c) and § 921(a)(7)." Feds' Br. at 15. If someone remakes a pistol into a rifle by swapping a brace (not designed to be fired from the shoulder) for a stock (designed to be fired from the shoulder), then the firearm may become a short-barreled rifle. But a brace is not a stock, no matter how the Agencies now try to conflate the two. And the Agencies cannot ignore objective design criteria, including the manufacturer's design and intent required under the NFA and GCA's plain meaning.

Additionally, while the Agencies argue that they are within their power to consider "a manufacturer's description of the weapon in marketing materials and information indicating its likely use, for purposes of determining whether the weapon is designed and intended to be fired

**APP.228**

from the shoulder," the Agencies provide examples where they simply ignore those representations in favor of other factors. Feds' Br. at 16 (citation omitted).

### 2.    The Final Rule is not a Logical Outgrowth of the Proposed Rule

All one must do to see the folly of the Agencies' argument is set the Proposed Rule's Worksheet 4999 next to the Final Rule's redefinition of federal regulation to demonstrate that the Final Rule is not a logical outgrowth. *Compare* Proposed Rule at 30,830–31, *with* Final Rule at 6,574–75. Interested parties could not anticipate the Final Rule would evolve from Worksheet 4999. *See Texas v. EPA*, 389 F. Supp. 3d 497, 503–04 (S.D. Tex. 2019). The Final Rule abandoned any objective guidance from the Proposed Rule, and includes new subjective factors, including third party use of a product. Final Rule at 6,574–75.

The Agencies' assertion that "[t]he factors discussed in the [Proposed Rule] will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle," Feds' Br. at 21 (quoting Final Rule at 6,494), is meaningless, given the Final Rule did not adopt the objective assessment criteria from the Proposed Rule and the Final Rule fully imbues the Agencies with discretion to consider whatever they want, whenever they want.

### C.    Alternatively, the Agencies' Regulation of Commonly owned Braced Pistols or Short-Barreled Rifles under the NFA violates the Second Amendment

If the Final Rule is upheld, the Agencies' enforcement of the NFA against braced-pistols and/or short-barreled rifles is unconstitutional. *See* Pls. Br. at 33–36. The Second Amendment protects these arms, which are commonly owned, and the required historical work has already been done. *See* Section II(A)(1); Pls. Br. at 33–35. But, if this Court looks to the Agencies' recitation of history, they fail to establish historical regulation consistent with the NFA. *See* Feds' Br. at 27. The Agencies provide four types of laws. 17th- and 18th-century militia laws allowing militia officers to ensure that militiamen had the requisite arms. *Id.* at 28. Two 19th-century laws requiring

**APP.229**

firearms be tested before being sold to ensure that the barrel would not explode. *Id.* Five laws over the course of nearly 250 years (from 1651 to 1899) requiring "[l]icenses or inspection" for random activities ranging from gunpowder exportation to participating in "sporting" activities—including one from Hawaii three decades before it was a U.S. territory. And four state taxation statutes from the 19th century that are addressed above. *See* Section II(A)(1).

Neither the militia nor barrel-testing laws burdened anyone's ability to possess any type of arm. Laws requiring that gunpowder be inspected before exportation are entirely irrelevant, as are laws requiring a license to engage in sporting activities, especially considering that one was from a foreign territory, and another was from 1899. At base, a few outlier laws are inadequate to meet the Agencies' burden. *See supra* Section II(A)(1); *Heller*, 554 U.S. at 632; *Bruen*, 142 S. Ct. at 2142. And laws falling outside of the period surrounding the Second Amendment's ratification are too late to benefit the Agencies. *See Bruen*, 142 S. Ct. at 2154, 2154 n.28. Thus, the Agencies cannot point to a historical analogue that permits them to enforce the NFA's onerous requirements on the acquisition and possession of commonly owned firearms. Absent such a showing, the Agencies have failed to meet their burden under *Bruen*.

## III.    PLAINTIFFS ARE CURRENTLY AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY WITHOUT PRELIMINARY RELIEF

Plaintiffs are suffering and will continue to suffer irreparable harm if the Final Rule is not enjoined or delayed, and "it is no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." *See VanDerStok*, 2022 WL 4809376, at *9. Additionally, despite the Agencies' cursory argument, *see* Feds' Br. at 11–12, Plaintiffs have standing to bring this suit.[7]

---

[7] The Agencies' argument that "a facial APA challenge to the Rule is ill-suited to redressing Plaintiffs' alleged injuries," misunderstands the APA. Feds' Br. at 11–12. The Final Rule is a final agency action, subject to this Court's review, that has harmed all Plaintiffs. *See* 5 U.S.C. § 704;

**APP.230**

The Agencies' argument that Mock and Lewis cannot establish harm because they have not received classification of their firearms is misplaced, since the Final Rule treats their firearms as short-barreled rifles according to the Agencies' guidance documents. *Compare* Mock Decl. ¶ 6; *with Common weapon platforms with attached "stabilizing brace" designs that are short-barreled rifles*, ATF;[8] and *compare* Lewis Decl. ¶ 5, *with Commercially available firearms equipped with a "stabilizing brace" that are short-barreled rifles*, ATF.[9] Mock and Lewis both alleged they do not wish to be subject to the NFA's heightened requirements, Mock Decl. ¶¶ 7–8, Lewis Decl. ¶¶ 6–7; they have concrete plans to purchase braced pistols in the future, but for the Final Rule's requirement they comply with the NFA or face criminal charges, Mock Decl. ¶ 7; Lewis Decl. ¶ 6; and that the Final Rule's chills the exercise of their rights because they "cannot know exactly how to comply[.]" Mock Decl. ¶ 11; Lewis Decl. ¶ 10. Thus, they have demonstrated a "credible threat of a potential felony indictment" and have "sufficiently demonstrated irreparable harm." *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *5 (N.D. Tex. Oct. 1, 2022).

Maxim Defense ceased the sale of braced pistols after the Final Rule went into effect, Dahl Decl. ¶ 10; Supplemental Declaration of David Dahl ("Dahl Supp. Decl.") ¶ 3; has lost millions of dollars and has been forced to lay off 5 employees due to the Final Rule, Dahl Supp. Decl. ¶¶ 5, 7; lost total sales of over $900,000 in February 2023, and of almost $1.2 million from March 1st through 14th, 2023, compared to the same periods in 2022, Dahl Supp. Decl. ¶ 5; and based on Maxim Defense's projections, it will continue to lose over $400,000 per month on braced pistols sales, for a total of over $4.5 million in 2023, Dahl Supp. Decl. ¶ 6. Absent an injunction, Maxim

---

Pls. Br. at 36–39. Because that action fails to comply with the APA and the Constitution, Plaintiffs challenge its lawfulness and constitutionality. *See* First Amended Petition, ECF No. 13.

[8] https://bit.ly/3YWKxCc (last visited Mar. 17, 2023).

[9] https://bit.ly/3n30uK9 (last visited Mar. 17, 2023).

**APP.231**

Defense will have to continue to strategically restructure and reorganize its operations to mitigate the impact of the Final Rule including attempting to liquidate millions of dollars of inventory and parting ways with 12 to 14 employees over the next few months. Dahl Supp. Decl. ¶¶ 8–9.

Finally, as to FPC, because Mock, Lewis, and Maxim Defense have standing, are injured, and because the interests FPC seeks to protect are germane to its purpose, FPC's burden as to associational standing is met. *See Warth v. Seldin*, 422 U.S. 490, 511 (1975) (explaining associational standing); *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (test for associational standing). More, it is unnecessary to require individual participation of FPC's members here, given the relief sought is injunctive in nature and would simply return federal regulation to the status quo as of January 30, 2023.[10]

## IV. THE AGENICES' CURSORY TREATMENT OF THE BALANCE OF HARMS DEMONSTRATES THE BALANCE WEIGHS IN PLAINTIFFS' FAVOR

The Agencies undermine their own argument that the balance weighs in their favor. While the Agencies claim the Final Rule will provide better clarity than the "prior system of *ad hoc* classification," Feds' Br. at 43, they inform the Court (and Plaintiffs) that "ATF is . . . drafting classification letters that it will send directly to manufacturers to notify them of how ATF has formally classified their weapons[,]" and that "an individual may request a classification determination from ATF for additional clarity[,]" Fed's Br. at 35.

The Agencies will not suffer significant harm by maintenance of a decade-long status quo while this Court considers the merits of the Final Rule. Indeed, there is no public benefit in

---

[10] The third prong is "prudential" and, while an association's action for damages running solely to its members would be barred, equitable claims of relief are not. *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 551, 553 (5th Cir. 2010) (quotation omitted). This District has already determined that FPC has met this test in a similar context. *See Firearms Policy Coal., Inc. v. McCraw*, No. 4:21-cv-1245-P, 2022 WL 3656996, at *2 (N.D. Tex. Aug. 25, 2022).

**APP.232**

allowing the Agencies to enforce an unlawful and unconstitutional Final Rule. *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4009048, at *10 (N.D. Tex. Sept. 2, 2022) ("Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully enjoyed until just last week.").

## V.    THE SCOPE OF RELIEF IS DICTATED BY THE IMPACT OF THE RULE AND THE EXTENT NECESSARY TO AFFORD PLAINTIFFS' FULL RELIEF

In APA cases, "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 533–34 (E.D. Tex. 2016) (quotation omitted). Given Fifth Circuit precedent recognizes the APA, specifically section 706, "empowers courts to 'set aside'—i.e., formally nullify and revoke—an unlawful agency action," this Court has equal power to broadly, preliminarily enjoin enforcement of the Final Rule. *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (quotation omitted); *see* Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1126 (2020).

Most telling, however, is that while the Agencies claim that broad relief is not "warranted or appropriate" here, Feds' Br. at 44, they do not offer *any* narrower construction of an injunction that would actually alleviate the harm suffered by Maxim Defense, its customers, Individual Plaintiffs, and FPC's members, while still allowing Maxim Defense to comply with the federal firearms regulations in selling its products. Contrary to the Agencies' assertion, Plaintiffs did not make this case an emergency, the Agencies did. The Agencies could have set a reasonable effective date. Instead, they chose to upend a decade of precedent immediately, with the stroke of a pen. The Agencies have no room to invoke the principle of "restraint" in this matter.

## CONCLUSION

Plaintiffs respectfully request this Court grant Plaintiffs' Motion, ECF No. 33.

**APP.233**

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.234**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 17, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Cody J. Wisniewski*

Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.235**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> MERRICK GARLAND, in his official capacity as Attorney General of the United States; *et al.*, <br><br> *Defendants*. | Civil Action No. 4:23-cv-00095-O |

## SUPPLEMENTAL DECLARATION OF DAVID DAHL

I, David Dahl, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.      I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am the Chief Operating Officer and Executive Vice President of Manufacturing of Maxim Defense Industries, LLC ("Maxim Defense") and have held those positions since 2018 I have worked for Maxim Defense, in some capacity, since 2015.

3.      As Maxim Defense understands the Final Rule, and the newly amended federal regulations, as of January 31, 2023, it is prohibited from selling pistols with stabilizing braces attached ("braced pistols") as ordinary firearms, absent the onerous requirements of the National Firearms Act ("NFA"). Any attempt to continue to sell braced pistols absent the onerous NFA process would potentially expose Maxim Defense to large fines and criminal liability—a risk Maxim Defense cannot take. While Maxim Defense may sell stabilizing braces on their own, the demand for the product has been almost completely destroyed by the Final Rule's seemingly

**APP.236**

uniform treatment of stabilizing braces as if they were stocks, despite Maxim Defense's clear design, manufacture, and intention for those products to operate to stabilize large, heavy pistols on the forearm.

4.    As previously forecasted, Maxim Defense lost $766,635.72 in sales of its stabilizing braces in February 2023 due to the impact of the Final Rule. These losses include a loss of direct consumer sales of Maxim Defense's products, as well as cancelled and discontinued OEM orders. Three of Maxim Defense's major OEM customers discontinued their stabilizing brace orders due to the impact of the Final Rule.

5.    Maxim Defense lost total sales of over $900,000 in February 2023, compared to February 2022, and of almost $1.2 million from March 1st through 14th, 2023, compared to the same period in 2022.

6.    Based on this information and Maxim Defense's projections, Maxim Defense will continue to lose over $400,000 per month on braced pistols sales, for a total of over $4.5 million in 2023.

7.    In February 2023, Maxim Defense was forced to part ways with 5 of its staff members as a direct result of these losses caused by the Final Rule.

8.    Absent an injunction, Maxim Defense will have to continue to undertake a strategic restructuring and reorganizing of its operations to mitigate the impact of the ongoing loss of revenue. Maxim Defense anticipates its debt will grow by 8.25% per month and due to this financial setback, Maxim Defense must adopt a twofold approach to avoid imminent bankruptcy. Maxim Defense will be forced to attempt to liquidate millions of dollars of inventory to pay down debt and to implement a workforce reduction plan, which entails reducing staffing levels by 40–

**APP.237**

50%. In other words, absent an injunction, Maxim Defense anticipates having to part ways with an additional 12 to 14 employees over the next few months.

9.      Absent an injunction, Maxim Defense anticipates being forced to spend an additional $250,000–$350,000 annually for content development, promotions, and events globally to try to reestablish its brand in a new and different market.


        DATED this  17 th day of March, 2023.


_____
David Dahl
COO/EVP of Manufacturing
Maxim Defense Industries, LLC

3

**APP.238**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **WILLIAM T. MOCK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:23-cv-00095-O** |
| | § | |
| **MERRICK GARLAND, et el.,** | § | |
| | § | |
| **Defendants.** | § | |

## OPINION & ORDER ON PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION OR, IN THE ALTERNATIVE, FOR POSTPONEMENT OF THE EFFECTIVE DATE OF THE FINAL RULE

Before the Court are Plaintiffs' Motion for Preliminary Injunction Or, in the Alternative, for Postponement of the Effective Date of the Final Rule (ECF No. 33) and Brief in Support (ECF No. 36), filed February 21, 2023; Defendants' Opposition (ECF No. 37), filed March 10, 2023; and Plaintiffs' Reply (ECF No. 38), filed March 17, 2023. Having considered the parties' briefing and applicable law, the Court holds that Plaintiffs have not carried their burden to demonstrate their substantial likelihood of success on the merits of any of their claims and therefore **DENIES** Plaintiffs' motion for preliminary injunctive relief or, in the alternative, for postponement of the Final Rule's effective date.

### I.    INTRODUCTION

#### A.  Statutory and Regulatory Background

In the first major federal attempt to regulate firearms, Congress enacted the National Firearms Act of 1934 (NFA), 26. U.S.C. §§ 5801–5872, which focused particularly on dangerous and concealable weapons used in organized crime. *See Lomont v. O'Neill*, 285 F.3d 9, 11 (D.C. Cir. 2002) (internal citations omitted). To that end, the Act identifies eight specific categories of "firearms" that are subject to certain registration and use requirements and associated taxes. 26

U.S.C. §§ 5801–02, 5811–12, 5821–22, 5841, 5845(a). Relevant to this dispute is the category of short-barreled rifles, i.e., "a rifle having a barrel or barrels of less than 16 inches in length" or "a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length." *Id.* § 5845(a)(3), (4). The Act defines a "rifle" as:

> [A] weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id.* § 5845(c). Given its focus on particular weapon categories, the NFA does not define every type of firearm, *e.g.*, handguns, and specifically exempts "a pistol or a revolver having a rifled bore" from its statutory purview. *Id.* § 5845(e).

Thirty years later, Congress enacted the Gun Control Act of 1968 (GCA), 18 U.S.C. §§ 921–931, which expanded federal firearms regulation in an effort to address the "widespread traffic in firearms and . . . their general availability to those whose possession thereof was contrary to the public interest." *Huddleston v. United States*, 415 U.S. 814, 825–26 (1974) (statutory references omitted). The GCA amended the NFA in some respects, defined additional terms, and reinforced the NFA in others. *See e.g.*, 18 U.S.C. §§ 921–22. Among other terms, the GCA defined "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." *Id.* § 921(a)(30). The GCA's definition of "rifle" is identical to that of the NFA. *Id.* § 921(a)(7).

