No. 23-10319

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation; MAXIM DEFENSE INDUSTRIES, L.L.C.,

Plaintiffs-Appellants,

v.

MERRICK GARLAND, U.S. Attorney General, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the Northern District of Texas

_____

## RESPONSE TO EMERGENCY MOTION
## FOR AN INJUNCTION PENDING APPEAL

_____

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

LEIGHA SIMONTON
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BENJAMIN R. LEWIS
*Attorneys, Appellate Staff*
*Civil Division*
*U.S. Department of Justice*
*950 Pennsylvania Ave., NW*
*Washington, DC 20530*
*202-514-2494*

# TABLE OF CONTENTS

**Page**

INTRODUCTION.................................................................................................... 1

STATEMENT ......................................................................................................... 2

ARGUMENT ......................................................................................................... 7

I.     Plaintiffs Are Not Likely to Succeed on the Merits............................................ 7

     A.     The Rule Does Not Violate the Second Amendment................................ 7

     B.     The Rule Does Not Violate Any Other Principle of Law........................ 12

II.     Plaintiffs Have Not Established That the Equitable Factors Support an
Injunction................................................................................................... 16

III.     Nationwide Relief Is Not Permissible.................................................... 20

CONCLUSION ..................................................................................................... 22

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## INTRODUCTION

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as weapons that are especially dangerous. A short-barreled "rifle" is a firearm "designed," "made," and "intended" to be "fired from the shoulder," with a barrel shorter than 16 inches. 26 U.S.C. §§ 5841, 5845. Some manufacturers have circumvented Congress's longstanding requirements by marketing "stabilizing braces" generally designed to attach to the rear of a heavy pistol. Though manufacturers claim that these devices are intended to rest against a shooter's forearm to assist with one-handed firing, many of them are virtually indistinguishable from common shoulder stocks and are designed to permit the braced pistol to be fired from the shoulder. Such "braces" convert pistols into short-barreled rifles.

In response to this extensive sidestepping of federal law, and resulting confusion for purchasers, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) promulgated an interpretive rule. *See* 88 Fed. Reg. 6478 (Jan. 31, 2023) (Rule). The Rule clarifies that whether a braced pistol is designed and intended to be fired from the shoulder does not turn on the manufacturer's claimed intent; it turns, instead, on the design features of the weapon and other objective evidence. The Rule then sets forth the relevant criteria ATF will consider when determining whether any particular brace-and-pistol combination is a "rifle" under the NFA. Finally, the Rule provides that current possessors of short-barreled rifles may come into compliance with the NFA by registering their weapons (free of tax) by May 31.

1

Plaintiffs challenged the Rule and sought preliminary injunctive relief. Although the district court denied their motion on March 30, plaintiffs waited 48 days to seek an injunction pending appeal in this Court, requesting relief within a week.

Nothing in plaintiffs' motion justifies that extraordinary request. Plaintiffs nowhere argue that the Rule violates the NFA, nor do they contend that particular braced weapons they manufacture or own are not in fact rifles. Nor do plaintiffs provide any reason to disturb the district court's conclusion that they are unlikely to succeed on the merits. Plaintiffs may continue to manufacture, purchase, and sell short-barreled rifles if they comply with the NFA's modest requirements. And all that the individual plaintiffs must do by May 31 is register—for free—any short-barreled rifles they own. The public interest in enforcing the NFA's requirements for weapons that Congress deemed particularly dangerous outweighs any minimal harms plaintiffs assert. This Court should deny the motion for injunction pending appeal.

## STATEMENT

1. The National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq.*, imposes requirements on persons who manufacture, possess, or transfer certain firearms. In enacting the NFA, Congress sought to curtail the criminal misuse of firearms by imposing additional restrictions on particularly dangerous and easily concealable weapons that "could be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395 (1954). *See also United States v. Thompson/Center Arms Co.*, 504 U.S. 505, 517 (1992) (plurality op.). One such firearm is a rifle with a barrel length under 16

inches, commonly called a short-barreled rifle. *Id.* § 5845(a)(3), (4). As relevant here, a "rifle" is defined as a firearm "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c).

