No. 23-10319

# In the United States Court of Appeals for the Fifth Circuit

WILLIAM T. MOCK; CHRISTOPHER LEWIS;
FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation;
MAXIM DEFENSE INDUSTRIES, L.L.C.,

*Plaintiffs-Appellants,*

v.

MERRICK GARLAND, U.S. Attorney General, in his official capacity as
Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES;
STEVE DETTELBACH, in his official capacity as the Director of the
Bureau of Alcohol, Tobacco, Firearms and Explosives,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of Texas, Fort Worth Division
Case No. 4:23-cv-00095-O

### PLAINTIFFS-APPELLANTS' OPENING BRIEF

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road
Suite 320
Las Vegas, NV 89149
Telephone: (916) 517-1665
Facsimile: (916) 476-2392
cwi@fpchq.org

Erik S. Jaffe
 *Counsel of Record*
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
ejaffe@schaerr-jaffe.com
jprince@schaerr-jaffe.com

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTERESTED PERSONS

No. 23-10319
*William T. Mock, et al. v. Merrick Garland, et al.*

I certify that the following persons and entities as described in the fourth sentence of Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made so the judges of this Court may evaluate possible disqualification or recusal:

1) **<u>Plaintiffs-Appellants:</u>**

William T. Mock

Christopher Lewis

Maxim Defense Industries, LLC, a limited liability company, is a wholly-owned subsidiary of Maxim Defense Group, Inc., a Florida S-Corp. Maxim Defense Group, Inc., has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

Firearms Policy Coalition, Inc., a nonprofit corporation has no parent corporation and there is no publicly held corporation that owns 10% or more of its stock.

2) **<u>Defendants-Appellees:</u>**

Merrick Garland, in his official capacity as Attorney General of the United States

United States Department of Justice

Steve Dettelbach, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives

Bureau of Alcohol, Tobacco, Firearms and Explosives

3)  **<u>Counsel for Plaintiffs-Appellants</u>**:

COOPER & SCULLY PC
R. Brent Cooper
Benjamin David Passey

FPC ACTION FOUNDATION
Cody J. Wisniewski

SCHAERR | JAFFE LLP
Erik S. Jaffe
Joshua J. Prince

4)  **<u>Counsel for Defendants-Appellees</u>**:

Brian M. Boynton
Brigham J. Bowen
Michael Drezner
Sean Janda
Jody Dale Lowenstein
Benjamin Lewis
Faith E. Lowry
Taylor Pitz
Abby C. Wright

United States Department of Justice

*/s/ Erik S. Jaffe*
Erik S. Jaffe

*Counsel of Record for*
*Plaintiffs-Appellants*

## STATEMENT REGARDING ORAL ARGUMENT

This matter is scheduled for oral argument on June 29, 2023 (ECF No. 66-1).

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ....................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iv

TABLE OF AUTHORITIES ................................................................. vii

JURISDICTION....................................................................................1

ISSUES ...............................................................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

STATEMENT ........................................................................................5

STANDARD OF REVIEW ......................................................................13

ARGUMENT .......................................................................................14

I.      APPELLANTS ARE LIKELY TO SUCCEED ON THE
        MERITS..................................................................................14

        A.      The Final Rule violates the Second Amendment...........................14

        B.      The NFA does not authorize the Final Rule. .................................23

                1.      The text of the NFA does not authorize the Final
                        Rule. ..................................................................................24

                2.      If supposedly ambiguous statutory text might allow
                        the regulation of braced pistols, then the Rule of
                        Lenity applies...................................................................27

                3.      If permissible under the statutes, then the Final Rule
                        is an improper delegation of authority to the
                        Agencies............................................................................29

                4.      The Final Rule is unconstitutionally vague. ........................31

        C.      The Final Rule Violates the First Amendment. .............................34

        D.      The Final Rule violates the APA's Substantive and Notice
                Requirements.................................................................................39

II.    APPELLANTS FACE IRREPARABLE HARM ....................................46

III.    THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF.........................................49

IV.    THE COURT SHOULD ENJOIN THE FINAL RULE IN ITS ENTIRETY.............................................................................51

CONCLUSION ...........................................................................................54

CERTIFICATE OF SERVICE ...................................................................55

CERTIFICATE OF COMPLIANCE..........................................................56

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allina Health Servs. v. Sebelius*,
    746 F.3d 1102 (D.C. Cir. 2014) ..........................................................45

*Ashcroft v. ACLU*,
    542 U.S. 656 (2004) ...........................................................................49

*Bd. of Cnty. Comm'rs v. Umbehr*,
    518 U.S. 668 (1996) ...........................................................................23

*Beckles v. United States*,
    580 U.S. 256 (2017) ...........................................................................33

*BST Holdings, LLC v. OSHA*,
    17 F.4th 604 (5th Cir. 2021) ..............................................................46

*Caetano v. Massachusetts*,
    577 U.S. 411 (2016) ...........................................................................17

*Califano v. Yamasaki*,
    442 U.S. 682 (1979) ...........................................................................51

*Calix v. Lynch*,
    784 F.3d 1000 (5th Cir. 2015) ............................................................30

*Canal Auth. of Fla. v. Callaway*,
    489 F.2d 567 (5th Cir. 1974) ..............................................................50

*Cargill v. Garland*, 57 F.4th 447 (5th Cir. 2023),
    *petition for cert. docketed*, No. 22-976 (U.S. Apr. 7, 2023) ............. 25, 27, 28, 31

*Chocolate Mfrs. Ass'n of U.S. v. Block*,
    755 F.2d 1098 (4th Cir. 1985) ............................................................43

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) ...........................................................................38

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) ..............................................................30

*CSX Transp., Inc. v. Surface Transp. Bd.*,
   584 F.3d 1076 (D.C. Cir. 2009) ..................................................... 40, 45

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
   45 F.4th 846 (5th Cir. 2022) .................................................................51

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
   661 F.2d 328 (5th Cir. Unit B Nov. 1981) ...........................................23

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ..................................... *passim*

*Elrod v. Burns*,
   427 U.S. 347 (1976) ...............................................................................46

*FCC v. Fox Television Stations, Inc.*,
   567 U.S. 239 (2012) ...............................................................................32

*Garcia v. Jones*,
   910 F.3d 188 (5th Cir. 2018) ................................................................13

*Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*,
   968 F.3d 454 (5th Cir. 2020) ................................................................30

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) ..........................................................................31

*Hardin v. ATF*,
   65 F.4th 895 (6th Cir. 2023) .................................................................28

*Heller v. District of Columbia*,
   670 F.3d 1244 (D.C. Cir. 2011) ...........................................................22

*Huawei Techs. USA, Inc. v. FCC*,
   2 F.4th 421 (5th Cir. 2021) ............................................................ 40, 43

*Idaho Farm Bureau Fed'n v. Babbitt*,
   58 F.3d 1392 (9th Cir. 1995) ................................................................39

*Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*,
   88 F.3d 274 (5th Cir. 1996) ..................................................................49

*J&J Sports Prods., Inc. v. Mandell Fam. Ventures, LLC*,
   751 F.3d 346 (5th Cir. 2014) ................................................................24

*Jacksonville Port Auth. v. Adams*,
    556 F.2d 52 (D.C. Cir. 1977) ...............................................................50

*Janvey v. Alguire*,
    647 F.3d 585 (5th Cir. 2011) ...............................................................46

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ........................................................................24

*Long Island Care at Home, Ltd. v. Coke*,
    551 U.S. 158 (2007) .............................................................................39

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) .......................................................14, 46

*Loving v. United States*,
    517 U.S. 748 (1996) .............................................................................29

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) .............................................................................21

*Moore v. Hannon Food Serv., Inc.*,
    317 F.3d 489 (5th Cir. 2003) ...............................................................30

*Murdock v. Pennsylvania*,
    319 U.S. 105 (1943) .............................................................................21

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    142 S. Ct. 2111 (2022) ................................................................ *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ........................................................................38

*Nicopure Labs, LLC v. FDA*,
    944 F.3d 267 (D.C. Cir. 2019) ............................................................11

*Nken v. Holder*,
    556 U.S. 418 (2009) .......................................................................49, 50

*Peyton v. Reynolds Assocs.*,
    955 F.2d 247 (4th Cir. 1992) ...............................................................24

*R.A.V. v. City of St. Paul,*
    505 U.S. 377 (1992) ...................................................................35

*Reed v. Town of Gilbert,*
    576 U.S. 155 (2015) ...................................................................35

*Richey v. Smith,*
    515 F.2d 1239 (5th Cir. 1975)....................................................48

*Sackett v. EPA,*
    598 U.S. --, 2023 WL 3632751 (2023) ........................................ 28, 32

*Sessions v. Dimaya,*
    138 S. Ct. 1204 (2018) ...............................................................32

*Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning,*
    620 F.2d 516 (5th Cir. 1980).......................................................32

*Small Refiner Lead Phase-Down Task Force v. EPA,*
    705 F.2d 506 (D.C. Cir. 1983). .............................................. 43, 44

*Smith v. Goguen,* 415 U.S. 566 (1974) ...................................................32

*Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,*
    989 F.3d 368 (5th Cir. 2021).......................................................40

*Tex. Pipeline Ass'n v. FERC,*
    661 F.3d 258 (5th Cir. 2011).......................................................29

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015)................................................. 40, 51

*Turner v. Lt. Driver,*
    848 F.3d 678 (5th Cir. 2017).......................................................35

*U.S. Navy Seals 1-26 v. Biden,*
    27 F.4th 336 (5th Cir. 2022)........................................................49

*United States v. Bass,*
    404 U.S. 336 (1971) ...................................................................31

*United States v. Cox,*
    906 F.3d 1170 (10th Cir. 2018)....................................................15

*United States v. Davis,*
  139 S. Ct. 2319 (2019) ........................................................32

*United States v. One TRW, Model M14, 7.62 Caliber Rifle,*
  441 F.3d 416 (6th Cir. 2006) ...............................................20

*United States v. Rahimi,*
  61 F.4th 443 (5th Cir. 2023), *petition for cert. docketed,*
  No. 22-915 (U.S. Mar. 21, 2023) ................................... 14, 16

