No. 23-10319

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

—————————

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY COALITION, INCORPORATED, a nonprofit corporation; MAXIM DEFENSE INDUSTRIES, L.L.C.,

Plaintiffs-Appellants,

v.

MERRICK GARLAND, U.S. Attorney General, in his official capacity as Attorney General of the United States; UNITED STATES DEPARTMENT OF JUSTICE; BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES; STEVEN DETTELBACH, in his official capacity as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives,

Defendants-Appellees.

—————————

On Appeal from the United States District Court
for the Northern District of Texas

—————————

## BRIEF FOR APPELLEES

—————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

LEIGHA SIMONTON
*United States Attorney*

ABBY C. WRIGHT
SEAN R. JANDA
BEN LEWIS
*Attorneys, Appellate Staff
Civil Division, Room 7250
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 514-2494*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties. 5th Cir. R. 28.2.1.

## STATEMENT REGARDING ORAL ARGUMENT

This Court has scheduled sixty minutes of oral argument to begin on Thursday, June 29, 2023, at 10:00 am in the En Banc Courtroom in the Wisdom Courthouse in New Orleans. *See* Dkt. No. 66-1.

# TABLE OF CONTENTS

**Page**

INTRODUCTION...................................................................................................1

STATEMENT OF JURISDICTION ....................................................................2

STATEMENT OF THE ISSUE .........................................................................2

STATEMENT OF THE CASE ...........................................................................2

SUMMARY OF ARGUMENT ..........................................................................9

STANDARD OF REVIEW................................................................................14

ARGUMENT .......................................................................................................15

I.    Plaintiffs Cannot Succeed on the Merits....................................................15

    A.    Plaintiffs' APA Challenges Fail.......................................................15

        1.    Plaintiffs' APA Claims Are Not Cognizable .................................15

        2.    The Rule Properly Interprets the NFA ...........................................17

            a.    The Rule Offers the Best Interpretation of Short-Barreled Rifle .......................................................................17

            b.    Plaintiffs' Attacks on the Rule Fail......................................20

        3.    The Rule Does Not Violate the APA's Procedural Requirements...................................................................................26

    B.    Neither the Rule nor the Statute Violates the Second Amendment.......31

        1.    The Text of the Second Amendment Is Not Implicated .............31

        2.    Historical Tradition Confirms the NFA Is Lawful........................39

    C.    Plaintiffs' and Amici's Remaining Challenges Are Unavailing ...............42

II.    Plaintiffs Have Not Demonstrated the Equitable Factors Necessary To Support an Injunction ............................................................................... 45

    A.    Plaintiffs Have Not Shown Irreparable Harm........................................... 45

    B.    The Balance of Equities and the Public Interest Weigh Against Injunctive Relief............................................................................................ 47

    C.    Plaintiffs' Request for Nationwide Relief Is Overbroad ......................... 49

CONCLUSION ............................................................................................................ 53

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                                  **Page(s)**

*Allina Health Servs. v. Sebelius*,
   746 F.3d 1102 (D.C. Cir. 2014) ................................................................... 30

*Arizona v. Biden*,
   40 F.4th 375 (6th Cir. 2022) ....................................................................... 50

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................... 16

*Bezet v. United States*:
   276 F. Supp. 3d 576 (E.D. La.), *aff'd*,
      714 F. App'x 336 (5th Cir. 2017) ....................................................... 2, 48
   714 F. App'x 336 (5th Cir. 2017) ................................................................. 9

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ...................................................................................... 35

*Califano v. Yamazaki*,
   442 U.S. 682 (1979) ...................................................................................... 49

*Cargill v. Garland*,
   57 F.4th 447 (5th Cir. 2023), *petition for cert. docketed*,
   No. 22-976 (U.S.) ............................................................................. 11, 22, 23

*Catawba County v. EPA*,
   571 F.3d 20 (D.C. Cir. 2009) ....................................................................... 24

*Chemical Mfrs. Ass'n v. EPA*,
   870 F.2d 177 (5th Cir. 1989) ....................................................................... 29

*City of Arlington v. FCC*,
   668 F.3d 229 (5th Cir. 2012), *aff'd*,
   569 U.S. 290 (2013) ...................................................................................... 30

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003) ..................................................................... 31

*Cox v. New Hampshire*,
    312 U.S. 569 (1941) ................................................................. 39

*Data Mktg. P'ship, LP v. U.S. Dep't of Labor*,
    45 F.4th 846 (5th Cir. 2022) ................................................. 50

*Dennis Melancon, Inc. v. City of New Orleans*,
    703 F.3d 262 (5th Cir. 2012) ................................................ 46

*District of Columbia v. Heller*,
    554 U.S. 570 (2008) ..............................................12, 31, 33, 36, 37, 41

*Elrod v. Burns*,
    427 U.S. 347 (1976) ................................................................ 46

*Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*,
    284 F.3d 575 (5th Cir. 2002) ................................................. 51

*Friends of the Earth, Inc. v. Chevron Chem. Co.*,
    129 F.3d 826 (5th Cir. 1997) ...............................................50-51

*FTI v. FAA*,
    58 F.4th 230 (5th Cir. 2023) ............................................. 15, 27

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) ........................................................... 49

*Google, Inc. v. Hood*,
    822 F.3d 212 (5th Cir. 2016) ................................................. 46

*Heller v. District of Columbia*,
    670 F.3d 1244 (D.C. Cir. 2011) ............................................. 38

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................... 24

*Hollis v. Lynch*,
    827 F.3d 436 (5th Cir. 2016) ........................................ 33, 34, 35, 36

*Huawei Techs. USA, Inc. v. FCC*,
    2 F.4th 421 (5th Cir. 2021) ................................................... 30

*International Women's Day March Planning Comm. v. City of San Antonio*,
619 F.3d 346 (5th Cir. 2010) ................................................................. 37, 39

*Laveta McA. ex rel. Christopher M. v. Corpus Christi Indep. Sch. Dist.*,
933 F.2d 1285 (5th Cir. 1991) .................................................................... 43

*Long Island Care at Home, Ltd. v. Coke*,
551 U.S. 158 (2007) .................................................................................... 29

*Louisiana v. Becerra*,
20 F.4th 260 (5th Cir. 2021) ....................................................................... 50

*Maracich v. Spears*,
570 U.S. 48 (2013) ...................................................................................... 22

*MediNatura, Inc. v. FDA*,
998 F.3d 931 (D.C. Cir. 2021) ................................................................... 48

*Muscarello v. United States*,
524 U.S. 125 (1998) .................................................................................... 22

*New York State Rifle & Pistol Ass'n v. Bruen*,
142 S. Ct. 2111 (2022) ......................................... 9, 12, 31, 36, 38, 39, 40, 41

*Nicopure Labs, LLC v. FDA*,
944 F.3d 267 (D.C. Cir. 2019) ................................................................... 42

*Nken v. Holder*,
556 U.S. 418 (2009) ........................................................................... 15, 47-48

*Northstar Wireless, LLC v. FCC*,
38 F.4th 190 (D.C. Cir. 2022) .................................................................... 24

*Perez v. Mortgage Bankers Ass'n*,
575 U.S. 92 (2015) ................................................................................. 16, 28

*Posters 'N' Things v. United States*,
511 U.S. 513 (1994) .................................................................................... 21

*Restaurant Law Ctr. v. U.S. Dep't of Labor*,
66 F.4th 593 (5th Cir. 2023) ....................................................................... 45

*Sig Sauer, Inc. v. Brandon,*
   826 F.3d 598 (1st Cir. 2016) ...............................................................11, 17, 18

*Staples v. United States,*
   511 U.S. 600 (1994) .................................................................................. 32

*Texas Democratic Party v. Abbott,*
   961 F.3d 389 (5th Cir. 2020) ................................................................... 24

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ................................................................... 46

*Texas v. EPA,*
   983 F.3d 826 (5th Cir. 2020) ................................................................... 24

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015) ................................................................... 27

*United States v. Cox,*
   906 F.3d 1170 (10th Cir. 2018) ...........................................................32, 33

*United States v. Freed,*
   401 U.S. 601 (1971) .............................................................................. 2, 44

*United States v. Gilbert,*
   286 F. App'x 383 (9th Cir. 2008) ............................................................ 33

*United States v. Gresham,*
   118 F.3d 258 (5th Cir. 1997) ................................................................... 44

*United States v. Jennings,*
   195 F.3d 795 (5th Cir. 1999) ................................................................ 2, 34

*United States v. Miller,*
   307 U.S. 174 (1939) ................................................................................. 33

*United States v. Rose,*
   695 F.2d 1356 (10th Cir. 1982) ............................................................... 20

*United States v. Serna,*
   309 F.3d 859 (5th Cir. 2002) ................................................................... 34

*United States v. Sineneng-Smith*,
   140 S. Ct. 1575 (2020) ............................................................... 43

*United States v. Stepp-Zafft*,
   733 F. App'x 327 (8th Cir. 2018) ........................................... 33

*United States v. Syverson*,
   90 F.3d 227 (7th Cir. 1996) ..................................................... 18

*United States v. Thompson/Ctr. Arms Co.*,
   504 U.S. 505 (1992) ........................................................... 2, 34

*Usery v. Pilgrim Equip. Co.*,
   527 F.2d 1308 (5th Cir. 1976) ................................................. 45

*VanDerStok v. Garland*,
   2022 WL 4809376 (N.D. Tex. Oct. 1, 2022) .......................... 51

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ......................................................... 23, 25

*Winter v. NRDC, Inc.*,
   555 U.S. 7 (2008) ............................................................. 15, 49

*Wisconsin v. Mitchell*,
   508 U.S. 476 (1993) ................................................................. 42

*Women's Med. Ctr. of Nw. Hous. v. Bell*,
   248 F.3d 411 (5th Cir. 2001) ................................................... 14

**U.S. Constitution:**

Amend. II ....................................................................................... 31

**Federal Statutes:**

5 U.S.C. § 553(b)(A) ................................................................... 27

18 U.S.C. § 926(a) ....................................................................... 26

26 U.S.C. § 5801 *et seq.* ................................................................ 2

26 U.S.C. §§ 5801-5802 ................................................................ 3

26 U.S.C. §§ 5811-5812 ................................................................ 3

26 U.S.C. §§ 5821-5822 ................................................................ 3

26 U.S.C. § 5841 ............................................................................. 1

26 U.S.C. § 5841(c) ........................................................................ 3

26 U.S.C. § 5845(a) ...................................................................... 37

26 U.S.C. § 5845(a)(3) .................................................................... 3

26 U.S.C. § 5845(b) ...................................................................... 20

26 U.S.C. § 5845(c) ........................................... 1, 3, 11, 17, 20

26 U.S.C. § 5848 ........................................................................... 44

26 U.S.C. § 7422 ........................................................................... 46

26 U.S.C. § 7801 ............................................................................. 3

26 U.S.C. § 7801(a)(2)(A) ............................................................ 26

26 U.S.C. § 7805(a) ...................................................................... 26

28 U.S.C. § 1292(a)(1) .................................................................... 2

28 U.S.C. § 1331 ............................................................................. 2

**State Statutes:**

Ala. Code § 13A-11-63(a) .............................................................. 34