Authority to administer and enforce the Acts is vested in the Attorney General, 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a), who delegated that responsibility to the Bureau of

**APP.240**

Alcohol, Tobacco, Firearms, and Explosives (ATF). 28 C.F.R. § 0.130. ATF has subsequently promulgated rules and regulations in keeping with that delegation of authority, including by classifying particular weapons and devices as subject to or exempt from federal regulation. 27 C.F.R. parts 478, 479; *e.g.*, U.S. ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 6, 2015) (indicating that using a stabilizing brace "as a shoulder stock" transforms a pistol or handgun into "a NFA firearm"); U.S. ATF, Reversal of ATF Open Letter on the Redesign of "Stabilizing Braces" (Mar. 21, 2017) (clarifying that purely "incidental, sporadic, or situational 'use'" of a stabilizing brace would not transform a pistol into an NFA-covered firearm).

Since 2012, ATF has seen a proliferation of "stabilizing brace" devices, which were originally designed "to assist people with disabilities or limited strength or mobility" to safely and single-handedly fire heavy pistols.[1] With time, the devices began to include characteristics resembling shoulder stocks and ATF soon learned that manufacturers were widely marketing these "braces" to consumers to as a means of creating functional short-barreled rifles without complying with NFA requirements.[2]

In response to this trend, ATF published a notice of proposed rulemaking (NPRM) in June 2021, which proposed amendments to 27 C.F.R. §§ 478.11 and 479.11 and identifying criteria by which ATF would determine whether a weapon was a "rifle" for purposes of the NFA and GCA. 86 Fed. Red. 30,826. After receiving more than 230,000 public comments on the NPRM, ATF published its Final Rule on January 31, 2023. Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023). Consequentially, the Final Rule modified ATF's earlier regulations addressing how the agency would determine whether a weapon is a "rifle" for purposes of the NFA and GCA. *Id.* at 6,480. Specifically, the Final Rule indicates that

---

[1] Pls.' Br. 6, ECF No. 36; Defs.' Opp. 4–6, ECF No. 37.
[2] Defs.' Opp 7–8, ECF No. 37.

**APP.241**

ATF interprets the phrase "designed or redesigned, made or remade, and intended to be fired from the shoulder" to include:

> [A] weapon that is equipped with an accessory, component, or other rearward attachment (e.g., a "stabilizing brace") that provides surface area that allows the weapon to be fired from the shoulder, provided other factors . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder.

*Id.* (interpreting the identical definition of "rifle," which is defined similarly in both the NFA and GCA, 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7)). The other factors relevant to ATF's determination are:

(1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(3) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(6) Information demonstrating the likely use of the weapon in the general community.

*Id.* While the NPRM had proposed a table (Worksheet 49999) that allotted points for specific criteria, the Final Rule did not implement the weighted point system. *Id.* at 6,479–80. The Final Rule took immediate effect for newly made or transferred firearms, but gives individuals already possessing subject firearms until May 31, 2023 to come into compliance by registering, permanently modifying, or disposing of them in accordance with ATF instructions. *Id.* at 6,570.

**APP.242**

### B. The Parties

Plaintiffs William T. Mock, Christopher Lewis, Maxim Defense Industries, LLC, and Firearms Policy Coalition, Inc. (FPC) have sued Defendants Attorney General Merrick Garland, in his official capacity, the United States Department of Justice, Director of ATF Steven Dettelbach, in his official capacity, and ATF.[3] Individual Plaintiffs Mock and Lewis are Texas residents who own at least one braced pistol and would purchase others in the immediate future but for the Final Rule's additional regulatory requirements.[4] Maxim Defense is a firearms and firearms accessories manufacturer and retailer that specializes in stabilizing braces and braced pistols.[5] The majority of Maxim Defense' revenues are attributable to sales of products now subject to the Final Rule.[6] FPC is a nonprofit organization that exists to defend and promote its members' constitutional rights, advance individual liberty and restore freedom through political and legal advocacy and public education.[7] FPC's membership includes individual gun owners, licensed manufacturers and retailers, gun ranges, firearms trainers and educators, and others.[8] Individual Plaintiffs and Maxim Defense are members of FPC.[9]

Plaintiffs filed this lawsuit the day the Final Rule was announced and moved for a preliminary injunction three weeks later.[10] They challenge the regulation on constitutional and procedural grounds and move the Court for a preliminary injunction or, in the alternative, for postponement of the Final Rule's effective date under 5 U.S.C. § 705.[11] The parties have briefed

---

[3] Am. Comp., ECF No. 13.
[4] *Id.* at 3–4.
[5] *Id.* at 4–5.
[6] *See id.*
[7] *Id.* at 5–6.
[8] *Id.*
[9] *Id.*
[10] Compl., ECF No. 1; Mot. for Prelim. Inj., ECF No. 33. Plaintiffs filed their Amended Complaint on February 7, 2023. Am. Compl., ECF No. 13.
[11] Mot. for Prelim. Inj., ECF No. 33.

**APP.243**

the issues and the motion is ripe for review.

## II.    LEGAL STANDARD

To obtain a preliminary injunction, the movant must demonstrate: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) that the balance of hardships weighs in the movant's favor; and (4) that issuance of a preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). The last two factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As movant, the party seeking relief bears the burden of proving all four elements of the preliminary injunction. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). And while the decision to grant or deny injunctive relief is committed to the district court's discretion, such relief is considered an "extraordinary remedy," never awarded as of right. *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008).

## III.    ANALYSIS

Plaintiffs attack the Final Rule on several grounds: (1) that it infringes on Individual Plaintiffs' and FPC's members' Second Amendment Rights; (2) that it violates the First Amendment by chilling speech; (3) that it runs afoul of the Fifth Amendment's due process guarantee; (4) that it violates the Constitution's structural provisions; (5) that it violates the APA as it was issued in excess of ATF's statutory authority; and (6) that it violates the APA's procedural requirements because it was not a logical outgrowth of the proposed rule.[12] Because it is arguably the most important element for injunctive relief, *Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005), the Court addresses first whether any of Plaintiffs' claims are substantially likely to

---

[12] *See generally* Pls.' Br. in Supp. of Mot. for Prelim. Inj. (Pls.' Br.), ECF No. 36.

**APP.244**

succeed on the merits, beginning with the violations of the APA before turning to the constitutional questions. *New York City Transit Auth. v. Beazer*, 440 U.S. 568, 582, 582 n.22 (1979).

### A.   Whether the Final Rule Exceeds ATF's Statutory Jurisdiction or Authority

The APA requires reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). When an agency has been given authority to administer and enforce a particular statute, as is the case here, they must often interpret the relevant congressional enactments in carrying out that charge. *Gonzales v. Oregon*, 546 U.S. 243, 255 (2006). And "courts have regularly recognized ATF's authority to interpret and apply the statutes that it administers, including the NFA's [statutory] definition[s]." *Guedes v. ATF*, 356 F.Supp.3d 109, 129 (D.D.C. 2019) (citations omitted).[13] Of course, this does not mean ATF may interpret or redefine terms in contravention of the originating statutes. *See Texas v. United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) ("The authority of administrative agencies is constrained by the language of the statute they administer."); *Vanderstok v. Garland*, --- F.Supp.3d ---, No. 4:22-CV-00691-O, 2022 WL 4009048, at *4 (N.D. Tex. Sept. 2, 2022) ("The Final Rule's redefinition of 'frame or receiver' conflicts with the statute's plain meaning"). Finally, though *Chevron* deference applies to agency interpretations of ambiguous statutes, in the Fifth Circuit such deference is

---

[13] The *Guedes* court held that ATF had the authority to interpret the NFA's definition of "machinegun," which is defined as:

> [A]ny weapon which shoots, is *designed* to shoot, or can be readily restored to shoot, automatically more than one shot, without manually reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part *designed and intended* solely and exclusively, or combination of parts *designed and intended*, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added).

**APP.245**

inapplicable if the interpreted statute imposes criminal penalties or, as in this case, the agency has not asked the reviewing court to defer. *Cargill v. Garland*, 57 F.4th 447, 465–66 (5th Cir. 2023).

Plaintiffs contend that the Final Rule exceeds ATF's statutory jurisdiction and authority, first, because ATF has not been delegated authority to interpret the statutorily defined and unambiguous term "rifle" and, second, even it could, the Final Rule's interpretation is inconsistent with the statutory term's plain meaning.[14] Given that other courts have recognized ATF's authority to interpret the statutes it has been charged with administering when there is an ambiguity, it is not substantially likely that the Final Rule exceeds the agency's scope of authority on this basis as the statute includes ambiguous terms in its definition of rifle. *Guedes*, 356 F.Supp.3d at 129. The statutory definition of "rifle" uses terms such as "designed," "redesigned," "remade," and "intended," words that necessarily require the enforcing agency—or anyone who would comprehend the statute's meaning—to evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is subject to the NFA. 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Rules explaining when a brace or stabilizer actually redesigns a firearm or remakes a firearm sufficiently to a short-barreled rifle are therefore permissible. What the Final Rule purports to do is identify the criteria by which enforcers, in their application of the statute, will make that determination. It does not, as Plaintiffs suggest, rewrite the definition itself. In short, it does not appear that the Final Rule so clearly contradicts the statutory definition of "rifle" that preliminary injunctive relief is in order. Thus, Plaintiffs have not carried their burden to show a substantial likelihood of success on the merits of this APA claim.

### B.   Whether the Final Rule is Not a Logical Outgrowth of the NPRM

When an agency promulgates a regulation, it must follow certain APA procedural

---

[14] Pls.' Br. 25, ECF No. 36.

**APP.246**

requirements, including issuing a "notice of proposed rule making . . . in the Federal Register" and notifying the public of "the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b). Interested persons must have the opportunity to offer comment on the proposed regulation. *Id.* § 553(c). And at publication, the agency's Final Rule must be a "logical outgrowth" of the proposed rule such that those subject to its regulation are given fair notice of its contents. *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). A final regulation satisfies this test if the proposed version "fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989). However, the final regulation need not "specifically identify every precise proposal [the agency might] ultimately adopt as a final rule." *Id.*

Importantly, final rules that are merely "interpretive" are not subject to these same notice-and-comment requirements, therefore do not need to satisfy the logical outgrowth test, and may take immediate effect. 5 U.S.C. § 553(d); *see Texas v. EPA*, 389 F.Supp.3d 497, 504 (S.D. Tex. 2019) (noting that "notice-and-comment requirements" for substantive regulations includes the "logical outgrowth" test). Interpretive rules are those that, as their label indicates, merely "*interpret* existing, substantive law." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 242 (5th Cir. 2023) (emphasis added).

Plaintiffs argue the Final Rule violates the APA's procedural requirements because it not a logical outgrowth of the proposed rule.[15] But Defendants contend that the Final Rule is merely interpretive, not substantive, and thus the logical outgrowth test does not apply.[16] If the Court assumes here for the sake of argument that the Final Rule is substantive, though its discussion above suggests otherwise, the Court finds for purposes of injunctive relief that the Final Rule likely

---

[15] Pls.' Br. 29, ECF No. 36.
[16] Defs.' Opp. 19–21, ECF No. 37.

**APP.247**

satisfies the logical outgrowth requirement. Plaintiffs' primary argument is that the Final Rule is not a logical outgrowth of its predecessor because the final version abandoned Worksheet 4999, the point system indicating how ATF would classify a firearm as a "rifle" based on objective characteristics, and instead utilizes a "subjective" six-factor test.[17] Though the Final Rule did not incorporate Worksheet 4999 as originally proposed, the NPRM indicated that ATF was considering a rule "to aid the firearms industry and public in understanding the criteria that [the agency] considers when evaluating" the classification of firearms under the NFA and CGA. 86 Fed. Reg. at 30,828. And while it abandoned the point system in response to the public comments criticizing that approach, the Final Rule's six criteria to be used for classifying firearms were "derived from the NPRM and proposed Worksheet 4999." 88 Fed. Reg. at 6,480. This is enough put the affected public on notice of the subjects and issues the Final Rule would address, and indeed, the very criteria the agency would employ in classifying firearms. Thus, under these circumstances and based on the briefing before it, the Court finds that Plaintiffs have not demonstrated a substantial likelihood of success on the merits of this claim.

### C.  Whether the Final Rule Violates the U.S. Constitution

Plaintiffs contend the Final Rule is violative of the Constitution's structural protections and the First, Second, and Fifth Amendments. Under the Second Amendment, Plaintiffs raise arguments in the alternative. For organizational purposes, the Court addresses the structural, First, and Fifth Amendment claims before turning to the Second Amendment claims.

---

[17] Pls.' Br. 29–33, ECF No. 36. Plaintiffs also suggest that, because the Final Rule's estimated economic impact doubled that of the NPRM, this supports a finding that the former is not a logical outgrowth of the latter. Plaintiffs' cited authority does not clearly support that proposition. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1107–08 (D.C. Cir. 2014) (reasoning that an agency's initial estimate that there would be *no* economic impact, followed by a complete reversal of opinion, supported the court's finding that the final rule was not a logical outgrowth of the proposed rule making).

**APP.248**

1. *Structural Constitutional Claims*

First, Plaintiffs argue that the Final Rule runs afoul of the Constitution's procedural protections because it "is an unreasonable construction of statutory terms and a clear example of the Agencies unlawfully creating law" and, if an agency has authority to issue legislative rules, "that authority requires 'a *clear delegation*' from Congress."[18] Based on the Court's assessment above that the Final Rule interprets—but does not rewrite—the underlying statutes, the Court finds these arguments unavailing. For this same reason, Plaintiffs' argument regarding the rule of lenity, which requires the Court to interpret an ambiguous statute in favor of a criminal defendant, (assuming it applies) is unpersuasive. In sum, Plaintiffs have not carried their burden to show that they are substantially likely to succeed on the merits of their structural constitutional claims.

2. *First Amendment Claim*

Plaintiffs argue the Final Rule violates their "First Amendment protected rights by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling speech."[19] The regulation chills speech, they say, "by threatening to reclassify pistols as rifles" based on what manufacturers and others say or write about particular weapons.[20] *See, e.g.*, 88 Fed. Reg. at 6,480 (indicating ATF will consider a "manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon" and "[i]nformation demonstrating the likely use of the weapon in the general community" to classify a firearm for purposes of the NFA). But because the Final Rule affords the agency discretion to apply these criteria, Plaintiffs say this "uncertainty will force [speakers] to be doubly caution with anything they say about protected arms, and even avoid speaking altogether,

---

[18] Pls.' Br. 23, ECF No. 36 (citations omitted).
[19] Pls.' Br. 15, ECF No. 36.
[20] *Id.* at 16.

**APP.249**

lest the Agencies come after them based on the content of their speech having somehow converted a lawful handgun into a short-barreled rifle."[21]

Plaintiffs' free speech arguments are unavailing. While the First Amendment provides robust speech protections and "generally prohibits the government from proscribing speech [based on its] disapproval of the ideas expressed," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992), no speech is being proscribed here. Rather, the Final Rule notifies the public that the government will *listen* to their speech to discern whether a particular weapon falls within the NFA's scope. Plaintiffs and others may continue to speak freely and, if they do, the government is permitted to listen to what they say about the products they manufacturer and purchase. *See, e.g.*, *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282–83 (D.C. Cir. 2019) ("use of a product's marketing and labeling to discern to which regulatory regime a product is subject [is not a First Amendment violation]"). Thus, on this claim, Plaintiffs have not shown that they are substantially likely to succeed on the merits.

### 3. Fifth Amendment Claim

Next Plaintiffs argue the Final Rule is void for vagueness and, as such, violates the Fifth Amendment's guarantee of due process.[22] The regulation is unconstitutionally vague, Plaintiffs argue, because it permits ATF to apply a set of non-dispositive criteria to decide whether a weapon is subject to the NFA.[23] And this discretion-laden process does not provide any useful guidance to regulated parties.[24]

To sustain a void for vagueness challenge, however, "the complainant must prove that the enactment is vague 'not in the sense that it requires a person to conform his conduct to an *imprecise*

---

[21] Pls.' Br. 17, ECF No. 36.
[22] Pls.' Br. 19–22, ECF No. 36.
[23] *Id.* at 20.
[24] *Id.*

**APP.250**

*but comprehensible* normative standard, but rather in the sense that no standard of conduct is specified at all." *Vill. Of Hoffman Ests. v. Flipside Inc.*, 455 U.S. 489, 495 n.7 (1982) (emphasis added) (internal citations omitted). Though the six criteria by which ATF will make a weapons classification are non-dispositive, and therefore imprecise, they *do* provide a standard—one that tracks the statutory definition regarding whether a weapon is "designed or redesigned, made or remade, and intended to be fired from the shoulder." Hence, while the Final Rule's factoring criteria approach may be imprecise, it is comprehensible enough to put a person of ordinary intelligence on notice that their weapon may be subject to federal firearms laws. Thus, at this stage Plaintiffs have not shown a substantial likelihood of success on the merits of their Fifth Amendment claim.