As with other weapons regulated by the NFA, short-barreled rifles must be registered in the National Firearms Registration and Transfer Record, 26 U.S.C. § 5841, and a person wishing to make or transfer a short-barreled rifle generally must pay a $200 tax and receive approval from the Attorney General. *Id.* §§ 5811-5812, 5821-5822. Any person engaged in the business of importing, manufacturing, or dealing in short-barreled rifles must register with the Attorney General and pay a special occupational tax, generally of $500 or $1000 annually. *Id.* §§ 5801-5802.

2. Over the last decade, ATF has received an increasing number of requests to determine whether weapons equipped with so-called "stabilizing brace" devices constitute "rifles." *See* 88 Fed. Reg. at 6482-84. In general, manufacturers design these devices to attach to the rear of a heavy pistol that does not contain a buttstock—such as a pistol variant of an AR-type rifle—and manufacturers nominally claim that they are meant to attach to or rest against a shooter's forearm to provide additional stability. *See id.* at 6518. At the same time, these braces often replicate characteristics of a shoulder stock and are frequently marketed and used as devices to enable a shooter to shoulder the firearm. *See id.* at 6479, 6527-29, 6544-47. Indeed, as the below photographs demonstrate, a pistol variant equipped with a stabilizing brace may be virtually indistinguishable from a similar model rifle.

3



*See* ROA.366 (top item is marketed as heavy pistol with "brace" while bottom is marketed as rifle).

Although ATF issued individual classification letters regarding brace-and-pistol combinations, over time it became concerned that its classifications did not always apply the same criteria—and, in some instances, applied a framework inconsistent with the NFA—to determine whether the weapon was designed and intended to be fired from the shoulder. These inconsistences led to substantial confusion among manufacturers and purchasers. Adding to the confusion, manufacturers labeled brace devices as "ATF compliant" without having submitted them for classification and widely promoted such devices as enabling firing from the shoulder. *See generally* 88 Fed. Reg. at 6479-505 (describing this history).

3. Against that backdrop, ATF determined it was necessary to clarify the agency's approach to the question whether a weapon equipped with a stabilizing brace is a rifle under the NFA and promulgated the Rule in January 2023.

The Rule primarily clarifies that, in determining whether a particular brace-and-weapon combination is "designed, redesigned, made or remade, and intended to be

fired from the shoulder," ATF need not accept a manufacturer's assertions about how the product is designed to be used but must instead examine the weapon's objective design features and other relevant evidence.

The Rule further elaborates that the statutory definition of "rifle" encompasses "a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a 'stabilizing brace') that provides surface area that allows the weapon to be fired from the shoulder, provided that other" enumerated factors "indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569. In brief, these other factors are (i) the weapon's "weight or length"; (ii) its "length of pull"; (iii) the existence of "sights or a scope" that require shouldering to use; (iv) the extent to which the rear surface area comes from an "attachment that is necessary for the cycle of operations"; (v) "marketing and promotional materials"; and (vi) the "likely use of the weapon in the general community." *Id.* at 6569-70.

The Rule also provides compliance options for individuals who possess unregistered short-barreled rifles. Recognizing that many parties had not registered their brace-and-pistol combinations as short-barreled rifles, including because of confusion engendered by previous classification letters, the Department exercised its enforcement discretion to permit current possessors to register the weapon by May 31, 2023, without penalty or tax (or, if the owner chooses, destroy or surrender it). 88 Fed. Reg. at 6480-81.

4. Plaintiffs—two individuals who possess pistols equipped with "stabilizing braces," an advocacy organization, and a manufacturer and retailer of braces—filed suit and moved for a preliminary injunction. The district court denied the motion, rejecting plaintiffs' contention that the NFA's requirements, as interpreted by the Rule, violate the Second Amendment as applied to stabilizing braces and brace-equipped pistols. App. 251-253. Relying on precedent, the court explained that the Second Amendment does not "bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership," like those imposed by the NFA. App. 252 (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022); *id.* at 2162 (Kavanaugh, J., concurring); and *Bezet v. United States*, 714 F. App'x 336, 340 (5th Cir. 2017)). The court also determined that plaintiffs had not demonstrated a likelihood of prevailing on their argument that the NFA's requirements are not consistent with this nation's history and tradition of gun regulation. *See* App. 253.