*United States v. Raines,*
  362 U.S. 17 (1960) ..............................................................49

*United States v. Smith,*
  997 F.3d 215 (5th Cir. 2021) ...............................................53

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ............................................................29

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
  455 U.S. 489 (1982) ....................................................... 12, 32

*West Virginia v. EPA,*
  142 S. Ct. 2587 (2022) ................................................... 24, 30

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................29

**Constitutional Provisions**

U.S. Const. amend. II ..............................................................15

U.S. Const. art. I, § 1 ..............................................................29

U.S. Const. art. II, § 3 .............................................................29

**Statutes**

18 U.S.C. § 921 ......................................................... 1, 5, 7, 25

26 U.S.C. § 5811 ......................................................................5

26 U.S.C. § 5812 ......................................................................5

26 U.S.C. § 5845 ......................................................... 1, 5, 25

26 U.S.C. § 5871 ...................................................................................... 3

28 U.S.C. § 1292 ....................................................................................... 1

5 U.S.C. § 553 ................................................................................... 39, 41

5 U.S.C. § 706 ................................................................................... 24, 39

Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213
    (codified as amended at 18 U.S.C. § 921 *et seq.*) .................................. 1

National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236
    (codified at 26 U.S.C. § 5801 *et seq.*) ............................................... 1

## Regulation

Factoring Criteria for Firearms With Attached "Stabilizing Braces,"
    88 Fed. Reg. 6,478 (Jan. 31, 2023) ............................................... *passim*

## Other Authorities

15 The Public Records of the Colony of Connecticut 191 (1890) ........................ 19

1775-1776 Mass. Acts 18 .................................................................... 18

2 General Laws of Massachusetts from the Adoption of the
    Constitution to February 1822 (1823) ............................................. 19

Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191
    (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)) .......................... 19

Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25
    (codified at 1879 Tex. Crim. Stat. 24) ............................................ 19

Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65 .................................... 18

Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352 ............................. 19

Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27 ................ 19

Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412 ........ 19

Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59......................... 19

Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210
    (codified at Kan. Gen. Stat. § 1003 (1901)) ..................................... 19

Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231 ..................19

An Act About Powder Money, 1759-1776 N.H. Laws 63 ......................................19

An Act to License the Carrying of Fowling Pieces and other Fire-
Arms, 1870 Haw. Sess. Laws 26, §§ 1-2 ......................................................19

An Act to Provide a License for the Sale of Pistols or Pistol Cartridges
within the Limits of this State, § 1, 1890 S.C. Acts 653 ......................................19

ATF, *Firearms Commerce in the United States: Annual Statistical
Update* (2020)..........................................................................................17

Colonial Laws of Massachusetts Reprinted from the Edition of 1672
(1890)......................................................................................................19

County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28 ......................................19

Factoring Criteria for Firearms With Attached "Stabilizing Braces,"
86 Fed. Reg. 30,826 (June 10, 2021)............................................. *passim*

Laws of the Commonwealth of Massachusetts from November 28,
1780 to February 28, 1807 (1807)..........................................................18

Laws of the State of Maine 546 (1830) ..............................................................18

Laws of the State of New Hampshire; with the Constitutions
of the United States and of the State Prefixed 277 (1830)...................................19

Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S.
Dep't of Just., Bureau of Alcohol, Tobacco, Firearms & Explosives,
#3311/2013-0172, (Nov. 26, 2012) .......................................................8

Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34...............................................19

The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12
(James T. Mitchell & Henry Flanders comps. 1911) ..........................................19

U.S. Patent No. 8,869,444 B2 (issued Oct. 28, 2014) ...............................................6

Joseph Abram Walker, The Revised Code of Alabama 169 § 10
(Reid & Screws, State Printers, 1867)..................................................................19

## JURISDICTION

This Court has jurisdiction for this appeal from the denial of a preliminary injunction under 28 U.S.C. § 1292(a)(1).

## ISSUES

1.     Whether the Final Rule treating braced pistols as short-barreled rifles likely violates the U.S. Constitution and/or the Administrative Procedure Act.

2.     Whether the district court erred in failing to preliminarily enjoin enforcement of the Final Rule.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 ("NFA") (codified at 26 U.S.C. § 5801 *et seq.*) and the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 ("GCA") (codified as amended at 18 U.S.C. § 921 *et seq.*), treat handguns and pistols—which the GCA defines as firearms with "a short stock" designed to be fired with one hand, 18 U.S.C. § 921(a)(30)—differently from rifles, which are "designed or redesigned, made or remade, and intended to be fired from the shoulder," 26 U.S.C. § 5845(c); 18 U.S.C. § 921(a)(7). Pistols and handguns are not subject to the more onerous obligations and requirements of the NFA, but many rifles are. 26 U.S.C. § 5845(a)(3)-(4), (e).

Many pistol owners attach a brace to their pistols, commonly called a stabilizing brace, for added support and stability when firing their pistols ("braced

pistols"). Such lawfully configured pistols remain exempt under the NFA, both under the plain meaning of the text of the NFA and under the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF") decade-long implementation of the same.

But on January 31, 2023, the Department of Justice and ATF (collectively "Agencies"), published a Final Rule reclassifying millions of braced pistols in the United States as federally regulated "rifles" and thus, due to their configuration, likely NFA-regulated "short-barreled rifles." Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6,478 (Jan. 31, 2023), https://www.federalregister.gov/d/2023-01001 ("Final Rule"). By that Final Rule, the Agencies immediately and effectively prohibited Appellant Maxim Defense Industries, LLC ("Maxim Defense") from selling braced pistols, as it had been lawfully doing for a decade, exempt from onerous NFA requirements and restrictions. It also destroyed the market for Maxim Defense's stabilizing braces, which it sold to original-equipment manufacturers and direct to consumers.

More, the Final Rule required individual Appellants Mock and Lewis, and the other lawful owners of at least 3 million affected firearms, 88 Fed. Reg. at 6,560, to either destroy or dispose of their property or, unrealistically, to register their firearms under the NFA by May 31, 2023, and submit to numerous added restrictions and increased risk of liability. Beyond the burdensome process of NFA registration,

additional background checks, and the submission of additional personal information, NFA weapons are subject to strict laws limiting their possession, transportation, storage, purchase, use, and sale. Failure to abide by these restrictions subjects gun owners to harsh criminal penalties—including a fine of up to $10,000 and imprisonment up to ten years. 26 U.S.C. § 5871. The Final Rule thus upends the legal landscape surrounding constitutionally protected arms—braced pistols—and vastly expands the Agencies' authority to impose criminal penalties on the possession, keeping, and transfer of millions of firearms not previously or properly subject to the NFA.

Appellants challenged the Final Rule and unsuccessfully sought a preliminary injunction of that rule or postponement of its effective date pending a merits decision. ROA.444, R.E.27. They then sought an injunction pending appeal in the district court, ROA.445, and subsequently received an injunction pending appeal in this Court after the district court did not expeditiously rule. R.E.28-29.

That injunction mitigated the harm the Final Rule was causing to Appellant Maxim Defense and, if continued, will allow it and many of Appellant Firearms Policy Coalition, Inc.'s ("FPC") corporate members to survive this appeal. It also protects Individual Appellants Mock and Lewis and FPC's individual members who faced irreparable choices once the Final Rule became effective as to individuals that own braces and braced pistols. Absent such relief, they either would have had to

3

register their constitutionally protected arms and be regulated under the NFA or had to functionally destroy their braced pistols or stabilizing braces.

The merits panel should extend the interim relief pending appeal into a preliminary injunction. The Final Rule violates the Second Amendment and is not authorized by the NFA. But even if the NFA is ambiguous enough to allow for the Final Rule, then the Final Rule is barred by lenity and reflects an unconstitutional delegation of authority to the Agencies. The Final Rule also violates the First Amendment by considering the speech of manufacturers and third parties, is hopelessly vague, and violates both the substantive and notice provisions of the APA. On each of these points, Appellants are likely to succeed on the merits.

Given the harms Appellants and lawful gun owners nationwide face, each of the equitable factors also support an injunction, as the motions panel already found. This panel should ensure that any injunction it enters goes further than the injunction pending appeal and protects not only Appellants and those connected to them, but also enjoins the Agencies from implementing the Final Rule at all. The immediate and irreparable harms Appellants faced before this Court granted them relief are also being felt nationwide. This Court has authority to declare the Final Rule unconstitutional and in violation of the APA and has authority over the Agencies in general. It should exercise that authority to prevent the inevitable and irreparable

harm that will otherwise result if the Final Rule remains in effect as this case proceeds to final judgment.

## STATEMENT

The NFA imposes severe taxes, burdens, delays, and restrictions upon the acquisition, possession, transfer, and lawful use of the arms it regulates. 26 U.S.C. §§ 5811 ($200 tax), 5812 (other burdens).[1] Pistols are expressly excluded from NFA restrictions and obligations. 26 U.S.C. § 5845(e). Short-barreled rifles ("SBRs"), however, are covered by the NFA. *Id.* § 5845(a)(3)-(4).

An SBR is an NFA-regulated "firearm" defined as "a rifle having a barrel or barrels of less than 16 inches in length; [or] a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length[.]" *Id.* A "rifle" is defined by the NFA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). Though "pistol" is not defined in the NFA, the GCA defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30).

This case involves the Agencies' attempt to reclassify NFA-exempt braced pistols as NFA-restricted SBRs. Stabilizing braces assist all people, including those

---

[1] Such firearms cannot be transferred or possessed, for example, without first obtaining approval from the Secretary of the ATF. NFA-registered firearms are also subject to limits on travel and must be stored differently than all other firearms.

having disabilities or limited strength or mobility, with the safe and comfortable one-handed firing of pistols. Stabilizing braces do so by attaching to a pistol on one end and wrapping around the wrist or forearm on the other end to "permit[] a user to handle and support a handgun without straining the user's arm, hand, or wrist" by "more evenly distribut[ing]" the weight of the handgun "through the user's hand, wrist, and forearm."[2] Braced pistols are thus *designed* to be fired with one hand—a reality reflected in the patent, which illustrates the way that braced pistols attach to the forearm.[3]



FIG. 1



FIG. 2          FIG. 3

---

[2] *See* U.S. Patent No. 8,869,444 B2 col. 3 ll. 22-23, col. 5 ll. 52-53 (issued Oct. 28, 2014), https://tinyurl.com/mr3esfhu.