Alaska Stat. Ann § 11.61.200(c) .................................................. 34

Ariz. Rev. Stat. Ann. § 13-3101(B) .............................................. 34

Cal. Penal Code § 16590, § 33215 ..................................................... 34

Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5) ................................... 34

D.C. Code Ann. § 7-2502.02 .............................................................. 34

Fla. Stat. Ann. § 790.221(1)-(3) ......................................................... 34

Ga. Code Ann § 16-11-122, § 16-11-121(4), § 16-11-122 ................. 34

Haw. Rev. Stat. Ann. § 134-8 ............................................................ 34

Ill. Comp. Stat. Ann. § 24-1(a)(7)(ii), § 24-2(c)(7) .......................... 34

Iowa Code Ann § 724.1C .................................................................... 34

La. Stat. Ann. § 40:1785 ..................................................................... 34

Md. Code Ann., Pub. Safety § 5-203 ................................................. 34

Mich. Comp. Laws Ann. § 750.224b .................................................. 34

Mo. Ann. Stat. § 571.020 ................................................................... 34

Mont. Code Ann. § 45-8-340 ............................................................. 34

Neb. Rev. Stat. Ann. § 28-1203 ......................................................... 34

Nev. Rev. Stat. Ann. § 202.275 .......................................................... 34

N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o) ...................................... 34

N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b ............................... 34

N.C. Gen. Stat. Ann. § 14-288.8 ........................................................ 34

N.D. Cent. Code Ann. § 62.1-02-03 ................................................... 34

Ohio Rev. Code Ann. § 2923.17 ......................................................... 34

Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E) ......................................... 34

Or. Rev. Stat. Ann. § 166.272(1)-(4) .................................................. 34

11 R.I. Gen. Laws Ann. § 11-47-8(b) ............................................................ 34

S.C. Code Ann. § 16-23-230, § 16-23-250 ................................................. 34

Tex. Penal Code Ann. § 46.05(a)(1)(C) ...................................................... 34

Va. Code Ann. § 18.2-300, § 18.2-303.1 .................................................... 34

Wash. Rev. Code Ann. § 9.41.190(4) .......................................................... 34

Wis. Stat. Ann. § 941.28(2)-(4) .................................................................. 34

**Regulation:**

28 C.F.R. § 0.130 ........................................................................................ 26

**Legislative Materials:**

H.R. Rep. No. 83-1337 (1954) ............................................................ 2, 32, 48

S. Rep. No. 90-1501 (1968) ......................................................................... 2

**Other Authorities:**

ATF, Firearms Commerce in the United States: Annual Statistical Update 2021,
    https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-
    report/download, ...................................................................................... 35

Factoring Criteria for Firearms With Attached "Stabilizing Braces,"
    86 Fed. Reg. 30,826 (June 10, 2021) ...................................................... 28

Factoring Criteria for Firearms with Attached "Stabilizing Braces,"
    88 Fed. Reg. 6478 (Jan. 31, 2023) ...............................1, 4, 5, 6, 7, 8, 13, 16, 17, 19, 21,
                                                                    23, 25, 28, 29, 33, 38, 42, 44, 45, 48

Firearms Policy Coalition, Twitter (May 23, 2023 8:45 PM),
    https://twitter.com/gunpolicy/status/1661171414186049538 ................ 52

Letter from Justin D. O'Connell, Acting Assistant Director, Public and Governmental Affairs, ATF to the Honorable Jim Jordan, Chairman, House Judiciary Committee (May 23, 2023) ............................................................................................ 25

# INTRODUCTION

For almost a century, Congress has regulated short-barreled rifles under the National Firearms Act (NFA) as especially dangerous weapons. A short-barreled "rifle" is a firearm "designed," "made," and "intended" to be "fired from the shoulder," with a barrel shorter than 16 inches. 26 U.S.C. §§ 5841, 5845(c). Some manufacturers circumvent the statute by selling firearms with rearward attachments marketed as "stabilizing braces." Though manufacturers claim that these devices are designed to rest against or wrap around a shooter's forearm to assist with one-handed firing, many of them are virtually indistinguishable from basic shoulder stocks and are designed to facilitate the firing of a firearm from the shoulder.

In response to widespread evasion of federal law—and resulting confusion—the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) issued an interpretive rule. *See* Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) (Rule). The Rule clarifies that whether a braced firearm is designed and intended to be fired from the shoulder does not turn on claimed intent; it turns, instead, on the design of the weapon and other objective evidence. The Rule then sets forth the evidence ATF will consider when determining whether any particular braced firearm is a "rifle" under the NFA.

Plaintiffs challenged the Rule and sought preliminary injunctive relief. The district court properly denied the motion, concluding that plaintiffs are unlikely to succeed on the merits of their myriad claims.

## STATEMENT OF JURISDICTION

The district court denied plaintiffs' preliminary injunction motion on March 30, 2023. *See* ROA.444. Plaintiffs filed a timely notice of appeal from that denial on the same day. *See* ROA.7. The district court had jurisdiction over the case under 28 U.S.C. § 1331, and this Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

The issue presented is whether the district court properly denied plaintiffs' request for a preliminary injunction.

## STATEMENT OF THE CASE

1. The National Firearms Act of 1934, 26 U.S.C. § 5801 *et seq.*, regulates firearms that can "be used readily and efficiently by criminals or gangsters," H.R. Rep. No. 83-1337, at A395 (1954). These firearms include "weapons of war" like "antitank guns" and "machine guns," S. Rep. No. 90-1501, at 28 (1968), as well as powerful "concealable weapon[s]," *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion), like "short-barreled shotguns," and as relevant here, "short-barreled rifles," *United States v. Jennings*, 195 F.3d 795, 799 n.4 (5th Cir. 1999).

For those firearms, the NFA establishes a registration-and-taxation scheme "in the interest of the public safety." *United States v. Freed*, 401 U.S. 601, 609 (1971). This scheme tracks "the flow of [NFA] firearms" to ensure they stay away from criminal, dangerous, or irresponsible individuals. *Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017). Under the statute, importers,

2

manufacturers, and dealers in firearms including short-barreled rifles must register with the government and pay an annual special occupational tax of $1000 or $500. *See* 26 U.S.C. §§ 5801-5802. In addition, a qualified manufacturer must register each firearm made. *See id.* § 5841(c).

Individuals who are not engaged in a firearms business but who wish to make an NFA-regulated firearm must obtain prior approval. *See* 26 U.S.C. §§ 5821-5822. To that end, they must describe the firearm; submit identifying information; and pay a $200 tax per firearm. *See id.* To transfer such firearms, a transferor must go through the same process to obtain prior approval—identifying a transferee, registering the firearm to the new owner, and paying a $200 tax. *See id.* §§ 5811-5812.

2. ATF is responsible for enforcing the NFA's restrictions on short-barreled rifles. *See* 26 U.S.C. § 7801. Under the NFA, as relevant here, a "rifle" is a firearm that is "designed or redesigned, made or remade, and intended to be fired from the shoulder." *Id.* § 5845(c). A rifle with a barrel under 16 inches is a short-barreled rifle subject to the NFA's requirements. *Id.* § 5845(a)(3).

For a typical short-barreled rifle, a person holds the firearm when firing by pressing the firearm's "stock" against their shoulder. Below is an example:



3

88 Fed. Reg. at 6525. At the front end, the firearm has a receiver and a short barrel. *See id.* at 6518. At the back, it has a "stock," "butt stock," or "shoulder stock," which is pressed against the shoulder when firing. *Id.* at 6522. This stock is often detachable or sold separately as a rearward attachment.

Over the last decade, ATF has received an increasing number of requests to determine whether weapons equipped with so-called "stabilizing brace[s]"—rather than stocks—constitute "rifles." *See* 88 Fed. Reg. at 6482-84. These braces are also rearward attachments, but they generally have features—such as an opening or straps—that may be used to fasten the firearm against the forearm. *See, e.g., id.* at 6483. Brace manufacturers have generally claimed that they are not intended to facilitate firing from the shoulder; instead, they are ostensibly designed "to assist people with disabilities or limited strength or mobility with firing heavy pistols" with one hand. *Id.* at 6482. In many cases, however, firearms with braces are designed nearly identically to those with stocks.



*See* ROA.366 (top item equipped with "brace" and bottom equipped with stock). And as demonstrated in marketing materials and trade magazines, many firearms equipped

with stabilizing braces are designed and intended to be shouldered in the same way as a firearm with a stock.

 

*See* 88 Fed. Reg. at 6505, 6527 (marketing materials on left; trade review on right).

Between 2012 and 2020, ATF reviewed various braced firearms for classification under the NFA, assessing whether each weapon was designed and intended to be fired from the shoulder. ATF classified "the majority of these submissions" as short-barreled rifles. 88 Fed. Reg. at 6482. But these classifications, which applied "only to the particular sample[s]" submitted, *id.*, were not always consistent, *id.* at 6484 n.26. And they sometimes gave undue weight to the "stated intent" of the manufacturer, *id.* at 6502, even when that stated intent was inconsistent with "the objective design features" of the firearm or how the firearm was "being used in the general community," *id.* at 6479. By 2020, ATF concluded that its case-by-case "classification determinations had led to confusion" and "a need to provide clarity to the firearm industry and public on how ATF evaluates firearms equipped with a 'stabilizing brace.'" *Id.* at 6494.

3. To provide that guidance, ATF issued the Rule, which primarily reiterates that, in determining whether a particular brace-and-weapon combination is designed and intended to be fired from the shoulder, the manufacturer's "stated intent will not necessarily be dispositive." 88 Fed. Reg. at 6479. Instead, it explains that ATF will also consider whether other relevant evidence, such as "objective design features," the manufacturer's marketing materials, and the "likely use of the weapon" in the general community, "support[s] or undermine[s] that intent." *Id.*

The Rule reiterates that the statutory term "rifle" includes "a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a 'stabilizing brace')" in certain circumstances. 88 Fed. Reg. at 6574. It also clarifies how ATF will determine whether a braced weapon is a rifle. The brace must "provide[] surface area that allows the weapon to be fired from the shoulder." *Id.* And "other factors" must "indicate that the weapon is designed, made, and intended to be fired from the shoulder." *Id.* These considerations include objective design features: whether the weapon has a "weight or length" and a "length of pull" similar to that of similar model rifles; whether it is equipped with "sights or a scope" that require shouldering to use; and whether the surface area that allows the weapon to be fired from the shoulder is created by a "rearward attachment that is necessary for the cycle of operations." *Id.* The considerations also include an examination of the "manufacturer's direct and indirect marketing and promotional materials indicating

the intended use of the weapon" and information showing "the likely use of the weapon in the general community." *Id.* at 6574-75.