### 4. *Second Amendment Claims*

Where a regulation implicates the Second Amendment, the government need only demonstrate that the regulation "is consistent with the Nation's historical tradition of firearm regulation" in order to justify its enactment. *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2002). It does so by pointing to a "well-established and representative historical analogue." *Id.* at 2133.

Plaintiffs raise two Second Amendment claims, one assuming that the Final Rule is unlawful, and the other in the event the Final Rule is upheld. First, Plaintiffs claim the Final Rule "impermissibly infringes on the 'right of the people to keep and bear Arms.'"[25] This is so, they argue, because "when firearms are 'in common use at the [present] time,' they cannot be banned." Pls.' Br. 13, ECF No. 36 (quoting *District of Columbia v. Heller*, 554 U.S. 578, 627 (2008)). And this Second Amendment protection, Plaintiffs assert, "extends not just to braced pistols, but to the

---

[25] Pls.' Br. 11, ECF No. 36 (quoting U.S. CONST. AMEND. II).

**APP.251**

braces themselves."[26] But Plaintiffs' first argument fails for the simple reason that the Final Rule does not ban stabilizing braces, nor firearms equipped with them. It *does* require regulated individuals and entities to comply with the NFA's statutory requirements (e.g., by registering the weapons with ATF or permanently detaching the brace from the pistol), but banning and regulating a firearm are not always one and the same. *See* 88 Fed. Reg. at 6,570. Nor does the Second Amendment bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership. *See, e.g.*, *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017); *see also Bruen*, 142 S. Ct. at 2138 n.9 (2022) ("nothing in our analysis should be interpreted to suggest the unconstitutionality [of reasonable licensing regimes]").

And importantly, the Final Rule does not regulate stabilizing braces *on their own* but only regulates the products when they are attached to a firearm.[27] Indeed, the language of the Final Rule and of Plaintiffs' own briefing confirms this. *See, e.g.*, Factoring Criteria for Firearms with *Attached* "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023) (emphasis added); *id.* at 6,481 (requiring individuals "to destroy, dispose of, modify, or register existing *braced pistols*") (emphasis added); Pls.' Br. 6, ECF No. 36 (discussing how "the *addition* of [a brace]" would change a "*pistol*'s" or "*weapon*'s classification") (emphasis added); *id.* at 7 (discussing ATF's prior indication that "stabilizing braces are perfectly legal accessories" but when used "*with a firearm*" they may be subject to the NFA). And Plaintiffs do not cite any language in the Final Rule that purports to regulate braces separately. Thus, Plaintiff Maxim Defense may still sell

---

[26] Pls.' Br. 12, ECF No. 36.
[27] *See* Pls.' Br. 14–15, ECF No. 36 (arguing that an individual could be found to be in "constructive possession" of a short-barreled rifle simply by owning a stabilizing brace and a handgun capable of being fitted with a brace).

**APP.252**

individual braces and Individual Plaintiffs may still purchase them without being affected by the Final Rule.

Second, Plaintiffs argue that there is no "historical practice of regulating gunsmithing," (i.e., a practice that includes equipping pistols with stabilizing braces), thus ATF cannot lawfully regulate it.[28] Finally, and in the alternative, Plaintiffs argue that if the Final Rule is upheld, then the agencies' regulation of braced pistols under the NFA violates the Second Amendment because such weapons are commonly owned and possessed by millions of Americans and are therefore subject to heightened constitutional protections following the Supreme Court's decisions in *Heller* and *Bruen*.[29] Both of these arguments rely on a purported lack of historical evidence of similar government regulations. Given the necessarily condensed briefing offered in support of this motion, the Court cannot—on the minimal historical analysis provided—conclude that Final Rule is substantially likely to violate Plaintiffs' Second Amendment rights. Though the historical record may support such a result at the summary judgment stage, the briefing presently before the Court is not sufficient to justify the extraordinary remedy of preliminary injunctive relief. As such, the Court finds that Plaintiffs are not likely to succeed on the merits of their Second Amendment claims at this juncture.

*    *    *    *

In sum, Plaintiffs have not shown they are entitled to the extraordinary remedy of preliminary injunctive relief. While Plaintiffs may ultimately prevail on summary judgment, the Court finds that they have not, at this preliminary stage, demonstrated a substantial likelihood of success on the merits of at least one of their claims. Failure to satisfy this element necessarily bars their request for injunctive relief. Therefore, the Court will not address the remaining elements for

---

[28] *Id.*
[29] Pls.' Br. 33, ECF No. 36.

15

**APP.253**

a preliminary injunction.

## IV.    CONCLUSION

For the reasons discussed, the Court **DENIES** Plaintiffs' request for injunctive relief or, in the alternative, for postponement of the Final Rule's effective date (ECF No. 33).

**SO ORDERED** this **30th day** of **March, 2023**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

**APP.254**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

## PLAINTIFFS' MOTION FOR INJUNCTION PENDING APPEAL

Pursuant to Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1)(C), Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC; and Firearms Policy Coalition, Inc., through their undersigned counsel, move this honorable Court for an injunction pending appeal prohibiting Defendants and their officers, agents, servants, and employees from implementing and enforcing the provisions established and amended by the Department of Justice and Bureau of Alcohol, Tobacco, Firearms, and Explosives' Final Rule entitled *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).

As explained in the accompanying brief in support, Plaintiffs satisfy each factor for an injunction pending appeal: (1) they are likely to succeed on the merits of their claims under the U.S.

**APP.255**

Constitution and the Administrative Procedure Act; (2) they continue to face irreparable injury absent an injunction; (3) Plaintiffs' injuries outweigh any harm that the injunction will cause Defendants pending appeal; and (4) an injunction will serve the public interest. *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011). Accordingly, Plaintiffs respectfully request that this Court issue an injunction pending appeal.[1]

Plaintiffs' counsel conferred with counsel for Defendants, who oppose the relief requested herein.

DATED this 30th day of March 2023.

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

---

[1]   If this Court declines to issue an injunction pending appeal, Plaintiffs respectfully request that this Court do so as quickly as possible to allow Plaintiffs to pursue their claims with the U.S. Court of Appeals for the Fifth Circuit. Due to the emergency nature of this case, Plaintiffs are forced to seek Fifth Circuit review as quickly as possible. Plaintiffs' irreparable harms grow by the day.

**APP.256**

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.257**

## CERTIFICATE OF SERVICE

I hereby certify that, on March 30, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION

## CERTIFICATE OF CONFERENCE

I hereby certify that, on March 30, 2023, Plaintiffs' counsel, Cody J. Wisniewski conferred with Defendants' counsel, Jody Lowenstein, Michael Drezner, and Faith Lowry with the U.S. Department of Justice, Civil Division, via email, who stated that Defendants oppose the relief request in this Motion.

/s/ *Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.258**

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 4:23-cv-00095-O |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | |
| *Defendants*. | |

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR INJUNCTION PENDING APPEAL

**APP.259**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES .................................................................. iii

INTRODUCTION .................................................................................... 1

BACKGROUND ....................................................................................... 2

STANDARD OF REVIEW ...................................................................... 5

ARGUMENT ............................................................................................ 6

I.      CONTRARY TO THIS COURT'S CONCLUSIONS, PLAINTIFFS
        ARE LIKELY TO SUCCEED ON THE MERITS ......................... 6

        A.      The Agencies' Final Rule is a Substantive Rule, Not an
                Interpretive One ................................................................... 6

        B.      Under *Bruen*, the Government, not Plaintiffs, Bears the
                Burden of Demonstrating a Historical Analog .................... 7

        C.      Because the Government Failed to Carry its Burden Here, the
                Final Rule is Presumptively Unconstitutional .................... 10

        D.      Plaintiffs are Likely to Succeed on the Merits of their Other
                Claims .................................................................................. 13

II.     PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN
        INJUNCTION PENDING APPEAL .............................................. 15

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC
        INTEREST, WHICH MERGE HERE, ALSO FAVOR AN
        INJUNCTION PENDING APPEAL .............................................. 16

CONCLUSION ...................................................................................... 18

CERTIFICATE OF SERVICE .............................................................. 20

**APP.260**

# TABLE OF AUTHORITIES

**CASES**                                                                                       **PAGE**

*Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr,*
   518 U.S. 668 (1996) ................................................................................... 11

*Bennett v. Spear,*
   520 U.S. 154 (1997) ................................................................................... 6

*Caetano v. Massachusetts,*
   577 U.S. 411 (2016) ................................................................................... 8

*Cardoni v. Prosperity Bank,*
   No. 14-cv-1946, 2015 WL 410589 (S.D. Tex. Jan. 29, 2015) ............................... 5

*Cargill v. Garland,*
   57 F.4th 447 (5th Cir. 2023)...................................................................... 14

*Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.,*
   333 U.S. 103 (1948) ................................................................................... 6

*City of Dallas, Texas v. Hall,*
   2008 WL 11350041 (N.D. Tex. July 28, 2008)....................................................... 18

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ................................................................................... 8, 10

*Elrod v. Burns,*
   427 U.S. 347 (1976) ................................................................................... 12, 15, 17

*Farmhand Inc. v. Anel Eng'g Indus., Inc.,*
   693 F.2d 1140 (5th Cir. 1982) ...................................................................... 5

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1997)........................................................................ 17

*Murdock v. Pennsylvania,*
   319 U.S. 105 (1943) ................................................................................... 11

*N. Mariana Islands v. United States,*
   686 F. Supp. 2d 7 (D.D.C. 2009)..................................................................... 17

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen,*
   142 S. Ct. 2111 (2022) ................................................................................ *passim*

*SD Voice v. Noem,*
   987 F.3d 1186 (8th Cir. 2021) ...................................................................... 17

**APP.261**

*Texas v. United States*,
  86 F. Supp. 3d 591 (S.D. Tex. 2015)....................................................... 6–7

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ............................................................... 6

*United States v. Rahimi*,
  61 F.4th 443 (5th Cir. 2023)................................................................ *passim*

*U.S. Navy SEALs 1-26 v. Biden*,
  578 F. Supp. 3d 822 (N.D. Tex. 2022) ................................................ 12, 15

*VanDerStok v. Garland*,
  __ F. Supp. 3d __, 2022 WL 4009048 (N.D. Tex. Sept. 2, 2022)........................ 18

*VanDerStok v. Garland*,
  __ F. Supp. 3d __, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) ......................... 15, 16

*Waterfall Victoria Master Fund Ltd. v. Avery*,
  No. 3:16-cv-0173-B, 2018 WL 8261598 (N.D. Tex. Nov. 5, 2018) ..................... 5

*Weingarten Realty Investors v. Miller*,
  661 F.3d 904 (5th Cir. 2011) ............................................................... 5

*West Virginia v. EPA*,
  142 S. Ct. 2605 (2022) ........................................................................ 7

**Statutes**

28 U.S.C. § 5845 ............................................................................. 3

National Firearms Act of 1934,
  Ch. 757, Pub. L. 73-474, 48 Stat. 1236 (1934)...................................... 3

**Rules**

Fed. R. Civ. P. 62 .............................................................................. 5

**Regulations**

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
  86 Fed. Reg. 30,826 (June 10, 2021)................................................... 4, 6

*Factoring Criteria for Firearms with Attached 'Stabilizing Braces'*,
  88 Fed. Reg. 6,478 (Jan. 31, 2023)..................................................... *passim*

**APP.262**

**<u>Other Authorities</u>**

Letter from ATF #2013-0172 (Nov. 26, 2012)..........................................................    3

*National Firearms Act*, ATF ....................................................................................    3

**APP.263**

## INTRODUCTION

On January 31, 2023, the Department of Justice and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF," collectively "Agencies"), published a final agency action that purportedly reclassified at least 3 million firearms that, prior to the rule, were lawfully sold, purchased, and possessed across the United States. *Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Final Rule"), 88 Fed. Reg. 6,478 (Jan. 31, 2023).[1] With the stroke of that pen, the Agencies immediately prohibited Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") from selling those firearms as it had been able to do for a decade—and instead requires Maxim Defense to comply with the onerous requirements of the National Firearms Act ("NFA"), which it has never had to do with regard to its pistols with stabilizing braces ("braced pistols"). Moreover, the Agencies are requiring Plaintiffs Mock and Lewis, and the other lawful owners of those 3 million affected firearms, to either destroy or dispose of their property, or to register their firearms under the NFA, which requires them to comply with a series of onerous requirements, such as passing an additional background check, submitting additional personal information (fingerprints, passport-style photographs, etc.), and subjects their firearms to additional limitations on how they can be transported, stored, bought, and sold. More simply put, the Final Rule completely alters the legal landscape surrounding constitutionally protected Arms, namely braced pistols, and vastly expands the Agencies' authority to interpret and enforce criminal law against 3 million additional firearms that the Agencies previously did not treat as subject to the NFA.

Plaintiffs recognize that preliminary relief, including an injunction pending appeal, is extraordinary relief, but this situation warrants exactly that. Absent relief, Maxim Defense will likely go out of business or be forced to declare bankruptcy. In other words, without an injunction,

---

[1]    The Final Rule is available at https://www.federalregister.gov/d/2023-01001.

**APP.264**

Maxim Defense and its 28 employees may not be around to test the legitimacy of their claims through more robust briefing on the merits. And this is true of many of Plaintiff Firearms Policy Coalition, Inc.'s ("FPC") corporate members, all of whom had their entire business practices upended immediately upon publication of the Final Rule—with no grace period or delayed effective date to allow them any room to adjust or even to challenge the Final Rule before its crushing weight was already felt. Plaintiffs' Mock and Lewis will also face choices that cannot be changed after the fact. If Mock and Lewis register their constitutionally protected Arms under the NFA, that cannot be undone. While a firearm can purportedly be removed from the National Firearms Registration and Transfer Record ("NFRTR"), they cannot un-disclose their personal information to the Agencies, nor can the undo the registration process. And it is not enough to simply remove their stabilizing braces, the Agencies require Mock and Lewis, and upwards of 3 million other peaceable citizens, to render the brace or firearm so that it cannot be reattached.

In light of this extreme scenario, Plaintiffs renew their request for this Court to press pause. Pause the Agencies' enforcement of the Final Rule. Prevent Maxim Defense from going out of business so it may have its day in court. Prevent Mock and Lewis from being forced to comply with an extreme registration requirement until they may have the same. And prevent Maxim Defenses' customers and FPC's members from the similar fates. Plaintiffs are more than willing to litigate this matter on an expedited basis, but they must be around to do so.

## BACKGROUND

Given the posture of this case and need for brevity, Plaintiffs' will not restate the entire background of this matter here.[2] But a few points of background are in order. Congress enacted

---

[2]    Plaintiffs refer this Court to their Brief in Support of their Motion for Preliminary Relief ("Pls. Br."), ECF No. 36, at 3–10, for a detailed background of this matter.

**APP.265**

the NFA "[t]o provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate transportation thereof." Ch. 757, 48 Stat. 1236 (1934). The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, and lawful use of the Arms it regulates, including short-barreled rifles ("SBR"). An SBR is an NFA-regulated "firearm" defined as "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]" 28 U.S.C. § 5845(a)(3)–(4). Indeed, ATF concedes that the purpose of the NFA was to stop individuals from purchasing certain Arms: "As the legislative history of the law discloses, its underlying purpose was to curtail, if not prohibit, transactions in NFA firearms . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms."[3]

And yet, since their initial classification by ATF on November 26, 2012, Letter from ATF #2013-0172 (Nov. 26, 2012); until the Agencies' publication of the Final Rule on January 31, 2023, stabilizing braces, which are designed to assist people with disabilities or limited strength or mobility with firing heavy pistols safely and comfortably, have broadly been treated as to not alter the classification of a pistol, designed to be fired with one hand, into a rifle, designed to be shouldered. *See* Pls. Br. at 6–8. While the Agencies indicated their regulatory changes may have such an impact on federal firearms law, their Notice of Proposed Rulemaking did not truly foreshadow the actual impact or contents of the Final Rule, nor did it indicate that the Final Rule

---

[3]    *National Firearms Act*, ATF, https://www.atf.gov/rules-and-regulations/national-firearms-act (last visited Mar. 30, 2023).