The district court also rejected plaintiffs' various contentions that the Rule is vague, explaining that the Rule's enumerated factors properly "provide a standard" that "tracks the statutory definition" and that "put[s] a person of ordinary intelligence on notice" regarding ATF's understanding of the statute. App. 250-51. Because the court concluded that the Rule was a proper interpretation of the NFA, it found no cause to apply the rule of lenity. *See* App. 249.

# ARGUMENT

To obtain an injunction pending appeal, plaintiffs "must show (1) a strong likelihood of success on the merits; (2) irreparable injury in the absence of an injunction; (3) that the balance of hardships weighs in their favor if injunctive relief is granted; and (4) that the public interest favors such relief." *Whole Woman's Health v. Jackson*, 13 F.4th 434, 441 (5th Cir. 2021) (per curiam). Plaintiffs have failed to carry their burden.

## I.    Plaintiffs Are Not Likely to Succeed on the Merits

### A.    The Rule Does Not Violate the Second Amendment

As the district court concluded, *see* App. 251-53, plaintiffs have failed to demonstrate a likelihood of success on their claim that the Rule violates the Second Amendment. To establish a Second Amendment violation, plaintiffs must first show that the Rule implicates "the Second Amendment's plain text." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. at 2111, 2126 (2022). If plaintiffs meet that threshold requirement, the government is then required to "demonstrate that the [Rule] is consistent with this Nation's historical tradition of firearm regulation." *Id.* Plaintiffs' claims founder on both levels.

1. The application of the NFA's requirements to short-barreled rifles made from stabilizing braces does not implicate the Second Amendment for three reasons: stabilizing braces are not bearable arms; short-barreled rifles are dangerous and

unusual weapons; and the NFA's requirements do not infringe the right protected by the Second Amendment.

First, the Second Amendment extends only to "instruments that constitute bearable arms," meaning "[w]eapons of offence, or armour of defence." *District of Columbia v. Heller*, 554 U.S. 570, 581-82 (2008). Laws that regulate the use of firearm accessories or attachments therefore do not implicate the Second Amendment. Thus, for example, courts have consistently held that because a "silencer is a firearm accessory," it is not "protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Similarly, a stabilizing brace is "not a weapon in itself," *id.*; thus, regulations affecting the use of braces do not implicate conduct covered by the Second Amendment's text.

Second, the regulation of short-barreled rifles does not implicate the Second Amendment because the "right to keep and carry arms" does not extend to quintessentially "dangerous and unusual" weapons. *See Heller*, 554 U.S. at 625, 627.

As plaintiffs nowhere contest, Congress's inclusion of short-barreled rifles within the scope of the NFA reflects its determination that such weapons are particularly dangerous because of "their concealability and their heightened ability to cause damage—a function of the projectile design, caliber, and propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." 88 Fed. Reg. at 6499. Given those features, they are also "likely" to be "used for criminal purposes." *Thompson/Center Arms Co.*, 504 U.S. at 517.

And short-barreled rifles are not in common usage. Many states do not permit their unrestricted lawful possession, *see* ROA.388 (collecting statutes); the "raw number" of short-barreled rifles falls well below the reference points this Court has considered for common use; and the "percentage and proportion" of short-barreled rifles out of the hundreds of millions of firearms in the United States is "quite low." *Hollis v. Lynch*, 827 F.3d 436, 449-50 (5th Cir. 2016). Accordingly, "short-barreled rifles fall[] outside the Second Amendment's guarantee." *Cox*, 906 F.3d at 1186.

Third, as the district court recognized, the NFA's registration, approval, and taxation requirements do not prevent individuals from exercising the "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156; *see* App. 252. The Supreme Court had made clear that its decisions do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626-27. And the Court has similarly approved licensing regimes that require applicants to (for example) "undergo a background check or pass a firearms safety course" in order "to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 142 S. Ct. at 2138 n.9 (quotation omitted). The NFA, which permits the manufacture and possession of short-barreled rifles so long as its relatively modest procedural requirements designed to ensure possessors are law-abiding and responsible are met, similarly does not infringe the Second Amendment.