[3] *Id.* at figs. 1, 2 & 3.

This reality is also reflected in images found in the Final Rule itself. [4]



**2012 submission of original "stabilizing brace" attached to an AR-type pistol**

Under the Final Rule, the only difference between an NFA-regulated SBR and an NFA-exempt pistol is the addition of the stabilizing brace or any other item that the Agencies believe could serve a similar function. The images below, for example, are NFA-exempt pistols that have short stocks and are "designed to be held and fired by the use of a single hand." 18 U.S.C. § 921(a)(30). But once configured with a brace, the Final Rule treats both as SBRs even though the brace exists to facilitate single-handed firing.



By contrast, a rifle is designed to be fired with two hands from the shoulder and uses the stock on the back and the second hand up front to stabilize the firearm.

---

[4] Final Rule, 88 Fed. Reg. at 6,483.

Since their initial classification by ATF in 2012, stabilizing braces have broadly been understood not to alter the NFA-exempt classification of pistols to which they attach. Letter from John R. Spencer, Firearms Tech. Branch Chief, U.S. Dep't of Just., Bureau of Alcohol, Tobacco, Firearms & Explosives, #3311/2013-0172, (Nov. 26, 2012), https://tinyurl.com/2z7pz2v6. The Agencies' Final Rule, however, unilaterally erases the line between a non-NFA braced pistol and an NFA-regulated SBR.[5] The Final Rule amended the federal regulatory definitions of "rifle" to include an indeterminate, open-ended, six-factor test for deciding whether a braced pistol was designed and intended to be fired from the shoulder, and thus was an NFA-regulated "rifle." Final Rule, 88 Fed. Reg. at 6,574-75. Those factors are:

(i) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;

(ii) Whether the weapon has a length of pull,[6] measured from the center of the trigger to the center of the shoulder stock or other rearward accessory, component or attachment (including an adjustable or telescoping attachment with the ability to lock into various positions along a buffer tube, receiver extension, or other attachment method), that is consistent with similarly designed rifles;

(iii) Whether the weapon is equipped with sights or a scope with eye relief that require the weapon to be fired from the shoulder in order to be used as designed;

---

[5] Reclassifying a pistol as a rifle would likely create a "short-barreled" rifle since pistols typically have barrels less than 16 inches long.

[6] The "length of pull" is the distance between the trigger to the butt of the firearm.

(iv) Whether the surface area that allows the weapon to be fired from the shoulder is created by a buffer tube, receiver extension, or any other accessory, component, or other rearward attachment that is necessary for the cycle of operations[7];

(v) The manufacturer's direct and indirect marketing and promotional materials indicating the intended use of the weapon; and

(vi) Information demonstrating the likely use of the weapon in the general community.

*Id.* The Final Rule also listed several pages of firearms that may be covered if they are configured with a stabilizing brace.[8]

As a result of these vague factors, at least 3 million lawfully possessed braced pistols—and potentially millions of other pistols that might be combined with a formal or informal "brace"—have been unilaterally converted by the Agencies to highly restricted NFA-regulated SBRs. Furthermore, under the Final Rule, it is now deemed unlawful for pistol owners to possess *any* item that could serve as a brace (or stock) under the new discretionary, non-exhaustive six-factor test, even if not actually attached to a pistol, given the risk of being charged with constructive possession of an unregistered SBR. The Final Rule thus effectively regulates all arms with a barrel of less than 16 inches to which one could theoretically attach a DIY

---

[7] The "cycle of operations" is the process taken "to expel a projectile by the action of an explosive." Final Rule, 88 Fed. Reg. at 6,485. A buffer tube, like that included in the image *supra*, at 7, on the right, is necessary for the cycle of operations for that firearm.

[8] *Id.* at 6,514-18, 6,535-37.

brace made from common household items, or any other device that the Agencies deem to meet their new, indeterminate test. The Final Rule went into effect upon publication for everyone—including manufacturers and dealers—but the Agencies chose not to enforce it for 120 days for individual gun owners. *Id.* at 6,478, 6,553.

Appellants sued the Agencies the same day the Agencies published the Final Rule. ROA.9-10. Appellants filed an Amended Petition seven days later and sought a preliminary injunction soon after. ROA.127; ROA.269. The district court denied the motion on March 30, 2023, finding that Appellants had not established that they were likely to succeed on any of their claims, though the court recognized that they might well succeed on a more developed record. ROA.429-44, R.E.12-27.

First, the district court held that Appellants had not shown that the Agencies exceeded their statutory authority. ROA.435-36, R.E.18-19. Rather, finding that "the statute includes ambiguous terms in its definition of rifle" such as "designed," "redesigned," "remade," and "intended," the court concluded that such terms "necessarily require the enforcing agency—or anyone who would comprehend the statute's meaning—to evaluate objective weapon characteristics, and perhaps conduct, to decide whether a particular firearm is subject to the NFA." ROA.436, R.E.19. It thus concluded that such ambiguous language justified an indeterminate Final Rule addressing whether the addition of a brace "actually redesigns a firearm or remakes a firearm sufficiently [in]to a short-barreled rifle." ROA.436, R.E.19.

Regarding Appellants' APA procedural challenge that the vague and indeterminate Final Rule was not a logical outgrowth of the score-based Proposed Rule, the district court held that the rule was interpretive, rather than legislative, and thus did not need to comply with the logical-outgrowth test. ROA.436-38, R.E.19-21. It further held that the Final Rule *was* a logical outgrowth of the Proposed Rule and hence the Notice of Proposed Rulemaking, Factoring Criteria for Firearms With Attached "Stabilizing Braces," 86 Fed. Reg. 30,826 (June 10, 2021) ("Proposed Rule"), provided adequate notice for the eventual Final Rule. ROA.438, R.E.21.

Regarding Appellants' constitutional claims, the district court again found that Appellants would be unlikely to succeed on the merits. ROA.438-43, R.E.21-26. *First*, the district court considered Appellants' claim regarding improper delegation of legislative authority, relying on its previous holding that the Final Rule was merely a valid interpretation of the statute, rather than a legislative expansion of the statute. It likewise held that the Rule of Lenity was inapplicable. ROA.439, R.E.22.

*Second*, the district court rejected Appellants' First Amendment claims, holding that the First Amendment was not implicated because "the government is permitted to listen to what [manufacturers] say about the products they manufacture[] and purchase." ROA.440, R.E.23 (citing *Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282-83 (D.C. Cir. 2019)).

11

*Third*, the district court rejected Appellants' Fifth Amendment vagueness claim, citing a footnote in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982), to conclude that vagueness only offends the Constitution when there is no standard at all for evaluating conduct. ROA.440-41, R.E.23-24. The court then found that because the imprecise six factors gave *some* standard to the public, "it is comprehensible enough to put a person of ordinary intelligence on notice that their weapon *may* be subject to federal firearms laws." ROA.441, R.E.24 (emphasis added).

*Finally*, regarding Appellants' Second Amendment claims, the district court held that the Final Rule merely regulates the use of stabilizing braces, and traditional registration and licensing requirements are not barred by the Second Amendment. ROA.441-43, R.E.24-26 (citing *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2162 (2022) (Kavanaugh, J., concurring)).[9] The district court incorrectly claimed that stabilizing braces are regulated *only* when they are attached to firearms and hence the purchase of a pistol brace alone is unaffected. ROA.442, R.E.25. Then, the district court concluded that because insufficient historical evidence had been

---

[9] The district court incorrectly conflated licensing and registration regimes. But Justice Kavanaugh's concurrence only speaks of the former and makes no reference to the latter.

presented at this stage in litigation, Appellants had not established a likelihood of success on the merits. ROA.443, R.E.26.

Having determined that Appellants were unlikely to succeed on the merits, the district court declined to consider the remaining preliminary-injunction factors and denied the motion. ROA.443-44, R.E.26-27. Appellants immediately sought an injunction pending appeal below, ROA.445, and—after waiting several weeks— filed a parallel motion here as the deadline for individual firearm owners approached. The motions panel granted the injunction pending appeal "as to the Plaintiffs in this case." R.E.29. Appellants then sought clarification that "Plaintiffs" included relief for FPC's members, Maxim Defense's customers (including the intermediaries necessary to sell and transfer firearms under federal law), and the Individual Plaintiffs' resident family members. The merits panel granted that motion and held that the injunction provided that protection. R.E.30-31.

## STANDARD OF REVIEW

Courts review the denial of a preliminary injunction for an abuse of discretion, factual findings for clear error, and legal conclusions *de novo*. *Garcia v. Jones*, 910 F.3d 188, 190 (5th Cir. 2018). "To obtain . . . a preliminary injunction, a movant must show: (1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an

injunction will not disserve the public interest." *Louisiana v. Biden*, 55 F.4th 1017, 1022 (5th Cir. 2022) (internal citations omitted).

## ARGUMENT

## I.    APPELLANTS ARE LIKELY TO SUCCEED ON THE MERITS

As the motion panel necessarily concluded when it granted an injunction pending appeal, the district court erred in finding that Appellants were unlikely to succeed on the merits.

### A.    The Final Rule violates the Second Amendment.

The district court's analysis of Appellants' Second Amendment protected rights incorrectly flipped the burden of proof by faulting *Appellants* for not providing historical evidence showing a lack of historical analog to the Final Rule even though this Court's precedent correctly places that burden on the government. *United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir. 2023), *petition for cert. docketed,* No. 22-915 (U.S. Mar. 21, 2023). Because braced pistols, however categorized under the Final Rule, are plainly bearable arms, the burden of historical proof rests with the government and any lack of historical evidence to justify restrictions on such arms confirms Appellants' likelihood of success on the merits.

"[T]he standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation

14

by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Bruen*, 142 S. Ct. at 2129-30 (cleaned up).