The Rule estimates that a "majority" of existing firearms with stabilizing braces are short-barreled rifles. 88 Fed. Reg. at 6480. But not all existing braced firearms or possible braced firearm designs are. For example, a braced weapon may not have "a surface area that allows shouldering"—as with "an elastic strap that wraps around the shooter's wrist." *Id.* at 6529-30. Or it might include "a feature intended specifically to prevent shooting the firearm from the shoulder," such as "a permanently attached protrusion" that would prevent comfortable shouldering. *Id.* at 6530.

The Rule reiterates that if an individual has an unregistered braced short-barreled rifle, she must comply with the statutory requirements by registering it, receiving approval, and paying a tax. In its enforcement discretion, however, ATF determined that any current possessor who submitted a registration by May 31 could forgo paying the tax and continue to possess the weapon pending approval. *See* 88 Fed. Reg. at 6554, 6480-81. Otherwise, the possessor must "remov[e] and replace[] the offending feature[s]," *e.g.*, the short barrel; remove the stabilizing brace "so that it cannot be reattached to the firearm"; or surrender or destroy the firearm. *Id.* at 6544. ATF also stated that it may "pursue forfeiture" of unregistered short-barrel rifles equipped with braces "in lieu of criminal prosecution." *Id.*

4. Plaintiffs—a firearms manufacturer and retailer, two individuals who possess firearms equipped with braces, and an advocacy organization—filed suit. *See*

ROA.200. Plaintiffs then moved for a preliminary injunction, asking the court to enjoin defendants "from implementing and enforcing" the Rule. ROA.269.

The district court denied the motion, concluding that plaintiffs were not likely to succeed on the merits of any claim. *See* ROA.429-44. Against claims that the agency lacks the statutory authority to issue the Rule, the court explained that ATF must assess "whether a particular firearm is subject to the NFA," and the Rule permissibly "identif[ies] the criteria by which enforcers, in their application of the statute, will make that determination." ROA.436. The court rejected arguments that the Rule's criteria violate the text of the statute, reasoning that the statutory intent standard "necessarily require[s] the enforcing agency" to "evaluate objective weapon characteristics, and perhaps conduct." ROA.436 (quotation omitted). Accordingly, the court saw no reason to resort to the rule of lenity. *See* ROA.439. Nor is the Rule void for vagueness. The rule "track[s] the statutory definition," which is "comprehensible enough to put a person of ordinary intelligence on notice." ROA.441.

The court also rejected plaintiffs' argument that the Rule violates the APA's procedural requirements as not a "logical outgrowth" of the proposed rule. The public was "on notice" that the agency was considering a rule to help "in understanding the criteria that" ATF "considers when evaluating" rifles, and the Rule adopts those "very criteria," even if it abandons a point system reflected in a proposed worksheet. ROA.438 (quotation omitted).

The district court was equally unpersuaded by plaintiffs' constitutional challenges. In rejecting the First Amendment claim, the court explained that rather than proscribe speech, the Rule makes clear that ATF may listen to "what [plaintiffs] say about the products they manufacture[] and purchase." ROA.440. And in rejecting the Second Amendment claim, the court explained that the Second Amendment does not "bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership," like those imposed by the NFA. ROA.442 (citing *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2138 n.9 (2022); *id.* at 2162 (Kavanaugh, J., concurring); and *Bezet*, 714 F. App'x at 340). Looking to the historical record, the court was also unpersuaded by plaintiffs' contention that there was a "lack of historical evidence of similar government regulations." ROA.443. The court therefore concluded that plaintiffs were not entitled to "the extraordinary remedy of preliminary injunctive relief." ROA.443.

5. Plaintiffs appealed, *see* ROA.476-77, and moved for an injunction pending appeal, *see* R.E.28. A motions panel granted an injunction "as to the Plaintiffs in this case," R.E.28-29, which was later clarified to cover the customers and other intermediaries of the manufacturer plaintiff, the resident family members of the individual plaintiffs, and the members of the advocacy organization. *See* R.E.30-32.

## SUMMARY OF ARGUMENT

The Rule is nothing extraordinary: an agency, charged with enforcing a statute, provided clarification to the public of how it interprets a statutory term in response to

9

widespread evasion of statutory constraints. For years, individuals who wished to possess a short-barreled rifle without complying with the NFA's requirements simply bought a device marketed as a "stabilizing brace," attached it to a firearm, and used the resulting combination as a rifle. Manufacturers claimed that such devices assisted disabled individuals with one-handed firing. But that claim could not be squared with reality: many devices were not useful for one-handed firing and served only to permit the shooter to fire from the shoulder. True braced pistols—which need not be registered under the NFA—were not a dominant part of the market.

In the face of these market realities and obvious side-stepping of federal law, ATF issued the Rule challenged here. Although plaintiffs urge that the Rule is invalid and the statute unconstitutional, the district court correctly ruled that plaintiffs were unlikely to succeed on the merits of those contentions. This Court should affirm.

**I.** The district court correctly concluded that plaintiffs had not demonstrated a likelihood of success on the merits.

**A.** None of plaintiffs' APA challenges succeeds.

The relevant provisions of the Rule are interpretive. The Rule does not change the scope of the statutory provisions at issue, which are the source of the requirements that attach to short-barreled rifles. The Rule is not final agency action challengeable under the APA, because ATF's decision to articulate for the public its understanding of the statute does not determine any legal rights or impose any legal obligations.

10

Even assuming plaintiffs may bring a facial challenge to the Rule, such a challenge cannot succeed. The Rule properly interprets the statute. A weapon constitutes a "rifle" if, as relevant here, it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). In interpreting that provision, the Rule properly clarifies that ATF need not uncritically accept stated intent but may also consider objective evidence of intent. This approach of using objective evidence to "ferret[] out a party's" true intent is a familiar one in the law and has been approved in the context of the NFA specifically. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016). The Rule also properly identifies evidence that ATF believes will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder.

Plaintiffs' substantive challenges to the Rule lack merit. There is no ambiguity in the NFA sufficient to trigger the rule of lenity; the Rule articulates ATF's understanding of the statute, and the "traditional tools of statutory construction" support that understanding. *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (en banc), *petition for cert. docketed*, No. 22-976 (U.S.). For similar reasons, the NFA as interpreted by the Rule is not unconstitutionally vague. Nor did ATF lack the authority to issue the Rule. Agencies may provide their interpretation of the statutes they enforce. And even if an express delegation were needed, Congress has unambiguously delegated authority to implement the NFA.

Plaintiffs' procedural claim that ATF provided improper notice is equally unpersuasive. At the outset, the Rule is not subject to the APA's notice requirements. In any event, the notice of proposed rulemaking (NPRM) provided sufficient notice to permit interested parties to comment. Although the Rule heeded commenters' concerns by declining to adopt the NPRM's specific proposal, the NPRM previewed the Rule's reliance on objective evidence of intent and the specific probative evidence identified in the Rule.

**B.** As the district court correctly concluded, *see* ROA.441-43, plaintiffs have failed to demonstrate a likelihood of success on their claim that the Rule and the NFA violate the Second Amendment.

The Rule does not implicate "the Second Amendment's plain text." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). The Second Amendment extends only to bearable arms that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581, 625 (2008). But stabilizing braces are not themselves bearable arms, and short-barreled rifles are quintessential "dangerous and unusual" weapons unprotected by the Amendment. *See id.* at 625, 627 (quotation omitted). Moreover, as the district court recognized, reasonable regulations and licensing regimes on firearm manufacture, sale, and possession do not infringe the Second Amendment.

In any event, the NFA is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Since colonial times, legislatures have

routinely exercised their authority to regulate the possession and manufacture of firearms through laws imposing registration, approval, and taxation requirements like the NFA's. That bevy of colonial and State laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Id.* at 2132.

**C.** None of plaintiffs' or amici's additional arguments persuades.

Contrary to plaintiffs' suggestion, the Rule's clarification that "marketing or promotional materials indicating the intended use of the weapon" are probative evidence of the weapon's designed and intended use, *see* 88 Fed. Reg. at 6512, does not offend the First Amendment. As the district court observed, "no speech is being proscribed" by the Rule or by the statute. ROA.440. Instead, the Rule permissibly uses speech as evidence of intent.

The additional legal theories raised by amici are not properly before this Court, which is limited to evaluating the claims presented by the parties. In any event, none of amici's arguments has merit.

**II.** Even if plaintiffs could demonstrate a likelihood of success, they would be unable to justify a preliminary injunction. First, they cannot establish irreparable harm. Their claims of harm are untethered from the Rule, which does not add requirements to the NFA, and the statutory requirements themselves do not impose irreparable harm. Individuals who wish to possess, manufacture, or transfer short-barreled rifles may continue to do so if they comply with the NFA's relatively modest requirements.

Second, the balance of equities and the public interest weigh against relief. As the Rule explains, ATF's previous case-by-case approach to classifying braced weapons led to confusion, regulatory inconsistency, and circumvention of the controls Congress deemed necessary for public safety. The Rule alleviates those problems by providing a clear explanation of ATF's understanding of the statute's application to braced firearms, and any injunction would thus undermine the substantial public interests that the Rule advances.

Third, plaintiffs cannot justify their request for nationwide relief. It is well settled that an injunction—which is an extraordinary remedy—must be limited to redressing irreparable harm to specific plaintiffs before the Court. And any injunction must be more limited than that granted pending appeal: the association plaintiff has failed to demonstrate that it is a membership organization, that its members have standing, or that an injunction should run to an ever-expanding list of donors numbering at least in the hundreds of thousands. For similar reasons, an injunction should not extend to the manufacturer plaintiff's customers and intermediaries.

## STANDARD OF REVIEW

This Court reviews a district court decision on a preliminary injunction for abuse of discretion. *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 418-19 (5th Cir. 2001). The district court's "[f]indings of fact are reviewed only for clear error," but "legal conclusions are subject to *de novo* review." *Id.*

14

# ARGUMENT

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). To justify that relief, a plaintiff must show that it is "likely to succeed on the merits," that it "is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Id.* at 20. The government's interest and the public interest "merge" when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs fail to meet that burden at each step.