**APP.266**

would go into effect immediately. *See Factoring Criteria for Firearms with Attached 'Stabilizing Braces'* ("Proposed Rule"), 86 Fed. Reg. 30,826 (June 10, 2021).[4] After abandoning the proposed Worksheet 4999, Proposed Rule at 30,830–31; the Agencies instead amended the federal regulatory definitions of "rifle" to include an open-ended, discretionary, six-factor test to purportedly allow the Agencies to determine a firearms' design and the intent of the manufacturer. Final Rule at 6,574–75. Those factors are:

> (i) whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

> (ii) whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method) that is consistent with similarly designed rifles;

> (iii) whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

> (iv) whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations;

> (v) the manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

> (vi) information demonstrating the likely use of the weapon in the general community

Final Rule at 6,480. In so doing, the Agencies effectively reclassified at least 3 million lawfully possessed pistols with stabilizing braces as SBRs and made it seemingly illegal to possess both a stabilizing brace and a pistol capable of having that brace attached without also running afoul of federal firearms law and the NFA.

---

[4]     The Proposed Rule is available at: https://www.federalregister.gov/d/2021-12176.

**APP.267**

Given that, for many, the Final Rule went into effect immediately upon publication, Plaintiffs initiated this lawsuit on January 31, 2023. ECF No. 1. Plaintiffs then filed an Amended Petition on February 7, 2023, to add Plaintiff Maxim Defense—which could go out of business any day now—to the litigation and to clarify Plaintiffs' Second Amendment claims. ECF No 13. To protect Plaintiffs, including Maxim Defense's customers and FPC's members, from continued irreparable injury, Plaintiffs sought a preliminary injunction, or postponement of the Final Rule, on February 21, 2021, ECF No. 33, which this Court denied on March 30, 2023, ECF No. 40. Thereafter, Plaintiffs filed this motion.[5]

### STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 62, a court may "grant injunctions pending appeal of an order denying injunctive relief." *Cardoni v. Prosperity Bank*, No. 14-cv-1946, 2015 WL 410589, at *1 (S.D. Tex. Jan. 29, 2015) (citing Fed. R. Civ. P. 62(c)). To obtain an injunction pending appeal, a party must show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury outweighs the threatened harm to the party whom it seeks to enjoin; and (4) that granting the injunction will not disserve the public interest. *See Weingarten Realty Investors v. Miller*, 661 F.3d 904, 910 (5th Cir. 2011).

---

[5]     Plaintiffs intend to file a notice of appeal of this Court's order, ECF No. 40, because of the immediacy of the harm that Plaintiffs are suffering, but that does not alter this Court's jurisdiction to decide this Motion. Although a notice of appeal generally divests a district court of jurisdiction, *see Farmhand Inc. v. Anel Eng'g Indus., Inc.*, 693 F.2d 1140, 1145 (5th Cir. 1982), "this rule is not absolute and district courts retain jurisdiction as to matters not involved in the appeal," including "grant[ing] an injunction," *Waterfall Victoria Master Fund Ltd. v. Avery*, No. 3:16-cv-0173-B, 2018 WL 8261598, at *2 (N.D. Tex. Nov. 5, 2018).

**APP.268**

## ARGUMENT

## I.    CONTRARY TO THIS COURT'S CONCLUSIONS, PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### A.    The Agencies' Final Rule is a Substantive Rule, Not an Interpretive One

As an initial matter, the Agencies' Final Rule is a substantive rule that imposes and alters the legal obligations of millions of Americans and a multitude of businesses across the United States. The Agencies' attempt to characterize it otherwise is misplaced.

*First*, as addressed in Plaintiffs' Reply, ECF No. 38, at 1; the Agencies engaged in a years' long notice and comment period in order to draft and publish the Proposed Rule, solicit comments, review those comments, and then to draft and publish the Final Rule. *See* Proposed Rule at 30,826; Final Rule at 6,478. The Agencies offer no explanation as to why, if the Final Rule is merely interpretive, and not subject to notice-and-comment requirements, the Agencies engaged in that process at all. If the Final Rule was merely interpretive, the Agencies seemingly could have issued a general guidance letter as to stabilizing braces, as they have several times in the past. *See* Pls. Br. at 6–8. And yet, the Agencies' adherence to the legal requirements of the notice-and-comment processes demonstrates the Agencies were aware that the Final Rule in this matter would be substantive. *See Bennett v. Spear*, 520 U.S. 154, 156 (1997) (classifying an action as a "final agency action for APA purposes," in part, when it "marks the consummation of the agency's decisionmaking process") (citing *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).

*Second*, the Final Rule is a "binding" substantive rule that creates new "rights and obligations," as to braced pistols, which the Final Rule now formally reclassifies as SBRs. *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), *aff'd* 577 U.S. 1101 (2016). The Final Rule is a "substantive change in existing law or policy," *Texas v. United States*, 86 F. Supp. 3d

**APP.269**

591, 670 (S.D. Tex. 2015), evidenced by the fact that the Final Rule changes a decade long status quo as to the legal status of at least 3 million firearms, as well as the legal process on how corporations may sell formerly "braced pistols", and how individuals may acquire those same Arms. Final Rule at 6,478–81. And the Final Rule imposes additional requirements on the possession, storage, and transportation of those formerly "braced pistols" once acquired. *Id*. The Agencies' claim that the Final Rule "does not impose any new legal obligations," is thus misplaced. *Compare Defendants' Opposition to Plaintiffs' Motion*, ECF No. 37, at 19 (quoted) *with id.* at 14 ("After completing the notice-and-comment process, the agency issued the Rule to amend its existing regulations . . . .") (citation omitted). Such an earthshattering agency action—bearing potential criminal penalties for millions of Americans—is of vast "political significance" and of "highly consequential power," not only evidencing the substantive nature of the rule, but also likely implicating the major question doctrine and thus dooming the Final Rule. *See West Virginia v. EPA*, 142 S. Ct. 2587, 2,608–09 (2022).

Regardless, even if the Final Rule is interpretive, the Agencies' Final Rule, in so far as it interprets and allows for the enforcement of federal firearms law, is still a violation of Plaintiffs' Second Amendment protected rights, or, at minimum, is vague and chills the exercise of Plaintiffs' constitutionally protected rights. Even an "interpretive" rule of this type establishes a threat of prosecution to Plaintiffs, including Maxim Defense's customers and FPC's members, which threat is directly traceable to the Final Rule's amendment to the federal regulatory definitions of "rifle." *See* Final Rule at 6,574–75.

B. **Under *Bruen*, the Government, not Plaintiffs, Bears the Burden of Demonstrating a Historical Analog**

The clearest reason, however, for this Court to enter an injunction pending appeal here is that this Court's decision flipped the burden of proof to the Plaintiffs even though the burden is on

**APP.270**

the government to demonstrate an appropriate historical analogue to its modern regulation, not Plaintiffs. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023).

The Supreme Court has explained that "[j]ust as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *see N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) ("Thus, even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that facilitate armed self-defense.") (citing *Caetano v. Massachusetts*, 577 U.S. 411, 411–12 (2016) (*per curiam*)). "[A]ll instruments that constitute bearable arms," are presumptively protected. *Bruen*, 142 S. Ct. at 2143; *accord Rahimi*, 61 F.4th at 453 (If the "Second Amendment's plain text covers an individual's conduct" then the "Constitution presumptively protects the conduct."). The Second Amendment's text unquestionably extends to pistols and rifles, thus both braced pistols and short-barreled rifles are presumptively protected under the Second Amendment.

That presumption can only be overcome by *the government* proving that its law is "consistent with this Nation's historical tradition of firearm regulation," not Plaintiffs. *Bruen*, 142 S. Ct. at 2126. Thus, when considering whether "history" and "tradition" support a restriction on "arms," the burden is on *the government* to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127; *accord Rahimi*, 61 F.4th at 453 (The government "must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). It is the government—not Plaintiffs—that is charged with "demonstrating that [the challenged law] is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2130. "Only then

**APP.271**

may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2130.[6]

Even if *Bruen* left open any ambiguity about who carries the burden of showing a historical analogue, the Fifth Circuit removed it entirely earlier this month in *Rahimi*. There, the Fifth Circuit expressly overruled its pre-*Bruen* precedent, 61 F.4th at 450–51, and emphasized, as Plaintiffs did in their briefing, *see* Pls. Br. at 35, that *Bruen* placed "the burden of proffering 'relevantly similar' historical regulations" squarely on the government, 61 F.4th at 455. And the Fifth Circuit then followed its own guidance and invalidated the challenged statute not because the criminal defendant had established a historical treatise on the Nation's firearm laws, but instead because *the government failed to demonstrate* that the challenged law "fits within our Nation's historical tradition of firearm regulation." *Id.* at 460.

Contrary to *Bruen* and *Rahimi*, in denying the preliminary injunction, this Court faulted *Plaintiffs* for what it deemed their "minimal historical analysis." ECF No. 40 at 15. This gets the analysis exactly backwards. And to the extent there was "minimal historical analysis" in the government's briefing, it is the government's failure to carry its burden and rebut the "presumptive" protections of the Second Amendment. *Rahimi*, 61 F.4th at 450, 453, 454; *accord id.* at 461 (Ho, J., concurring).

---

[6]    Nor, as Plaintiffs have fully argued in their prior briefing, is *Bruen* silent about how the text-and-history test applies in the context of bans or regulations on the possession of commonly possessed arms. Both *Bruen* and *Heller* identified only one aspect of our history and tradition that is sufficiently analogous to—and therefore capable of justifying—a broad ban or regulation: the tradition, dating back to the Founding, of restricting "dangerous and unusual weapons" that are not "in common use at the time." *Bruen*, 142 S. Ct. at 2128. By contrast, where a type of arm is in "common use," there is no and can be no historical tradition justifying strict regulations or bans. For this type of restriction, then, the Supreme Court has already analyzed the relevant historical tradition and established its scope: "dangerous and unusual" weapons may be restricted, but arms "in common use at the time" may not. *Id.* Given Plaintiffs fully address this issue in their prior briefing, they will not address it further here. *See* Pls. Br. at 12–13, 33–35; Pls. Reply at 2–3, 6.

**APP.272**

**C.    Because the Government Failed to Carry its Burden Here, the Final Rule is Presumptively Unconstitutional**

Proper application of *Bruen*'s "analytical steps," *Rahimi*, 61 F.4th at 453, shows that the Final Rule—which prohibits Plaintiffs from owning either braced pistols or SBRs without first announcing themselves to the government—violates Plaintiffs' constitutionally protected right to keep and bear arms. Because of the Final Rule, Plaintiffs cannot sell or possess those arms, absent the NFA's requirements. And not only are pistols specifically exempted from the NFA, but the Agencies have failed to carry their burden in establishing a historical analogue to justify the constitutionality of the NFA in this matter—as the Agencies are required to do under *Bruen*.

Pistols are unquestionably protected by the Second Amendment. *See Heller*, 554 U.S. at 628–35. Rifles, which are also in common use, are protected for the same reason. Moreover, whether this Court treats them as "braced pistols" under Plaintiffs' Count VIII, or as SBRs under Plaintiffs' alternative Count IX, the Arms at issue are both "in common use" and presumptively protected by the Second Amendment. *See Bruen*, 142 S. Ct. at 2128. While that should end this Court's inquiry, given this Court proceeded to the historical analysis, the burden is on the government to justify its regulation of Arms that are protected by the Second Amendment based on historical analogues.[7]

This Court sidestepped this question by concluding that because the Final Rule "does not ban stabilizing braces, nor firearms equipped with them," but instead requires only "regulated individuals and entities" to "register[] the weapons with ATF or permanently detach[] the brace from the pistol." ECF No. 40 at 14. But this ignores two points raised in Plaintiffs' briefing.

---

[7]    While the braces themselves are protected even if they are not attached to a firearm, Pls. Br. at 12, that matter is distinct from Plaintiffs' claims regarding the Agencies treatment of braced pistols and/or SBRs via the Final Rule and the NFA.

**APP.273**

First, the registration requirement imposes a $200 tax,[8] onerous compliance requirements, and enhanced criminal penalties expressly designed to discourage or even eliminate transactions in firearms even though the Supreme Court has made clear that the government cannot "impose a charge for the enjoyment of a right granted by the federal constitution." *See* Pls. Br. at 34 (quoting *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943)). No court would ever uphold a statute that required a Twitter user to pay the government $200 and be placed on a government database before accessing the website. Nor would any court uphold a requirement that those subject to a search pay $200 to avail themselves of the warrant requirement. To find no infringement of Plaintiffs' Second Amendment protected rights despite identical circumstances is to do exactly what *Bruen* told courts not to do—treat the constitutionally protected right to bear arms as a "second-class right, subject to an entirely different body of rules than the other Bill of Right guarantees." *Bruen*, 142 S. Ct. at 2156.

Second, Plaintiffs demonstrated to this Court, Pls. Br. at 35, that the government often takes months to over a year to grant permission to possess NFA-regulated firearms. The Second Amendment—co-equal in the panoply of protected rights—recognizes no less than other constitutional rights that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996). For these reasons, the Court was wrong to find no violation of the Second Amendment just because the Final Rule graciously declines to impose an outright prohibition on the right to own braced pistols or SBRs.

Given the Arms at issue are presumptively protected, according to *Bruen*, *even at this*

---

[8]    The Agencies decision to temporarily waive the $200 tax might is irrelevant to the question of the constitutionality of the Final Rule and/or the NFA, given the waiver is temporary in nature.

**APP.274**

*preliminary stage*, the absence of historical justification in this case must fall against the Agencies. It is of no comfort to Plaintiffs that this Court reasoned that the government may fail to do on the merits what it already failed to do here, particularly facing the ruinous harms they face. Thus, the fact that "the historical record may support such a result at the summary judgment stage," does not relieve the government of its burden now, ECF No. 40 at 15, particularly as the "loss of constitutional rights for even minimal periods of time, unquestionably constitutes irreparable injury." *U.S. Navy SEALs 1-26 v. Biden*, 578 F. Supp. 3d 822, 834 (N.D. Tex. 2022); *accord Elrod v. Burns*, 427 U.S. 347, 374–75 (1976).[9] Put simply, if "the briefing presently before the Court is not sufficient to justify the extraordinary remedy of preliminary injunctive relief," then the Agencies failed to carry their burden, and the ones who will suffer for their failure are Plaintiffs and the millions of other law-abiding citizens who are forced to comply with the Final Rule, and thus the NFA's onerous requirements, or to abandon their Second Amendment protected rights. ECF No. 40 at 15. And the little history the Agencies did cite, as Plaintiffs thoroughly addressed in their Reply, *see* Pls. Reply at 3, 6–7, was not "'relevantly similar'" to the Final Rule—an issue that *Rahimi* considered the "core question" after *Bruen*. 61 F.4th at 454. By finding the briefing on this issue insufficient at this stage, this Court necessarily reached the same conclusion—that the Agencies had not shown that the Final Rule "impose[d] a comparable burden on the right of self-defense" as "historical regulations." *Bruen*, 142 S. Ct. at 2133. The Agencies thus failed—as they ultimately will fail on the merits, given the lack of any historical analogue to the Final Rule— to establish a historical record necessary to justify their regulations, meaning that Plaintiffs that

---

[9]     It is no answer that the *Seals* and *Elrod* opinions address First Amendment protected rights because, again, the Second Amendment is equal in importance and cannot be treated as a "second-class right, subject to an entirely different body of rules than the other Bill of Right guarantees." *Bruen*, 142 S. Ct. at 2156.

**APP.275**

are likely to succeed.

Accordingly, because the Arms at issue are protected by the Second Amendment even if they are not completely banned, and because the Agencies did not and cannot carry their burden in establishing a historical analogue, Plaintiffs are likely to succeed on the merits of their Second Amendment claim, whether the Arms at issue are pistols or SBRs.