2. The Rule is well-supported by historical tradition. As the government explained in district court, *see* ROA.389-90,[1] state governments have exercised their authority since colonial times to regulate the possession and manufacture of firearms through laws imposing requirements like the NFA's.

As early as 1631, Virginia required a regular survey of arms and munition; Rhode Island (1667), South Carolina (1747), and New Jersey (1781) similarly authorized door-to-door surveys of firearms, while Massachusetts (1775) and New York (1778) provided for inspections of militia members' firearms. Massachusetts (1805) and Maine (1821) required that firearm barrels generally be inspected and marked before sale. Similarly, Massachusetts (1651, 1809), Connecticut (1775), and New Hampshire (1820) required licenses or inspection to export or sell gunpowder. And not only did those colonies and States impose incidental costs on firearm ownership through such regulatory requirements, but other States—including Alabama (1867), Mississippi (1844, 1867), North Carolina (1857) and Georgia (1866)—also enacted direct taxes on firearms ownership.

Taken together, these laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Bruen*, 142 S. Ct. at 2132. Like these laws, the NFA seeks to raise revenue through taxation, regulate (but not prohibit) firearm

---

[1] Citations for each of these historical laws are available in the record. *See* ROA.389-90. The government can provide copies of each law if so ordered.

ownership, and gather information on firearms. Those restrictions are "comparable" and "comparably justified" to historical laws. *Id.* at 2133.

3. Plaintiffs fail to rebut this showing. Although plaintiffs assert (at 10-11) that short-barreled rifles are not unusual (without contesting dangerousness), plaintiffs do not meaningfully discuss the relevant factors identified in *Hollis*, nor explain how braces constitute bearable arms. Nor do they grapple with the Supreme Court's approval of similar regulatory requirements, even though the district court rejected their constitutional claims on that basis, *see* App. 252. And they do not distinguish even a single historical law, relying instead on the bald assertion (at 10) that the cited laws are not "relevantly similar."

No more successful is plaintiffs' contention (at 8-10) that the district court erred by "flipp[ing] the burden" in examining history. That assertion is immaterial to whether plaintiffs are entitled to an injunction from this Court. In any event, the district court's opinion is best read as properly concluding—after it had already held that the NFA's requirements did not implicate the Second Amendment and against the backdrop of substantial historical evidence marshalled by the government—that plaintiffs failed to rebut the government's evidence, just as they have done in this Court. *See* App. 253.

Finally, plaintiffs briefly suggest (at 12-13) that the NFA's requirements impermissibly delay or tax the exercise of Second Amendment rights. Those arguments presume (incorrectly, as explained) that pistols equipped with stabilizing

11

braces are subject to the Second Amendment's protection. And plaintiffs' suggestion that the Second Amendment categorially forbids such fees and costs cannot be squared with the Supreme Court's approval of licensing regimes that impose costs on, or cause delays in, acquiring firearms. *See Bruen*, 142 S. Ct. at 2138 n.9.

Plaintiffs' reliance on First Amendment precedent (at 12-13) only underscores their error. Fees are permissible under those principles if they are designed (like the NFA's $200 tax) to "meet the expense incident to the administration" of a regulatory regime, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941), or they "have some relationship to solving the problems that supposedly justify their imposition," *International Women's Day March Plannning Comm. v. City of San Antonio*, 619 F.3d 346, 370 (5th Cir. 2010). And plaintiffs cite no support for their contention that regulations that might delay the exercise of the right are categorically prohibited in the First Amendment context; instead, the government may impose licensing or permitting requirements, even though those might well delay the exercise of the right. *See, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990) (explaining that a license must only be issued within "a reasonable period of time").

## B.    The Rule Does Not Violate Any Other Principle of Law

1. The agency's interpretation of "rifle" to include a braced weapon when it "provides surface area that allows the weapon to be fired from the shoulder" and factors indicate that it is "designed, made, or intended to be fired from the shoulder," 88 Fed. Reg. at 6569, flows directly from the plain text of the NFA. As explained, that

statute defines a "rifle" as a firearm "designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). As the district court recognized, the Rule simply "identif[ies] the criteria by which enforcers, in their application of the statute, will make" the statutorily required determination. App. 246.