There is no serious question that the Final Rule, which regulates the keeping and bearing of braced pistols, falls within the plain text of the Second Amendment. U.S. Const., amend. II ("[T]he right of the people to keep and bear Arms, shall not be infringed."). "Just as the First Amendment protects modern forms of communications, . . . the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *District of Columbia v. Heller*, 554 U.S. 570, 582 (2008); *accord Bruen*, 142 S. Ct. at 2132, 2143. The Final Rule applies to *firearms* with braces attached, *firearms* capable of accepting them, or any item that *could* convert a pistol into a rifle under the Agencies' new regulation.[10] Braces alone are regulated only if

---

[10] The Agencies argue that a stabilizing brace, standing alone, is a "firearm accessory," not a Second Amendment protected "bearable arm." ROA.384 (citing *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018)). That same sophistry could apply to the grip of a pistol, a trigger, a barrel, a rifle stock, and any of the myriad firearm parts that make up various arms. But accepting it would mean the government could declare a single permissible variation of firearm, forbid the use of *any* different "accessories," and thus avoid constitutional scrutiny for a regulation that banned virtually all firearms on the excuse that there remained a single available firearm configuration. *Contra District of Columbia v. Heller*, 554 U.S. 570, 582 (2008).

15

attached *to* or constructively possessed *with*, a pistol, and thus the regulation falls upon the pistol, not the brace as an *objet d'art*. And whether this Court views a braced pistol as a handgun or a short-barreled rifle, both are presumptively protected bearable arms and are in common use. *See Heller*, 554 U.S. at 628-35; *Bruen*, 142 S. Ct. at 2128.

That presumption can only be overcome if the Agencies—not Appellants— meet their burden of "affirmatively prov[ing] that [their] firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" and is thus "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126-27; *accord Rahimi*, 61 F.4th at 453, 455. That burden is the Agencies' alone. Appellants are not obligated to prove a negative—the absence of historical firearm restrictions.

Contrary to *Bruen* and *Rahimi*, the district court here incorrectly faulted Appellants for what it deemed their "minimal historical analysis." ROA.443, R.E.26. This gets the analysis backwards. Any lack of "historical analysis" in the briefing reflects the government's failure to carry its burden and rebut the "presumptive" protections of the Second Amendment. *Rahimi*, 61 F.4th at 450, 453, 454. And the district court ignored that *Bruen* and *Heller* identified only one aspect of our history sufficiently analogous to, and therefore capable of justifying, a broad ban or sweeping regulation of a category of arms: the history of restricting "dangerous and

unusual weapons" not "in common use at the time." *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627). The Supreme Court already conducted this analysis when it comes to semiautomatic arms, determining that they are in common use and cannot be subjected to ahistorical bans or regulation. *See Heller*, 554 U.S. at 624, 627-28.

But even if the Supreme Court had not conducted such an analysis, the conclusion that braced pistols are in common use is unavoidable. The Final Rule itself recognizes that over a million Americans own—conservatively—3 million pistol braces. 88 Fed. Reg. at 6,560. ATF also reported 460,544 registered short-barreled rifles in circulation in 2020. ATF, *Firearms Commerce in the United States: Annual Statistical Update* 15 (2020), https://tinyurl.com/dhvwsdj8.[11] In *Caetano*, Justice Alito recognized that stun guns were "widely owned and accepted" when they were only owned by about 200,000 civilians. *Caetano v. Massachusetts*, 577 U.S. 411, 420 (2016) (Alito, J., concurring in the judgment). Whether pistols or SBRs, the Final Rule thus regulates the ownership of a bearable arm in common use falling easily within the textual protection of the Second Amendment and outside the historical tradition of firearm regulation.

---

[11] Indeed, even assuming, *arguendo*, that braced pistols are SBRs that means SBRs are *more* common than they otherwise would be.

Given such textual coverage and presumptive constitutional protection, the Agencies failed to establish even a passing likelihood that they will provide the historical record necessary to justify the Final Rule. To the contrary, the only statutes cited below—and in opposition to the motion for an injunction pending appeal here—to support the Final Rule were questionable outliers that do not comprise a historical *tradition* of limitation on the right to keep and bear arms. Indeed, even the few statutes the Agencies could find come from inapposite time periods either long before or long after the Second Amendment's ratification—the unquestionably relevant period for *federal* regulations. The Agencies' cited statutes are also substantively different. For example, they cited 17th- and 18th-century militia laws allowing militia officers to ensure that militiamen had the requisite arms (but did not *restrict* such arms), ignoring those parts of colonial statutes that *required* individuals to have stabilizing rests for their muskets;[12] 19th-century laws requiring firearms be tested before being sold to ensure that the barrel would not explode;[13] several laws over the course of nearly 250 years (from 1651 to 1899) requiring "[l]icenses or inspection" for random activities ranging from gunpowder exportation to

---

[12] ROA.389 (citing 1775-1776 Mass. Acts 18; Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 65).

[13] ROA.389 (citing Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28, 1807, at 259-61 (1807); Laws of the State of Maine 546 (1830)).

participating in "sporting" activities—including one from Hawaii three decades before it was a U.S. territory;[14] and several state taxation statutes from the 19th century.[15] But none of those laws come close to requiring the registration and taxation of commonly owned arms or imposing harsh post-registration requirements like the NFA does on the transportation, storage, and use of firearms.

Even if they did, both *Heller* and *Bruen* hold that a few outlier laws are inadequate, *see Heller*, 554 U.S. at 632; *Bruen*, 142 S. Ct. at 2142, and the outlier laws cited by the Agencies do not enlighten the scope of the *right* as understood at

---

[14] ROA.390 (citing Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126 (1890); 2 General Laws of Massachusetts from the Adoption of the Constitution to February 1822, at 199 (1823); 15 The Public Records of the Colony of Connecticut 191 (1890); Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 277 (1830); An Act to Provide a License for the Sale of Pistols or Pistol Cartridges within the Limits of this State, § 1, 1890 S.C. Acts 653; Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at Ark. Code. Ann. ch. 48 § 1498 (1894)); Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24); Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at Kan. Gen. Stat. § 1003 (1901)); Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352; Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; An Act to License the Carrying of Fowling Pieces and other Fire-Arms, 1870 Haw. Sess. Laws 26, §§ 1-2; Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32-33.

[15] ROA.390 (citing An Act About Powder Money, 1759-1776 N.H. Laws 63; The Statutes at Large of Pennsylvania, ch. 1857, §§ 1-12, 346-51 (James T. Mitchell & Henry Flanders comps. 1911); Joseph Abram Walker, The Revised Code of Alabama 169 § 10 (Reid & Screws, State Printers, 1867); Act of Feb. 24, 1844, ch. 1, § 1, 1844 Miss. Laws 57-59; Act of Feb. 21, 1867, ch. CCCXVII, §§ 1-8, 1867 Miss. Laws 412; Revenue, ch. 34, § 23(4), 1857 N.C. Sess. Laws 34; County Bonds, Taxes, Etc. tit. VI, 1866 Ga. Laws 27-28.

the Founding. *See Bruen*, 142 S. Ct. at 2143-46, 2154 & n.28. And, as Texas explained in its brief supporting the injunction pending appeal, "voluminous historical evidence . . . confirm[s] that the Brace Rule is an unconstitutional infringement on the right to bear arms." Br. for Amicus Curiae State of Texas et al. in Supp. of Mot. for Inj. Pending Appeal 5 n.4 (ECF No. 43) ("Texas MIPA Br.").

The district court also sought to sidestep the Second Amendment analysis by stating that the Final Rule "does not ban stabilizing braces, nor firearms equipped with them," but requires only "regulated individuals and entities" to "register[] the weapons with ATF or permanently detach[] the brace from the pistol." ROA.442, R.E.25. But this is incorrect.[16]

First, beyond just "registration," owners of NFA firearms are subject to additional onerous and ongoing compliance requirements, enhanced criminal penalties designed to discourage transactions in firearms, and a $200 tax. *See supra* at 5. Those substantial restrictions go well beyond registration and limit a person's ability to keep and bear braced pistols. Furthermore, the government cannot "impose

---

[16] The district court incorrectly suggested, ROA.442-43, R.E.25-26, that detached braces could be owned and sold. The Final Rule, however, demands not merely detachment of any braces, but rendering them *incapable* of being attached at all, effectively destroying them for their only purpose. 88 Fed. Reg. at 6,481. Merely separating pistols from still-functional braces risks prosecution for constructive possession of an NFA-regulated firearm. *See United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422-24 (6th Cir. 2006).

a charge for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).[17] No court would ever uphold a statute that required a Twitter user to pay the government $200, be placed on a government database before accessing the service, and comply with numerous restrictions on Twitter-enabled electronic devices. Nor would any court uphold a requirement that those subject to a search pay $200—and be placed on an Orwellian list—to invoke the Fourth Amendment's warrant requirement. By dismissing comparable conditions and restrictions on the exercise of Second Amendment protected rights, the district court violated *Bruen*'s prohibition on treating the right to keep and bear arms as a "second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees." *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).

While the Agencies relied below on *Bruen*'s footnote 9 to argue that registration regimes are categorically constitutional, in so doing they understated the nature of the restrictions here and overread the footnote. The NFA imposes many further restrictions beyond mere licensing for covered firearms, including restrictions on their possession, use, transport, transfer, and more. Registration is merely the start, not the end, of the NFA restrictions imposed by the Final Rule's

---

[17] The Agencies' temporary waiver of the $200 tax is irrelevant to the Final Rule's constitutionality as the tax has now resumed.

recategorization of pistols as SBRs. *Bruen*'s footnote does not endorse *any* possible restrictions attached to a "registration" requirement. Further, footnote 9 contemplates *licensing* regimes, not firearm registration. *See Heller v. District of Columbia*, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("Registration of all lawfully possessed guns—as distinct from licensing of gun owners or mandatory record-keeping by gun sellers—has not traditionally been required in the United States and even today remains highly unusual. Under *Heller*'s history- and tradition-based test, D.C.'s registration requirement is therefore unconstitutional."). Furthermore, *Bruen* struck down a licensing system that was less than a complete ban because even those partial restrictions were not proven to be within the historical limits on the scope of the right to bear arms. *Bruen*, 142 S. Ct. at 2156. The Agencies thus overread *Bruen*'s footnote 9 dicta and ignore the qualifier that even "shall-issue regimes" could still unconstitutionally burden the right to carry with "lengthy wait times" or "exorbitant fees." *Id.* at 2138 n.9; *see* ROA.64-65 ("[T]he Agencies commonly impose delays of many months to over one year with respect to acquiring the government's permission to take possession of the [NFA-covered] firearms at issue.").