## I.    Plaintiffs Cannot Succeed on the Merits

### A.    Plaintiffs' APA Challenges Fail

#### 1.    Plaintiffs' APA Claims Are Not Cognizable

The Rule is an interpretive rule: it "clarifies, rather than creates, law.'" *FTI v. FAA*, 58 F.4th 230, 240 (5th Cir. 2023) (quotation omitted). ATF did not "claim to be exercising authority to itself make positive law." *Id.* (quotation omitted). The Rule explains instead ATF's understanding of the best interpretation of the NFA and identifies evidence that ATF thinks will generally be probative of the statutorily required determination of intent. It is therefore a rule "issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (quotation omitted).

The Rule thus makes clear that it does not have the independent force and effect of law and that the statute is the source of legal force for imposing the NFA's requirements on braced firearms. *See, e.g.*, 88 Fed. Reg. at 6478 ("[T]his rule does not impose any new legal obligations on owners of 'stabilizing braces' at all, as any obligations for these owners result only from the NFA and the [Gun Control Act]. Instead, this rule merely conveys more clearly to the public the objective design features and other factors that indicate a weapon is in fact a firearm or short-barreled rifle under the relevant statutes."); *id.* at 6480 (similar); *id.* at 6501 (similar). Thus, for example, in any enforcement proceeding, the government could not rely on the Rule to establish whether a weapon is a short-barreled rifle; instead, the court would apply the statutory definition.

That proper understanding of the Rule makes clear that the relevant portions of the Rule are not final agency action. ATF's articulation of its view of the best understanding of the statute does not itself determine any legal rights or impose any legal obligations, as would be required to demonstrate finality. *See Bennett v. Spear*, 520 U.S. 154, 178 (1997). Plaintiffs have not attempted to demonstrate that the particular braced firearms they possess or manufacture are classified as "short-barreled rifles" under the Rule but would not be under the correct interpretation of the statute. If plaintiffs disagree with ATF about whether a particular braced firearm they currently (or wish to) own or manufacture is a short-barreled rifle, the proper course is to seek relief specific to that firearm, not mount a broadside attack on the Rule.

### 2.    The Rule Properly Interprets the NFA

Even assuming plaintiffs' APA challenges may proceed, such challenges fail.

### a.    The Rule Offers the Best Interpretation of Short-Barreled Rifle

Under the NFA, a weapon constitutes a "rifle" if it is "designed," "made," and "intended to be fired from the shoulder." 26 U.S.C. § 5845(c). The challenged provisions of the Rule primarily clarify two aspects of ATF's interpretation of the statute: First, the Rule makes clear that whether a braced firearm is designed and intended to be fired from the shoulder is not properly determined solely by reference to a manufacturer's claimed intent but instead must be determined by evaluating other objective evidence of intent. *See* 88 Fed. Reg. at 6495. Second, the Rule catalogs the sort of evidence that ATF considers probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. *See id.* at 6569-70. Both features of the Rule are consistent with the statute.

i. The NFA does not require ATF to uncritically accept a manufacturer's statements about whether its product is designed and intended to be fired from the shoulder, a proposition plaintiffs do not seem to dispute, *cf.* Br. 25-26. To the contrary, it is a "very familiar [approach] in the law" to use "objective" evidence to "ferret[] out a party's" true intent, notwithstanding the party's subjective representations about its intent. *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 601-02 (1st Cir. 2016) (collecting cases). That approach makes particular sense in the context of the

17

NFA because "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record . . . indicates is not actually an intended one." *Id.* at 602.

Multiple courts of appeals have therefore held that a product's intended use may be determined by reference to objective evidence of intent, including evidence of design features. For example, in *Sig Sauer*, the First Circuit upheld ATF's determination that a product was a silencer. Although the manufacturer claimed that the product was "intended for use as a muzzle brake"—that is, a "device that is added to a gun to reduce recoil"—ATF examined the product and determined, based primarily on evidence derived from the design of the product, that it was in fact intended for use only as a silencer. *See Sig Sauer*, 826 F.3d at 600, 602.

Similarly, in *United States v. Syverson*, 90 F.3d 227 (7th Cir. 1996), the Seventh Circuit affirmed a conviction for possession of an unregistered and unmarked silencer, in violation of the NFA, based on objective evidence of intent. Although the defendant in that case testified that "he had designed and manufactured" the item in question "to be a muzzle break," not a silencer, the court explained that there was evidence in the record "casting doubt on his professed intentions": the government's "expert testified that muzzle breaks usually have slots cut into them" to make them effective but the item the defendant produced "had no slots." *Id.* at 232. The court thus concluded, based on that evidence, that a jury could reasonably infer that the

defendant's "description of the [item] was not credible" and that he had made it "to be a silencer." *Id.*

ii. ATF also properly identified evidence that will be probative of whether a particular braced firearm is designed and intended to be fired from the shoulder. In the Rule, ATF identified both evidence related to the design features of the weapon—such as whether the weapon includes certain features useful for firing from the shoulder but not useful for one-handed firing—and more direct evidence, including the way the weapon is marketed and used in the real world. And the Rule contains a substantial explanation related to each identified category, explaining why ATF believes that evidence is probative. *See* 88 Fed. Reg. at 6510-43.

ATF's explanations of why particular evidence is probative reflect ATF's desire to clarify the scope of the statutory provision in the face of inconsistent prior determinations, public confusion, and widespread circumvention. As made clear through photos of firearms with purported "braces" attached, *see supra* p. 5, ATF properly identified objective design features—such as whether the surface area allows the weapon to be fired from the shoulder, whether the rearward attachment is necessary for firing, and whether the firearm is equipped with sights or a scope that are only functional if the firearm is fired from the shoulder, 88 Fed. Reg. at 6574—along with marketing materials and other evidence, to determine when a product marketed as a "brace" was in fact designed and intended to facilitate firing from the shoulder.

**b.     Plaintiffs' Attacks on the Rule Fail**

Plaintiffs' claims that the Rule is contrary to the NFA are unpersuasive, and plaintiffs' various fallback arguments suggesting that the Rule may be invalid even if it reflects the best interpretation of the statute fare no better.

i. In attacking the substance of the Rule, plaintiffs contend that braced firearms cannot be "rifles" under the NFA because, in their view, a braced pistol "is designed to be held and fired by a single hand." Br. 25. But that *ipse dixit* is not an argument.

Nor is it enough, as plaintiffs suggest (at 25), that a braced firearm may be capable of one-handed firing. That contention rests on the incorrect premise—repeatedly rejected by courts—that a weapon may be a rifle only if it is designed "to be fired exclusively from the shoulder." *United States v. Rose*, 695 F.2d 1356, 1357-58 (10th Cir. 1982) (collecting cases). Unlike other NFA definitions, the definition of "rifle" does not include any exclusive-intent requirement. *Compare, e.g.*, 26 U.S.C. § 5845(b) (defining "machinegun" to include "any part designed and intended *solely and exclusively*" for "use in converting a weapon into a machinegun" (emphasis added)0, *with id.* § 5845(c) (defining "rifle" to include a weapon "designed," "made," and "intended to be fired from the shoulder"). Thus, if a braced firearm is designed and intended to be fired from the shoulder, it is a rifle, even if it may also be capable of one-handed firing.

Equally unpersuasive is plaintiffs' assertion (at 26) that some of the evidence identified by the Rule as probative of intent is irrelevant. ATF explained the relevance

of the factors in the Rule, and those explanations are backed by both ATF's expertise and common sense. Thus, for example, although plaintiffs complain that the agency considers the relative weight of the weapon, the Rule cogently explains that if the weight and length of a braced firearm are close to those of a similar product sold as a short-barreled rifle, that may suggest that the products are in fact designed and intended to be used in the same way (*i.e.*, fired from the shoulder). *See* 88 Fed. Reg. at 6511, 6514.

Similarly, ATF properly considered the way in which the product is used in the real world as a relevant indicator of the manufacturer's design and intent. *See* 88 Fed. Reg. at 6544-48. Indeed, the Supreme Court has recognized that Congress may properly identify "factors [that] generally focus on the actual use of the item in the community" as relevant evidence of whether a product was "primarily intended" for a particular use. *Posters 'N' Things v. United States*, 511 U.S. 513, 519-20 (1994) (quotation omitted).

ii. Plaintiffs next contend that even if the Rule comports with the best interpretation of the NFA, concerns regarding the rule of lenity (at 27-29), the void-for-vagueness doctrine (at 31-34), and delegated authority (at 29-31) render the Rule invalid. Those concerns are misplaced.

A. Although plaintiffs suggest (at 27-29) that the rule of lenity requires construing the NFA in the narrowest possible way, plaintiffs fail to identify any ambiguity in the NFA sufficient to trigger that rule. The Rule articulates ATF's

21

understanding of the best interpretation of the statute, and the rule of lenity does not apply where, as here, the "traditional tools of statutory construction" support that reading. *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir. 2023) (en banc), *petition for cert. docketed*, No. 22-976 (U.S.).

Moreover, although plaintiffs emphasize (at 27-28) that the district court thought the statute included some "ambiguous terms," *see* ROA.436, plaintiffs fail to identify any ambiguity in the relevant statutory language—which states that a weapon is a "rifle" if it is "designed" and "intended" to be fired from the shoulder. In referencing ambiguity, the district court may have been acknowledging the challenge of applying an intent-based standard to particular facts. But that is not unique to the NFA. Many statutes, including numerous criminal statutes and other provisions of the NFA, govern conduct based on a party's intent. Courts routinely apply those provisions in criminal and civil cases alike, and plaintiffs point to no authority to support the remarkable proposition that an inquiry into intent is per se ambiguous and thus prohibited under the rule of lenity.

In any event, "some statutory ambiguity" does not trigger the rule of lenity, *Muscarello v. United States*, 524 U.S. 125, 138 (1998); instead, the rule comes into play only when there is "a grievous ambiguity or uncertainty in the statute," *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (quotation omitted). As explained, no ambiguity exists, let alone grievous ambiguity.

Plaintiffs' suggestion (at 28-29) that the rule of lenity applies because the agency changed its interpretation is equally misplaced. The Rule does not reflect an about-face by the agency on the legal interpretation of the NFA. To the contrary, ATF has stated for years that firearms equipped with "braces" may be short-barreled rifles. *See* 88 Fed. Reg. at 6487. Recognizing that it had at times been inconsistent as to particular braced firearm combinations, ATF provided the public with additional guidance to ensure consistent application of the statutory provision.