### D.    Plaintiffs are Likely to Succeed on the Merits of their Other Claims

Plaintiffs are likely to succeed on their other claims too. To the extent that the federal definition of "rifle" can bear the Agencies' interpretation as given in the Final Rule, then the definition itself is unconstitutionally vague, and any ambiguity must, under the rule of lenity given the criminal penalties violation of the Final Rule imposes, be resolved in Plaintiffs' favor.[10]

While the confusion is understandable because of the dizzying impact of the Final Rule, Plaintiffs, and similarly situated Americans, cannot simply "still purchase [braces] without being affected by the Final Rule." ECF No. 40 at 15. Because of the Agencies' treatment of braced pistols and their reliance on constructive possession, if an individual possesses a pistol that is *capable of accepting* a stabilizing brace, and that individual does purchase a stabilizing brace (from Maxim Defense or otherwise), that individual could then be in constructive possession of an unregistered SBR, and thus subject to criminal fines and prison time. The same is true of braces that individuals already possess. The Agencies specifically note that if individuals remove a stabilizing brace from their firearm, the individual must "dispose of, *or alter*, the 'stabilizing brace' such that it cannot be reattached, thereby removing the weapon from regulation as a 'firearm' under the NFA." Final

---

[10]    Plaintiffs recognize this Court has already denied Plaintiffs' prior motion, and thus Plaintiffs will not rehash their entire analysis as to their likelihood of success. Instead, Plaintiffs point to key concerns evidenced by this Court's Order and incorporate the remainder of their arguments with the belief that, through this clarified framework, the Court will agree that Plaintiffs are likely to succeed on the merits of several of their claims.

**APP.276**

Rule at 6,570. This is why the Final Rule is not only vague, but it constitutes a chilling effect on the exercise of Plaintiffs' constitutionally protected rights. While Plaintiffs may know that a stabilizing brace meets the Agencies' six-factor analysis, they cannot possibly know what other items may fit that analysis. And possession of *any item* that the Agencies determine may be capable of converting a pistol into a rifle subjects those individuals to potential criminal liability for unlawful constructive possession of an unregistered SBR. This applies to possession of any item that may be classified at any time by the Agencies, and that may be classified not just by design criteria, but by use of the item by third parties. Final Rule at 6,480. Federal law cannot possibly bear this level of uncertainty for both regulated parties and for laypeople alike, especially when that law bears criminal penalties.

And in the context of a statute imposing criminal liability, fundamental principles of statutory interpretation and the equally fundamental due process and separation of powers concerns driving the rule of lenity forbid the Agencies' efforts to broaden the reach of the definition of "firearm" or "rifle" while ignoring the definition of "handgun" and the common meaning of "pistol or revolver," even if this Court were to conclude that the statutory definition of a "firearm" or a "rifle" were ambiguous enough to include a braced pistol. *Cargill v. Garland*, 57 F.4th 447, 469–71 (5th Cir. 2023) (*en banc*). In other words, even if the statute or Final Rule is vague, then it must be read narrowly under the rule of lenity. And such a narrow construction would preclude the Agencies' broader regulation under the Final Rule based on their own pre-narrowing construction of the statute prior to the Final Rule's promulgation.

Of course, the question of vagueness and the effect of the rule of lenity also further bolster Plaintiffs' likelihood of success as to their other constitutional claims and their statutory authority claims. *See* Pls. Br. at 15–29; Pls. Reply at 4–6.

**APP.277**

## II.    PLAINTIFFS WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION PENDING APPEAL

Although the Court did not reach this factor in its analysis, Plaintiffs' irreparable injury is beyond dispute. Plaintiffs are suffering and will continue to suffer irreparable harm if the Final Rule is not enjoined pending appeal, and it remains "no answer to say that [Plaintiffs] may avoid the harm by complying with an unlawful agency rule." *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4809376, at *9 (N.D. Tex. Oct. 1, 2022).

At the outset, if this Court concludes, as it should, that Plaintiffs are likely to succeed on the merits of their Second Amendment claim when *Bruen* is properly applied, the irreparable injury prong flows directly from that conclusion, as the "loss of constitutional rights for even minimal periods of time, unquestionably constitutes irreparable injury." *U.S. Navy SEALs 1-26*, 578 F. Supp. 3d at 834; *accord Elrod*, 427 U.S. at 374–75.

But the harms go further than even the significant constitutional harms that flow from government infringement of an inalienable, fundamental right. Plaintiff Maxim Defense's injury can be summed up into a single sentence—absent an injunction against the Final Rule, Maxim Defense will either go out of business, or be forced to file for bankruptcy. While this Court is correct that Maxim Defense can continue to sell stabilizing braces, there remain two problems. *First*, there is no viable market for stabilizing braces under the Final Rule. Individuals purchase stabilizing braces precisely because they aid in the firing of large and heavy pistols but do not convert those pistols into rifles. If individuals wanted an SBR, they would buy a stock not a brace. *Second*, the Final Rule reclassifies braced pistols, which constitute the vast majority of Maxim Defense's firearms sales and account for millions of dollars of sales every year. Declaration of David Dahl ("Dahl Decl."), ECF No. 36-2, at ¶ 6. Because of the Final Rule, Maxim Defense can no longer sell braced pistols as it has for years, absent the NFA's requirements. Maxim Defense's

**APP.278**

entire business is structured around the production and sale of stabilizing braces and braced pistols. Without an injunction, and the ability to continue conducting business as it has in reliance on the Agencies' long-standing guidance, Maxim Defense faces the end of its ability to operate, and its 28 employees face the end of their livelihoods.

Plaintiffs Mock and Lewis fair no better. Both will be forced to either subject themselves to the NFA's heightened requirements against their wishes or to destroy or divest themselves of their constitutionally protected property, or potentially face criminal prosecution and prison. *See* Declaration of William T. Mock ("Mock Decl."), ECF No. 36-4, ¶¶ 7–8; Declaration of Christopher Lewis ("Lewis Decl."), ECF No. 36-3, ¶¶ 6–7. Both are prohibited from pursuing their concrete plans to purchase braced pistols in the future, but for the Final Rule's requirement they comply with the NFA or face criminal charges. Mock Decl. ¶ 7; Lewis Decl. ¶ 6. And both still fear criminal prosecution for exercising their constitutionally protected right to keep and bear arms because the Final Rule, and the Agencies' use of constructive possession, is so unclear that they "cannot know exactly how to comply[.]" Mock Decl. ¶ 11; Lewis Decl. ¶ 10. Thus, they have demonstrated a "credible threat of a potential felony indictment" and have "sufficiently demonstrated irreparable harm." *See VanDerStok*, 2022 WL 4809376, at *5.

Plaintiffs Mock, Lewis, and Maxim Defense are representative of not just Plaintiff FPC's members, but also the millions of Americans and dozens of businesses that the Agencies acknowledged would be impacted by the Final Rule, with costs of the Final Rule estimated in the hundreds of millions of dollars. *See* Final Rule at 6,572–73.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST, WHICH MERGE HERE, ALSO FAVOR AN INJUNCTION PENDING APPEAL

The irreparable injury Plaintiffs and other gun owners and manufacturers face because of the Final Rule outweighs any harm to the Agencies or the public and further militates in favor of

**APP.279**

an injunction pending appeal.

Not only would an injunction merely maintain the status quo that has been in place for the past decade, "the public interest is served when administrative agencies comply with their obligations under the APA." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997). And there is, of course, "an overriding public interest . . . in the general importance of an agency's faithful adherence to its statutory mandate." *Jacksonville Port Auth.*, 556 F.2d at 59. Finally, as addressed above, this case is about more than just enforcing the APA; this case is about protecting the constitutionally protected rights of millions of affected Americans. *See Elrod*, 427 U.S. at 374–75 (the impairment of constitutional freedoms like those addressed above, "for even minimal periods of time, unquestionably constitutes irreparable injury") (citation omitted); *SD Voice v. Noem,* 987 F.3d 1186, 1190–91 (8th Cir. 2021) (reasoning that protection of constitutional rights serves public interest). Plaintiffs merely request the ability to survive and retain lawful possession of their constitutionally protected braced pistols through the pursuit of their appeal and this case.

The Agencies, on the other hand, will not suffer significant harm by maintenance of the decade-long status quo regarding what constitutes a "rifle." The Agencies have not identified any substantial harm, much less "extraordinary harm," that would result from an injunction. Indeed, the Final Rule itself contains a delay in enforcement. Final Rule at 6,553 ("The Department, in its enforcement discretion, has determined that current possessors of these affected firearms have until 120 days after this rule is published to take the necessary actions, as described in this rule, to comply with Federal law to avoid civil and criminal penalties."). In the face of putting Plaintiff Maxim Defense out of business, and requiring Mock and Lewis and millions of other Americans to comply with onerous provisions of the NFA to continue possessing their constitutionally

**APP.280**

protected pistols, the Agencies' purported harms bear little weight.

Granting a preliminary injunction pending Plaintiffs' appeal serves the public interest by "ensur[ing] the status quo is maintained so the legal system can resolve [an] important dispute." *City of Dallas, Texas v. Hall*, 2008 WL 11350041, at *3 (N.D. Tex. July 28, 2008). There can be no public benefit in allowing the Agencies to enforce an unlawful and unconstitutional Final Rule. *See VanDerStok v. Garland*, __ F. Supp. 3d __, 2022 WL 4009048, at *10 (N.D. Tex. Sept. 2, 2022) ("Defendants' enforcement of the rule strips Plaintiffs of freedoms they lawfully enjoyed until just last week.").

## CONCLUSION

Based on the foregoing, Plaintiffs respectfully request that this Court reconsider its conclusion that Plaintiffs are unlikely to succeed on their claims by properly placing the burden of establishing historical analogues on the government—even in this preliminary stage. Plaintiffs are facing serious, irreparable injuries that warrant this Court granting Plaintiffs' Motion for an Injunction Pending Appeal to prevent the harms to their constitutionally protected rights, which this Court expressly recognized may be shown at the summary judgment stage. By doing so, this Court will ensure that it will be able to issue meaningful and full relief at the conclusion of this case. Without an injunction, Plaintiffs will continue to suffer irreparable injuries for which this Court will not be able to provide adequate relief later.

**APP.281**

DATED this the 30th day of March 2023.

Respectfully submitted,

R. Brent Cooper
Texas Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin David Passey
Texas Bar No. 24125681
ben.passey@cooperscully.com

COOPER & SCULLY PC
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
 Facsimile: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
Colorado Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION, INC.
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Facsimile: (916) 476-2392

* Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.282**

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 30, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.283**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation, | |
| *Plaintiffs*, | |
| v. | |
| MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES, | Civil Action No. 4:23-cv-00095-O |
| *Defendants*. | |

**<u>NOTICE OF APPEAL</u>**

Pursuant to Federal Rules of Appellate Procedure 3 and 4, notice is hereby given that Plaintiffs William T. Mock; Christopher Lewis; Maxim Defense Industries, LLC; and Firearms Policy Coalition, Inc., appeal to the United States Court of Appeals for the Fifth Circuit from this Court's Opinion and Order denying Plaintiffs' Motion for Preliminary Injunction or, in the Alternative, for Postponement of the Effective Date of the Final Rule, dated and entered March 30, 2023. ECF No. 40.

1

**APP.284**

DATED this the 30th day of March 2023.

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX 75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.285**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on March 30, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Cody J. Wisniewski*
Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.286**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WILLIAM T. MOCK, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| v. | § | **Civil Action No. 4:23-cv-00095-O** |
| | § | |
| **MERRICK GARLAND, et el.,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER EXPEDITING BRIEFING

Before the Court is Plaintiffs' Motion for an Injunction Pending Appeal (ECF No. 41), filed March 30, 2023. Having considered the motion, the Court **ORDERS** the parties to comply with the following briefing schedule:

- On or before April 12, 2023, Defendants will file their response to Plaintiffs' motion;

- On or before April 19, 2023, Plaintiffs may file a reply in support of their motion.[1]

**SO ORDERED** this **31st day** of **March, 2023**.

_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

---

[1] This Order does not alter the Defendants' deadline to Answer Plaintiffs' Complaint.

**APP.287**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK, *et al.*, <br><br>    *Plaintiffs,* <br><br>   v. <br><br> MERRICK B. GARLAND, *et al.*, <br><br>    *Defendants.* | Civil Action No. 4:23-cv-95-O |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
FOR AN INJUNCTION PENDING APPEAL**

**APP.288**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................................1

LEGAL STANDARDS.........................................................................................................1

ARGUMENT.........................................................................................................................2

I.      Plaintiffs are unlikely to succeed on the merits of their appeal. ............................2

II.     Plaintiffs have failed to establish the remaining equitable factors. ......................7

CONCLUSION....................................................................................................................12

**APP.289**

# TABLE OF AUTHORITIES

**CASES**

*Alcresta Therapeutics, Inc. v. Azar,*
   318 F.Supp.3d 321 (D.D.C. 2018)................................................................11

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.,*
   878 F.2d 806 (5th Cir. 1989).....................................................................2

*Am. Hosp. Ass'n v. Harris,*
   625 F.2d 1328 (7th Cir. 1980)...................................................................9

*Am. Meat Inst. v. U.S. Dep't of Agric.,*
   968 F. Supp. 2d 38 (D.D.C. 2013)..........................................................8, 9

*Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.,*
   897 F.3d 314 (D.C. Cir. 2018) ...............................................................10

*Baird v. Bonta,*
   2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) .........................................6

*Bezet v. United States,*
   714 F. App'x 336 (5th Cir. 2017)...........................................................5

*Cardoni v. Prosperity Bank,*
   2015 WL 410589 (S.D. Tex. Jan. 29, 2015) ..........................................2

*District of Columbia v. Kroger Co.,*
   2022 WL 18910855 (D.D.C. Dec. 14, 2022)..........................................2

*Def. Distributed v. Bonta,*
   2022 WL 15524977 (C.D. Cal. Oct. 21) ................................................6

*Eastland v. U.S. Servicemen's Fund,*
   421 U.S. 491 (1975)...............................................................................12

*Elrod v. Burns,*
   427 U.S. 347 (1976)...............................................................................10

*Fath v. Tex. Dep't of Transp.,*
   670 F. App'x 294 (5th Cir. 2016)........................................................1, 2

*Flight Training Int'l, Inc. v. FAA,*
   58 F.4th 234 (5th Cir. 2023).................................................................3

*Freedom Holdings, Inc. v. Spitzer,*
   408 F.3d 112 (2d Cir. 2005)..................................................................9

*Gill v. Whitford,*
   138 S. Ct. 1916 (2018) ....................................................................................12

*Hilton v. Braunskill,*
   481 U.S. 770 (1987) ..........................................................................................2

*Holland Am. Ins. Co. v. Succession of Roy,*
   777 F.2d 992 (5th Cir. 1985) .........................................................................10

*Jacksonville Port Auth. v. Adams,*
   556 F.2d 52 (D.C. Cir. 1997) .........................................................................12

*Madsen v. Women's Health Ctr., Inc.,*
   512 U.S. 753 (1994) ........................................................................................12

*Maryland v. King,*
   567 U.S. 1301 (2012) ......................................................................................12

*Metro. Sch. Dist. of Wayne Twp. v. Davila,*
   969 F.2d 485 (7th Cir. 1992) ......................................................................3, 4

*Mkt. Synergy Grp., Inc. v. U.S. Dep't of Lab.,*
   2016 WL 6948061 (D. Kan. Nov. 28, 2016) ..............................................8, 9

*Monumental Task Comm., Inc. v. Chao,*
   678 F. App'x 250 (5th Cir. 2017) ..................................................................11

*Monumental Task Comm., Inc. v. Foxx,*
   157 F. Supp. 3d 573 (E.D. La. 2016) ............................................................11

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
   142 S. Ct. 2111 (2022) ..............................................................................5, 6, 7

*Nat'l Council for Adoption v. Blinken,*
   4 F.4th 106 (D.C. Cir. 2021) ...........................................................................3

*New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.,*
   434 U.S. 1345 (1977) ......................................................................................12

*Nken v. Holder,*
   556 U.S. 418 (2009) ........................................................................................11

*Or. Firearms Fed'n, Inc. v. Brown,*
   2022 WL 17454829 (D. Or. Dec. 6, 2022) .....................................................5

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ............................................................................................3