Plaintiffs' motion does not develop any argument that the Rule contravenes the statute. Nor do plaintiffs contest the Rule's central premises: manufacturers have marketed products as braces rather than stocks to circumvent the NFA, and ATF is not bound to accept a manufacturer's characterization of its own intent to determine whether a weapon is designed and intended to be fired from the shoulder. That approach is not novel: ATF has long examined "objective evidence," "such as a part's design features," to discern intent, *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016), and its factors are justified by in-depth explanations, 88 Fed. Reg. 6510-43.

Plaintiffs suggest (at 14-15) that the rule of lenity requires construing the statute in the narrowest possible way. But the Rule articulates ATF's understanding of the best reading of the statute, and the rule of lenity does not apply where, as here, the "traditional tools of statutory construction" support that reading. *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (en banc), cert. petition pending, No. 22-976.

Although plaintiffs emphasize (at 13-14) that the district court concluded that the statute included some "ambiguous terms," App. 246, that is not the same as finding the "grievous ambiguity" necessary to trigger the rule of lenity, where a court must "simply guess" at the statute's meaning, *Maracich v. Spears*, 570 U.S. 48, 76 (2013).

13

Furthermore, the court recognized ambiguity only in explaining that the statutory definition "necessarily require[s]" ATF to "evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is subject to the NFA." App. 246.

2. Contrary to plaintiffs' contention (at 15-17), the Rule is not unconstitutionally vague. The Rule clarifies ATF's view that the statutory term "rifle" includes a weapon equipped with an attachment "that provides surface area that allows the weapon to be fired from the shoulder" under circumstances where various articulated factors "indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6569.

As the district court recognized, the Rule therefore proceeds from the statute's "comprehensible normative standard"—whether a weapon is intended to be fired from the shoulder. *Village of Hoffman Estates. v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982). It then "define[s] and explain[s] the criteria" ATF considers relevant under the standard. *Catawba County. v. EPA*, 571 F.3d 20, 39 (2009). That is more than enough to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020); *see also Texas v. EPA*, 983 F.3d 826, 839-40 (5th Cir. 2020) (upholding use of a "multi-factor balancing test" against administrative challenge); *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 218-19 (D.C. Cir. 2022) (upholding same against "fair notice" challenge).

14

Plaintiffs' attempt to require the Rule to provide "perfect clarity and precise guidance," *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989), is particularly misplaced here. Rather than identify specific brace-pistol combinations for which the Rule fails to provide guidance, plaintiffs complain about the Rule's criteria in a vacuum. But as the Supreme Court has admonished, a court must "consider whether a statute is vague as applied to the particular facts at issue," because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010). Plaintiffs also ignore the Rule's assurance that anyone may "request a classification determination from ATF for additional clarity." 88 Fed. Reg. at 6552. That opportunity for clarity from "an administrative process" ameliorates any harm. *Village of Hoffman Estates.*, 455 U.S. at 498.

3. Plaintiffs likewise cannot show (at 17-18) that the Rule will impermissibly chill conduct. The Rule does not regulate speech or marketing materials, as the district court correctly concluded. *See* App. 249-50. Instead, the Rule explains that a manufacturer's marketing materials are relevant evidence of a product's intended use—a common-sense reality that plaintiffs cannot contest. 88 Fed. Reg. at 6544-45. The government may use "a product's marketing and labeling to discern to which regulatory regime a product is subject" without violating the First Amendment. *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282-83 (D.C. Cir. 2019).

There is also no risk of chilling Second Amendment activity. Plaintiffs repeatedly speculate (at 7, 12 n.5, 16, 18, 22) that ATF will find individuals in "constructive possession" of a regulated firearm, but the agency has not banned possession of stabilizing braces, 88 Fed. Reg. at 6478, and individuals can seek clarification for whether particular brace-and-pistol combinations must be registered. Plaintiffs' "unsubstantiated fears of a speculative harm … on Second Amendment activity" are inadequate. *Robinson v. Sessions*, 721 F. App'x 20, 23 n.2 (2d. Cir. 2018).