Further, both the delay and threatened penalties from the NFA substantially discourage ownership of braced pistols. Under the Second Amendment, no less than with other constitutionally protected rights, "constitutional violations may arise from

the deterrent, or 'chilling,' effect of governmental efforts that fall short of a direct prohibition." *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (cleaned up). For these reasons, the Court was wrong to find no violation of the Second Amendment just because the Final Rule graciously declines to impose a total and complete prohibition on the right to own braced pistols.

Given the arms at issue are presumptively protected, according to *Bruen*, the absence of historical justification in this case must fall against the Agencies. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 336-38 (5th Cir. Unit B Nov. 1981) ("The application of an improper legal standard in determining the likelihood of success on the merits is never within the district court's discretion.") (citation omitted). Under the proper Second Amendment standard, Appellants are extremely likely to succeed on the merits.

### B.    The NFA does not authorize the Final Rule.

The Final Rule is also unlawful (1) because it is not authorized by the NFA, which excludes pistols and handguns; (2) because any statutory ambiguity triggers the Rule of Lenity; (3) because the NFA is an unconstitutional delegation of authority if it authorizes the indeterminate and sweeping Final Rule; and (4) because if the Final Rule is permissible under the statutes, the rule and statutes are unconstitutionally vague.

### 1.    The text of the NFA does not authorize the Final Rule.

The Final Rule, which redefines the term "rifle" to encompass what the NFA's plain terms exclude, is an impermissible reading of the plain limits of the statute.

The APA requires courts to "hold unlawful and set aside agency action . . . found to be . . . in excess of statutory . . . authority." 5 U.S.C. § 706(2)(C). An agency whose regulation conflicts with statutory definitions has exceeded its authority. *See Peyton v. Reynolds Assocs.*, 955 F.2d 247, 251 (4th Cir. 1992) ("If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation."). As the Supreme Court stated in *West Virginia v. EPA*, "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." 142 S. Ct. 2587, 2609 (2022) (cleaned up).

Courts interpreting statutes follow the "plain meaning of [the statute] and the statutory framework," *J&J Sports Prods., Inc. v. Mandell Fam. Ventures, LLC*, 751 F.3d 346, 353 (5th Cir. 2014), employing "traditional tools of construction" by looking to a statute's "text, structure, history, and purpose," *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019) (cleaned up), before deferring to an agency interpretation.[18]

---

[18] Deference is particularly inappropriate here because 1) the statute unambiguously does not apply to braced pistols, 2) the Final Rule carries criminal

The GCA defines a "rifle," *inter alia,* as a "weapon designed or redesigned, made or remade, and intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The NFA has a near identical definition. 18 U.S.C. § 921(a)(7). A short-barreled rifle is defined as "a rifle having one or more barrels less than sixteen inches in length and any weapon made from a rifle (whether by alteration, modification, or otherwise) if such weapon, as modified, has an overall length of less than twenty-six inches." 18 U.S.C. § 921(a)(8). On the other hand, the GCA defines a "handgun" as "(A) a firearm which has a short stock and is designed to be held and fired by the use of a single hand; and (B) any combination of parts from which a firearm described in subparagraph (A) can be assembled." 18 U.S.C. § 921(a)(30).

A braced or stabilized pistol—like any other handgun—is designed to be held and fired by a single hand and is thus exempt from the NFA. 26 U.S.C. § 5845(a)(3)-(4), (e). Indeed, the very point of a stabilizing brace is to *facilitate* the one-handed operation of a pistol. That the brace, which is fitted to the tail end of the firearm, is designed to attach to the forearm belies any suggestion in the Final Rule that braced pistols are designed to be fired from the shoulder, even if such a brace *might* be fired from the shoulder contrary to its design. Indeed, the possibility of shoulder-firing no

---

penalties; (3) the agency changed its position; and (4) deference has not been invoked. *Cargill v. Garland*, 57 F.4th 447, 464-69 (5th Cir. 2023) (en banc), *petition for cert. docketed*, No. 22-976 (U.S. Apr. 7, 2023).

more makes a braced pistol a rifle than does the potential to fire a true rifle with one hand convert it into a pistol.[19] For this reason, the Agencies' repeated claim that the mere possibility of a pistol being used contrary to its plain design and intent is enough to convert it into an NFA-regulated SBR only highlights the impermissible breadth and ambiguity of the Final Rule.

Worse still, the Final Rule's new multi-factor analysis only further removes the Final Rule from the inquiry of whether a braced pistol is designed to be fired by the use of a single hand or from the shoulder by considering wholly irrelevant factors like the relative weight of the braced pistol and even indirect statements made by manufacturers or the conduct of third parties. Final Rule, 88 Fed. Reg. at 6,574-75. The plain text of the NFA and GCA do not encompass such subjective statements from a manufacturer or third parties, nor do they include discretionary, undefined factors to assess all *potential* uses of a firearm. The statutory emphasis is on the actual design of the firearm and the intent of the manufacturer. Because braced pistols are expressly and overtly designed to facilitate one-handed—not shouldered—firing, the plain text of the NFA unambiguously excludes braced pistols from its reach and restrictions.

---

[19] The Agencies' earlier attempt to replace actual design intent with what they falsely describe as "objective" factors ignores their own long-held position that manufacturers' intent trumps any potential for contrary use. Texas MIPA Br., *supra*, at 9 & n.5 (ECF No. 43).

## 2. If supposedly ambiguous statutory text might allow the regulation of braced pistols, then the Rule of Lenity applies.

If the Court nevertheless concludes, as the district court did, that the plain text of the NFA is ambiguous enough to allow the Final Rule, it should apply the Rule of Lenity to reject the Agencies' newly asserted authority to regulate braced pistols.

"[A]mbiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (en banc) (citation omitted), *petition for cert. docketed*, No. 22-976 (U.S. Apr. 7, 2023). A statute is ambiguous if, after a court has "availed [itself] of all traditional tools of statutory construction," the Court is left to "guess at its definitive meaning" among several options. *Id.* (cleaned up). In those circumstances involving ambiguous criminal statutes, the Court is "bound to apply the rule of lenity." *Id.* at 471. Though this Court has not decided whether lenity applies only if a statute is "grievously ambiguous" or instead applies when there is even "reasonable doubt" as to the statute's meaning, *id.* at 469, if the Court determines that the statute permits the highly indeterminate Final Rule, the statute is ambiguous enough under either standard.

The district court concluded that the statutory definition of rifle "includes ambiguous terms." ROA.436, R.E.19. But rather than viewing that ambiguity as a reason to apply the Rule of Lenity and adopt a narrow construction of those terms, it held that the ambiguity "necessarily require[d] the enforcing agency—or anyone

who would comprehend the statute's meaning—to evaluate" various factors to determine whether the relevant object was a "rifle." ROA.436, R.E.19. That approach is wrong under this and the Supreme Court's precedents. *See Sackett v. EPA*, 598 U.S. --, 2023 WL 3632751, at *15 (2023). A properly narrow statutory reading would preclude the hopelessly broad and unpredictable test adopted by the Final Rule. The district court's approach instead defends regulatory vagueness with statutory vagueness. Thus, whether an interpretive rule or a substantive legislative rule, the vagueness of the Final Rule, and the supposed statutory ambiguity on which the district court relied, trigger the Rule of Lenity and invalidate the Final Rule.

Even if this Court were to find that the statutory definition of a "rifle" is ambiguous enough to include a braced pistol, that is far from the most obvious reading of the statute—as shown by a decade of agency interpretations reaching the exact opposite result. *See* ROA.290-92 (summarizing past interpretations). In *Cargill*, this Court cited ATF's change of position on the status of bump-stocks as a reason deny deference to ATF's new interpretation. *Cargill*, 57 F.4th at 468. Likewise, the Sixth Circuit cited "ATF's own flip-flop in its position," regarding bump stocks, as evidence of the NFA's ambiguity. *Hardin v. ATF*, 65 F.4th 895, 898 (6th Cir. 2023). This Court should do the same here by looking to the Agencies' past interpretations as evidence that the Agencies' newfound interpretation, if not plainly wrong, at best demonstrates ambiguity. If the Agencies can—consistent with the

statute's text—reach two conflicting conclusions about what the language requires, then the statutory language is hopelessly ambiguous, and the Rule of Lenity applies.

### 3. If permissible under the statutes, then the Final Rule is an improper delegation of authority to the Agencies.

The concerns animating the Rule of Lenity also show why the Final Rule, if permitted, would reflect an improper delegation of authority to the Agencies contrary to the Constitution's structural protections.

Article I of the Constitution grants Congress the sole authority to craft legislation and create law. *See* U.S. Const. art. I, § 1. On the other hand, the President, and by extension, the Executive Branch departments under his purview, "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. "In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952). This separation of powers is "a basic principle of our constitutional scheme" under which "one branch of the Government may not intrude upon the central prerogatives of another." *Loving v. United States*, 517 U.S. 748, 757 (1996).

The Supreme Court has repeatedly "reaffirmed[ed] the core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). As this Court has explained, this limitation means agencies "cannot manufacture statutory ambiguity with semantics to enlarge their congressionally mandated border." *Tex. Pipeline Ass'n v. FERC*, 661 F.3d 258, 264 (5th Cir. 2011).

If agencies are given authority to create a legislative rule, that authority requires "a *clear delegation*" from Congress. *West Virginia*, 142 S. Ct. at 2616 (emphasis added).