In any event, an agency change in legal position does not invalidate an interpretive rule. In *Cargill*, this Court cited the agency's change in interpretation as one reason that "*Chevron* deference does not apply." 57 F.4th at 468. The Court did not, however, suggest that an agency's change in interpretation requires application of the rule of lenity. Traditional tools of statutory construction confirm that the Rule reflects the best interpretation of the statute, and plaintiffs cannot leverage any prior inconsistent interpretation to reach a different result.

For similar reasons, plaintiffs' contention (at 31-34) that the NFA and the Rule are unconstitutionally vague hits even wider of the mark, and the district court correctly rejected this argument. *See* ROA.440-41. As the district court recognized, the Rule proceeds from the statute's "comprehensible normative standard"—whether a weapon is intended to be fired from the shoulder. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 n.7 (1982) (quotation omitted). Plaintiffs do

not—and could not—contend that the statute's focus on intent is itself unconstitutionally vague.

And the Rule—which does no more than interpret the statute—provides additional clarity by "defin[ing] and explain[ing] the criteria" ATF considers relevant to a party's intent. *Catawba County v. EPA*, 571 F.3d 20, 39 (D.C. Cir. 2009) (per curiam). That is more than enough to give a "person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Texas Democratic Party v. Abbott*, 961 F.3d 389, 409 (5th Cir. 2020) (quotation omitted).

This Court should reject plaintiffs' invitation (at 32-33) to create a constitutional prohibition on the use of multifactor tests. Such holistic inquiries are permissible to assess design and intent, and an agency is free to apply "multifaceted considerations" without offending constitutional notice principles so long as it provides "comprehensible and actionable guidance about the standards" it will employ. *Northstar Wireless, LLC v. FCC*, 38 F.4th 190, 218-19 (D.C. Cir. 2022); *see also, e.g.*, *Texas v. EPA*, 983 F.3d 826, 839-40 (5th Cir. 2020) (upholding an agency's use of a "multi-factor balancing test"). The Rule meets that standard.

Nor does this Court address a vagueness claim in a vacuum: a court must "consider whether a statute is vague as applied to the particular facts at issue," because a plaintiff "cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (quotation omitted). Plaintiffs have not identified any braced firearm for which it is

unclear how the statute and Rule might apply, and to the extent plaintiffs remain

uncertain, they may "request a classification determination from ATF for additional

clarity." 88 Fed. Reg. at 6552. That ability to receive additional clarity "by resort to an

administrative process" ameliorates any harm from claimed vagueness. *Hoffman*

*Estates*, 455 U.S. at 498.[1]

For similar reasons, plaintiffs' suggestion (at 32) that the Rule's interpretation

of the statute is so vague that it impermissibly chills Second Amendment activity is

unavailing. As an initial matter, plaintiffs misunderstand the scope of the Second

Amendment. *See infra* pp. 31-42. In any event, individuals can obtain classifications

from ATF to ameliorate any such concerns. And, as explained, *see supra* pp. 7-8, the

Rule provides clear guidance about particular braced pistol designs that include true

arm braces for assisting one-handed firing and are therefore not subject to the NFA;

individuals are free to obtain or construct one of those designs.

---

[1] Plaintiffs also suggest (at 34 n.20) that the ATF Director made errors in his testimony to Congress regarding the compliance options contained in the Rule and that this asserted inaccurate testimony demonstrates the Rule's vagueness. As ATF explained in a letter submitted to Congress, the Director's testimony was limited by the format of the hearing and he repeatedly directed Congress to the specific, detailed language of the Rule. *See* Letter from Justin D. O'Connell, Acting Assistant Director, Public and Governmental Affairs, ATF to the Honorable Jim Jordan, Chairman, House Judiciary Committee (May 23, 2023). In any event, compliance options—the subject of these alleged misstatements—are clearly outlined in the Rule, *see* 88 Fed. Reg. at 6570, and plaintiffs have not advanced any argument that the Rule is vague in that respect.

B. Plaintiffs next unsuccessfully attack (at 29-31) the agency's authority to issue the Rule.

As an initial matter, insofar as plaintiffs' argument proceeds from the premise that agencies do not possess statutory authority to "rewrite clear statutory terms," Br. 29, it is simply a repackaging of plaintiffs' erroneous argument that the Rule is not the best interpretation of the NFA. *See supra* pp. 17-24.

Moreover, to the extent that plaintiffs urge that the Rule is invalid because the agency does not possess some sufficiently clear "delegation" of "authority to create a legislative rule," Br. 30, that is incorrect. For one, the Rule is an interpretive—not a legislative—rule. *See supra* pp. 16-17. Thus, the Rule's validity is not dependent on any delegation of rulemaking authority. Regardless, Congress has unambiguously vested in the Attorney General the authority to prescribe rules and regulations to enforce the NFA and other legislation regarding firearms. *See* 18 U.S.C. § 926(a); 26 U.S.C. § 7805(a); *id.* § 7801(a)(2)(A). In turn, the Attorney General has delegated that responsibility to ATF, a bureau within the Department of Justice. 28 C.F.R. § 0.130. As the district court correctly concluded, *see* ROA.436, that authority amply supports ATF's issuance of its rule interpretating the statutory definition of "rifle."

### 3.    The Rule Does Not Violate the APA's Procedural Requirements

Unable to demonstrate any error in the Rule's interpretation of the NFA, plaintiffs contend (at 39-45) that ATF failed to give proper notice because the Rule

departs from the point-based approach proposed in the NPRM. But the Rule is an interpretive rule not subject to the APA's notice-and-comment requirements and is, in any case, a logical outgrowth of the NPRM.

a. The Rule, which simply clarifies ATF's understanding of the best meaning of the NFA's designed-and-intended standard, is an interpretive rule, *see supra* pp. 16-17, that is not subject to the APA's notice-and-comment requirements, *see* 5 U.S.C. § 553(b)(A).

In response, plaintiffs primarily urge that the Rule is not interpretive because it does not "genuinely leave[] the agency and its decision-makers free to exercise discretion"—that is, because once ATF "determine[s] that a braced pistol is" a rifle using the Rule's approach, that conclusion will remove ATF's discretion not to consider the weapon subject to the NFA. Br. 40-41 (quoting *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015)). That argument fails on all levels.

Whether a rule leaves an agency free to exercise discretion is relevant to the question whether that rule is a "policy statement," not whether it is an interpretive rule. *Texas*, 809 F.3d at 171. "[T]he requirement of notice and comment attaches only to rules that are both 'substantive' and 'legislative.'" *FTI*, 58 F.4th at 241 n.5. Interpretive rules inform the public of an agency's view on the meaning of statutory terms and are in that sense substantive; such rules are, of course, meant to be followed by the agency when it applies those terms. That does not mean notice and comment are required.

In any event, the Rule does not circumscribe ATF's enforcement discretion. If a braced firearm is a short-barreled rifle, the NFA's requirements apply of the statute's own force. But nothing in the Rule requires ATF to pursue any particular enforcement action. *Cf.* 88 Fed. Reg. at 6554 (recognizing different enforcement avenues). And were an individual to be charged with unlawful possession, a court would determine whether the statute—not the Rule—covered the conduct.

Nor are plaintiffs correct (at 41 n.23) that the fact that ATF issued the rule through notice and comment means the rule is legislative. Agencies are "free to grant additional procedural rights in the exercise of their discretion." *Perez*, 575 U.S. at 102 (quotation omitted). ATF's decision to do so did not transform the Rule into a legislative rule.

b. Even were ATF required to undertake notice and comment, nothing about that process was deficient. The NPRM announced ATF's intent to amend the regulatory definition of "rifle," proposed that ATF consider evidence beyond a party's stated intent in determining whether a firearm was designed and intended to be fired from the shoulder, and included a list of specific factors—arranged in a points-based worksheet—that ATF proposed to consider. *See* 86 Fed. Reg. 30,826, 30,826-29 (June 10, 2021).

That description provided sufficient notice to permit parties to offer informed comments. Indeed, ATF received 237,000 comments from interested parties. *See* 88 Fed. Reg. at 6497. Many of those comments expressed "general dissatisfaction" with

the points-based worksheet, which commenters found "confusing and overly complex." *Id.* at 6510.

Heeding commenters' dissatisfaction, ATF abandoned the specific points-based system and instead identified evidence—such as specific design features—that ATF considers probative of intent. *See* 88 Fed. Reg. at 6513 ("[T]his rule clarifies and simplifies the criteria from the Worksheet[.]"). In all cases, however, "the objective design features and factors listed in the rule that indicate the weapon is designed, made, and intended to be fired from the shoulder are derived from the NPRM and proposed Worksheet 4999." *Id.* at 6480; *see also id.* at 6494 ("The factors discussed in the NPRM will, under the final rule, continue to help determine whether a weapon meets the statutory definition of a 'rifle.'").

In short, as the district court held, the NPRM not only "put the affected public on notice of the subjects and issues" the Rule would address, but it also informed the public of "the very criteria the agency would" eventually adopt in the Rule. ROA.438. Given that close connection between the NPRM and the Rule, the "possibility" that ATF might adjust the specific framework for feasibility or other reasons was more than "reasonably foreseeable." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007).

Contrary to plaintiffs' contention (at 41-45), an NPRM is not required to "specifically identify every precise proposal which the agency may ultimately adopt as a final rule," *Chemical Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (quotation

and alteration omitted). Instead, a notice need only "adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (quotation omitted). The NPRM more than sufficed to "fairly appris[e] interested persons," *id.* at 448 (quotation omitted), of the Rule's general approach and the specific evidence of intent and design it identifies.

No more persuasive is plaintiffs' reliance on (at 45) the difference between ATF's estimations of the Rule's economic effects in the NPRM and in the Rule. In the single case plaintiffs cite, the court relied in part on the NPRM's suggestion that there "should not be a major impact associated with" the rule—and the "mere 26 pages" of submitted comments—to conclude that the agency had not provided adequate notice that it was proposing to reconsider, rather than merely clarify, a preexisting policy. *Allina Health Servs. v. Sebelius*, 746 F.3d 1102, 1108 (D.C. Cir. 2014). Here, by contrast, the Rule made clear the scope of ATF's intended action; as explained, 237,000 comments were submitted, reflecting that the public was aware of the agency's proposal.

c. Regardless, any error would be harmless. Under the APA, plaintiffs must "demonstrate prejudice from" the agency's asserted error. *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012) (quotation omitted), *aff'd*, 569 U.S. 290 (2013). Plaintiffs claiming that notice was inadequate must show that "had proper notice been provided, they would have submitted additional, different comments that could have

invalidated the [agency's] rationale." *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (per curiam). Plaintiffs do not identify any specific comments that they would have submitted, much less explain how any such hypothetical comments would have affected ATF's reasoning.