**APP.291**

*Postal Police Officers Ass'n v. U.S. Postal Serv.*,
   502 F.Supp.3d 411 (D.D.C. 2020)...................................................................11

*Robertson v. REP Processing, LLC*,
   2021 WL 5354713 (D. Colo. Oct. 12, 2021) ...................................................2

*Safari Club Int'l v. Jewell*,
   47 F. Supp. 3d 29 (D.D.C. 2014)....................................................................9

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021)...........................................................................12

*United States v. Jackson*,
   2023 WL 2499856 (D. Md. Mar. 13, 2023) ...................................................6

*United States v. Rahimi*,
   61 F.4th 443 (5th Cir. 2023) ...........................................................................6

*United States v. Saleem*,
   2023 WL 2334417 (W.D.N.C. Mar. 2, 2023) ................................................6

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992)........................................................................................11

*V Real Estate Grp., Inc. v. U.S. Citizenship & Immigr. Servs.*,
   2014 WL 5243369 (D. Nev. Oct. 15, 2014) ...................................................9

*VanDerStok v. Garland*,
   2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) .................................................10

*Voile Mfg. Corp. v. Dandurand*,
   551 F. Supp. 2d 1301 (D. Utah 2008)............................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................................2

*Wis. Gas Co. v. FERC*,
   758 F.2d 669 (D.C. Cir. 1985) .......................................................................9

**RULES**

Federal Rule of Civil Procedure 62(d) ....................................................................1

**REGULATIONS**

*Factoring Criteria for Firearms With Attached "Stabilizing Braces,"*
   88 Fed. Reg. 6,478 (Jan. 31, 2023) ...............................................................1

**APP.292**

**OTHER AUTHORITIES**

Blake Emerson & Ronald M. Levin, *Agency Guidance Through Interpretive Rules: Research and Analysis*, (May 28, 2019) https://perma.cc/9NDR-UCNG ........................................................................................... 4

*NFA Handbook* (Apr. 2009) https://perma.cc/P3NL-G35G ........................................................................................... 10

## INTRODUCTION

Two weeks ago, this Court denied Plaintiffs' motion to preliminarily enjoin enforcement of a rule promulgated by the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), *Factoring Criteria for Firearms With Attached "Stabilizing Braces,"* 88 Fed. Reg. 6,478 (Jan. 31, 2023) ("Rule").[1] After analyzing each of Plaintiffs' claims challenging the Rule and their arguments in support of the motion, the Court determined that Plaintiffs had not demonstrated a substantial likelihood of success on the merits of any of their claims, and thus were not entitled to preliminary injunctive relief. *See* Opinion at 1, 6–16.

Having appealed that order,[2] Plaintiffs are now taking a second bite at the apple, renewing their request to enjoin enforcement of the Rule, this time for the duration of their appeal.[3] That request is governed, however, by the same standards that this Court applied in denying their motion for a preliminary injunction. But Plaintiffs' current motion simply rehashes arguments that the Court has already considered, and offers no persuasive reason why the Court should second-guess its prior conclusion that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits of their claims. That alone should settle this matter. But even if it did not, Plaintiffs would still not be entitled to injunctive relief because the remaining equitable factors militate strongly against it.

The Court should thus deny Plaintiffs' motion for an injunction pending appeal.

## LEGAL STANDARDS

Under Federal Rule of Civil Procedure 62(d), a district court may issue an injunction pending an interlocutory appeal. The standard for granting such relief is the same as the standard for granting a preliminary injunction. *Fath v. Tex. Dep't of Transp.*, 670 F. App'x 294, 295–96 (5th Cir. 2016) (per

---

[1] Op. & Order on Pls.' Mot. for Prelim. Inj. or, in the Alternative, for Postponement of the Effective Date of the Final Rule ("Opinion"), ECF No. 40.

[2] Notice of Appeal, ECF No. 43.

[3] Pls.' Br. in Supp. of Their Mot. for Inj. Pending Appeal ("Mot."), ECF No. 42.

curiam); *accord Cardoni v. Prosperity Bank*, 2015 WL 410589, at *1 (S.D. Tex. Jan. 29, 2015). And like a preliminary injunction, an injunction pending an appeal is an "extraordinary remedy" that intrudes "into the ordinary processes of administration and judicial review." *Dist. of Columbia v. Kroger Co.*, 2022 WL 18910855, at *1 (D.D.C. Dec. 14, 2022) (cleaned up); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Accordingly, a plaintiff requesting such relief must make a "strong showing" that (i) it has a substantial likelihood of success on the merits of the appeal; (ii) it will suffer irreparable harm without the requested injunction; (iii) the balance of equities tips in its favor; and (iv) preliminary relief serves the public interest. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). Failure to demonstrate any one of these elements requires denial of the injunction. *Fath*, 670 F. App'x at 296; *accord Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 809 (5th Cir. 1989).

## ARGUMENT

### I.     Plaintiffs are unlikely to succeed on the merits of their appeal.

Plaintiffs acknowledge that this Court has already held that they have not shown a substantial likelihood of success on the merits of their claims in requesting a preliminary injunction, Mot. at 6, 18—a finding that alone precludes the issuance of an injunction pending appeal, *see Fath*, 670 F. App'x at 296. Still, Plaintiffs ask the Court to "reconsider" that conclusion, Mot. at 18, while providing no cogent reason why reconsideration is warranted. Indeed, Plaintiffs' current motion relies on the same unpersuasive arguments that failed to carry their burden at the preliminary-injunction stage, adding nothing more for the Court to consider. *See Robertson v. REP Processing, LLC*, 2021 WL 5354713, at *4 (D. Colo. Oct. 12, 2021) ("[A]ttempt[ing] to re-hash the same arguments" that a plaintiff made in support of a preliminary-injunction motion "does not demonstrate a likelihood of success on appeal." (cleaned up)). The Court should reject each of Plaintiffs' arguments for the same reasons it denied their first request for an injunction. *See* Opinion at 1, 6–16.

Defendants' opposition to Plaintiffs' preliminary-injunction motion adequately addresses each

of Plaintiffs' claims on the merits.[4] Defendants will nevertheless respond to the two arguments that Plaintiffs emphasize in support of their motion.

*First,* Plaintiffs repeat various reasons why they believe that the Rule is a substantive rule. *See* Mot. at 6–7. But as Defendants have already explained, *see* PI Opp. at 19–20, the Rule is a quintessential interpretive rule that simply advises the public of ATF's construction of the NFA and the GCA and imposes no new legal obligations, *see Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240–42 (5th Cir. 2023) ("[I]nterpretive rules explain what an agency thinks a statute or regulation actually says."); *accord Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) ("[I]nterpretive rules [are] issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." (cleaned up)); *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 114 (D.C. Cir. 2021) ("[I]nterpretive rule[s] explain[] *pre-existing* legal obligations . . . ." (cleaned up)). Indeed, this Court held that it is unlikely that the Rule exceeds the agency's statutory authority "to interpret the statutes it has been charged with administering when there is an ambiguity," which the Court recognized suggests that the Rule is an interpretive rule, not a substantive rule. Opinion at 8–9; *see also id.* at 11 (noting that it is "the Court's assessment . . . that the Final Rule interprets—but does not rewrite—the underlying statutes").

Plaintiffs' arguments to the contrary are unpersuasive. Although the Rule could be said to speak in mandatory terms regarding the application of NFA and GCA requirements to short-barreled rifles equipped with stabilizing braces, that characteristic alone does not transform the agency's interpretation into a substantive rule. *See Flight Training Int'l*, 58 F.4th at 241 n.5; *accord Metro. Sch. Dist. of Wayne Twp. v. Davila*, 969 F.2d 485, 493 (7th Cir. 1992) ("Could an agency [seriously] announce, 'We think Congress intended this when it enacted this statute, but you don't have to do it.'? . . . All rules which interpret the underlying statute must be binding … on the regulated parties in the sense that

---

[4] *See* Defs.' Opp. to Pls.' Mot. for Prelim. Inj. or, in the Alternative, for Postponement of the Effective Date of the Final Rule ("PI Opp.") at 11–39, ECF No. 37.

they set . . . the legal minima of behavioral standards" in light of "what the agency believes is congressional intent."). Nor is the Rule substantive simply because ATF, as a matter of prudence and good governance, solicited public comments on the proposed rule; indeed, given the substantial benefits from the public-comment process, agencies routinely utilize notice-and-comment procedures in promulgating interpretive rules. *See* Blake Emerson & Ronald M. Levin, *Agency Guidance Through Interpretive Rules: Research and Analysis*, at 28–30 (May 28, 2019) (report to the Admin. Conf. of the U.S.), https://perma.cc/9NDR-UCNG.

In any event, Plaintiffs do not explain how their arguments on this score advance any of their claims. While Plaintiffs allege in their complaint that the Rule is not a "logical outgrowth" of ATF's proposed rule, Am. Compl. ¶¶ 105–14, ECF No. 13—an APA procedural requirement applicable only to substantive rules, Opinion at 9—this Court has already held that Plaintiffs have not shown a likelihood of success on that claim, *id.* at 9–10. The Court concluded that, assuming "for the sake of argument that the Final Rule is substantive, . . . the Final Rule likely satisfies the [APA's] logical outgrowth requirement." *Id.* Plaintiffs do not acknowledge that conclusion or the Court's reasoning, let alone grapple with it. Nor do they contend with any of Defendants' arguments as to why the Rule satisfies the APA's logical-outgrowth requirement, assuming it applies. *See* PI Opp. at 20–22.

**Second,** Plaintiffs insist that they have demonstrated a likelihood of success on the merits of their Second Amendment challenge to the Rule, notwithstanding this Court's holding to the contrary. In particular, Plaintiffs assert that the Rule violates the Second Amendment because it subjects their brace-equipped pistols to the NFA's registration requirements (assuming the weapons are short-barreled rifles under the statute). Mot. at 10. But the Court rejected that claim. Opinion at 14. Plaintiffs nonetheless contend that the Court erroneously shifted the burden to Plaintiffs to show that the NFA's registration requirement lacks support in the historical record, rather than requiring the Government to show that a historical tradition of firearms regulation supports it. Mot. at 7–9. Not so.

**APP.297**

As the Court explained, although the Rule clarifies that individuals and entities possessing short-barreled rifles configured with stabilizing braces must "comply with the NFA's statutory requirements," including "registering the weapons," "the Second Amendment [does not] bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership." Opinion at 14 (citing *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022); *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017)). In reaching that conclusion, the Court relied in part on Justice Kavanaugh's concurring opinion in *Bruen*, Opinion at 14, which emphasized that the vast majority of states have a concealed-carry licensing regime that impose similar "licensing requirements" that do not offend the Second Amendment, *Bruen*, 142 S. Ct. at 2162 (Kavanaugh J., concurring, joined by Roberts, C.J.). And the Court further relied on the majority opinion in *Bruen*, Opinion at 14, which similarly explained that certain basic licensing requirements do not "prevent 'law-abiding, responsible citizens' from exercising" their Second Amendment rights, 142 S. Ct. at 2138 n.9. Therefore, the Court rightly rejected Plaintiffs' claim that the NFA's registration requirements violate the Second Amendment, not because of any lack of historical evidence in the record, but because Plaintiffs failed to carry their burden to show that these requirements implicate their constitutional right to bear arms in the first place. *See* PI Opp. at 24–25; *see also Bruen*, 142 S. Ct. at 2138 n.9; *id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.); *Bezet*, 714 F. App'x at 340; *Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *15 (D. Or. Dec. 6, 2022) (relying on *Bruen* in holding that a Second Amendment challenge to a state's firearms permit requirement was unlikely to succeed on the merits).[5]

---

[5] As Defendants have explained, *see* PI Opp. at 23–27, neither the Rule nor the NFA implicate Plaintiffs' constitutional right to bear arms for two other reasons: (i) stabilizing braces are not themselves bearable arms protected under the Second Amendment; and (ii) short-barreled rifles—whether configured with stabilizing braces or not—are not protected under the Second Amendment because they are dangerous and unusual weapons. For those reasons as well, Plaintiffs have failed to demonstrate a likelihood of success on the merits of their Second Amendment claims.

**APP.298**

Plaintiffs' failure to make this predicate showing ends the constitutional analysis under *Bruen*. Only where an individual's conduct is protected under the Second Amendment's plain text must the Government justify a challenged regulation based on a "historical tradition of firearm regulation." 142 S. Ct. at 2129–30; *accord United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023).[6] As much as Plaintiffs urge this Court to move on to the history-and-tradition inquiry, they have not satisfied the first step in *Bruen*'s analysis, and thus the Court needs to go no further. *See United States v. Saleem*, 2023 WL 2334417, at *11 (W.D.N.C. Mar. 2, 2023) (holding that, where the "Second Amendment's plain text does not protect Defendant's conduct," "the Court need not reach the historical inquiry"); *accord United States v. Jackson*, 2023 WL 2499856, at *4 (D. Md. Mar. 13, 2023).

But be that as it may, Defendants' opposition to Plaintiffs' preliminary-injunction motion contains a considerable list of historical precedents evincing a longstanding tradition of firearm regulations that are comparable to and consistent with the NFA's registration requirements. *See* PI Opp. at 27–31; *see also Bruen*, 142 S. Ct. at 2130 ("The government must" justify a regulation implicating a Second Amendment right "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."). Therefore, assuming for argument's sake that the NFA's registration requirements implicate rights protected under the Second Amendment, Defendants have already satisfied their burden—at least at this early stage of litigation—to show that they are constitutional under *Bruen*'s two-step analysis.[7]

---

[6] Plaintiffs do not assert their Second Amendment argument pertaining to "gunsmithing" in support of their motion for an injunction pending appeal.

[7] While there is no need for this Court to conduct a history-and-tradition analysis to resolve Plaintiffs' request for an injunction pending appeal (for reasons just explained), it is eminently reasonable to defer completing that analysis until the merits phase of the litigation. *See, e.g., Def. Distributed v. Bonta*, 2022 WL 15524977, at *5 & n.9 (C.D. Cal. Oct. 21) (denying motion for a preliminary injunction, and noting that if a historical inquiry had been required, there was "no possibility" that the State could "present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)"), *adopted*, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022); *Baird v. Bonta*, 2022 WL 17542432, at *8 (E.D. Cal. Dec. 8, 2022) (holding that plaintiffs had not shown that it is

\*       \*       \*

In sum, Plaintiffs' motion for an injunction pending appeal provides no additional arguments or evidence that should convince this Court to rethink its determination that Plaintiffs have failed to show a likelihood of success on the merits of any of their claims, or to persuade it that the Fifth Circuit will reach a contrary conclusion. For that reason alone, this Court should deny Plaintiffs' motion.

## II.     Plaintiffs have failed to establish the remaining equitable factors.

Setting the merits aside, Plaintiffs have again failed to demonstrate that they will suffer imminent, irreparable harm unless this Court enjoins ATF's "enforcement" of the Rule. And on the other side of the ledger, an injunction pending appeal would undermine numerous public interests that the Rule advances.

*Irreparable harm.* In their motion for an injunction pending appeal, Plaintiffs rely most heavily on Maxim Defense's claim that it will either "go out of business" or have "to file for bankruptcy" unless ATF is prohibited from enforcing the Rule. Mot. at 15; *see also id.* at 1–2 (asking the Court to "press pause" to "[p]revent Maxim Defense from going out of business"). That's so, Maxim contends, because there is no longer a "viable market" for its stabilizing braces after the Rule's promulgation, because consumers no longer view brace-equipped pistols as a valuable alternative to weapons marketed explicitly as a short-barreled rifle, given that both are subject to the NFA. *Id.* at 15.[8]

It's worth pausing here to acknowledge that Maxim's argument concedes a principal rationale for the Rule—*i.e.,* that the firearms industry has manufactured and marketed, and individual possessors have purchased and used, weapons equipped with "stabilizing braces" to skirt NFA controls applicable

---

better to upend the status quo while the court conducts "the type of searching historical surveys that the Supreme Court's approach" required in that case (quoting *Bruen,* 142 S. Ct. at 2179)).