## II.    Plaintiffs Have Not Established That the Equitable Factors Support an Injunction

A. Plaintiffs have not demonstrated that the Rule will cause irreparable harm. The regulatory requirements associated with manufacturing, selling, and possessing short-barreled rifles come from the NFA—not the Rule—and the Rule does no more than inform regulated entities of ATF's understanding of the scope of the underlying statute. Even absent the Rule, plaintiffs must comply with the NFA.

Further, as explained, plaintiffs who wish to manufacture, transfer, or possess brace-equipped pistols are not prohibited by the Rule or statute from doing so; they might—depending on the particular design—simply need to comply with the NFA's requirements. And those requirements are not especially onerous: the NFA's making and transfer tax is $200, and the Department is not collecting tax for braced pistols that individuals already possess and timely register. In addition, if a plaintiff pays the tax but it is later determined that the statute did not cover his weapon, the plaintiff

may request, or sue for, a refund. *See* 26 U.S.C. § 7422. That possibility of obtaining future "corrective relief," in "the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Similarly, although the NFA imposes additional minimal regulatory requirements—such as submission of a registration form when an NFA-regulated firearm is manufactured— plaintiffs have not identified any requirement that imposes more than a *de minimis*— much less irreparable—cost on them.

Plaintiffs' substantial delay in seeking relief further belies their claim that irreparable harm will occur if they do not receive an injunction within the week. The district court denied plaintiffs' motion for a preliminary injunction on March 30, *see* App. 254, and yet plaintiffs waited until May 17 to move this Court for an injunction pending appeal. That "delay in seeking relief vitiates much of the force" of plaintiffs' "allegations of irreparable harm." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894-95 (8th Cir. 2013). The Rule has been in effect since its promulgation in January. Although the Department exercised its enforcement discretion to allow previous possessors to come into compliance by May 31, no grace period was provided with respect to manufactures and transfers that occurred after the Rule's promulgation. After living with the Rule for four months, plaintiffs can hardly persuasively claim irreparable injury will befall them absent an injunction in the next week.

B. Attempting to demonstrate irreparable harm, plaintiffs claim (at 18-20) a scattershot of injuries, but none persuade. As an initial matter, plaintiffs suggest (at

17

18) that "irreparable injury flows directly from th[e] conclusion" that they are likely to succeed on their Second Amendment claims. As explained, plaintiffs are not likely to succeed on those claims. But even if they were, the mere "invocation of the [Second] Amendment cannot substitute for" a plaintiff's obligation to demonstrate "an imminent, non-speculative irreparable injury" that will occur absent emergency relief. *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). Here, the NFA requirements indisputably do not prevent plaintiffs from exercising their Second Amendment right "to keep and bear arms for self-defense," *Bruen*, 142 S. Ct. at 2125, and they thus do not give rise to imminent constitutional injury.

The manufacturer plaintiff next contends (at 19) that the Rule will cause it irreparable harm by destroying the market for its braces and braced pistols. But the manufacturer plaintiff fails to provide any persuasive evidence substantiating the assertion that any decline in sales was caused by the Rule—rather than by, for example, other market forces or the manufacturer's apparent own choice to "cease[] all sales of its braced pistols" rather than comply with the NFA's requirements, App. 151; *see Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) ("[S]elf-inflicted" injury "does not qualify as irreparable."). And the manufacturer's assertions about the effect of the Rule are also impossible to square with the relatively minor costs of complying with the NFA's requirements, especially because the manufacturer plaintiff appears to already sell other weapons that require NFA registration, *see* ROA.403.

Indeed, to the extent plaintiffs' allegations of harm rest on the proposition that buyers only want to purchase stabilizing braces in order to circumvent the NFA's requirements, that suggestion underscores ATF's determination that many of these manufactured "braces" are in fact designed and intended to create short-barreled rifles fired from the shoulder. Plaintiffs can hardly claim cognizable injury from their newfound inability to facilitate circumvention of federal gun laws.