The clear-delegation requirement refutes the idea that agencies can answer questions "left unresolved" in a statute "merely because a statute's 'authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope.'" *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)). Indeed, it forbids courts from "presum[ing] that a power is delegated if Congress does not expressly withhold it, as then agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Contender Farms, LLP v. U.S. Dep't of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015) (internal citation omitted); *see also Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 461 (5th Cir. 2020).

For the reasons addressed above, the Final Rule is not clearly authorized by the NFA, and the Court should therefore reject the Agencies' newly asserted authority to regulate braced pistols under the NFA and to prosecute potential violations that accompany such expanded regulation. "[B]ecause of the seriousness of criminal penalties, and because criminal punishment usually represents the moral condemnation of the community, legislatures . . . should define criminal activity."

*United States v. Bass*, 404 U.S. 336, 348 (1971). "[T]he question of Congress's delegating legislative power to the Executive in the context of criminal statutes raises serious constitutional concerns." *Cargill*, 57 F.4th at 472.

Despite the Final Rule being a new expansion of what the NFA covers, and new power over new items not regulated by statute, the district court incorrectly held that the rule was interpretive and not substantive. ROA.437, R.E.20. In doing so, the district court ignored not only the Final Rule's deviations from the textual language, but also ignored the "flight of power from the legislative to the executive branch" by the Agencies' efforts to expand their regulatory and prosecutorial reach. *Gundy v. United States*, 139 S. Ct. 2116, 2142 (2019) (Gorsuch, J., dissenting). These separation-of-powers concerns are another reason why the statutory definitions should be read narrowly to exclude the Final Rule, why they would be unconstitutional if they were not so read, and hence why Appellants are likely to succeed on the merits.

### 4.     The Final Rule is unconstitutionally vague.

The many uncertainties relating to how the Final Rule will be enforced acutely illustrate why the district court should have invalidated the Final Rule as void for vagueness.

The vagueness doctrine states that "[a] law is unconstitutionally vague if people of common intelligence must guess at its meaning and differ as to its

application*." Shamloo v. Miss. State Bd. of Trustees of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980). This limitation is grounded in principles of fair notice and the "twin constitutional pillars of due process and separation of powers." *United States v. Davis*, 139 S. Ct. 2319, 2325 (2019). Laws must provide fair notice to citizens of the conduct the laws proscribe so as to "guard[] against arbitrary or discriminatory law enforcement[.]" *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018); *accord FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

The need for clarity is heightened when laws attach criminal consequences. *See Davis*, 139 S. Ct. at 2323. "Where a penal statute could sweep so broadly as to render criminal a host of what might otherwise be considered ordinary activities," the Supreme Court has "been wary about going beyond what Congress certainly intended the statute to cover." *Sackett*, 2023 WL 3632751, at *15 (cleaned up). And if statutes governing "ordinary activities" require heightened clarity, *id.*, then statutes that "threaten[] to inhibit the exercise of constitutionally protected rights" require even greater clarity. *Vill. of Hoffman Ests.*, 455 U.S. at 499; *Smith v. Goguen*, 415 U.S. 566, 572-73 (1974).

Under these principles, the Final Rule is unconstitutionally vague because it, and the Agencies' interpretation of the underlying statutes, provide no meaningful clarity on what constitutes an impermissible stabilizing brace or what other items may convert a pistol into a rifle under the Final Rule's multi-factor test. The multi-

factor test incorporates both so-called "objective design features" and "other factors," the latter of which are inherently subjective. Final Rule, 88 Fed. Reg. at 6,500. Worse, included in "other factors" are actions by third parties such as the "manufacturer's direct and indirect marketing and promotional materials" and how a firearm is used by others. Final Rule, 88 Fed. Reg. at 6,480. Such statements or actions are not necessarily knowable to the end user, endangering the principle of proper notice. While a manufacturer's direct statements to purchasers might be tracked, the Final Rule's subjective factors also include "indirect" statements and "[i]nformation demonstrating the likely use of the weapon in the general community[,]" thus criminalizing law-abiding gun owners based on the statements and actions of unknown, unaffiliated, and uncontrollable third parties. Final Rule, 88 Fed. Reg. at 6,479.

If this vagueness is not eliminated or reduced by applying the Rule of Lenity, then the Final Rule is void for vagueness. Though the district court suggested that the Final Rule is "comprehensible enough," even if imprecise, ROA.441, R.E.24, this, again, gets things wrong. To be sure, as the district court recognized, a law is unconstitutionally vague if it is "so standardless that it invites arbitrary enforcement." *Beckles v. United States*, 580 U.S. 256, 262 (2017) (citation omitted). But the district court ignored that a law is also void for vagueness if it "fails to give ordinary people fair notice of the conduct it punishes." *Id*. Given that the district

court concluded that the "six criteria by which ATF will make a weapons classification are non-dispositive, and therefore imprecise," ROA.441, R.E.24, it also should have found that those factors failed to give "fair notice." If the Agencies themselves are so perplexed by the statutory definitions of "handgun" and "rifle" that they require an indeterminate six-factor test to determine whether a particular braced pistol is a rifle, then Appellants and other gun owners cannot possibly know from the statute or the Final Rule what items subject them to regulation and potential criminal penalties. And given that the possession of *any* item that the Agencies determine may convert a pistol into a rifle subjects individuals to potential criminal liability for unlawful constructive possession of an unregistered SBR, the consequences of getting that question wrong are enormous.[20] Accordingly, the Final Rule—far from being "comprehensible enough"—is unconstitutionally vague.

## C.    The Final Rule Violates the First Amendment.

The district court also erred by failing to find that Appellants are likely to show that the Final Rule violates the First Amendment by allowing the Agencies to more stringently regulate firearms based on statements made by manufacturers and other third parties, thus chilling protected speech.

---

[20] The Final Rule's facial vagueness, moreover, is also shown by the fact that the Director of ATF himself is unsure about what the Final Rule requires. *See* Texas MIPA Br., *supra*, at 3 (ECF No. 43) (explaining the ways ATF's director got the Final Rule wrong before Congress).

34

Regulations that chill or compel speech, like outright prohibitions on speech, "abridge" the freedom protected by the Free Speech Clause. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("The First Amendment generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed."). This Court has thus recognized that "the First Amendment goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *Turner v. Lt. Driver*, 848 F.3d 678, 688 (5th Cir. 2017) (cleaned up). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

The district court downplayed the ways that the Final Rule uses the speech of manufacturers, purchasers, and third parties to determine whether a particular object converts a pistol into an SBR, effectively penalizing such speech. By using their speech against them, the Final Rule impermissibly chills speech based on the speech's content and is subject to—and would fail—strict scrutiny. Furthermore, the vagueness described above likewise demonstrates that the Final Rule will chill the exercise of First and Second Amendment protected rights.

The district court suggested, ROA.440, R.E.23, that basing potential NFA coverage and criminal liability on the direct and indirect speech of manufacturers and others precluded no one from speaking, but only meant that the government would "listen" to such speech when deciding whether they have violated the law. Even though some speech may be the basis for criminal liability—solicitation of a crime or incitement, for example—any vague standard that threatens to chill more speech than strictly necessary is unconstitutional. For example, statements by third parties that a firearm designed and intended to be fired with one hand *could* be used differently and *could* be fired from the shoulder are certainly protected speech but risk converting NFA-exempt pistols into NFA-regulated SBRs under the Final Rule—without any actual change to the firearm.

There is no compelling state interest in regulating manufacturer, purchaser, and third-party speech about stabilizing braces given that the Agencies have permitted the sale and advertisement of stabilizing braces and braced pistols for over a decade. The government cannot now claim an overwhelming need to regulate these braces—and speech about them—after sitting on its hands for so long. Nor can the Agencies establish a compelling interest by pointing to vague statements such as ATF having "traced numerous firearms equipped with a 'stabilizing brace' in connection with crimes in recent years," ROA.301 at n.14 (quoting Final Rule, 88

Fed. Reg. at 6,508).[21] Just like the Second Amendment protected right to bear arms "is the very *product* of an interest balancing by the people," *Heller*, 554 U.S. at 635 (emphasis in original), short of narrow exceptions, the Agencies cannot point to harms they claim come from First Amendment activities as a justification for regulating those activities. Below, Appellees suggested a generic substantial interest in the proper enforcement of the NFA. ROA.400. That claim begs the question of NFA coverage and, as shown above, the Final Rule does not *enforce* the NFA, but unconstitutionally *supersedes* the NFA with the Agencies' own policy judgment.

The Final Rule also fails the tailoring required under strict scrutiny because there are less restrictive means of furthering the Agencies' asserted interests. Even the Proposed Rule's Worksheet 4999—which ignored speech altogether—was more narrowly tailored than the Final Rule. The Agencies could have avoided speech restrictions in the Final Rule as well by relying solely on the objective physical aspects of a firearm or brace. ROA.302. That manufacturers and purchasers will instead be subject to the vagaries of the Agencies' interpretation of marketing statements, some of which many purchasers may not even have seen or heard,

---

[21] Such statements do not even claim that such braced pistols were fired from the shoulder rather than by one hand. Indeed, they simply reflect a *policy* dislike for braced pistols that highlights the Final Rule's legislative nature.

confirms that the Final Rule will chill far more speech than necessary to address any supposed government interests.

In addition to creating uncertainty and chilling speech, the government violates the First Amendment when it regulates speech "based on the identity of the speaker." *See Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). "Speaker-based laws run the risk that the state has left unburdened those speakers whose messages are in accord with its own views." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2378 (2018) (cleaned up). The "First Amendment stands against attempts to disfavor" not only certain "viewpoints," but also certain "subjects." *Citizens United*, 558 U.S. at 340. The Final Rule explicitly disfavors certain viewpoints and speakers—manufacturers—as it decrees that "manufacturers' direct and indirect marketing and promotional materials" will be scrutinized by regulators in some unknowable way. Final Rule, 88 Fed. Reg. at 6,511.

The Final Rule's singling out of manufacturers impermissibly creates a speaker-based law that discourages any manufacturer speech that might lead the Agencies to declare those products to be short-barreled rifles (and their customers to be felons). ROA.300-02. By targeting such speech in their attempt to regulate stabilizing bracers, the Agencies thus unconstitutionally regulate speech "based on the identity of the speaker." *Citizens United*, 558 U.S. at 340.