## B.     Neither the Rule nor the Statute Violates the Second Amendment

As the district court correctly concluded, *see* ROA.441-43, plaintiffs have failed to demonstrate a likelihood of success on their claim that the Rule and the NFA violate the Second Amendment. To establish a Second Amendment violation, plaintiffs must first show that the Rule implicates "the Second Amendment's plain text." *New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). If plaintiffs meet that threshold requirement, the government is then required to "demonstrate that the [Rule] is consistent with this Nation's historical tradition of firearm regulation." *Id.* Plaintiffs' claims founder on both text and history.

### 1.     The Text of the Second Amendment Is Not Implicated

a. The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Second Amendment's protection extends only to "instruments that constitute bearable arms" and that are "typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581-82, 625 (2008). Neither stabilizing braces alone nor short-barreled rifles qualify.

First, because the Second Amendment covers only bearable arms, laws that regulate firearm accessories or attachments do not implicate its protections. A stabilizing brace is "not a weapon in itself"; regulation of braces thus does not implicate conduct protected by the Amendment's plain text, just as a "silencer is a firearm accessory" and so is not "protected by the Second Amendment." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018). Plaintiffs' concerns (at 20 n.16) regarding burdens they believe the Rule may place on their ability to possess or transact in detached braces therefore have no grounding in the Second Amendment.

In response, plaintiffs contend in a footnote (at 15 n.10) that stabilizing braces must be protected because, otherwise, the government could "ban[] virtually all firearms" by banning constituent parts like barrels and triggers. That argument is unpersuasive. Unlike a barrel or a trigger, a stabilizing brace is not integral to the operation of any firearm.

Second, it has been understood for at least a century that short-barreled rifles are dangerous and unusual weapons. Like other NFA firearms, they have long been regulated due to their "quasi-suspect character," *Staples v. United States*, 511 U.S. 600, 611-12 (1994), and Congress has found they can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395. This reality arises from "their concealability" compared to long-barreled rifles and "their heightened ability to cause damage" compared to handguns—"a function of the projectile design, caliber, and

propellant powder used in the ammunition and the ability to shoulder the firearm for better accuracy." 88 Fed. Reg. at 6499.

For this reason, the Supreme Court has twice affirmed that short-barreled shotguns are "dangerous and unusual weapons" not protected by the Second Amendment. Shortly after the NFA's enactment, the Supreme Court rejected a Second Amendment challenge to the statute's restrictions on short-barreled shotguns. *United States v. Miller*, 307 U.S. 174, 178 (1939). And in *Heller*, the Court reaffirmed that conclusion, explaining that "short-barreled shotguns" are unprotected because they are "dangerous and unusual" weapons. *Heller*, 554 U.S. at 581, 622-25 (2008); *cf.* Br. 17 (erroneously suggesting *Heller* concludes that all semiautomatic arms are not "dangerous and unusual"). As the courts of appeals have repeatedly concluded, that principle applies equally to short-barreled rifles, because there is "no constitutional distinction" between the two. *United States v. Stepp-Zafft*, 733 F. App'x 327, 329 (8th Cir. 2018); *see Cox*, 906 F.3d at 1185; *see United States v. Gilbert*, 286 F. App'x 383, 386 (9th Cir. 2008) (unpublished).

This conclusion is confirmed by application of the approach this Court adopted in *Hollis v. Lynch*, 827 F.3d 436, 448-49 (5th Cir. 2016) for evaluating whether a firearm is dangerous and unusual. This approach considers the extent to which the firearm is regulated or banned and the absolute and relative number of that firearm in circulation.

Short-barreled rifles are substantially regulated—or banned—by jurisdictions across the country. Their regulation under the NFA reflects Congress's finding that they are particularly dangerous and "likely" to be "used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion); *see United States v. Serna*, 309 F.3d 859, 863 (5th Cir. 2002) ("In enacting gun control legislation Congress expressed the view that a short-barreled firearm, or sawed-off shotgun, when unlawfully possessed, is primarily used for violent purposes."); *United States v. Jennings*, 195 F.3d 795, 799 (5th Cir. 1999) ("The primary reason that unregistered possession of [NFA] weapons is a crime is the virtual inevitability that such possession will result in violence."). And at least 30 States and the District of Columbia generally prohibit possession of short-barreled rifles outright or unless the NFA is followed,[2] which is comparable to the 34 States that impose similar restrictions on machineguns. 827 F.3d at 450.

---

[2] Ala. Code § 13A-11-63(a); Alaska Stat. Ann § 11.61.200(c); Ariz. Rev. Stat. Ann. § 13-3101(B); Cal. Penal Code § 16590, § 33215; Colo. Rev. Stat. Ann. § 18-12-102(1), (3), (5); D.C. Code Ann. § 7-2502.02; Fla. Stat. Ann. § 790.221(1)-(3); Ga. Code Ann § 16-11-122, § 16-11-121(4), § 16-11-122; Haw. Rev. Stat. Ann. § 134-8; Ill. Comp. Stat. Ann. § 24-1(a)(7)(ii), § 24-2(c)(7); Iowa Code Ann § 724.1C; La. Stat. Ann. § 40:1785; Md. Code Ann., Pub. Safety § 5-203; Mich. Comp. Laws Ann. § 750.224b; Mo. Ann. Stat. § 571.020; Mont. Code Ann. § 45-8-340; Neb. Rev. Stat. Ann. § 28-1203; Nev. Rev. Stat. Ann. § 202.275; N.J. Stat. Ann. § 2C:39-3(b), § 2C:39-1(o); N.Y. Penal Law § 265.00(3)(c), (d), § 265.01-b; N.C. Gen. Stat. Ann. § 14-288.8; N.D. Cent. Code Ann. § 62.1-02-03; Ohio Rev. Code Ann. § 2923.17; Okla. Stat. Ann. tit. 21, § 1289.18(B)-(E); Or. Rev. Stat. Ann. § 166.272(1)-(4); 11 R.I. Gen. Laws Ann. § 11-47-8(b); S.C. Code Ann. § 16-23-230, § 16-23-250; Tex. Penal Code Ann. § 46.05(a)(1)(C); Va. Code Ann. § 18.2-300, § 18.2-303.1; Wash. Rev. Code Ann. § 9.41.190(4); Wis. Stat. Ann. § 941.28(2)-(4).

Moreover, out of the hundreds of millions of firearms in the United States, there are only approximately 530,000 registered short-barreled rifles. *See* ATF, Firearms Commerce in the United States: Annual Statistical Update 2021, at 15-16.[3] Short-barreled rifles thus constitute a miniscule portion of all firearms and exist in numbers far lower than the benchmark numbers this Court and others have employed to indicate common use. *See Hollis*, 827 F.3d at 449-50 (citing other court decisions— including one later vacated on rehearing en banc—concluding that the possession of "50 million large-capacity magazines" and "8 million AR- and AK-platform semi-automatic rifles" suggested the weapons were in common use (quotation omitted)). Moreover, although plaintiffs suggest (at 17) that the relevant comparator may include many of the estimated 3 million stabilizing braces, that is incorrect. If those braces have been used to make short-barreled rifles that have not been registered, possession of those weapons is unlawful. A decade of widespread violation of the NFA cannot create a constitutional right. In any event, even counted on plaintiffs' terms, the number of short-barreled rifles remains well below the relevant benchmarks.

In response, plaintiffs do not engage with any of the evidence deemed relevant in *Hollis* (indeed, do not even cite *Hollis*). Instead, they primarily argue (at 17) that Justice Alito's concurring opinion in *Caetano v. Massachusetts*, 577 U.S. 411 (2016), concluded that stun guns were commonly owned on the basis that 200,000 such

---

[3] *Available at* https://www.atf.gov/firearms/docs/report/2021-firearms-commerce-report/download.

weapons were possessed. Of course, the concurrence that plaintiffs cite is—unlike *Hollis*—not binding on this Court. And this Court rejected a similar argument in *Hollis*, explaining that the *Caetano* concurrence did not rely on "the absolute number by itself" but on the number of weapons "paired with the statistic that stun guns may be lawfully possessed in 45 states." 827 F.3d at 450.

b. As the district court correctly suggested, *see* ROA.441-42, even if braces or short-barreled rifles were generally covered by the Second Amendment, the NFA's regulatory scheme, which includes registration, approval, and taxation requirements, does not infringe the right because it does not prevent individuals from exercising the Second Amendment "right to bear arms in public for self-defense." *Bruen*, 142 S. Ct. at 2156.

i. The Supreme Court has repeatedly explained that its decisions do not "cast doubt" on "laws imposing conditions and qualifications on the commercial sale of arms," *Heller*, 554 U.S. at 626-27. Similarly, the Supreme Court has spoken approvingly of shall-issue licensing regimes that require applicants to (for example) "undergo a background check or pass a firearms safety course" in order "to ensure only that those bearings arms in the jurisdiction are, in fact, law-abiding, responsible citizens," *Bruen*, 142 S. Ct. at 2138 n.9 (quotation omitted). These regimes, the Court has explained, are permissible because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Id.* (quotation omitted). The NFA, which permits law-abiding individuals to

manufacture, purchase, and possess short-barreled rifles, does no more than similarly impose modest regulatory requirements to ensure that such weapons are used only by law-abiding citizens. And, indeed, the Rule alleviated some of those requirements by permitting previous possessors of braced firearms to register for free by May 31.

The restricted sweep of the NFA underscores the correctness of this view. The firearms subject to the NFA's requirements are limited to narrow classes of arms that Congress has determined are particularly dangerous, such as short-barreled rifles and shotguns, machineguns, and destructive devices. *See* 26 U.S.C. § 5845(a). The NFA in no way interferes with individuals' ability to possess the most common firearms, including handguns ("the quintessential self-defense weapon," *Heller*, 554 U.S. at 629) and full-length rifles. Plaintiffs have not demonstrated that the NFA's requirements meaningfully limit their exercise of the right to armed self-defense. *Cf. International Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 371 (5th Cir. 2010) (upholding fees imposed on certain First Amendment processions in part because the regulatory regime provided "sufficient alternatives for expression unburdened by fees").

ii. None of plaintiffs' attempts (at 20-23) to rebut this reasoning succeeds.