[8] Maxim repeatedly claims that the Rule prohibits it from selling pistols equipped with stabilizing braces "as it has for years." Mot. at 15–16; *see also id.* at 1. But the Rule does not ban the sale of any products, as this Court has recognized. *See* Opinion at 14–15. Maxim simply must comply with the NFA's requirements when selling brace-equipped weapons that are short-barreled rifles, as clarified by the Rule.

to short-barreled rifles. *See* PI Opp. at 4–7. Indeed, Maxim appears to concede that brace-equipped pistols have little, if any, marketable value now that the Rule has clarified that these weapons are generally subject to the same requirements as similar weapons marketed explicitly as short-barreled rifles. But if (as Plaintiffs have repeatedly suggested) there were truly a market for heavy pistols equipped with rearward devices that provide forearm support to assist with single-handed firing, there is no reason to expect that the market for these weapons would suddenly vanish simply because they need to be registered and are subject to a $200 tax, or that the market is unable to adapt its offerings to satisfy this demand.

But putting that aside, Maxim's claim that it will "go out of business" because of diminishing consumer demand for its products, Mot. at 15, does not establish that the Rule causes it imminent, irreparable injury. First of all, Maxim's assertion that there is no longer a "viable market" for stabilizing braces is based entirely on speculation about how potential consumers of these devices will respond to the Rule. *Id.* But "speculation about how third parties will react to" a challenged rule, and about how that possible reaction will affect the market value of a product, "is insufficient to demonstrate irreparable harm." *Mkt. Synergy Grp., Inc. v. U.S. Dep't of Lab.*, 2016 WL 6948061, at *30 (D. Kan. Nov. 28, 2016); *accord Voile Mfg. Corp. v. Dandurand*, 551 F. Supp. 2d 1301, 1307 (D. Utah 2008) ("[A] probable loss in market share . . . does not amount to irreparable harm."); *Am. Meat Inst. v. U.S. Dep't of Agric.*, 968 F. Supp. 2d 38, 78–79 (D.D.C. 2013) (rejecting claim of irreparable harm based on assertions about what plaintiffs "truly 'expect' [will] happen in the marketplace; what their customers are 'likely' to demand; and what 'could' happen to their businesses").

And even if Maxim could substantiate its allegations, any potential harms to its business would result from the independent choices of potential consumers, not from the Rule. Courts routinely reject claims of irreparable harm (like Maxim's) that depend on an indirect theory of causation about how a challenged action will impact a plaintiff's economic interests. *See, e.g.*, *Mkt. Synergy Grp.*, 2016 WL

6948061, at *30; *Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 36–37 (D.D.C. 2014) (holding that the plaintiff could not establish irreparable harm to economic interests because any revenue losses resulted from third parties' independent decisions, and not directly from the challenged rule); *Am. Meat Inst.*, 968 F. Supp. 2d at 80–81 ("[Alleged harms] based on independent market variables such as how the supplier's customers and/or retail consumers might react" to the challenged rule and concerns that plaintiffs "will ultimately lose future business because others may respond to the new . . . rules and react in a manner that may ultimately affect their companies negatively" are "indirect harm[s]" that are "neither certain nor immediate."); *V Real Estate Grp., Inc. v. U.S. Citizenship & Immigr. Servs.*, 2014 WL 5243369, at *3 (D. Nev. Oct. 15, 2014) (explaining that harms resulting from "independent decision of . . . third-parties to withhold their investments . . . do[] not constitute irreparable injury for the purposes of a preliminary injunction").

Separately, Plaintiffs appear to complain about having to comply with the NFA's requirements for any brace-equipped weapons that are short-barreled rifles under the Rule's analysis. Mot. at 15 ("Maxim Defense can no longer sell braced pistols as it has for years" without complying with "the NFA's requirements."); *id.* at 16 ("Mock and Lewis" will now be subject "to the NFA's heightened requirements against their wishes."). But as Defendants have already explained, *see* PI Opp. at 41, Plaintiffs' obligations to comply with the NFA is attributable not to the Rule but to Congress. And insofar as they complain about the costs of compliance, those costs also flow from requirements imposed by Congress. *See Wis. Gas. Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) (explaining that a plaintiff "must show that the alleged harm will directly result from the action which [he] seeks to enjoin"). At any rate, compliance costs are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *accord Am. Hosp. Ass'n v. Harris*, 625

**APP.302**

F.2d 1328, 1331 (7th Cir. 1980).[9]

Plaintiffs also continue to maintain that they will suffer irreparable injury because the Rule and the NFA impinge on their Second Amendment rights. Mot. at 15. But as Defendants have explained, *see* PI Opp. at 22–31, neither the Rule nor the NFA implicates those rights, let alone imminently threatens them. Indeed, this Court has already determined that Plaintiffs have failed to demonstrate that they are likely to succeed on the merits of their Second Amendment claims, removing any doubt that Plaintiffs have established that they will likely suffer irreparable harm based on the deprivation of a constitutional right. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 374 (1976); *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (explaining that, to show irreparable harm based on loss of constitutional rights, a movant must show likely success on the merits).

Mock and Lewis, for their part, claim that they have established a "credible threat" that they will be criminally prosecuted for possessing their brace-equipped weapons because the Rule "is so unclear" that they cannot figure out "how to comply." Mot. at 16 (citations omitted). Again, as explained, the Rule imposes no criminal sanctions; any penalties for possessing an unregistered short-barreled rifle are imposed under the NFA. Regardless, Mock and Lewis's alleged confusion as to the proper application of the Rule does not establish a "credible threat" of criminal sanction. Neither identifies a weapon that he possesses or intends to possess that he believes is on the margins of being a short-barreled rifle under the Rule's analysis. And even if they did identify such a weapon, they can easily request a classification from ATF to clear up any confusion they may have. *See NFA Handbook* § 7.2.4 (Apr. 2009), https://perma.cc/P3NL-G35G. Mock and Lewis's alleged fear of criminal sanction is thus hardly credible. *See, e.g.*, *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("[T]here must be more than an unfounded fear on the part of the applicant" to show

---

[9] While Plaintiffs claim that they should not have to comply "with an unlawful agency rule," Mot. at 15 (quoting *VanDerStok v. Garland*, 2022 WL 4809376, at *9 (N.D. Tex. Oct. 1, 2022)), they have not demonstrated that the Rule is likely unlawful, *see* Opinion at 1, 6–16.

irreparable harm.); *Monumental Task Comm., Inc. v. Foxx*, 157 F. Supp. 3d 573, 584 (E.D. La. 2016) ("[I]njunctions will not be granted merely to allay fears and apprehensions, or to soothe anxieties."), *aff'd sub nom., Monumental Task Comm., Inc. v. Chao*, 678 F. App'x 250 (5th Cir. 2017).[10]

Finally, Plaintiffs' reliance on alleged harms to "Maxim Defenses' customers" and other third parties, Mot. at 2, 16, is misplaced. "[I]njuries to third parties are not a basis to find irreparable harm." *Alcresta Therapeutics, Inc. v. Azar*, 318 F.Supp.3d 321, 326 (D.D.C. 2018). A plaintiff's "burden is to show irreparable harm to *itself*," *Postal Police Officers Ass'n v. U.S. Postal Serv.*, 502 F.Supp.3d 411, 426 (D.D.C. 2020) (emphasis added), which Plaintiffs have failed to do.

<u>*Balance of the equities.*</u> In contrast to Plaintiffs' speculative claims of harm, Defendants have identified real, concrete ways in which an injunction will undermine public interests. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (noting that the third and fourth requirements for issuance of preliminary injunctive relief—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party"). As Defendants explained, *see* PI Opp. at 43, the public is better served by the Rule than by its absence, as it provides regulated parties with greater clarity as to the uniform framework ATF applies when classifying weapons equipped with stabilizing braces and other similar rearward devices. Moreover, the Rule benefits public safety by clarifying and supporting the enforcement of NFA controls designed to address the safety risks posed by the proliferation of short-barreled rifles, uniquely dangerous and concealable weapons specifically targeted by Congress for their criminal utility. *See United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.).

Finally, an injunction against the Rule would impinge on ATF's ability to effectuate, pursuant to its statutorily delegated duty, regulations on short-barreled rifles that Congress imposed through

---

[10] The Firearms Policy Coalition offers no claim of irreparable injury to its members that is independent of those asserted by Mock, Lewis, and Maxim Defense. *See* Mot. at 16.

the enactment of the NFA and the GCA. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, J., in chambers) ("Any time [the Government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (alteration adopted) (quoting *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)). And as Plaintiffs acknowledge, "there is, of course, 'an overriding public interest in the general importance of an agency's faithful adherence to its statutory mandate.'" *See* Mot. at 17 (alteration adopted) (quoting *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997)); *cf. Trump v. Thompson*, 20 F.4th 10, 48 (D.C. Cir. 2021) ("[C]ourts must take care not to unnecessarily halt the functions of a coordinate branch." (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 511 n.17 (1975))).[11]

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for an injunction pending their interlocutory appeal of this Court's order denying Plaintiffs' motion for a preliminary injunction.

Dated: April 12, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

*/s/ Jody D. Lowenstein*
JODY D. LOWENSTEIN (MT Bar No. 55816869)
MICHAEL DREZNER (VA Bar No. 83836)
TAYLOR PITZ (CA Bar No. 332080)
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW

---

[11] In all events, while an injunction pending appeal is unwarranted here, at a minimum, any such relief should be no broader than necessary to redress Plaintiffs' alleged, cognizable injuries. *See, e.g., Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see also* PI Opp. at 43–44.

Washington, DC 20005
Phone: (202) 598-9280
Email: jody.d.lowenstein@usdoj.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

On April 12, 2023, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the Court's electronic case filing system. I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

/s/ Jody D. Lowenstein
JODY D. LOWENSTEIN
Trial Attorney
U.S. Department of Justice

**APP.307**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| WILLIAM T. MOCK; CHRISTOPHER LEWIS; MAXIM DEFENSE INDUSTRIES, LLC, a limited liability company; and FIREARMS POLICY COALITION, INC., a nonprofit corporation,<br><br>*Plaintiffs*,<br><br>v.<br><br>MERRICK GARLAND, in his official capacity as Attorney General of the United States; the UNITED STATES DEPARTMENT OF JUSTICE; STEVE DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES,<br><br>*Defendants*. | Civil Action No. 4:23-cv-00095-O |

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR INJUNCTION PENDING APPEAL**

**APP.308**

Rather than meaningfully responding to Plaintiffs' showing that this Court improperly applied the burdens of proof articulated in *New York State Rifle & Pistol Ass'n v. Bruen*, the Agencies accuse Plaintiffs of seeking "a second bite at the apple." *See* Defs' Opp. to Pls' Motion for Injunction Pending Appeal ("Feds' Opp."), ECF No. 49, at 1. But when the burden is properly placed on the Agencies, as *Bruen* requires, Plaintiffs are likely to succeed on the merits of their Second Amendment claims. As to vagueness, Plaintiffs ask this Court to look not only to whether there is *no standard* articulated in the Final Rule, but also to whether the Final Rule provides them fair notice. And Plaintiffs draw attention the impact and role of the rule of lenity in this matter. Both of which further demonstrate that Plaintiffs are likely to succeed on the merits of their claims.

Moreover, Plaintiffs' livelihoods are at stake and they risk being forced to take irreversible actions. While this Motion has been briefed, Plaintiff Maxim Defense Industries, LLC ("Maxim Defense") has been forced to terminate 7 additional employees and has lowered the salary of every remaining employee on its payroll. And Plaintiffs Mock and Lewis are faced with the irreparable choice of either permanently registering their constitutionally protected Arms, destroying them, or surrendering them. Plaintiffs request an injunction now because without one, Maxim Defense will likely not survive the pendency of this case and the other Plaintiffs will be forced to make decisions with respect to their constitutionally protected Arms that later relief cannot fix. An injunction is needed now to ensure that any eventual victory on the merits is meaningful, not pyrrhic.[1]

## I.    PLAINTIFFS ARE *LIKELY* TO SUCCEED ON THE MERITS OF THEIR CLAIMS

Based on the misapplication of the *Bruen* standard, the vague nature of the Final Rule, and the impact of the rule of lenity, Plaintiffs are likely to succeed on the merits of their claims.

---

[1] Alternatively, this Court could, in its discretion, reconsider its Order denying Plaintiffs' Motion for Preliminary Relief, ECF No. 40.

**APP.309**

### A.    When the *Bruen* Test is Properly Applied, Plaintiffs are Likely to Succeed on the Merits of their Second Amendment Claims

The Agencies' Opposition only confirms that, when the burden of proving the Final Rule's constitutionality is correctly placed on the Agencies, they fail to carry it.

The Agencies fail to rebut Plaintiffs' showing that the Agencies' regulation of pistols with stabilizing braces ("braced pistols") and/or short-barreled rifles ("SBRs") implicates the individual, constitutionally protected right to keep Arms. *See, e.g.*, Amended Petition, ECF No. 13, at 10–12, 61–72; Pls' Brief in support of their Motion for Preliminary Relief ("Pls' MPI Brief"), ECF No. 36, at 11–12; Pls' Brief in support of their Motion for Injunction Pending Appeal, ECF No. 42, at 7–9. The Final Rule does not just impact stabilizing braces, it also impacts *firearms* with those braces attached and *firearms* capable of accepting those braces (or any item that *could* convert a pistol into a rifle under the Agencies' new regulation). And the Agencies offer no serious argument that an impact on the ability to possess a firearm for lawful purposes does not *implicate* the plain text of the Second Amendment's protections. *See District of Columbia v. Heller*, 554 U.S. 570, 582 (2008) ("[T]he Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding."); *accord Caetano v. Massachusetts*, 577 U.S. 411, 411 (2016) (per curiam).

Instead, the Agencies put the cart before the horse, arguing that because—to their view— firearm registration requirements are constitutional, the right to bear arms is not even implicated. But the Agencies misstate the *Bruen* test and incorrectly blend two independent inquiries. Plaintiffs are not required to show that the challenged regulation or law is outside of our Nation's historical tradition of regulation to show that their conduct is presumptively protected by the text of the Second Amendment. Rather, once Plaintiffs demonstrate that a regulation implicates "Arms" within the meaning of the Second Amendment, the burden then shifts to the Agencies to

**APP.310**

demonstrate their law or regulation comports with history. *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 20129–30 (2022). This is the precise error that this Court now has the opportunity to correct.

Given Plaintiffs have met their initial requirement, *the Agencies* must prove that the NFA's onerous requirements comport with the universe of allowable historical regulation on the right to keep Arms. *See Bruen*, 142 S. Ct. at 2126. But once more, the Agencies fail to provide an in-depth historical analysis justifying their law or regulation, relying on the same lack of evidence they presented earlier. *See* Feds' Opp. at 6 (seeking to incorporate by reference ECF No. 37, at 27–31). But this Court already characterized that evidence as providing only "minimal historical analysis" and simply drew the wrong conclusion from that dearth of historical analysis. Opinion & Order, ECF No. 40, at 15. Under *Bruen*, such lack of "historical analysis" means that the Agencies failed to carry their burden by rebutting the presumptive protections of the Second Amendment.[2]

Further, the Agencies' request that this Court rely on nonbinding district court decisions from the Ninth Circuit to relieve them of their burden under *Bruen* should be declined. *See* Feds' Opp. at 6 n.7. Those cases conflict with both *Bruen* and *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023). And the Agencies cite no cases to show that the standard applied at the preliminary injunction phase can ever be different than the ultimate merits standard—a point that the Fifth Circuit squarely rejects. *See Deerfield Med. Ctr.*, 661 F.2d at 335 ("The application of an improper legal standing in determining the likelihood of success on the merits is never within the district court's discretion.") (quotation omitted).

---

[2] In any event, the few statutes the Agencies cite to are either distinguishable based on their subject matter, come too late in time to fit within the Second Amendment's allowable historical regulations, and represent minor outliers. *See* Pls' Reply in support of their Motion for Preliminary Relief ("Pls' MPI Reply"), ECF No. 38, at 3, 6–7.

**APP.311**

Nor is it relevant that the Final Rule and the NFA do not operate as a complete ban on possession. *Bruen* itself addressed and struck down a licensing system—not a complete ban—that implicated the Second Amendment protected right to bear Arms in public because the government failed to prove that the licensing system at issue was sufficiently analogous to any contemporaneous historical regulation on the individual right to bear arms. *Bruen*, 142 S. Ct. at 2156. And although the Agencies repeatedly cite *Bruen*'s footnote 9 for the apparent (and incorrect) suggestion that registration regimes are categorically constitutional, the Supreme Court there expressly left open the possibility that even "shall-issue regimes" with "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry" could violate the Second Amendment. *Id.* at 2138 n.9.[3] Plaintiffs here have shown that NFA registration imposes those very burdens. Pls' MPI Brief at 35 ("[T]he Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission to take possession of the firearms at issue.").