Finally, the individual plaintiffs briefly suggest (at 19-20) that the Rule will irreparably harm them by forcing them to forgo purchases of new braced pistols and destroy existing ones and by exposing them to criminal prosecution. But nowhere do plaintiffs attempt to square those assertions with the fact that the NFA does not criminalize the possession of short-barreled rifles. Thus, plaintiffs may continue to possess their braced pistols and buy new ones—with no threat of criminal liability— so long as they comply with the statutory requirements. And plaintiffs do not develop any argument that those relatively minor requirements themselves impose irreparable harm. Nor could plaintiffs manufacture irreparable injury by choosing not to comply with those minimally burdensome requirements or by choosing to destroy, rather than register, their previously possessed short-barreled rifles; any such injury would be impermissibly self-inflicted. *See Texas*, 10 F.4th at 558.

C. Even if plaintiffs had demonstrated some irreparable harm, their minimal asserted harms could not outweigh the countervailing public interest in public safety and in regulatory clarity. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (explaining that

the balance of the equities and public interest "merge" when the government is a party).

First, the Rule benefits public safety. As explained, the NFA reflects Congress's determination that short-barreled rifles pose a specific and unusual risk to public safety and that regulating them through, for example, registration and taxation requirements is necessary to ameliorate that risk. *See* 88 Fed. Reg. at 6566. The Rule reinforces these controls that Congress determined advance public safety by clarifying the weapons subject to the statute; conversely, plaintiffs' requested injunction would decrease public safety by facilitating continued widespread disregard of the NFA.

Second, the Rule promotes the public interest in regulatory clarity and consistent enforcement of statutory requirements. ATF promulgated the Rule in large part to ameliorate substantial confusion among regulated entities regarding the proper interpretation of the NFA's definition of "rifle" and to ensure that ATF would consistently apply the definition moving forward. To advance those goals, the 98-page Rule provides an in-depth explanation of the analytical approach and specific factors that ATF believes reflect the best understanding of the statute. An injunction pending appeal would deprive the agency, and the regulated public, of that explanation and risk engendering future confusion and inconsistency in application of the statute.

## III.   Nationwide Relief Is Not Permissible

Even if plaintiffs were to demonstrate an entitlement to relief pending appeal —which they have not—under no circumstances would they be entitled to a

nationwide injunction pending appeal. Fundamental constitutional and equitable principles require the Court to limit any injunction to the specific plaintiffs whom the Court finds have demonstrated some irreparable injury from the Rule. *See Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (Article III authorizes federal courts to grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury"); *Califano v. Yamazaki*, 442 U.S. 682, 702 (1979) (similar constraints in equity). At minimum, this does not include the plaintiff organization, whose assertions of harm (at 20) are wholly undeveloped.

In response, plaintiffs suggest (at 21-22) that nationwide relief is necessary to enable them to purchase or sell short-barreled rifles. But plaintiffs offer no reason why the Court could not tailor any injunction to protect both any plaintiff who the Court finds has demonstrated irreparable harm and their counterparty in any such transaction. *See, e.g.*, *VanDerStok v. Garland*, 2022 WL 4809376 (N.D. Tex. Oct. 1, 2022), *appeal filed*, No. 22-11071.

Separately, plaintiffs claim (at 21) that the APA permits a court to "set aside" unlawful agency action without consideration of equitable principles. But even if the Rule were to be set aside under the APA, the statutory requirements would still require registration of short-barreled rifles. In any event, and even putting aside the question whether such relief is permissible under the APA, *see* Brief for the Petitioners at 40-44, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022), the question whether to grant an injunction pending appeal is indisputably subject to the constraints of

equity. The sole case plaintiffs cite to support their argument is not to the contrary.

*See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859-60 (5th Cir. 2022)

(appeal following grant of summary judgment).

## CONCLUSION

For the foregoing reasons, the Court should deny plaintiffs' motion.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA

*/s/ Ben Lewis*
BENJAMIN R. LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*

May 2023

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 5193 words. This brief also complies with the typeface and type-style requirements of Federal Rules of Appellate Procedure 27(d)(1)(E) and 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*/s/ Ben Lewis*
BENJAMIN R. LEWIS

## CERTIFICATE OF SERVICE

I hereby certify that on May 19, 2023, I electronically filed the foregoing

response with the Clerk of the Court for the United States Court of Appeals for the

Fifth Circuit by using the appellate CM/ECF system. Participants in the case are

registered CM/ECF users, and service will be accomplished by the appellate

CM/ECF system.

*/s/ Ben Lewis*
BENJAMIN R. LEWIS