**D.     The Final Rule violates the APA's Substantive and Notice Requirements.**

The APA requires courts to set aside agency action that is "contrary to constitutional right [or] power." 5 U.S.C. § 706(2)(B). If Appellants are likely to succeed on the statutory and constitutional claims discussed above, then they are also likely to succeed on their claim that the Final Rule violates the APA. Furthermore, the Court should find that the Appellants are likely to show that the Agencies violated the APA by failing to observe the required rulemaking procedures when they enacted the Final Rule. Reviewing courts "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . without observance of procedure required by law[.]" 5 U.S.C. § 706(2)(D).

The APA requires federal agencies to provide the public with a meaningful opportunity to comment on the elements of proposed rules and the materials that undergird the proposed rule. *See, e.g.*, 5 U.S.C. § 553(c*)*; *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). The APA ensures this by requiring that whenever an agency seeks to promulgate, amend, or repeal a regulation it must first issue a "notice of proposed rule making . . . in the Federal Register"—which must include, *inter alia*, "either the terms or substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). A corollary of this requirement is that "the final rule the agency adopts must be a logical outgrowth of the rule proposed." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007) (cleaned up). The baseline is that a notice of proposed rulemaking

is inadequate if it does not "indicate[] that the [agency] was contemplating a particular change" that appears in the final rule. *CSX Transp., Inc. v. Surface Transp. Bd.*, 584 F.3d 1076, 1081-82 (D.C. Cir. 2009); *see also Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 382 (5th Cir. 2021). Adequate notice ensures that those who will be affected can "anticipate[] the agency's final course." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).

Here, there is a substantial discrepancy between the Proposed Rule and its Worksheet 4999 and the Final Rule's indeterminate test such that the public (including Appellants) were not given adequate notice or the ability to comment on the substance of the Final Rule. The district court largely ignored that discrepancy by concluding that the Final Rule was "merely interpretive, not substantive," and hence not subject to the "logical outgrowth" requirement. ROA.437; R.E.20. But that conclusion was incorrect. In evaluating whether a rule is interpretive and not substantive, this Court considers "two criteria": "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015), as revised (Nov. 25, 2015) (cleaned up). Where a rule leaves genuine discretion to the agencies, it is more likely to be interpretive. *Id.* Under these criteria, the Final Rule is substantive. Though the agencies will be able to apply their test to different braced pistols, once they determine that a braced pistol is subject to the

Final Rule, that conclusion will control ATF's enforcement decisions and the burdens such decisions, even if ultimately unsuccessful, will impose on manufacturers and purchasers.[22] And the Final Rule will also affect the rights of gun owners who, for the first time, are now required to comply with the NFA's onerous requirements regarding their braced pistols in order to avoid criminal liability.[23]

Once the district court's erroneous conclusion that the Final Rule is merely "interpretive" is corrected, its error about the Final Rule violating the APA's logical-outgrowth requirement follows. The Agencies' focal point of the Proposed Rule was Worksheet 4999 ("Worksheet"). Proposed Rule, 86 Fed. Reg. at 30,830. The Worksheet determined whether a firearm was a "rifle" through a point system with a score of 4 or more rendering a gun a "rifle" (or a "short-barreled rifle" if the attached barrel is also less than 16 inches) under the NFA and GCA. *Id.* at 30,829. In its Proposed Rule, the Agencies represented that this Worksheet would provide a "detailed methodology" and "uniform consideration and application" of their new regulation. *Id.*

---

[22] And it cannot be that a vague rule is interpretive—and hence immune—from procedural and substantive protections precisely because its vagueness infects it with improper potential for discretionary enforcement.

[23] Moreover, there is no answer as to why the Agencies engaged in a years' long notice-and-comment period to promulgate the Final Rule if it was merely interpretive, as the APA does not require notice-and-comment periods for interpretive rules. 5 U.S.C. § 553(b)(3)(A).

While imperfect, the Worksheet provided objective measurement criteria for whether a particular stabilizing brace was a "shoulder-fired design" that would be subject to the NFA and GCA. *See* Proposed Rule, 86 Fed. Reg. at 30,830-31. This included considerations of whether the stabilizing brace included a secondary grip (signifying two-handed firing likely from the shoulder) and whether it had been modified for shouldering. *Id.* at 30,834. This point system maintained some emphasis on the design of the firearm rather than possible uses.

But the Final Rule completely scraps Worksheet 4999 and its point system. Instead, the Final Rule amends the definition of a "rifle" under 27 C.F.R. §§ 478.11 and 479.11 to read "a weapon that is equipped with an accessory, component, or other rearward attachment . . . that allows the weapon to be fired from the shoulder, provided the other factors, as listed in the amended regulations . . ., indicate that the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6,480. The six "other factors" include subjective criteria such as the weight or length of the weapon compared to other designed rifles, the length of pull, and subjective statements made by manufacturers and third parties. *Id.* at 6,574-75. The Final Rule does not explain how these factors are to be weighed against each other or how many factors are required to render a weapon a "rifle."

As justification for the complete abandonment of the Proposed Rule and Worksheet 4999, the Agencies noted that "there was general dissatisfaction with the

proposed Worksheet 4999" and that the Agencies "agree[d] with commenters that the factoring criteria with a point system as proposed in the Worksheet 4999 were not easily understood or applied" and that aspects of the worksheet were "ambiguous and subject to interpretation." Final Rule, 88 Fed. Reg. at 6,510, 6,513. This made the Proposed Rule and Worksheet 4999 "unworkable," leading to adopting the six-factor test. *Id*. at 6,513.[24] How the vagueness and uncertainty of the Worksheet justifies an even vaguer and more indeterminate multi-factor test remains a mystery.

In any event, even if the Proposed Rule and Worksheet 4999 were "unworkable," the district court disregarded the Agencies' obligation to give notice of an entirely new test so that the public may comment on the revised proposal. A Proposed Rule "must adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs*., 2 F.4th at 447 (cleaned up). Here, nothing in the Proposed Rule suggested that the Agencies were contemplating the complete scrapping of the point-based Worksheet regime that was the focal point of the Proposed Rule. On the

---

[24] Appellants do not disagree that the Worksheet and the Proposed Rule were themselves unworkable. But that has no bearing on the issues here—"[a]n agency . . . does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period." *Chocolate Mfrs. Ass'n of U.S. v. Block*, 755 F.2d 1098, 1104 (4th Cir. 1985). Instead, "[a]gency notice must describe the range of alternatives being considered with reasonable specificity." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983).

contrary, the Proposed Rule stated that "[t]he ATF Worksheet 4999 is *necessary to enforce the law consistently*," Proposed Rule, 86 Fed. Reg. at 30,829 (emphasis added). Commentators having read this language could not have reasonably foreseen that the Final Rule would involve a complete abandonment of the Worksheet and substitute a new six-factor test which is more subjective and somehow even less consistent.

Despite that significant change, the district court found that the public was on notice as the Proposed Rule indicated that ATF was considering a rule "to aid the firearms industry and public in understanding the criteria that [the agency] considers when evaluating" the classification of firearms under the NFA and GCA, ROA.438; R.E.21 (citing Proposed Rule, 86 Fed. Reg. at 30,828), and the Final Rule's six criteria were "derived from the [Proposed Rule] and proposed Worksheet 4999." ROA.21, R.E.21 (citing Final Rule, 88 Fed. Reg. at 6,480). The "Comments Sought" section of the Proposed Rule never suggested that the Worksheet might not be used but instead requested "additional criteria that should be considered" and comments on whether the ATF "selected the most appropriate criteria." Proposed Rule, 86 Fed. Reg. at 30,850. The eventual multi-factor test, even if derived from the Worksheet in general, was not described within the range of alternatives being considered, and thus there was insufficient notice to the public of that final approach. *Small Refiner Lead*, 705 F.2d at 549.

Even if the Final Rule had "not amount[ed] to a complete turnaround" from the Proposed Rule, notice was still inadequate as the Proposed Rule did not indicate that the Agencies were contemplating the particular change. *See CSX Transp.*, 584 F.3d at 1081-82. There was "no way that commenters here could have anticipated which particular aspects of [the Agencies'] proposal were open for consideration." *Id*. at 1082 (cleaned up).

The elimination of the Worksheet was not the only major and unpredictable change between the Proposed Rule and the Final Rule. The Agencies' estimation of the economic effect on affected societal groups—specifically the manufacturers, dealers, and owners of firearms (such as Appellants)—changed substantially. The Proposed Rule estimated costs over ten years at $114.7 million at a 3% discount rate and $125.7 million at a 7% discount rate. Proposed Rule, 86 Fed. Reg. at 30,845 tbl. 2. On the other hand, the Final Rule has an estimated cost of $242.4 million at a 3% discount rate and $263.6 million at a 7% discount rate. Final Rule, 88 Fed. Reg. at 6,573 tbl. 2. This dramatic change of more than $100 million in the "estimated financial impact of [the Agencies'] proposal" also "supports [the] conclusion" that the Final Rule was not a logical outgrowth of the Proposed Rule. *See Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014).

Because of the substantial discrepancy between the Proposed Rule and the Final Rule, Appellants are likely to succeed on their claim that the public was denied the chance to comment on the Final Rule's substance in violation of the APA.

## II.    APPELLANTS FACE IRREPARABLE HARM

Although the district court did not reach this factor, Appellants' irreparable injury is beyond any reasonable dispute.

"[H]arm is irreparable" where, as here, "there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The impairment of constitutional freedoms "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Having to choose between compliance with an unconstitutional mandate and incurring stiff penalties is also a form of irreparable harm. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021). Moreover, "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Louisiana*, 55 F.4th at 1034 (citations omitted; emphasis in original).