First, plaintiffs appear to accept that licensing and background checks are permissible but contend (at 21-23) that the NFA's restrictions are overly burdensome and discourage ownership of short-barreled rifles. But plaintiffs' complaints are limited to generic assertions that the NFA's requirements are "onerous and ongoing"

and that registration takes a period of time; plaintiffs do not provide any additional details to demonstrate with specificity that the NFA's requirements reflect the sort of "abusive" or "exorbitant" regulatory regimes that *Bruen* suggested might implicate the Second Amendment. 142 S. Ct. at 2138 n.9. More fundamentally, plaintiffs' complaints cannot provide any basis to *facially* invalidate the NFA. At most plaintiffs might challenge processing times with respect to a specific registration request. But that contention cannot succeed here: the Rule provided that individuals could register their currently possessed short-barreled rifles by May 31 and continue to possess those items while they await ATF approval. 88 Fed. Reg. at 6480-81.

Second, plaintiffs erroneously suggest (at 22) that the Supreme Court's statements in *Bruen* are irrelevant here because the Court focused on licensing, not registration, regimes. But *Bruen*'s reasoning is not limited to licensing; rather it reflects the conclusion that regulatory burdens aimed at ensuring that firearms are possessed by responsible, law-abiding citizens are permissible where they do not undermine the ability of an individual to exercise her Second Amendment rights. Similarly unpersuasive is plaintiffs' reliance (at 22) on then-Judge Kavanaugh's dissent in *Heller v. District of Columbia*, 670 F.3d 1244 (D.C. Cir. 2011). That dissent addressed the permissibility of a D.C. law requiring "[r]egistration of all lawfully possessed guns"—a requirement that was "significantly more stringent than any other federal or state gun law in the United States." *Id.* at 1270 (Kavanaugh, J., dissenting). But the NFA does

not require registration of all lawfully possessed guns; rather it requires registration of a very narrow set of weapons that Congress determined are especially dangerous.

Plaintiffs also briefly argue by analogy to the First Amendment (at 20-21) that the NFA's tax is categorically unconstitutional. But short-barreled rifles are unprotected by the Second Amendment, as explained. In any event, even in the First Amendment context, the Supreme Court and this Court have made clear that not all taxes or fees affecting constitutional rights are impermissible. *See, e.g.*, *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941); *International Women's Day March*, 619 F.3d at 370. And application of principles specific to the Second Amendment makes clear that the NFA's tax is permissible. The NFA's statutory scheme fits comfortably within the regulatory regimes that *Bruen* approved as not infringing the right (even though such regimes, like the NFA, necessarily impose costs on applicants). *See supra* pp. 36-37. And such taxes and costs are amply supported by history. *See infra* pp. 39-42.

## 2. Historical Tradition Confirms the NFA Is Lawful

The NFA, enacted nearly a century ago, is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. Since colonial times, States have regulated the possession and manufacture of firearms by imposing registration, approval, and taxation requirements analogous to the NFA's.

a. The colonies routinely imposed requirements that—like the NFA— authorized the government to keep a record of firearm ownership in the community. Thus, as early as 1631, Virginia required a regular survey of the arms and munition in

the colony, *see* Add.18, and Rhode Island (1667), *see* Add.24, South Carolina (1747), *see* Add.26, and New Jersey (1781), *see* Add.68, similarly authorized door-to-door surveys of firearms. Indeed, these laws swept substantially more broadly than the NFA by applying to all firearms.

In addition, a number of colonies and early States imposed inspection or testing requirements that—like the NFA's scheme—were aimed at ensuring safe firearm possession. Thus, Massachusetts (1775), *see* Add.49, and New York (1778), *see* Add.57, provided for inspections of militia members' firearms, while Massachusetts (1805), *see* Add.84, and Maine (1821), *see* Add.95, required that firearm barrels generally be inspected and marked before sale. Similarly, Massachusetts (1651, 1809), *see* Add.21; Add.87, Connecticut (1775), *see* Add.45, and New Hampshire (1820), *see* Add.91, required licenses or inspection to export or sell gunpowder. And not only did those colonies and States impose incidental costs on firearm ownership through such regulatory requirements, but other States—including Mississippi (1844, 1867), *see* Add.97; Add.112, North Carolina (1857), *see* Add.100, Georgia (1866), *see* Add.105, and Alabama (1867), *see* Add.108—also enacted direct taxes on firearms ownership.

Taken together, these laws reflect a historical tradition of regulation "relevantly similar" to the requirements under the NFA. *Bruen*, 142 S. Ct. at 2132. Like these laws, the NFA taxes and regulates (but does not prohibit) firearm ownership to ameliorate the danger that weapons pose and gather information on firearms. Those restrictions are "comparable" and "comparably justified" to past laws. *Id.* at 2133.

b. In response, plaintiffs contend (at 18) that these historical regulations do not suffice to show a tradition of regulation because they are "questionable outliers" and "come from inapposite time periods either long before or long after" the Second Amendment. That contention fails: the cited laws encompass more than half of the 13 colonies, as well as a significant percentage of early States—hardly the sorts of "outliers" that might be disregarded. And even "relatively few" historical examples may suffice where there were "no disputes regarding the lawfulness" of those statutes, *Bruen*, 142 S. Ct. at 2133; plaintiffs do not mount any argument that the cited laws were the subject of contemporaneous debate. Plaintiffs' contentions are no more successful with respect to timing. Many of the cited laws were enacted in the decades surrounding the Second Amendment's ratification, and, as *Heller* makes clear, the Second Amendment "codified a pre-existing right," 554 U.S. at 592. Laws dating before 1791 therefore shed light on the scope of that right.

Although plaintiffs generally state (at 18-19) that the cited laws are different from the NFA, *Bruen* makes clear that the government need not identify "historical twins"—"historical analogues" are sufficient. 142 S. Ct. at 2133. And plaintiffs fail to explain why the historical laws cited above do not meet that standard. Plaintiffs do not, for example, compare the burdens imposed by those laws to the burdens imposed by the NFA, nor do they explain how the justifications for the laws might differ. In short, nothing that plaintiffs say undercuts the fundamental lesson to be drawn from the historical record: it is consistent with historical tradition for the

government to impose regulatory requirements, such as registration, inspection, and taxation requirements, that burden (not ban) ownership of firearms to ensure that those arms are used in a safe manner.

## C.    Plaintiffs' and Amici's Remaining Challenges Are Unavailing

1. As the district court correctly held, *see* ROA.440, plaintiffs err in arguing (at 35-38) that the Rule violates the First Amendment.

As explained, the Rule "clarifies that marketing or promotional materials indicating the intended use of the weapon" may be probative evidence "in determining whether the weapon is designed, made, and intended to be fired from the shoulder." 88 Fed. Reg. at 6512. Plaintiffs urge (at 35, 38) that the use of marketing materials in this way "effectively penaliz[es that] speech" and "disfavors certain viewpoints and speakers," in violation of the First Amendment.

That contention is unavailing. As the district court explained, "no speech is being proscribed" by the Rule or by the statute. ROA.440. Instead, "[p]laintiffs and others may continue to speak freely," and the Rule simply "notifies the public that the government will listen to their speech to discern whether a particular weapon falls within the NFA's scope." ROA.440. It is well established that the First Amendment "does not prohibit the evidentiary use of speech," including to demonstrate "intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489-90 (1993); *see also, e.g. Nicopure Labs, LLC v. FDA*, 944 F.3d 267, 282-83 (D.C. Cir. 2019) (explaining that the First Amendment is

42

not offended by the government's "use of a product's marketing and labeling" as "evidence of that product's intended use"). And of course, it is not surprising that the evidentiary value of the speech may turn on the identity of the speaker. It does not, for example, violate the First Amendment for the government to treat a defendant's confession as more probative than statements made by other individuals. That is not, *contra* Br. 38, an impermissible speaker-based prohibition on speech.

2. Amici advance additional claims that the Rule is invalid. Those claims are not properly before the Court and provide no basis to reverse, in any event.

As an initial matter, in "our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020). That principle generally requires the parties to "advanc[e] the facts and argument entitling them to relief." *Id.* (quotation omitted). Thus, "[a]bsent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae." *Laveta McA. ex rel. Christopher M. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1292-93 (5th Cir. 1991).

This case presents no exceptional circumstances that might justify relying on arguments waived by the parties. Plaintiffs in this civil case are represented by experienced counsel. *Cf. Sineneng-Smith*, 140 S. Ct. at 1579 (explaining that departure from the party presentation principle may occur "[i]n criminal cases" to "protect a pro se litigant's rights" (quotation omitted)). And many of the amici attempting to raise

claims here have brought their own suits challenging the Rule, in which they are free to raise those claims.

In any event, as the government has comprehensively explained in the various cases in which amici are parties, none of amici's arguments has merit. For example, Texas's claim (at 16-18) that the NFA does not represent a valid exercise of Congress's taxing power founders: this Court has held that the NFA implements a permissible tax and that the NFA's additional requirements are validly "part of the web of regulation aiding enforcement of" the "tax provision." *United States v. Gresham*, 118 F.3d 258, 263 (5th Cir. 1997) (quotation omitted). Similarly, Texas's claim (at 20-22) that ATF failed to consider reliance interests is belied by the Rule's specific discussion of reliance interests, *see* 88 Fed. Reg. at 6507-08, and, indeed, the Rule's adoption of compliance options specifically tailored to ameliorate any burden on such interests. And Texas's claim (at 18-20) that the Rule violates the Fifth Amendment's Self-Incrimination Clause by requiring previous possessors to register their short-barreled rifles if they wish to continue to possess them ignores not only the federal "statutory barrier against use" of NFA registrations "in a prosecution for prior or concurrent offenses," *United States v. Freed*, 401 U.S. 601, 606 (1971); *see also* 26 U.S.C. § 5848, but also the fact that nothing in the Rule compels any previous possessor to register (rather than, for example, surrender or destroy) his braced firearm. Nor does Texas explain how it can assert self-incrimination rights under the Fifth Amendment.

## II.   Plaintiffs Have Not Demonstrated the Equitable Factors Necessary To Support an Injunction

### A.   Plaintiffs Have Not Shown Irreparable Harm

1. In claiming harm from the Rule, plaintiffs primarily assert harms stemming from the application of the NFA to short-barreled rifles they own or manufacture, or intend to acquire or manufacture. But a plaintiff can demonstrate harm only where a "new requirement" imposes "new costs." *Restaurant Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 599 (5th Cir. 2023). Plaintiffs' alleged harms, however, are untethered from the Rule and spring instead from the NFA.

The NFA has applied to short-barreled rifles for decades, and ATF has long considered many braced weapons to be short-barreled rifles. *See, e.g.*, 88 Fed. Reg. at 6483; *id.* at 6487; *id.* at 6493. The Rule clarifies ATF's approach and increases consistency by articulating a framework for evaluating classification requests. Plaintiffs have never claimed that they desire to possess or manufacture weapons that are not properly classified as short-barreled rifles under the statute. Nor have they set forth any other basis for concluding that the Rule imposes "new costs" that would justify an injunction. They therefore cannot obtain an injunction against the Rule.