The Agencies' inability to identify suitable historical support to justify their regulation of braced pistols and/or SBRs demonstrates Plaintiffs are likely to win on the merits of their claims.

**B.    The Unconstitutionally Vague Nature of the Final Rule and the Rule of Lenity Further Demonstrate that Plaintiffs are Likely to Succeed on the Merits of Several of their Claims**

The Agencies also completely ignore Plaintiffs' Motion's showing that the Final Rule is unconstitutionally vague because it is so arbitrary that neither regulated parties nor ordinary individuals can understand how it will be enforced. That failure constitutes a concession. *Kellam*

---

[3] The Agencies also cite Justice Kavanaugh's concurring opinion for this point, Feds' Opp. at 5–6, but they provide no explanation for their bizarre *Marks* analysis that allows a concurring opinion to override the plain requirements of the majority opinion joined by the concurring Justices.

**APP.312**

*v. Servs.*, No. 3:12-CV-352-P, 2013 WL 12093753, at *3 (N.D. Tex. May 31, 2013), *aff'd sub nom.*

*Kellam v. Metrocare Servs.*, 560 F. App'x 360 (5th Cir. 2014).

Even if it is not a concession, the Final Rule is irreconcilably vague. A law is unconstitutionally vague if it is "so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 580 U.S. 256, 262 (2017). But it is also void for vagueness if it "fails to give ordinary people fair notice of the conduct it punishes." *Id.*; *see Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980) ("A law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its application."). This Court did not consider the latter. *See* Opinion & Order at 12–13 (addressing only the "no standard" standard of vagueness). Moreover, the Constitution requires regulations to be even clearer when dealing with criminal laws than when dealing with civil laws. *Vill of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982).

Given this Court already concluded that the "six criteria by which ATF will make a weapons classification are non-dispositive, and therefore imprecise," Opinion & Order at 13, it should have also found that the criteria fail to give the "fair notice" required by due process. That non-dispositive, imprecise criteria analysis does not give ordinary people "fair notice of the conduct it punishes," nor can people of "common intelligence" truly know its meaning.

Additionally, the vague nature of the Final Rule chills the exercise of Plaintiffs' Second Amendment protected rights. Even if the restriction of braced pistols and/or SBRs were permissible in principle, the vague standards used to distinguish between lawful and unlawful arms chills the constitutionally protected possession of lawful arms and cannot survive constitutional scrutiny. In fact, given the Agencies' position on constructive possession, and the fact that an unknown universe of items could be capable of converting a pistol to a rifle under the Final Rule,

**APP.313**

merely owning a pistol is itself fraught with legal peril. *See* ATF, *Can I possess a pistol and unattached "stabilizing brace"?* (last reviewed Mar. 23, 2023), https://tinyurl.com/5adbp2k7 ("An NFA firearm need not be assembled to be regulated as such.").[4]

Lastly, should this Court determine that the statute at issue is in any way ambiguous, this Circuit's precedent is clear—that ambiguity *must* be resolved in favor of Plaintiffs and the least restrictive reading. First, the Agencies have, at no point, invoked a need for deference here, which constitutes a waiver in this Circuit. *Cargill v. Garland*, 57 F.4th 447, 465 (5th Cir. 2023).

Second, even if this Court *sua sponte* evaluates the propriety of deference here *and* the Agencies are correct that the Final Rule at issue is an interpretive rule, the Fifth Circuit also concluded that *Chevron* does not apply when the government adopts an interpretive position inconsistent with its prior position. *Id.* at 468–69. Here, just as in *Cargill*, the Agencies' new position is inconsistent with its prior position of the past decade, thus foreclosing deference.

Third, *Cargill* concluded that even if the federal defendants did not waive *Chevron* and if the statutory definition was somewhat ambiguous, the rule of lenity would resolve any such ambiguity against the federal defendants and for the plaintiff. *See id.* at 469–71. The Fifth Circuit reasoned that it has applied the rule of lenity "many times to construe ambiguous statutes against imposing criminal liability." *Id.* at 470 (citations omitted). "Therefore, assuming *arguendo* that the statute is ambiguous, we conclude that the rule of lenity demands that we resolve that ambiguity in favor of" the regulated party. *Id.* at 471; *see United States v. Universal C.I.T. Credit Corp.*, 344

---

[4] This also shows why it was incorrect to conclude that Individual Plaintiffs "may still purchase [stabilizing braces] without being affected by the Final Rule." Opinion & Order at 15. Since Mock and Lewis both already own a pistol with a barrel of less than 16 inches *capable* of having a stabilizing brace attached, purchasing a new stabilizing brace would subject them to criminal liability for constructive possession of an unregistered SBR—true for millions of other similarly situated gun owners across the country. *See* Declaration of William T. Mock ("Mock Decl."), ECF No. 36-4, ¶ 6; Declaration of Christopher Lewis ("Lewis Decl."), ECF No. 36-3, ¶ 5.

**APP.314**

U.S. 218, 221–22 (1952) ("[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite."). Here, just as in *Cargill*, even if the statute is ambiguous, lenity dictates that such ambiguity be resolved in favor of Plaintiffs and the least restrictive reading of the statute. And once any statutory ambiguity is read narrowly, the Final Rule itself does not and cannot comport with such a narrowed reading.

## II.    THE AGENCIES' ATTEMPTS TO DISTINGUISH PLAINTIFFS' IRREPARABLE INJURIES ARE UNAVAILING

The Agencies' also fail to meaningfully respond to Plaintiffs' showing as to the other preliminary injunction factors.[5]

The Agencies assume the sweeping harm to the stabilizing brace market is only because those braces are used circumvent the NFA. But the Agencies ignore the many valid uses for stabilizing braces that do not even remotely suggest circumvention of SBR restrictions but are nonetheless prevented because the Final Rule is so broad and so vague that millions of individuals across the United States fear criminal prosecution for being in simultaneous possession of *any* functioning stabilizing brace and a firearm that it *may* be able to be attached to. In reality, the Final Rule has devastated the market because individuals must now live in fear of the potential of criminal liability for constructively violating the NFA—the same fear that Plaintiffs Mock and Lewis suffer. But most importantly, it does not matter at this stage *why* the market has been destroyed, simply that is *has* been destroyed because of the Final Rule's amendment of federal regulation and its change in the Agencies' administration and enforcement of the NFA.

---

[5] Plaintiffs' arguments as to harm are not an omission that stabilizing braces seek to "skirt NFA controls applicable to short-barreled rifles." *See* Feds' Opp. at 7. Plaintiffs' actions, and the braced pistol market, were based not just on the plain text of the NFA and GCA, but also on *the Agencies own published guidance documents*. *See, e.g.*, Amended Petition ¶¶ 37–44.

**APP.315**

The Agencies' argument that the NFA and thus Congress is responsible for the harm here, and not the Agencies or the Final Rule, is equally unavailing. *See* Feds' Opp. at 9.[6] First, Plaintiffs do not dispute that their injuries ultimately stem from the NFA's requirements and federal law—something true of every agency action. Every agency action of this type, unless ultra vires (something Plaintiffs also allege), is nothing more than an action dictating how an agency will implement and enforce federal law. If the Agencies can avoid review in this case because no injury is attributable to their action, then they could avoid review in every APA case of this kind.

Second, the need for Plaintiffs to comply with the NFA is directly attributable to the Final Rule. The Final Rule amended federal regulation in such a way that the Agencies are changing how they enforce the NFA. Before the Final Rule, the Agencies did not enforce the NFA against braced pistols. Now they do. The Final Rule is the agency action that amended federal regulation, and it is the Final Rule that constitutes the shift in agency enforcement that injures Plaintiffs.

Turning to the actual harmed being suffered, there is no "speculation about how potential consumers of these devices will respond to the Rule." Feds' Opp. at 8. Maxim has repeatedly demonstrated to this Court the brutal effect the Final Rule has had on their business. As of March 17, 2023, Maxim Defense had already lost millions of dollars and was forced to lay off 5 employees due to the Final Rule. Supplemental Declaration of David Dahl ("Dahl Supp. Decl."), ECF No. 38-1, ¶¶ 5, 7. Specifically, Maxim Defense lost total sales of over $900,000 in February 2023, compared to February 2022. Dahl Supp. Decl. ¶ 5. Since Plaintiffs filed their Motion for an Injunction Pending Appeal, Maxim Defense was forced to lay off an additional 7 employees and was forced to cut the salaries of all remaining staff. Third Declaration of David Dahl ("3rd Dahl

---

[6] This point is irrelevant for Plaintiffs' alternative claim for relief, which directly challenges a portion of the NFA as a federal question with the federal officials and agencies charged with enforcing federal law as named defendants. *See* Amended Petition ¶¶ 206–33.

**APP.316**

Decl.") ¶ 4 (filed concurrently herewith). More, Maxim Defense lost total sales of over $1.2 million for March 2023, and of over $730,000 from April 1st through 15th, 2023, compared to the same periods in 2022. 3rd Dahl Decl. ¶ 6. Importantly, not only is a "substantial financial injury" sufficient to show irreparable injury, but "complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir 2016). Unrecoverable injuries such as Maxim Defense's are irreparable. *See Deerfield Med. Ctr.*, 661 F.2d at 338 ("An injury is 'irreparable' only if it cannot be undone through monetary remedies.") (citations omitted).

As to Plaintiffs Mock and Lewis, the Agencies have either ignored Plaintiffs briefing or blatantly misrepresent it. *See* Feds' Opp. at 10 ("Neither [Mock or Lewis] identifies a weapon that he possesses or intends to possess that he believes is on the margins of being a short-barreled rifle under the Rule's analysis."). Both Mock and Lewis have identified arms that are impacted by the Final Rule's changes to federal regulation and agency enforcement, both of which are directly implicated by the Agencies' guidance documents. Mock Decl. ¶ 6; Lewis Decl. ¶ 5; Pls' MPI Reply at 8 (comparing Mock and Lewis's affected Arms and the Agencies' guidance documents that implicate those Arms under the Final Rule). And both Mock and Lewis have alleged that they have concrete plans to purchase braced pistols in the future, *but for* the Final Rule's implications. Mock Decl. ¶ 7; Lewis Decl. ¶ 6; Pls' MPI Reply at 8. The Agencies' failure to see the credible threat alleged by Mock and Lewis is nothing more than the Agencies' failure to review Plaintiffs' allegations, not Plaintiffs' failure to make them. And, like Maxim Defense's injuries, the loss of and chilling effect on Mock and Lewis's constitutionally protected rights cannot be undone by monetary relief. *See Deerfield Med. Ctr.*, 661 F.2d at 338 (constitutionally protected rights "must

**APP.317**

be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief") (citations omitted).

Lastly, Plaintiffs' do not represent the injuries of unknown third parties, but rather Maxim Defense represents the injuries suffered by its customers and Plaintiff Firearms Policy Coalition represents those of its members. *See, e.g.,* Amended Petition ¶¶ 8, 9; *Craig v. Boren*, 429 U.S. 190, 192–97 (1976); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343–44 (1977).

## III.  THE AGENCIES' CURSORY TREATMENT OF THE BALANCE OF HARMS DEMONSTRATES THE BALANCE WEIGHS IN PLAINTIFFS' FAVOR

The Agencies claim the Final Rule "benefits public safety by clarifying and supporting the enforcement of the NFA," but the Agencies have already admitted that the Final Rule is so incomprehensible that "ATF is . . . drafting classification letters that it will send directly to manufacturers to notify them of how ATF has formally classified their weapons[.]" Feds' MPI Opp., ECF No. 37, at 35. The Agencies fail to reconcile why they need to draft such letters if the Final Rule actually "provides regulated parties with greater clarity[.]" Feds' Opp. at 11.

But most telling, the Agencies say that the "public is better served by the Rule than by its absence," but never address Plaintiffs' contention that the Agencies will not suffer any significant harm by maintenance of a decade-long status quo while this Court considers the merits of the Final Rule. More, if Plaintiffs are indeed likely to succeed, there is no public benefit in allowing the Agencies to enforce a likely unlawful and unconstitutional Final Rule. *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009); *accord Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58–59 (D.C. Cir. 1997).

**CONCLUSION**

Plaintiffs respectfully request this Court grant Plaintiffs' Motion, ECF No. 41.

**APP.318**

DATED this the 18th day of April, 2023.

Respectfully submitted,

R. Brent Cooper
TX Bar No. 04783250
brent.cooper@cooperscully.com
Benjamin D. Passey
TX Bar No. 24125681
Ben.passey@cooperscully.com

COOPER & SCULLY, P.C.
900 Jackson Street, Suite 100
Dallas, TX  75202
Telephone: (214) 712-9500
Telecopy: (214) 712-9540

*/s/ Cody J. Wisniewski*
Cody J. Wisniewski*
CO Bar No. 50415
cwi@fpchq.org

FIREARMS POLICY COALITION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV  89149
Telephone: (916) 378-5785
Telecopy: (916) 476-2392

*Admitted *pro hac vice*

*Attorneys for Plaintiffs*

**APP.319**

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on April 18, 2023, a true and correct copy of the foregoing document was served via the Court's CM/ECF system to all counsel of record.

/s/ *Cody J. Wisniewski*

Cody J. Wisniewski
FIREARMS POLICY COALITION

**APP.320**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

|  |  |
|---|---|
| WILLIAM T. MOCK; *et al.*,<br><br>    *Plaintiffs*,<br><br>   v.<br><br>MERRICK GARLAND, in his official<br>capacity as Attorney General of the United States;<br>*et al.*,<br><br>    *Defendants*. | Civil Action No. 4:23-cv-00095-O |

### <u>THIRD DECLARATION OF DAVID DAHL</u>

I, David Dahl, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge:

1.      I am over 18 years of age, competent to testify, and have personal knowledge of the matters stated herein.

2.      I am the Chief Operating Officer and Executive Vice President of Manufacturing of Maxim Defense Industries, LLC ("Maxim Defense") and have held those positions since 2018 I have worked for Maxim Defense, in some capacity, since 2015.

3.      Since submitting my second declaration with this Court on March 17, 2023, Maxim Defense's financial situation has continued to deteriorate due to the Final Rule and the effect it is having on the stabilizing brace and braced pistol market.

4.      On April 10, 2023, Maxim Defense was forced to part ways with another 7 employees and to reduce all remaining employees' wages by 15%. An additional employee is unable to remain with Maxim Defense due to the pay decrease and will be parting ways shortly. With those 8 individuals, and the 5 individuals from February 2023, Maxim Defense has now been

**APP.321**

forced to part ways with 13 employees due to the negative impact of the Final Rule in order to even have a chance at surviving long enough to obtain a decision on the merits in this case.

5.    But even taking those steps will not guarantee Maxim Defense's long-term survival.  The Final Rule's immediate application destroyed the market for hundreds of thousands of dollars of stabilizing braces already in Maxim Defense's inventory. Because of the Final Rule, Maxim Defense has been unable to pay for that past inventory, which has destroyed its ability to obtain new capital to purchase *any* firearm parts to allow it to survive.

6.    Maxim Defense lost total sales of over $1.2 million in March 2023, compared to March 2022, and of over $730,000 from April 1st through 15th, 2023, compared to the same period in 2022. These losses include a loss of both direct consumer and OEM sales of Maxim Defense's products.

7.    Thus, although Maxim Defense is continuing its efforts to undertake a strategic restructuring and reorganizing of its operations to mitigate the impact of the ongoing loss of revenue, including by attempting to enter into new and different markets without the ability to obtain financing, those efforts have not been able to offset the enormous harm to Maxim Defense's business stemming directly from the Final Rule.


DATED this _18_th day of April, 2023.


David Dahl
COO/EVP of Manufacturing
Maxim Defense Industries, LLC


2

**APP.322**

## CERTIFICATE OF COMPLIANCE

I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

Dated: May 17, 2023

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel for Plaintiffs-Appellants*


## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on May 17, 2023, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system, and, that a copy of the foregoing document was served upon counsel for all parties to this action by email.

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel for Plaintiffs-Appellants*