Appellants are irreparably harmed by the Final Rule's violation of their First, Second, and Fifth Amendment protected rights and the separation of powers. Furthermore, without an injunction, Appellant Maxim Defense will be unable to sell its brace inventory to pay off debts and thus, unable to purchase new firearm parts,

risks going out of business. ROA.423-24. The Final Rule functionally destroys any viable market for Maxim Defense's braced pistols, which constitute the vast majority of Maxim Defense's firearms sales and account for millions of dollars of sales every year. ROA.335-36. Indeed, because of the Final Rule, Maxim Defense has not only lost millions of dollars in sales, but it has also had to terminate more than a dozen employees and cut the salaries of those who remain by 15%. ROA.337-38, ROA.423-24; App.321-22 (ECF No. 26).[25]

These harms highlight two problems with the district court's conclusion that Maxim Defense can continue to sell stabilizing braces. *First*, the Final Rule reclassifies braced pistols, which previously constituted 74% of Maxim Defense's annual firearms sales and accounted for millions of dollars of sales every year. ROA.336. Because of the Final Rule, Maxim Defense can no longer sell braced pistols as it has for years, without first satisfying the NFA's requirements. Maxim Defense's entire business is structured around the production and sale of stabilizing braces and braced pistols. *Second,* although stabilizing braces constituted 59% of Maxim Defense's non-firearm sales in previous years, ROA.336, there is no longer a viable market for stabilizing braces under the Final Rule. Individuals purchase stabilizing braces precisely because they aid in the firing of large and heavy pistols

---

[25] A third declaration, filed in support of Appellants' motion for an injunction pending appeal, is not in the ROA but is in the MIPA Appendix.

but do not convert those pistols into rifles. If individuals wanted an SBR, they would buy a stock, not a brace. Without a preliminary injunction preserving the business that Maxim Defense built relying on the Agencies' long-standing guidance, Maxim Defense faces closure or bankruptcy.

Appellants Mock and Lewis fair no better, as both face the impossible choice of either subjecting themselves to the NFA's heightened requirements against their wishes, destroying or divesting themselves of their constitutionally protected property, or facing criminal prosecution and prison. *See* ROA.340-42, ROA.343-45. Both are prohibited from pursuing their concrete plans to purchase braced pistols in the future unless they comply with the NFA or risk criminal charges. ROA.340-42, ROA.343-45. And both fear criminal prosecution for exercising their Second Amendment protected rights because the Final Rule is so unclear that they "cannot know exactly how to comply[.]" ROA.342, ROA.345. This credible threat of an indictment is also irreparable injury. *Richey v. Smith*, 515 F.2d 1239, 1243 n.10 (5th Cir. 1975).

Appellants Mock, Lewis, and Maxim Defense are representative of not just Plaintiff FPC's members and Maxim Defense's customers, but also the millions of Americans and dozens of businesses that the Final Rule would harm. *See* Final Rule, 88 Fed. Reg. at 6,572-73. For that reason, this Court should find irreparable harm as the motions panel did.

## III.   THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST FAVOR INJUNCTIVE RELIEF

The irreparable injury Appellants face from the Final Rule outweighs any harm to the Agencies or the public and further favors an injunction.

The factors of "harm to the opposing party and weighing the public interest" "merge when the Government is the opposing party[.]" *Nken v. Holder*, 556 U.S. 418, 435 (2009). Both the actual infringement on constitutionally protected rights and a chilling effect on their exercise constitute "extraordinary harm." *Ashcroft v. ACLU*, 542 U.S. 656, 670-71 (2004). The constitutional violations alleged above are more than enough to show that the public interest is furthered by an injunction, which is "always" served by an injunction protecting constitutional freedoms—including those protected by the Second Amendment if the Second Amendment is to be treated like the other rights in the Constitution. *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 353 (5th Cir. 2022); *see also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) ("The [challenged law] is unconstitutional so the public interest was not disserved by an injunction preventing its implementation."). In short, an injunction would serve the "highest public interest in the due observance of all the constitutional guarantees." *United States v. Raines*, 362 U.S. 17, 27 (1960).

In addition, as demonstrated above, manufacturers and retailers, such as Appellant Maxim Defense will continue to be seriously harmed by the Final Rule

not only because they would become more highly regulated entities, but also because of the harms the Final Rule imposes on their customers, like those faced by Individual Appellants. "The market for braced pistols and pistol braces will not simply shift into compliance—the industry will more likely die." ROA.324. Customers thus will be deprived of the distinct benefits of braced pistols. The purpose of braced pistols and stabilizing braces is to provide stabilization for heavy or long pistols, not to acquire SBRs subject to the NFA.

Appellants' interests also favor an injunction because their interests merge with those of the public. *Nken*, 556 U.S. at 435. And the public, given its strong interest in ensuring government agencies follow the law, has an interest in an injunction. *Jacksonville Port Auth. v. Adams*, 556 F.2d 52, 58-59 (D.C. Cir. 1977) (recognizing the "overriding public interest . . . of an agency's faithful adherence to its statutory mandate").

Granting a preliminary injunction would also serve the public interest by preserving the status quo (and Maxim Defense) long enough for Appellant Maxim Defense to obtain a meaningful decision on the merits. *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). There is no benefit to enforcing a Final Rule that prevents Maxim Defense from engaging in freedoms it lawfully enjoyed for nearly a decade and puts it out of business before it can prove its case.

By contrast, the Agencies will suffer no harm if forced to maintain the decade-long status quo on what constitutes a "rifle." Indeed, the Final Rule itself contains a 120-day delay in enforcement for individual owners. Final Rule, Fed. Reg. 88 at 6,553. To suggest that harm would befall the Agencies if they were enjoined from immediately enforcing the Final Rule against Appellant Maxim Defense, who would then soon go out of business, is thus belied by the Agencies' exercise of their discretion not to enforce the rule immediately against individuals.

## IV. THE COURT SHOULD ENJOIN THE FINAL RULE IN ITS ENTIRETY

As the motion's panel and this panel recognized, any injunction should at least "provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Thus, at a minimum, this Court should extend the injunction pending appeal as clarified to include FPC's members and Maxim Defense's customers and those intermediaries necessary to sell and transfer a firearm under federal law. But the many harms felt by Appellants, their members, and their customers are being felt by others nationwide. Because this Court's precedents recognize this Court's power "to 'set aside'—*i.e.*, formally nullify and revoke—an unlawful agency action," *Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859 (5th Cir. 2022) (citation omitted), a power which extends equally to temporary as to permanent relief, the Court should enter a preliminary injunction that enjoins the Final Rule entirely. *See Texas v. United States*, 809 F.3d at 188 ("[The judicial] power is not limited to the

district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction.").

The circumstances here warrant such broad relief. This panel, in granting Appellants' motion for clarification, has already recognized that an injunction limited to Maxim Defense, and not extending to its customers and any intermediaries legally necessary to process sales, would afford Maxim Defense incomplete relief and thus clarified that the injunction pending appeal did have such scope. If the ensuing injunction excludes licensed dealers, retailers, wholesalers, and other third parties, there is no one who could legally accept or retransfer such items free of the heightened NFA restrictions imposed by the Final Rule. For an injunction to provide Maxim Defense with the relief it needs, that injunction needs to cover not only Maxim Defense's customers, but also any persons and businesses that may participate in the federally mandated purchase chain from manufacturer to final purchaser, including all Federal Firearms Licensees (FFLs) in between.

Likewise with Individual Plaintiffs and other individual customers, any limitation on the injunction that leaves a break in the required chain of sale would make it impossible to purchase a braced pistol. And, if the injunction excluded other related individuals, family members would remain subject to constructive possession charges even if plaintiffs themselves were temporarily protected. As this Court has recognized, "a defendant has constructive possession when he has

'ownership, dominion, or control' over either the firearm itself *or* over the premises in which the firearm is found." *United States v. Smith*, 997 F.3d 215, 219 (5th Cir. 2021) (emphasis added).

FPC's many members around the country would face similar risks and restrictions—as would their families. Just as with the individual Plaintiffs, if the Court were to grant relief again for FPC's members without clarifying that the relief extends equally to their resident family members, then FPC's covered members would receive incomplete relief. This ever-expanding web of harms from the Final Rule is no speculation—the NFA governs every aspect of firearm transactions, and relief, therefore, must be sufficiently expansive—indeed, nationwide—to preserve the status quo pending final judgment.

Anything short of nationwide relief will lead to significant confusion about who is protected from the Final Rule. Indeed, the downstream effects of the Final Rule could hinder even full relief to Appellants as the potential criminal penalties could chill those at the margins of this Court's interim relief. The Court should now extend the interim relief into a nationwide preliminary injunction to protect not only Appellants, their members, their families, and their customers, but also all intermediaries, other FFLs, and other retailers. A panel of this Court has already determined that the Final Rule is likely unlawful, and the merits panel should do so

again by preliminarily enjoining the Final Rule in its entirety so that no harm will befall the rest of the country from the Final Rule.

## CONCLUSION

This Court should extend the interim relief granted by the motion's panel and grant a preliminary injunction that protects not only Plaintiffs, but everyone in the country that is harmed by the Final Rule, pending final judgment.

Respectfully submitted,

*/s/ Erik S. Jaffe*
Erik S. Jaffe
  *Counsel of Record*
Joshua J. Prince
SCHAERR | JAFFE LLP
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
Facsimile: (202) 776-0136
ejaffe@schaerr-jaffe.com
jprince@schaerr-jaffe.com

Cody J. Wisniewski
FPC ACTION FOUNDATION
5550 Painted Mirage Road, Suite 320
Las Vegas, NV 89149
Telephone: (916) 517-1665
Facsimile: (916) 476-2392
cwi@fpchq.org

*Counsel for Plaintiffs-Appellants*

Dated: June 5, 2023

## CERTIFICATE OF SERVICE

Pursuant to Fed. R. App. P. 25(d) and 5th Cir. R. 25.2.5, I hereby certify that on June 5, 2023, I electronically filed the foregoing motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

*/s/ Erik S. Jaffe*
Erik S. Jaffe

## CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,950 words excluding those portions exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and 5th Cir. R. 32.1 and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Additionally, I certify that (1) any required redactions have been made in compliance with 5th Cir. R. 25.2.13; and (2) the document has been scanned with the most recent version of Microsoft Defender virus detector and is free of viruses.

*/s/ Erik S. Jaffe*
Erik S. Jaffe

Dated: June 5, 2023