2. In any event, the NFA's requirements do not impose irreparable harm. For example, plaintiffs allege that the cost of acquiring passport photos and fingerprints for an application is $67, *see* ROA.341, but that cost is "so nominal as to be de minimis," *Usery v. Pilgrim Equip. Co.*, 527 F.2d 1308, 1314 (5th Cir. 1976) (annual

charge of $50, adjusted for inflation). Likewise, the NFA's tax on firearms is not *irreparable* harm because an individual who pays the tax but believes the statute does not cover his weapon may request, or sue for, a refund. *See* 26 U.S.C. § 7422; *cf. Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

And despite plaintiffs' suggestion otherwise (at 48), the NFA's penalties for noncompliance are irrelevant. It is undisputed that plaintiffs may continue to manufacture, possess, and transfer short-barreled rifles—with no threat of criminal or civil liability—so long as they comply with the NFA's requirements. Plaintiffs cannot manufacture irreparable harm by choosing not to comply with those minimally burdensome requirements. Such "self-inflicted" injury "does not qualify as irreparable." *Texas v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (per curiam) (quotation omitted).

3. Plaintiffs claim (at 46-48) a scattershot of additional injuries, but none persuades. As an initial matter, plaintiffs assert (at 46) that they suffer irreparable harm because the agency violated their constitutional rights. As explained, plaintiffs are not likely to succeed on those claims. But even if they were, the mere "invocation" of a constitutional right "cannot substitute for the presence of an imminent, non-speculative irreparable injury." *Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). That showing may be made where the impairment of a constitutional right inflicts an immediate and significant real-world injury, as with limitations on the freedom of speech or conscience. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). But here, plaintiffs

fail to demonstrate any such injury. For example, the NFA requirements indisputably do not prevent plaintiffs from keeping and bearing their arms (including short-barreled rifles, if registered) for self-defense, nor does the Rule punish or prohibit any speech. *See supra* pp. 42-43.

The manufacturer plaintiff has failed to provide any persuasive evidence substantiating its assertion (at 46-48) that the Rule has destroyed the market for its braces and braced pistols such that it may go out of business. It has not, for example, provided evidence that any decline in sales was caused by the Rule and not by other factors, such as unrelated market forces or the manufacturer's apparent choice to "cease[] all sales of its braced pistols" rather than comply with the NFA's requirements, *see* ROA.337. Indeed, the manufacturer plaintiff acknowledges that it complies with the NFA when it sells other NFA firearms. *See* ROA.336. And to the extent individuals will only choose to purchase braced weapons if they would not be subject to the NFA's requirements, that fact only underscores ATF's determination that such braced weapons are in fact short-barreled rifles designed and intended to be fired from the shoulder. Plaintiffs can hardly claim cognizable injury from their newfound inability to facilitate circumvention of the federal gun laws.

### B.    The Balance of Equities and the Public Interest Weigh Against Injunctive Relief

Even if plaintiffs had shown some irreparable harm, that harm would not outweigh the countervailing public interest. *See Nken v. Holder*, 556 U.S. 418, 435

(2009) (explaining that the balance of equities and public interest "merge" when the government is a party).

First, the Rule promotes regulatory clarity and consistency. As explained, ATF's previous case-by-case "classification determinations had led to confusion" about how to evaluate a braced firearm and inconsistent determinations. *See* 88 Fed. Reg. at 6484 n.26, 6494. Thus, the Rule provides an in-depth explanation of the proper approach for the benefit of the agency and the regulated public. Enjoining the Rule would promote confusion and might require ATF to revert to an outdated approach "that no longer reflects its current enforcement thinking," which "is not in the public interest." *MediNatura, Inc. v. FDA*, 998 F.3d 931, 945 (D.C. Cir. 2021).

In addition, the NFA, and the Rule clarifying its application, benefit public safety. As explained, Congress has found that short-barreled rifles are powerful concealable weapons that can "be used readily and efficiently by criminals," H.R. Rep. No. 83-1337, at A395, and has established a registration-and-taxation scheme to track such firearms to keep them away from non-law-abiding citizens. *See Bezet v. United States*, 276 F. Supp. 3d 576, 612 (E.D. La.), *aff'd*, 714 F. App'x 336 (5th Cir. 2017); *cf.* 88 Fed. Reg. at 6499 (reviewing prevalence of braced weapons in criminal investigations).

In response, plaintiffs do not appreciably contest any of these equities. Instead, they argue (at 49-50) the government's equities and the public interest should be discounted because in their view they are likely to show that the Rule is unlawful. But

that argument rests on a fundamental misapplication of the preliminary injunction framework. To prevail, plaintiffs must demonstrate not only that they are "likely to succeed on the merits," but also that "the balance of equities tips in [their] favor" and "that an injunction is in the public interest." *Winter*, 555 U.S. at 20. If plaintiffs' reasoning were correct, the consideration of equitable factors would collapse into one inquiry: any plaintiff who could establish a likelihood of success on the merits would also establish that the balance of equities and the public interest tipped in her favor. That is not the law. *See id.* at 31-32 (declining to "address the underlying merits" but holding plaintiffs had failed to meet the equitable factors).

### C.     Plaintiffs' Request for Nationwide Relief Is Overbroad

1. In any event, plaintiffs' request for nationwide relief is overbroad in multiple respects. At the outset, fundamental constitutional and equitable principles require the Court to limit any injunction to the specific plaintiffs whom the Court finds have demonstrated some irreparable injury from the Rule. *See Gill v. Whitford*, 138 S. Ct. 1916, 1929-30 (2018) (Article III authorizes federal courts to grant relief only to remedy "the inadequacy that produced [the plaintiff's] injury" (quotation omitted)); *Califano v. Yamazaki*, 442 U.S. 682, 702 (1979) (similar constraints in equity).

In response, plaintiffs primarily argue (at 51) that this Court has the power to "set aside" the Rule nationwide under the APA. Even assuming this Court has the power to do so at final judgment, *but see* Brief for the Petitioners at 40-44, *United States v. Texas*, No. 22-58 (U.S. Sept. 12, 2022), the question whether to grant a preliminary

injunction is indisputably subject to the constraints of equity. The sole case plaintiffs cite to support their argument is not to the contrary. *See Data Mktg. P'ship, LP v. U.S. Dep't of Labor*, 45 F.4th 846, 859-60 (5th Cir. 2022) (appeal following grant of summary judgment).

And the need for restraint is particularly clear here, because "[o]ther courts are considering these same issues." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam). Lawsuits challenging the Rule are pending in the Fourth Circuit and in district courts in the Eighth and Eleventh Circuits, as well as other district courts in this Circuit. Allowing those suits to proceed and the issues to percolate both respects the coequal authority of those other circuits and benefits the judiciary generally. *See Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022) (Sutton, C.J., concurring).

2. At the very least, any injunction should be narrower than that granted pending appeal.

First, no injunction should extend to the members of plaintiff Firearm Policy Coalition. Not only are the association's allegations of harm entirely undeveloped, *see* Br. 48, but the Coalition fails to demonstrate that it possesses associational standing to litigate on behalf of its members. The Coalition has not shown that it is a bona fide membership organization. It has not identified any "indicia of membership," such as "a clearly articulated and understandable membership structure" with members who "elect[] the governing body," nor has it explained how its members direct or control the organization. *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th

Cir. 1997). To the contrary, the Coalition's explanation that it has "hundreds of thousands of members across the country" and that any individual may join through its website, ROA.332, suggests the lack of any such structure or member control. *Cf. VanDerStok v. Garland*, 2022 WL 4809376, at *7 (N.D. Tex. Oct. 1, 2022) (declining to extend injunction to the Coalition's members). Under plaintiffs' view, a "member" need only donate to the cause; the Coalition would then purport to litigate on behalf of that member, including presumably binding that member to any final judgment.

The nature of this lawsuit confirms that an injunction should not be granted to cover the association's "members." The claims asserted here cannot be resolved without an understanding of whether each member has a firearm equipped with a stabilizing brace and, if so, whether that braced weapon is a short-barreled rifle under the statute. *Cf. Friends for Am. Free Enter. Ass'n v. Wal-Mart Stores, Inc.*, 284 F.3d 575 (5th Cir. 2002) (holding that association lacked standing because the court "would need individualized information" to "determine the proper scope of an injunction").

Finally, any extension of an injunction to the Coalition's members would severely undermine public safety and regulatory clarity, such that the balance of the equities could not support it. As explained, the government and the public possess substantial interests in reinforcing the controls that Congress determined are necessary to ameliorate the specific risk that short-barreled rifles pose to the public. Extending the injunction to hundreds of thousands, or more, unnamed individuals would substantially undermine not only that public safety benefit but also the

regulatory clarity and consistent enforcement of those statutory requirements brought about by the Rule. The scope of this proposed injunction is laid bare by Firearms Policy Coalition tweets urging the public to join (*i.e.*, donate to) the organization to receive the benefit of the injunction. *See, e.g.*, Firearms Policy Coalition, Twitter (May 23, 2023 8:45 PM), https://twitter.com/gunpolicy/status/1661171414186049538 ("We cannot predict what the Court will do with our request for clarification. So the best we can say tonight is: Plan ahead. Become an FPC Official Member at JoinFPC.org TODAY[.]").

Plaintiffs' request (at 52) that any injunction cover plaintiff Maxim's customers and other unspecified downstream entities also contravenes equitable principles. Plaintiffs present nothing that could justify imperiling the public interest in service of extending the injunction to various unnamed and unknowable third parties. And plaintiffs' request is particularly pernicious given the reality of firearm sales. The injunction plaintiffs request would permit any individual to continue to circumvent the NFA, so long as he shops at Maxim (or at a dealer that sells Maxim's products). Such relief would not be limited and tailored but would instead permit continued circumvention of Congress's requirements.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney*
*General*

LEIGHA SIMONTON
*United States Attorney*

ABBY C. WRIGHT
SEAN. R. JANDA

*s/ Ben Lewis*
BEN LEWIS
*Attorneys, Appellate Staff*
*Civil Division, Room 7250*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-2494*
*benjamin.r.lewis@usdoj.gov*

June 2023

## CERTIFICATE OF SERVICE

I hereby certify that on June 15, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.  Service will be accomplished by the appellate CM/ECF system.

*s/ Ben Lewis*

Ben Lewis

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12992 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Ben Lewis*
Ben Lewis