# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 1, 2023

Lyle W. Cayce
Clerk

No. 23-10319

WILLIAM T. MOCK; CHRISTOPHER LEWIS; FIREARMS POLICY
COALITION, INCORPORATED, *a nonprofit corporation*;
MAXIM DEFENSE INDUSTRIES, L.L.C.,

*Plaintiffs—Appellants,*

*versus*

MERRICK GARLAND, *U.S. Attorney General,*
*in his official capacity as Attorney General of the United States*;
UNITED STATES DEPARTMENT OF JUSTICE;
BUREAU OF ALCOHOL, TOBACCO, FIREARMS, and EXPLOSIVES;
STEVEN DETTELBACH, *in his official capacity*
*as the Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives*,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:23-CV-95

Before SMITH, HIGGINSON, and WILLETT, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

The National Firearms Act of 1934 ("NFA") and the Gun Control
Act of 1968 ("GCA") are two of the primary means of federal arms regula-
tion and licensure. To that end, the statutes impose heightened, and at times,

No. 23-10319

onerous requirements on manufacturing, selling, and transferring certain firearms, including short-barreled rifles ("SBRs"). Pistols and handguns are not subject to those extra requirements.

In 2012, a federal firearms licensee ("FFL") submitted a "stabilizing brace" for review to the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and asked whether that stabilizing brace, when attached to a pistol, transformed the pistol into a rifle and thus an SBR. The stabilizing brace was intended to attach to the forearm and, according to the licensee, to permit disabled and weaker persons to fire pistols more easily. Although the brace also could be used to shoulder the weapon, the ATF initially indicated that the brace did not transform the pistol into a rifle. Now, a decade later, the use of stabilizing braces and braced pistols has dramatically increased.

So, in 2021, the ATF issued a Proposed Rule[1] indicating that the agency would use a point system to classify a firearm with a stabilizing brace as either a braced pistol or a rifle. After a comment period, during which the agency received hundreds of thousands of negative comments, the ATF published the Final Rule.[2]

The Final Rule scrapped the points-based approach of the Proposed Rule and, instead, instituted a six-factor balancing test considering everything from the weight of the firearm with the stabilizing brace attached to the prevalence of Youtubers' demonstrating the likely use of the weapon.

The Final Rule went into effect on January 31, 2023, but the ATF allowed a grace period of four months, which ended on May 31, 2023, giving

---

[1] Factoring Criteria for Firearms with Attached "Stabilizing Braces," 86 Fed. Reg. 30826 (June 10, 2021) ("Proposed Rule").

[2] Factoring Criteria for Firearms with Attached "Stabilizing Braces," 88 Fed. Reg. 6478 (Jan. 31, 2023) ("Final Rule").

owners of weapons now considered SBRs multiple options for compliance, including registration under the NFA, before criminal penalties would take effect.

These plaintiffs sued for injunctive relief, alleging various statutory deficiencies with the process and substance of the Final Rule. They also brought constitutional challenges. The district court denied injunctive relief, and after it did not rule expeditiously on a motion for an injunction pending appeal, this court enjoined enforcement of the Final Rule against the named plaintiffs. Plaintiffs now request that we extend that interim relief.

We reverse the denial of an injunction because plaintiffs will likely succeed on the merits of their Administrative Procedure Act ("APA") challenge. We remand with instruction to adjudicate the remainder of the preliminary-injunction factors and determine the scope of any relief.

## I.

### A.

As stated, this suit is a challenge to the Final Rule, which announces when a device marketed as a stabilizing brace turns a pistol or handgun into a rifle. In most cases, such a weapon would subsequently be characterized as a short-barreled rifle. But examining the Final Rule, as well as the challenge to it, requires reviewing the text and history of the NFA and the GCA.[3]

The NFA applies to "firearms." 26 U.S.C. § 5861. "Firearms" is a term of art—one that is both highly under- and over-inclusive (as compared to the word's ordinary meaning today). For instance, the NFA's definition

---

[3] The Attorney General is authorized to administer and enforce the GCA and the NFA. 26 U.S.C. §§ 7801(a)(2)(A), 7805(a); 18 U.S.C. § 926(a). That authority was subsequently delegated to the ATF, which promulgates the challenged rule per those Acts. 28 C.F.R. § 0.130.

of "firearm" does not include pistols—but it does include both "silencer[s]" and "poison gas." *See id*. § 5845(a), (e), (f).  That is because the NFA was designed to target "gangster-type weapons" that are "especially dangerous and unusual."[4]  Final Rule at 6482.

Because of this, NFA "firearms" are extensively regulated.  And SBRs are regulated because an NFA "firearm" includes

> [A] a rifle having a barrel or barrels of less than 16 inches in length; . . . a weapon made from a rifle if such weapon as modified has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length; . . . any other weapon, as defined in subsection (e); . . . .
> . . .
> (e) . . . The term "any other weapon" . . . shall not include a pistol or a revolver having a rifled bore . . . .

26 U.S.C. § 5845(a), (e).  Although the NFA does not define a "pistol," it does define a "rifle":

> The term "rifle" means a weapon *designed* or redesigned, *made* or remade, *and intended to be fired from the shoulder* and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.

*Id*. § 5845(c) (emphasis added).  Putting all of that together, a weapon is a "rifle"—that is, either an ordinary rifle (which is not an NFA "firearm") or a short-barreled rifle (which is)—only if it is "designed," "made," and "intended to be fired from the shoulder."  A weapon that fails any one of those

---

[4] To that end, the NFA's definition of "firearm" also includes machineguns and short-barreled shotguns.

No. 23-10319

criteria is neither an ordinary rifle nor a short-barreled rifle. Ergo, a weapon not meeting the criteria is not a "firearm" under the NFA. A rifle is different from an SBR because of the length of the barrel. And the text also states that a "pistol" is not an NFA firearm. Nevertheless, the NFA does not define "pistol" or explain how to distinguish a pistol from an SBR.

Enter the GCA, which supplements and is much broader than the NFA. The GCA's definition of "firearm" includes "any weapon . . . designed . . . to expel a projectile by the action of an explosive." 18 U.S.C. § 921(a)(3). In other words, the GCA's definition includes all "firearms" — in both the NFA's specialized use of that word and the ordinary-meaning use. The GCA also prohibits certain persons from possessing firearms, *see, e.g.*, *id*. § 922(g)(1), and, as relevant here, establishes requirements for FFLs who wish to sell an SBR, *id*. § 922(a)(4), (b)(4).

The definition of "rifle" is essentially identical under the NFA and the GCA. *See* 18 U.S.C. § 921(a)(7); 26 U.S.C. § 5845(c). Similarly, the definitions of an SBR roughly track in both statutes, although the GCA, unlike the NFA, expressly defines the term. *Compare* 18 U.S.C. § 921(a)(8), *with* 26 U.S.C. § 5845(a)(3)–(4).

The GCA further defines a "handgun" as "a firearm which has a short stock and is designed to be held and fired by the use of a single hand" and "any combination of parts from which a firearm described [before] can be assembled." 18 U.S.C. § 921(a)(30). Per regulations providing for ATF's implementation of the NFA, the term "handgun" includes pistols and revolvers. 27 C.F.R. §§ 478.11, 479.11.[5]

———————————

[5] A pistol is a "weapon originally designed, made, and intended to fire a projectile (bullet) from one or more barrels when held in one hand, and having: [1] a chamber(s) as an integral part(s) of, or permanently aligned with, the bore(s); and [2] a short stock designed to be gripped by one hand and at an angle to and extending below the line of the

No. 23-10319

So the main difference between rifles and handguns is the shoulder stock. A handgun, intended to be fired with one hand, is statutorily required to have a short stock and functionally does not need a longer one for recoil management or aim.[6] Yet that statutory emphasis on a stock leads to some odd results: An AR-style rifle with a barrel shorter than 16 inches is subject to the restrictions of the NFA, while an identical AR-style pistol with similar dimensions but missing a shoulder stock is not.[7]

That distinction is important. NFA-regulated firearms require registration in the National Firearms Registration and Transfer Record, *see* 26 U.S.C. § 5841(a), and are subject to stringent restrictions and requirements. NFA-regulated firearms may not be possessed, made, or transferred without the authorization of the Attorney General. *Id*. §§ 5812, 5822. The ATF's authorization is also required before crossing state lines with an NFA weapon. 18 U.S.C. § 922(a)(4); 27 C.F.R. § 478.28.[8]

---

bore(s)." 27 C.F.R. § 478.11. A revolver is a "projectile weapon, of the pistol type, having a breechloading chambered cylinder so arranged that the cocking of the hammer or movement of the trigger rotates it and brings the next cartridge in line with the barrel for firing." *Id.* The relevant firearms are primarily pistols, not revolvers, so we use the terms "handgun" and "pistol" more or less interchangeably.

[6] Generally speaking, most pistols are actually fired with two hands, with the dominant hand gripping the pistol itself and the supporting hand gripping on top of the dominant hand.

[7] "AR" stands for "ArmaLite Rifle" (named after the original developer), and AR-15 rifles are rifles based on the design of the original AR-15 military rifle. AR-pistols are pistol-length versions of the rifle without a stock. *See Types of Firearms*, U.S. Concealed Carry Ass'n, https://www.usconcealedcarry.com/resources/terminology/types-of-firearms/ (last visited July 7, 2023).

[8] Although state-by-state bans on specific NFA weapons vary greatly, numerous states ban, or functionally ban, all SBRs, even if the NFA's requirements are followed. *See, e.g., What NFA Firearms Are Permitted by Each State?*, Nat'l Gun Trusts (Aug. 8, 2018), https://www.nationalguntrusts.com/blogs/nfa-gun-trust-atf-information-

No. 23-10319

Importers, manufacturers, and dealers of SBRs must register with the ATF, must pay a special occupation tax annually, and must register any SBR they manufacture. *See* 26 U.S.C. §§ 5801–02; 5841(c). Finally, when purchased by individuals, most NFA-regulated firearms, including SBRs, are subject to a $200 transfer tax stamp. *Id.* § 5811; 27 C.F.R. § 479.11. Although that financial burden is not particularly onerous today,[9] in 1934, when the NFA was enacted, the tax was explicitly intended to tax these weapons out of existence.[10] In today's dollars, $200 in 1934 is approximately $4,500.[11]

---

database-blog/nfa-items-permitted-by-state.

[9] A more burdensome issue today may be the time it takes to register a firearm under the NFA. In comments on the Proposed Rule, commentators asserted that registration often takes many months to a year. Final Rule at 6558. The ATF's response was less than reassuring, merely noting that "NFA processing times continue to decline as efficiencies and technology improve." *Id.* at 6559. Named plaintiff Christopher Lewis specifically mentioned the long delays in his declaration:

> I have specific plans to purchase at least one additional braced pistol within the next three to four months, so long as such purchase would not subject me to any civil or criminal fines or penalties and could be purchased without submitting to the heightened requirements of the NFA, including but not limited to . . . the delays imposed by the ATF and other federal agencies in administering the NFA.

[10] As the ATF itself avers, the purpose of the NFA was to "curtail, if not prohibit, transactions in NFA firearms . . . . The $200 making and transfer taxes on most NFA firearms were considered quite severe and adequate to carry out Congress' purpose to discourage or eliminate transactions in these firearms." *National Firearms Act*, ATF (Apr. 7, 2020), https://www.atf.gov/rules-and-regulations/national-firearms-act.

[11] *CPI Inflation Calculator*, U.S. Bureau of Lab. Stats., https://www.bls.gov/data/inflation_calculator.htm. The tax was set at the approximate market price of a machine gun in 1934. *See National Firearms Act: Hearing on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 12 (1934) (statement of Homer S. Cummings, Att'y Gen. of the United States).

Inflation adjustment also does not capture the severity of the tax. The tax was on a per-weapon basis, and in 1940, the average citizen earned only $1,368 a year. *See* Diane Petro, *Brother, Can You Spare a Dime? The 1940 Census: Employment and Income*, Prologue Mag., Spring 2012,

No. 23-10319

This especially restrictive regime resulted from panic over gangster-related violence and thus was instituted to regulate "weapons likely to be used for criminal purposes." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion). Attorney General Homer Cummings testified,

> A sawed-off shotgun is one of the most dangerous and deadly weapons. A machine gun, of course, ought never to be in the hands of any private individual. There is not the slightest excuse for it, not the least in the world, and we must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

*National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 6 (1934). Although not the focus of the Attorney General's comment, sawed-off shotguns were particularly valued for their ability to be easily concealed and to unleash devastating damage at short range.[12]

No one was under any misconception that gangsters would obey the strictures of the NFA. Indeed, Attorney General Cummings expounded, "I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position . . . to convict [them] because

---

https://www.archives.gov/publications/prologue/2012/spring/1940.html.

[12] As the ATF asserts, the NFA was a "direct response to gang violence" and accordingly "imposed criminal, regulatory and tax requirements on weapons favored by gangsters: machine guns, silencers and sawed-off shotguns." *National Firearms Act, 1934*, ATF (Sept. 28, 2016), https://www.atf.gov/our-history/timeline/national-firearms-act-1934; *see also* Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U. J.L. & Liberty 48, 67 (2008) (quoting a *New York Times* article from 1939 noting that the "favorite arm" of "bank robbers, gangsters and other criminals" was the sawed-off shotgun.).

No. 23-10319

[they have] not complied."[13]

Given that focus on "public safety," Congress may have believed that "a[ny] long gun with a shortened barrel is both dangerous, because its concealability fosters its use in illicit activity, and unusual, because of its heightened capability to cause damage." *United States v. Cox,* 906 F.3d 1170, 1185 (10th Cir. 2018) (cleaned up).  Accordingly, the initial draft of the NFA would have regulated a "pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."[14]

But that was not the version that Congress passed.  Instead, the final text of the NFA specifically exempts "a pistol or a revolver having a rifled bore" from its coverage.  26 U.S.C. § 5845(e).  And when Congress enacted the GCA 30 years later to expand federal firearms regulation, the statute defined handguns but did not include any additional restrictions on them.

And again, those statutory restrictions have teeth:  Failure to comply with the requirements of the NFA and GCA carries severe consequences. Violating the GCA exposes one to criminal penalties, including fines and a maximum of five years' imprisonment.  18 U.S.C. § 924(a)(1).  Violating the NFA carries the potential for ten years' imprisonment, 26 U.S.C. § 5871, seizure and forfeiture of the firearm, *id.* § 5872, an assessment of tax liabilities, 27 C.F.R. § 479.191, and a fine up to $250,000 for an individual and $500,000 for an organization.  18 U.S.C. § 3571(b)–(c).  As failure to comply can also be a felony, a violation may also lead to a lifetime ban on ownership of firearms.  *See* 18 U.S.C. § 922(g)(1).

---

[13] *National Firearms Act: Hearings on H.R. 9066 Before the H. Comm. on Ways & Means*, 73d Cong. 22 (1934).

[14] *Id.* at 1.

## B.

Consequently, there are immense incentives not to own an SBR but instead to have a non-NFA-regulated pistol. Enter the stabilizing brace. Otherwise known as a pistol brace, it is a device attached to the rearward part of a handgun. Though braces work in different ways, the general concept is that they attach to or support the forearm in some way, either by straps or another mechanism, and easily allow safe and comfortable pistol-firing with one hand.

In 2012, the first stabilizing brace was submitted to the ATF for review. The applicant asked whether the attachment of that device would change the pistol's classification under firearm laws.[15] The applicant stated that the brace was designed so that disabled persons could fire heavy pistols more safely and comfortably.[16] The ATF examined the sample and concluded that the submitted brace did "not convert that weapon to be fired from the shoulder and would not alter the classification of a pistol or other firearm." Final Rule at 6479.

Post-submission, these styles of braces increased in popularity, and the ATF avers that over the past decade, many of them were being used to fire heavy pistols from the shoulder without using the features of the brace. *See id.* Still, ATF regulations defining braces and the legality of their uses

---

[15] The ATF's Firearms and Ammunition Technology Division ("FATD") determines whether a firearm is regulated under either the GCA or the NFA. Because the FATD is part of ATF, we, for simplicity, attribute FATD decisions and letters to the ATF. *See How Do I Send in a Firearm or Ammunition to FATD for Classification?*, ATF (May 26, 2020), https://www.atf.gov/firearms/qa/how-do-i-send-firearm-or-ammunition-fatd-classification.

[16] *See, e.g., About Us*, SB TACTICAL, https://www.sb-tactical.com/about/company/ ; *see also* Letter for John Spencer, Chief, Firearms Technology Branch, ATF, from Alex Bosco, NST Global (Nov. 8, 2012); Final Rule at 6560.

No. 23-10319

have not been a model of clarity.

In March 2014, for example, the ATF posited that although it classifies weapons "based on their physical design characteristics . . . [and] usage/functionality . . . does influence the intended design, it is not the sole criterion for determining the [weapon's classification]." Letter from ATF #2014-301737 (Mar. 5, 2014). The ATF explicitly claimed that it does not "classify weapons based on how an individual uses a weapon." *Id.* As a result, an individual's improperly firing a braced pistol from the shoulder did not reclassify the pistol as a short-barreled rifle. *Id.*

Then in October of that year, the ATF backtracked and asserted that subjective use, instead of design criteria, may change a weapon's classification. Letter from ATF #2014-302492 (Oct. 28, 2014). Still, by December of that year, the ATF approved devices such as the Shockwave Blade Pistol stabilizer for use, so long as the device was "used as originally designed and NOT used a shoulder stock." Letter from ATF #2014-302672 (Dec. 15, 2014).

In 2015, in response to requests for clarification, the ATF issued an Open Letter noting that "[a]ny person who intends to use a handgun stabilizing brace as a shoulder stock on a pistol (having a rifled barrel under 16 inches in length or a smooth bore firearm with a barrel under 18 inches in length) must first file an ATF Form 1 and pay the applicable tax because the resulting firearm will be subject to all provisions of the NFA."[17]

In 2017, the ATF noted that "incidental, sporadic, or situational 'use' of an arm-brace (in its original approved configuration)" did not constitute a "redesign" under the NFA and so did not transform the weapon. Letter

---

[17] Max M. Kingery, ATF, Open Letter on the Redesign of "Stabilizing Braces" (Jan. 16, 2015).

No. 23-10319

from ATF #9000:GM, 5000 (Mar. 27, 2017). "Therefore, an NFA firearm has not necessarily been made when the device is not re-configured for use as a shoulder stock—even if the attached firearm happens to be fired from the shoulder." *Id.* As of 2019, the ATF asserted in criminal prosecutions that "ATF letters do correctly state that they consider a firearm with a pistol brace to not be a rifle under the NFA for purposes of the NFA."[18]

On the other hand, the ATF asserts that manufacturers were making pistol braces so consumers could functionally obtain SBRs without the required authorization.[19] Nonetheless, the ATF maintained that stabilizing braces were not stocks and that pistols equipped with braces were not short-barreled rifles. Exceptions to that general position appeared only when *objective* design features indicated that a weapon was "intended to be fired from the shoulder." 26 U.S.C. § 5845(c).[20] Regardless of their individual merit, those determinations proceeded on somewhat of an *ad hoc* basis, and the unifying logic was not always discernable.

Over this period, the number of pistol braces in America increased rapidly, as ATF's letter rulings approving the braces helped create a thriving

---

[18] Sentencing Hr'g Tr. at 38, *United States v. Kamali*, No. 3:18-cr-00288 (D. Conn. Sept. 30, 2019), ECF 110.

[19] For example, the ATF points to manufacturer SB Tactical's alleging that its braces were "ATF compliant" even though the ATF had evaluated only two of the twenty stabilizing braces SB Tactical was selling. *See* Final Rule at 6492.

[20] The ATF rejected a pistol brace with rearward ridges on the brace, as the ridges "serve[d] no functional purpose in the design of a pistol brace" and instead served only to support shoulder fire. *See* Final Rule at 6488. Similarly, the ATF rejected a weapon design that featured both a pistol brace and a forward grip because the forward grip would be useful only for two-handed firing, and therefore its presence indicated that the brace's only purpose was to support shoulder fire. *Id.* at 6485. The agency also rejected a "two-strap" style brace design whose straps "were not long enough to wrap around the shooter's arm," as without the straps, the brace's only purpose was to support shoulder fire. *Id.* at 6493.

No. 23-10319

market. Thus, "[b]y late 2020," the ATF had "concluded" that "previous . . . classification determinations had led to confusion and there was a need to provide clarity to the firearm industry and public on how [the agency] evaluates firearms equipped with a 'stabilizing brace.'" Final Rule at 6494. As of 2023, the ATF estimates there are about 3 million pistol braces in circulation (with 7 million at the high end).[21]

Pistol braces also have been used in multiple violent crimes. The ATF specifically points to mass shootings in Boulder, Colorado, and Dayton, Ohio, where mass shooters killed a combined 19 persons while purportedly using a pistol brace as a shoulder stock. *Id.* at 6508. In the Final Rule, the ATF theorizes that SBRs are "dangerous and unusual due to both their concealability and their heightened ability to cause damage." *Id.* at 6499. In support, the ATF notes that since 2015, approximately 63 firearms with stabilizing braces have been identified in criminal investigations, and there are about 105 firearms cases or investigations involving braced weapons. *Id.*[22]

In response to this regulatory confusion and purported safety threat, the ATF published the Proposed Rule through a Notice of Proposed Rulemaking ("NPRM") on June 10, 2021. The NPRM proposed to amend the Bureau's regulations "to clarify when a rifle is 'intended to be fired from the

---

[21] ATF, RIN 1140-AA55, Factoring Criteria for Firearms with Attached "Stabilizing Braces": Final Regulatory Impact Analysis and Final Regulatory Flexibility Analysis 18 (2023), https://www.atf.gov/rules-and-regulations/docs/undefined/atf2021r-08stabilizingbracefrriapdf/download [hereinafter Final Regulatory Impact Analysis].

[22] The ATF suggests that statistic likely undercounts the total number. Still, compare that number to the annual average of 17,730 people in the United States who are killed by guns in homicides (for which Everytown includes shootings by the police). *Everystat: How does gun violence impact the communities you care about?*, Everytown for Gun Safety, https://everystat.org/ (last visited July 7, 2023).

No. 23-10319

shoulder'" when "equipped with a purported 'stabilizing brace'" so that the ATF could "determine whether these weapons would be considered a . . . 'short-barreled rifle' under the [GCA] or a . . . 'firearm' subject to regulation under the [NFA]." Proposed Rule at 30826.

The NPRM focused on a weapon's "objective design features." *Id.* at 30828. "Similar to . . . Form 4590, used to determine if a firearm is 'sporting' for purposes of importation," the ATF proposed to use a new "Worksheet 4999 to determine if a firearm is designed and intended to be fired from the shoulder." *Id.* at 30830 (internal quotations added).

That Worksheet assigned points to various design criteria to indicate whether a brace device, in conjunction with the firearm, was intended to be shouldered when fired. *Id.* at 30830–31. If the Worksheet yielded a "total point value . . . equal to or greater than 4—in either Section II or III—then the firearm, with the attached 'stabilizing brace,'" would be considered a "rifle." *Id.* at 30829. And it would very likely be considered a short-barreled rifle, too, thereby triggering the NFA and the GCA. The ATF then accepted comments until September 8, 2021. *Id.* at 30826.

Needless to say, the Proposed Rule was controversial. Comments were overwhelmingly negative, with 217,000 of the 237,000 comments made in opposition (~92%). *See* Final Rule at 6497. Approximately 44% of those comments were form letters. *Id.* In contrast, of the 8% of comments in support of the NPRM, only 10% were unique, with the rest being form letters. *Id.*

Although the Worksheet attempted to let the populace know, with objective criteria, whether their respective weapons with a brace would be classified as rifles, the implementation left much to be desired in practice. Just as a short example of the many issues with the Worksheet, determining whether an accessory only "[i]ncorporates shoulder stock design feature(s)"

or instead was "[b]ased on a known shoulder stock design" has some inherent level of subjectivity. *See* Proposed Rule at 30830–31. Additionally, some design characteristics were doubly penalized, such as whether the stabilizing support had a "fin-type" design without an arm strap or whether the stabilizing brace was adjustable. *See* Final Rule at 6530. On the other hand, the Proposed Rule did provide specific examples of how an individual could grade his firearm: It graded three firearms with attached stabilizing braces per Worksheet 4999. And one, an AR-type firearm with an SB-Mini accessory, passed muster as an approved braced handgun, not a rifle. Proposed Rule at 30834–37. The Proposed Rule also had an estimated cost over ten years, at a 3% discount rate, of $114.7 million. *Id.* at 30845.

Nonetheless, as the ATF recounts in the Final Rule, the Proposed Rule was complex and confusing. So about eighteen months later, the ATF published the Final Rule. In it, the Worksheet approach was abandoned entirely. It instead interpreted the NFA's and GCA's definitions of "rifle" with a two-step process. First, the Final Rule amended the definition of rifle under 27 C.F.R. §§ 478.11 and 479.11 to state that the term "desired or redesigned, made or remade, and intended to be fired from the shoulder" includes

> a weapon that is equipped with an accessory, component, or other rearward attachment (*e.g.*, a "stabilizing brace") that *provides surface area that allows the weapon to be fired from the shoulder*, provided *other factors* . . . indicate that the weapon is designed, made, and intended to be fired from the shoulder.

Final Rule at 6480 (emphasis added). Second, the other factors are

> (1) Whether the weapon has a weight or length consistent with the weight or length of similarly designed rifles;
>
> (2) Whether the weapon has a length of pull, measured from the center of the trigger to the center of the shoulder stock or

No. 23-10319

other rearward accessory, component or attachment (including
an adjustable or telescoping attachment with the ability to lock
into various positions along a buffer tube, receiver extension,
or other attachment method), that is consistent with similarly
designed rifles;

(3) Whether the weapon is equipped with sights or a scope with
eye relief that require the weapon to be fired from the shoulder
in order to be used as designed;

(4) Whether the surface area that allows the weapon to be fired
from the shoulder is created by a buffer tube, receiver exten-
sion, or any other accessory, component, or other rearward at-
tachment that is necessary for the cycle of operations;

(5) The manufacturer's direct and indirect marketing and pro-
motional materials indicating the intended use of the weapon;
and

(6) Information demonstrating the likely use of the weapon in
the general community.

*Id.* The ATF explains in the Final Rule that "[a]ll of the objective design
features and factors listed in the rule that indicate the weapon is designed,
made, and intended to be fired from the shoulder are derived from the NPRM
and proposed Worksheet 4999." *Id.* The agency also emphasizes repeatedly
that the Final Rule does not ban stabilizing braces or prohibit firearms with a
stabilizing brace. *See e.g.*, *id.* at 6480, 6506, 6509.

The ATF theorized that under this new definition of "rifle," approx-
imately 99% of pistols with stabilizing braces would be classified as rifles[23]; it
issued approximately 60 contemporaneous adjudications with the Rule clas-
sifying various configurations of firearms with stabilizing braces as rifles.[24]

---

[23] *See* Final Regulatory Impact Analysis, *supra* note 21, at 21.

[24] *See* ATF, Common Weapon Platforms with Attached 'Stabil-
izing Brace' Designs That Are Short-Barreled Rifles (2023),

No. 23-10319

No explanations are included for how the ATF came to its conclusion as to each weapon and platform. The AR-type firearm with an SB-Mini accessory, determined to be a braced pistol under the Proposed Rule, now appears to be adjudicated as an SBR under the Final Rule.[25] We also cannot find a single given example of a pistol with a stabilizing brace that would constitute an NFA-exempt braced pistol.[26]

Regardless, the ATF emphasizes that no stabilizing braces or firearms with stabilized braces are banned. Instead, if the clarified definitions indicate that a firearm owner now possesses an SBR, the ATF provided five options:

> 1. Remove the short barrel and attach a 16-inch or longer rifled barrel to the firearm.
>
> 2. Permanently remove and dispose of, or alter, the "stabilizing

---

https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-non-commercial/download; ATF, Commercially Available Firearms Equipped with a 'Stabilizing Brace' That Are Short-Barreled Rifles (2023), https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-commerciallypdf/download.

[25] *See* ATF, Common Weapon Platforms with Attached 'Stabilizing Brace' Designs That Are Short-Barreled Rifles 8–9 (2023), https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-non-commercial/download.

[26] The ATF did helpfully note that a design feature that prevents shouldering would keep a braced pistol from being classified as a rifle. *See* Final Rule at 6530 ("A potential example of such a feature is a permanently attached protrusion that would dig into a shooter's shoulder should the firearm be fired from the shoulder."). Presumably, a stabilizing brace with a spike on the end of it may pass muster.

A recent post states that the "'other factors' (including, for example, total weight, length-of-pull, and the presence of raised optics) are almost always present in some combination in heavy pistol set-ups," so the Rule "has the effect of classifying almost all braced pistols as SBRs." A.W. Geisel, *Litigation Highlight: Legal Challenges to ATF Rule on Stabilizing Braces*, Duke Center for Firearms Law (Mar. 22, 2023), https://firearmslaw.duke.edu/2023/03/litigation-highlight-legal-challenges-to-atf-rule-on-stabilizing-braces/.

No. 23-10319

brace" such that it cannot be reattached.[27 28]

3. Turn the firearm into a local ATF office.

4. Destroy the firearm.

5. Register the firearm with the ATF as an SBR per NFA requirements.[29]

---

[27] The ATF notes that removing a stabilizing brace from a firearm originally received as an SBR would produce a weapon "made from a rifle" under the NFA, which generally requires registration. The ATF affirms that it would use its discretion not to require the registration of any of these firearms so long as the reconfiguration was made by May 31, 2023. Final Rule at 6570.

[28] Plaintiffs observe that ATF Director Steve Dettelbach provided inaccurate testimony to the House Judiciary Committee on the operation of this portion of the Final Rule—*to-wit*, when questioned by Rep. Thomas Massie about the number of persons who had already complied with the Final Rule, Dettelbach stated that he did not have the number on hand but could provide it post-hearing. He volunteered that the ATF could not count compliance for persons who merely removed a non-compliant brace from a firearm. He specifically said,

> We wrote the rule to make it easy to comply with. If somebody just, at their home, detaches the weapon from the brace and keeps them apart, uh, they do not have to register anything. They can keep the brace. They can keep the business end of the gun.

*Oversight of ATF, Hearing Before the H. Judiciary Comm.*, 118th Cong. (Apr. 26, 2023), video available at https://www.youtube.com/watch?v=k91Ugjn9dWE (between 1:54:00–1:56:30)).

That is not a correct description of the operation of this portion of the Rule, which the government somewhat acknowledges in its brief. The ATF primarily blames the hearing format and directs this panel to review a supplemental letter sent from the agency to the House Judiciary Committee after the hearing.

[29] If an owner chose to register his firearm with the ATF before May 31, 2023, the ATF would not require him to pay the $200 tax on registration. *See* Final Rule at 6571. The ATF has additionally suggested that an owner who does not believe the statute covers his weapon can comply with the Final Rule, pay the tax, and then sue for a refund. Compliance would require engraving the weapon and placing it on a national registry. *See id.* at 6554, 6563. There is no given process for undoing or recouping those compliance costs.

No. 23-10319

Final Rule at 6570.

Although the Final Rule became effective January 31, 2023, the ATF delayed the compliance date to May 31, 2023. *Id.* at 6478. Anyone possessing a braced firearm that the ATF considers, after the Final Rule, to be a rifle, and subsequently, a non-NFA-registered firearm, is subject to criminal punishment. *Id.* at 6498.

The ATF reported it received about 250,000 applications to register pistol-brace-equipped firearms before the deadline, for an estimated registration-compliance rate (on the high end) of approximately 8%.[30] The number of pistol braces removed from weapons or otherwise surrendered to the ATF or destroyed is unknown.[31]

## C.

Groups of dissatisfied plaintiffs sued to enjoin the Final Rule or postpone its effective date. Though multiple cases are percolating through the courts,[32] the present lawsuit has four named plaintiffs.

William Mock and Christopher Lewis are Texas residents who own at least one braced pistol and would purchase more if not for the Final Rule. Maxim Defense is a firearms manufacturer and retailer specializing in stabilizing braces and braced pistols. Maxim Defense alleges that the majority of

---

[30] Stephen Gutowski, *ATF Says a Quarter Million Guns Registered Under Pistol-Brace Ban*, THE RELOAD (June 2, 2023), https://thereload.com/atf-says-a-quarter-million-guns-registered-under-pistol-brace-rule/.

[31] *Id.*

[32] *See, e.g.*, *Firearms Regulatory Accountability Coal., Inc. v. Garland*, 1:23-cv-00024 (D.N.D.); *Texas v. ATF*, 6:23-cv-00013 (S.D. Tex.); *Colon v. ATF*, 8:23-cv-00223 (M.D. Fla.); *Second Amendment Found. v. ATF*, 3:21-cv-00116 (N.D. Tex.); *Britto v. ATF*, 2:23-cv-00019 (N.D. Tex.); *Watterson v. ATF*, 4:23-cv-00080 (E.D. Tex.); *Nat'l Rifle Ass'n of Am., Inc. v. ATF*, 3:23-cv-01471 (N.D. Tex.).

No. 23-10319

its revenue comes from products that would be subject to the additional restrictions of the Final Rule. The Firearms Policy Coalition is a nonprofit gun-rights organization whose membership includes individual gun owners, licensed manufacturers and retailers, gun ranges, firearms trainers and educators, and many others. Mock, Lewis, and Maxim Defense are members of the Firearms Policy Coalition.

As stated, the district court denied a preliminary injunction. First, the court held that the ATF likely had statutory authority to issue the Final Rule and that the Rule's criteria do not violate the NFA. The court also rejected arguments that it should apply the rule of lenity, or hold the Rule void for vagueness, as the Rule "track[s] the statutory definition" and was "comprehensible enough to put a person of ordinary intelligence on notice."

Next, the district court reviewed plaintiffs' APA challenge. The court indicated that the Final Rule was interpretative, not legislative. Regardless, the court found the Rule did not fail the logical outgrowth test anyway, as the Proposed Rule put the public on notice of the subjects, issues, and criteria the Final Rule would use and address. Finally, the district court rejected plaintiffs' constitutional claims, holding that the First Amendment was not violated, as the rule did not proscribe speech, nor did it violate the Second Amendment. The Second Amendment did not "bar the imposition of traditional registration and licensing requirements commonly associated with firearm ownership," and plaintiffs' historical-record evidence was deemed inadequate.

Plaintiffs then moved for an injunction pending appeal, which this Court's motions panel granted while also expediting the appeal. This merits panel granted a motion for clarification, explaining that the "plaintiffs in this case" covered the customers and members of Maxim Defense and the Firearms Policy Coalition, "whose interests [those organizations] have repre-

No. 23-10319

sented since day one of this litigation." We additionally clarified that the injunction included the individual plaintiffs' family members. Before this merits panel now is the appeal of the order denying a preliminary injunction, over which we have appellate jurisdiction per 28 U.S.C. § 1292(a)(1).

## II.

"Although the ultimate decision whether to grant or deny a preliminary injunction is reviewed only for abuse of discretion, a decision grounded in erroneous legal principles is reviewed *de novo*." *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009) (quoting *Women's Med. Ctr. v. Bell*, 248 F.3d 411, 419 (5th Cir. 2001)). Preliminary injunctions are extraordinary remedies, and the moving party must satisfy four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Id.* (quoting *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006)). The government's and the public's interests merge when the government is a party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.

No party disputes that the authority to administer and enforce the GCA and the NFA is vested in the Attorney General, *see* 18 U.S.C. § 926(a), 26 U.S.C. §§ 7801(a)(2)(A), 7805(a), who then delegated that authority to the ATF, *see* 28 C.F.R. § 0.130. Specifically, 28 C.F.R. § 0.130(a) states that "the Director of [the ATF] shall: (a) Investigate, administer, and enforce the laws related to alcohol, tobacco, firearms, explosives, and arson . . . including exercising the functions and powers of the Attorney General under [provi-

No. 23-10319

sions including the NFA and GCA]."

Indeed, previous ATF regulations using this authority to classify certain weapons and devices as subject to or exempt from federal regulation have been recognized consistently in courts nationwide.[33] Yet plaintiffs challenge the ATF's statutory authority to issue the Final Rule. Plaintiffs aver that "[t]he Final Rule, which redefines the term 'rifle' to encompass what the NFA's plain terms exclude, is an impermissible reading of the plain limits of the statute." Alternatively, plaintiffs urge this court to apply the rule of lenity in the context of the ATF's authority to promulgate rules governing what devices fall into the statutory definition of a rifle.

In *Cargill*, our en banc court addressed the rule of lenity in the specific context of the definition of a "machinegun" and whether a bump stock device was covered under it. 57 F.4th at 469–71. We held that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Id.* at 469 (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). Plaintiffs also challenge whether Congress's delegation of authority to the Bureau fails the nondelegation doctrine.[34] Although these claims may be colorable, we decline to address them because plaintiffs have a substantial

---

[33] *See Cargill v. Garland*, 57 F.4th 447, 450 (5th Cir. 2023) (en banc), *petition for cert. filed* (Apr. 6, 2023) (No. 22-976); *see also Guedes v. ATF*, 920 F.3d 1, 6–7 (D.C. Cir. 2019), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019) (per curiam).

[34] Though we have never reasoned that those delegations to the ATF violate the nondelegation doctrine, there are perhaps serious concerns about the constitutionality of the ATF's interpreting criminal statutes. Although we sidestepped the issue, the en banc court pondered whether "[t]he delegation raised serious constitutional concerns by making ATF the expositor, executor, *and* interpreter of criminal laws." *Cargill*, 57 F.4th at 471 (quoting *Aposhian v. Wilkinson*, 989 F.3d 890, 900 (10th Cir. 2021) (Tymkovich, C.J., dissenting)).

No. 23-10319

likelihood of success based on their APA challenge.

## IV.

We move on to plaintiffs' claim that the Final Rule violates the APA's procedural and substantive requirements. On that front, plaintiffs establish a substantial likelihood of success on the merits. The ATF incorrectly maintains that the Final Rule is merely interpretive, not legislative, and thus not subject to the logical-outgrowth test. The Final Rule affects individual rights, speaks with the force of law, and significantly implicates private interests. Thus, it is legislative in character. Then, because the Final Rule bears almost no resemblance in manner or kind to the Proposed Rule, the Final Rule fails the logical-outgrowth test and violates the APA.

## A.

Legislative rules are ones with the "force and effect of law,"[35] while interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers.[36] As a result, "[a] court is not required to give effect to an interpretive regulation." *Chrysler Corp.*, 441 U.S. at 315 (internal quotations omitted). Only legislative rules must go through notice and comment rulemaking under 5 U.S.C. § 553(b)–(c).[37] *Perez*, 575 U.S. at 96.

Most litigation about whether a rule should be properly considered legislative or interpretive arises because the agency did not go through the

---

[35] *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

[36] *Id.* at 97 (quoting *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995)).

[37] Concurrently, "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice" do not have to go through notice and comment. 5 U.S.C. § 553(b)(A).

No. 23-10319

time and expense of notice-and-comment rulemaking.  The interesting twist here is that the ATF chose to go through notice and comment before promulgating the Final Rule.  As a result, whether the Final Rule is legislative or interpretive should not be the crux of the APA challenge.  Because of plaintiffs' chosen litigation strategy, however, it is.  Plaintiffs have focused on whether the Final Rule was a logical outgrowth of the Proposed Rule, *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007), a requirement only for legislative rules.[38]  Though the analysis requires reviewing first principles, we agree.  The Final Rule is a legislative rule.

The difference between legislative and interpretive rules has been described as "enshrouded in considerable smog."[39]  And our court has not exactly spoken with one voice, in a cognizable and consistent manner, about how to tell the difference.

"[I]t is only when the agency seeks to *make substantive law* that notice and comment is required."[40]  But determining when an agency is making

---

[38] Even if the Final Rule is properly considered interpretive and not legislative, the Rule could have still been tested for procedural regularity and challenged as arbitrary and capricious in violation of 5 U.S.C. § 706(2)(a).  As the Supreme Court made clear in *Perez*, the public is not without recourse even if an agency attempts to "skirt" the strictures of notice and comment with an interpretive rule.  *See* 575 U.S. at 105–06.

In the present case, such a challenge may have succeeded.  But the words "arbitrary and capricious" appear nowhere in plaintiffs' opening brief, nor does the statutory standard of § 706(2)(a).  "A party forfeits an argument . . . by failing to adequately brief the argument on appeal."  *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021).

[39] *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1108 (D.C. Cir. 1993) (quoting *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc)).

[40] *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 241 n.5 (5th Cir. 2023).  *Flight Training* also attempted to clarify the distinction between legislative and substantive rules:

Legislative rules are sometimes called "substantive rules."  In truth, the requirement of notice and comment attaches only to rules that are both

No. 23-10319

substantive law is the million-dollar question.[41]

This circuit does not look just to whether a rule "limits discretion or uses binding language," as "[i]f a law is mandatory, it is natural for an agency's restatement of the law to speak in mandatory terms as well." *Flight Training*, 58 F.4th at 242. On the other hand, legislative rules functionally "affect individual rights" and "creat[e] new law." *Davidson v. Glickman*, 169 F.3d 996, 999 (5th Cir. 1999) (internal quotations omitted). Yet, if all the rule is doing is interpreting existing law, it is not substantive and thus is not legislative in character. *Flight Training*, 58 F.4th at 241 n.5; *see also* 5 U.S.C. § 553(b)(A).

This court has not laid out a clear test appropriate to resolve the question. With that in mind, we adopt Judge Ezra's methodology in *Cargill v. Barr*,[42] in which he largely adopted the D.C. Circuit's framework, *see, e.g.,*

---

"substantive" and "legislative." A rule may be called "substantive," in the sense that it is neither procedural nor a mere policy statement, if it is binding on the rights and obligations of private persons.

*Id.* (citing *Texas v. United States*, 809 F.3d 134, 171, 176 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016)).

[41] Neither plaintiffs nor the ATF properly states this circuit's test. Plaintiffs point to the rule this court laid out for policy statements, not interpretive rules, citing *Texas v. United States*, 809 F.3d at 171. On the other hand, the ATF merely notes that the rule is purportedly not legislative because "were an individual to be charged with unlawful possession, a court would determine whether the statute—not the Rule—covered the conduct." That reading is too restrictive and ignores an inquiry into the rule's effect. It also begs the question—the ATF (or other government entity) would presumably be charging an individual with a violation of the statute solely because of the rule.

[42] *See* 502 F. Supp. 3d 1163 (W.D. Tex. 2020), *aff'd sub nom. Cargill v. Garland*, 20 F.4th 1004 (5th Cir. 2021), *rev'd*, 57 F.4th 447 (5th Cir. 2023) (en banc), *petition for cert. filed* (Apr. 6, 2023) (No. 22-976). Neither the vacated panel opinion nor the en banc opinion addressed whether the ATF's bump stock rule was a legislative or interpretive rule, although our en banc court assumed for the sake of argument that it was legislative. *See Cargill v. Garland*, 57 F.4th at 458 n.6.

No. 23-10319

*Guedes*, 920 F.3d at 17–20, to determine whether the ATF's bump stock rule was legislative or interpretive, *see Cargill*, 502 F. Supp. 3d at 1185. The test has five factors, and we are not bound by an agency's classification of its action. *See U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1149 (5th Cir. 1984).

The five factors are, first, whether the agency intended to speak with the force of law. *See Cargill*, 502 F. Supp. 3d at 1184 (citing *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 215 (2016)). We examine the "language actually used by the agency." *Id.* (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)). Second, we see whether the agency published its rule in the Code of Federal Regulations. *Id.* (citing *Am. Mining Cong.*, 995 F.2d at 1112). Third, we examine whether the agency "explicitly invoked its general legislative authority." *Id.* (citing *Am. Mining Cong.*, 995 F.2d at 1109). Fourth, we note whether the agency claimed *Chevron* deference.[43] *Id.* (citing *Guedes*, 920 F.3d at 18–19)). Finally, in the Fifth Circuit, courts scrutinize "whether the rule 'will produce [] significant effects on private interests.'" *Id.* (quoting *Gulf Restoration Network v. McCarthy*, 738 F.3d 227, 236 (5th Cir. 2015) (alteration in original)).

We can start with the easy factors. The ATF did not invoke *Chevron* deference, cutting against holding that the Final Rule is legislative. Next, the Final Rule is published in the Code of Federal Regulations. Publication in the C.F.R. is limited to rules "having general applicability and legal effect," 44 U.S.C. § 1510, which cuts in favor of the Final Rule's being legislative. *Guedes* observed that "amendments [to C.F.R. provisions] would be highly unusual for a mere interpretive rule." 920 F.3d at 19. The Final Rule plainly

---

[43] Referring to *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council. Inc.*, 467 U.S. 837 (1984).

amends two C.F.R. provisions (27 C.F.R. §§ 478.11, 479.11).[44] *See* Final Rule at 6480.

The other three factors are more difficult. First, we must determine whether the agency intended to speak with the force of law. In *Guedes*, the D.C. Circuit found it persuasive that the published rule on bump stocks used language informing bump stock owners that their devices "*will be prohibited*" upon the rule's effective date. 920 F.3d at 18 (quoting 83 Fed. Reg. 66514, 66514). *Guedes* also keyed in on other important terms, which included that the bump stock rule affirmed that "[a]nyone currently in possession of a bump-stock-type device *is not acting unlawfully unless* they fail to relinquish or destroy their device *after* the effective date of this regulation." *Id.* (quoting 83 Fed. Reg. at 66523) (alteration in original) (second emphasis added). Additionally, the rule at issue in *Guedes* "provide[d] specific information about acceptable methods of disposal, as well as the timeframe under which disposal must be accomplished to avoid *violating*" the "interpreted" statute. *Id.* (quoting 83 Fed. Reg. at 66530). Finally, the D.C. Circuit also found it noteworthy that the rule asserted that only future possession of the bump stock devices would be criminalized. *Id.*

All of those indicators are present in the Final Rule. Though the government carefully designates that the Final Rule does not "ban" stabilizing braces, the language of the Final Rule maintains that if an individual has an NFA-regulated firearm post-Final Rule 'clarification,' he must perform one of five options to avoid violating the NFA. *See* Final Rule at 6572. Similarly to *Guedes*, the Final Rule provided information about acceptable dis-

---

[44] At oral argument, ATF's counsel was asked whether he was aware of any other time a government agency had published an interpretive rule in the C.F.R. yet still went through notice and comment. ATF's counsel could point only to the bump-stock rule at issue in *Guedes*. Oral Argument at 39:05–40:00.

No. 23-10319

posal methods and gave a timeframe for compliance (by May 31, 2023). *See id*. at 6478, 6572.

The above shows "prospective, binding language." *Cargill*, 502 F. Supp. 3d at 1184. Our conclusion is bolstered by the ATF's responses to commentators alleging that the Proposed Rule was an unconstitutional *ex post facto* law. In response, the ATF suggested that the regulation would not "criminalize past conduct." Instead, the agency, through "enforcement discretion," would give unlicensed individuals 120 days to comply with federal law "to avoid civil and criminal penalties," and the agency was waiving "past making and transfer taxes." Final Rule at 6552–53. Those statements, and others throughout the Rule, evince an effort to "directly govern[] the conduct of members of the public, affecting individual rights and obligations." *Guedes*, 920 F.3d at 18 (quoting *Long Island Care*, 551 U.S. at 172) (alteration in original).[45]

Second, we must determine whether the ATF "explicitly invoked its general legislative authority." *Cargill*, 502 F. Supp. 3d at 1184 (quoting *Am. Mining*, 995 F.2d at 1112). The answer is yes. The Final Rule cites 26 U.S.C. § 7801(a)(2), 28 U.S.C. § 599A(b)(1), (c)(1), and 28 C.F.R. § 0.130(a)(1)–(2) and affirms that those provisions vest "the responsibility for administering and enforcing the NFA and GCA" in the Attorney General (and then by delegation to the ATF Director). *See* Final Rule at 6481. That authority provides the ATF the ability to promulgate the Final Rule.

Finally, we apply the substantial-impact test to see whether the Final Rule will "produce . . . significant effects on private interests." *Cargill*,

---

[45] That prong also cuts against the ATF's contention that the "relevant portions of the Rule are not final agency action . . . [and the Rule] does not itself determine any legal rights or impose any legal obligations, as would be required to demonstrate finality," citing *Bennett v. Spear*, 520 U.S. 154, 178 (1997).

No. 23-10319

502 F. Supp. 3d at 1184 (quoting *Gulf Restoration*, 783 F.3d at 236). That test is the "primary means . . . [to] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Texas v. United States*, 787 F.3d 733, 765 (5th Cir. 2015) (quoting *Kast Metals Corp.*, 744 F.2d at 1153).

As applied, that test strongly favors determining the Final Rule to be legislative, not interpretive. The ATF's calculations indicate that, using the low estimate of 3 million firearms equipped with stabilizing braces, the "combined private societal and government annualized cost of under this final rule would be $245.6 million and $266.9 million" at a 3 percent and 7 percent discount rate, respectively.[46] The total cost over ten years is anywhere from $1,874,405,737 to $2,095,312,630 (depending on the discount rate).[47] Those numbers increase considerably if we review the calculations using the high estimate of 7 million firearms equipped with stabilizing braces.[48] In *Cargill*, Judge Ezra found the substantial-impact test was met through a 'mere' economic impact of $102.5 million. 502 F. Supp. 3d at 1185. Accordingly, "[t]his adjustment imposes the type of 'significant effect[] on private interests' characteristic of legislative rules." *Id.* (quoting *Gulf Restoration*, 783 F.3d at 236).

Inspecting the Final Rule from 10,000 feet, it has significant implications for braced-pistol owners. If the government is correct, and the rule is only interpretive, millions of Americans were committing a felony the entire time they owned a braced pistol. *Guedes* expounded on the extraordinary implications of that determination:

> The government now characterizes the Rule's effective

---

[46] *See* Final Regulatory Impact Analysis, *supra* note 21, at 65–66.

[47] *Id.*

[48] *See id.* at 66–67.

No. 23-10319

date as merely marking the end of a period of discretionary withholding of enforcement, in that the Rule informs the public that the Department will not pursue enforcement action against individuals who sold or possessed bump stocks prior to the effective date. Once again, that is not what the Rule says. The government engages in enforcement discretion when it voluntarily refrains from prosecuting a person *even though he is acting unlawfully*. The Rule, by contrast, announces that a person in possession of a bumpstock type device *is not acting unlawfully* unless they fail to relinquish or destroy their device *after* the effective date of this regulation. *That is the language of a legislative rule establishing when bump-stock possession will become unlawful, not an interpretive rule indicating it has always been unlawful.*

920 F.3d at 20 (cleaned up) (final emphasis added). Although the government has been more circumspect here, the overall implication and conclusion are the same. Before the Final Rule, the ATF would not prosecute an individual for owning a braced pistol. There was no indication that persons or organizations acted unlawfully before the Final Rule's publication by possessing or transferring a braced pistol. Post-Final Rule, the government has attempted to claim that the stabilizing braces were always unlawful—but that is flatly unpersuasive given the history of ATF regulation and action. The character of the rule is legislative.[49]

The ATF's main rebuttal is that "were an individual to be charged with unlawful possession, a court would determine whether the statute—not the Rule—covered the conduct." That is too clever by half. We do not look at just the prosecutorial effect of the Rule—we scrutinize the Rule as a whole

---

[49] The ATF consistently states that it averred "firearms equipped with 'braces' may be short-barreled rifles," citing Final Rule at 6487. But the ATF often issued letter rulings permitting braced pistols to proliferate instead of enforcing the law against persons it now, overnight, deems to be potential felons.

No. 23-10319

and determine its effects.[50]  In *Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000), the court found that an EPA guidance document was a legislative rule despite the document's denying it was compulsory.  The court examined the whole document and was struck that "the entire Guidance, from beginning to end—except the last paragraph—reads like a ukase.  It commands, it requires, it orders, it dictates."  *Id.* at 1023.  *The same appears true here.*  The factors as a whole indicate that the Final Rule is a legislative rule.

## B.

Because the Final Rule is properly characterized as a legislative rule, it must follow the APA's procedural requirements for notice and comment, including providing the public with a meaningful opportunity to comment on the proposed rule.  *See* 5 U.S.C. § 553(c).  After the required NPRM is published in the Federal Register, with "either the terms or substance of the proposed rule or a description of the subjects and issues involved," *id.* § 553(b)(3), "the final rule the agency adopts must be a logical outgrowth of the rule proposed," *Long Island Care*, 551 U.S. at 174 (cleaned up).  If the logical-outgrowth requirement is not satisfied, a court must set aside the agency action found to be "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).

In the Fifth Circuit, the logical-outgrowth rule requires the NPRM to provide "fair notice" of the eventual Final Rule.  *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 381 (5th Cir. 2012) (citing *Long Island Care*, 551 U.S. at 174).  "If interested parties 'should have anticipated'

---

[50] Moreover, as mentioned *supra*, prosecution will ensue only because of the Final Rule.  Nor is it likely that any reviewing court would fail to consider the Rule in any criminal prosecution.

that the change was possible, and thus reasonably should have filed their comments on the subject during the notice-and-comment period, then the rule is deemed to constitute a logical outgrowth of the proposed rule." *Id.* at 381–82 (quoting *Am. Coke & Coal Chems. Inst. v. EPA*, 452 F.3d 930, 938 (D.C. Cir. 2006)).

An NPRM is not required to "specifically identify every precise proposal which the agency may ultimately adopt as a final rule." *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989) (cleaned up). Instead, an NPRM must "adequately frame the subjects for discussion such that the affected party should have anticipated the agency's final course in light of the initial notice." *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 447 (5th Cir. 2021) (cleaned up).

As plaintiffs persuasively posit, the NPRM and the Final Rule bear little resemblance to one another. The Proposed Rule centered entirely on Worksheet 4999, which determined, by an extensive point system, whether a firearm was a "rifle" under the NFA. *See* Proposed Rule at 30830–31. Although the Worksheet was flawed in many aspects, it focused on the design of a firearm with the stabilizing brace and attempted to provide objective measurement criteria for whether a particular stabilizing brace was a shoulder-fired design that would be subject to the NFA and GCA.

Unsurprisingly, the comments on the Proposed Rule concentrated on implementing Worksheet 4999. *See* Final Rule at 6510–48. The Worksheet was the focal point of the entire Proposed Rule, to the extent that the ATF represented that "[t]he ATF Worksheet 4999 is necessary to enforce the law consistently." Proposed Rule at 30829. Nothing in the Proposed Rule put the public on notice that the Worksheet would be replaced with a six-factor test based on almost entirely subjective criteria. Nor was the public, which criticized the subjective nature of the purportedly objective criteria of Work-

No. 23-10319

sheet 4999 and its overbreadth, *see, e.g.*, Final Rule at 6513–14, 6521–22, 6527, 6529–30, put on notice that not only would the ATF change the criteria, but it also would make the criteria so expansive as to subject an estimated 99% of stabilizing braces on the market to enhanced regulations[51] and increase the economic effect of the Rule by over $100 million.[52]

As the district court found, the logical-outgrowth test requires that the proposed rule "fairly apprises interested persons of the subjects and issues the agency is considering," citing *Chemical Mfrs. Ass'n*, 870 F.2d at 203. But merely informing the public, in a generic sense, of the broad subjects and issues the Final Rule would address is insufficient. Instead, the Proposed and Final Rule must be alike in kind so that commentators could have reasonably anticipated the Final Rule.

Commentators were given the Proposed Rule. They reacted negatively, piling in almost 217,000 comments of "general dissatisfaction" with the use of Worksheet 4999. *See* Final Rule at 6510, 6513. Nevertheless, nowhere in the Proposed Rule did the ATF give notice that it was considering getting rid of the Worksheet for a vaguer test. Instead, the "Comments Sought" section of the Proposed Rule requested only "additional criteria that should be considered" and comments on whether the ATF "selected the most appropriate criteria." Proposed Rule at 30850. Removing all objective criteria operates a rug-pull on the public.

The ATF's counterarguments are not compelling. The Bureau primarily avers that the factors in the Final Rule are "derived from the NPRM and proposed Worksheet 4999," citing the Final Rule at 6480. Furthermore, the agency alleges that the changes were made because of the

---

[51] *See* FINAL REGULATORY IMPACT ANALYSIS, *supra* note 21, at 21.

[52] *Compare* Proposed Rule at 30845 tbl.2, *with* Final Rule at 6573 tbl.2.

aforementioned dissatisfaction with the Proposed Rule. But proclaiming something to be the case, even in the Federal Register, does not make it so, hence why "[a]n agency . . . does not have carte blanche to establish a rule contrary to its original proposal simply because it receives suggestions to alter it during the comment period." *Chocolate Mfrs. Ass'n of the U.S. v. Block,* 755 F.2d 1098, 1104 (4th Cir. 1985). Instead, an "[a]gency notice must describe the range of alternatives being considered with reasonable specificity." *Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 549 (D.C. Cir. 1983). If comments indicated that the method in the Proposed Rule was so unworkable that the entire procedure needed to be replaced, then the proper process would be to start the notice-and-comment process again and receive public comments on the new test.

　　With that in mind, commentators reading the Proposed Rule's language could not have reasonably foreseen that the Final Rule would replace the Worksheet entirely with a more subjective six-factor test. It was indeed "reasonably foreseeable" that changes would be made between the NPRM and the Final Rule, *see Long Island Care*, 551 U.S. at 175, but the specific changes in the Final Rule, and their scope, were not. In short, the fatal flaw is conceptual: Whereas the Worksheet allowed an individual to analyze his own weapon and gave each individual an objective basis to disagree with the ATF's determinations, the Final Rule vests the ATF with complete discretion to use a subjective balancing test to weigh six opaque factors on an invisible scale.

　　Under the Final Rule, it is nigh impossible for a regular citizen to determine what constitutes a braced pistol, and outside of the sixty contemporaneous adjudications that the ATF released, whether a specified braced

pistol requires NFA registration.[53] Various AR pistols without a recognizable "brace" may fall into the strictures of the Final Rule.[54] Such an owner may not be on notice that his firearm is subject to criminal penalties without registration.

Nor does the ATF bother to clarify the matter. The agency maintains that its six-factor test objectively assesses "design features common to rifles." *See* Final Rule at 6513. But it simultaneously declares that the objective criteria given to assess certain factors "are not themselves determinative," *see id.* at 6518, and that adjudications are made "on a case-by-case basis," *id.* at 6495.

Predictably then, the six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace. The ATF did not provide explanations with its contemporaneous adjudications that certain

---

[53] *See supra* note 25.

[54] The ATF includes a picture of an AR-type pistol with a padded buffer tube as a potential example of a pistol not classified as a rifle because the buffer tube is required for the cycle of operations. The ATF states that "[a]n AR-type pistol with a standard 6 to 6½ inch buffer tube *may not* be designed and intended to be fired from the shoulder even if the buffer tube provides surface area that allows the firearm to be shoulder fired because it is required for the cycle of operations of the weapon." ATF, Final Rule 2021R-08F: Factoring Criteria for Firearms with Attached "Stabilizing Braces" 19 (2023) (emphasis added), https://www.atf.gov/rules-and-regulations/docs/undefined/finalrule2021r-08f508pdf/download

But the ATF is not explicit about when the amount of padding on a required buffer tube matters or about whether the AR-type pistol shown would, in fact, be adjudicated as not a rifle after looking at all of the other factors (we note that the epistemic modality marker "may" is used instead of a verb denoting certainty). From our view, the padding on the end of the buffer tube is unnecessary for operation, although the buffer tube itself is. *But see* Final Rule at 6485 (finding that a foam-padded stabilizer tube on a Glock-type pistol with an overmold kit was an SBR). So both the AR-pistol and the Glock-type pistol can be fired from the shoulder with the padding, and both have "a surface area that allows shouldering." *Id.* at 6529. The ATF merely states that it would analyze other factors in the rule. *Id.* at 6529–30.

No. 23-10319

weapons and platforms with stabilizing braces were SBRs under the Final Rule, nor did the ATF provide a single example of a stabilizing brace with a handgun that would be permitted under the Final Rule. Nor is the Final Rule even logically coextensive with the examples provided in the Proposed Rule.

For example, it is wholly unclear why the AR-type firearm with an SB-Mini accessory, adjudicated as an approved braced handgun in the NPRM, *see* Proposed Rule at 30834–37, is not adjudicated the same way under the Final Rule.[55] What is more, the ATF's bald assertion, in briefing, that "the Rule provides clear guidance about particular braced pistol designs that include true arm braces for one-handed firing and are therefore not subject to the NFA" is supported by no citations to the Final Rule and no examples of any designs are identified in the Final Rule.

Other serious infirmities in the Final Rule that vastly expand its scope are unrelated to, and do not correlate with, anything mentioned in the Proposed Rule. In particular, the requirements involving analysis of third parties' actions, such as the "manufacturer's direct and indirect marketing and promotional materials," and "[i]nformation demonstrating the likely use of the weapon in the general community," Final Rule at 6480, would hold citizens criminally liable for the actions of others, who are likely unknown, unaffiliated, and uncontrollable by the person being regulated.[56] None of those factors was included in the Proposed Rule, and we cannot say "that the ulti-

---

[55] *See* ATF, Common Weapon Platforms with Attached 'Stabilizing Brace' Designs That Are Short-Barreled Rifles 8–9 (2023), https://www.atf.gov/rules-and-regulations/docs/undefined/bracefinalruleguidance-non-commercial/download.

[56] None of those issues would be a problem if the ATF adjudicated stabilizing braces systematically, such as by stating that a particular manufacturer's specific brace was impermissible, instead of adjudicating braces on an entirely *ad hoc* basis. But the ATF considered and explicitly rejected that approach. *See* Final Rule at 6513.

No. 23-10319

mate changes in the proposed rule were in character with the original scheme or a logical outgrowth of the notice." *Chocolate Mfrs.*, 755 F.2d at 1107.

Nor is the agency correct that "any error would be harmless." Although our circuit has held that plaintiffs challenging an agency's error for procedural challenges must "demonstrate prejudice," *City of Arlington v. FCC*, 668 F.3d 229, 243 (5th Cir. 2012) (cleaned up), *aff'd*, 569 U.S. 290 (2013), plaintiffs have easily proven that. As they have illustrated, they could not comment on the specifics of the Final Rule, given how vastly different the Proposed and Final Rule turned out. As a result, plaintiffs were not on notice,[57] nor could they comment on the expanded rule. That is sufficient prejudice.[58]

In conclusion, it is relatively straightforward that the Final Rule was not a logical outgrowth of the Proposed Rule, and the monumental error was

---

[57] This is in direct contrast to *City of Arlington*, where the FCC did adequately put the plaintiffs on notice that the agency was considering changing the proposed rule, nor were the FCC's changes substantially different in kind from what it had proposed previously, and what petitioners had a chance to comment on. *See* 668 F.3d at 235, 244–45.

[58] The ATF cites *City of Waukesha v. EPA*, 320 F.3d 228, 246 (D.C. Cir. 2003) (per curiam), to support the proposition that plaintiffs would have had to submit additional and different comments. That requirement has no Fifth Circuit support, and in any event, the plaintiffs have suggested, through briefing, a number of comments they would have liked to have made against the Final Rule. Moreover, as *City of Waukesha* itself declares,

> [T]here are also situations where prejudice need not be shown by petitioners in a notice-and-comment rulemaking challenge, "where the agency has entirely failed to comply with notice-and-comment requirements, and the agency has offered no persuasive evidence that possible objections to its final rules have been given sufficient consideration" . . . . [A] rule requiring petitioners in all "logical outgrowth" cases to show what additional comments they would have submitted had notice been adequate would improperly merge the analysis on the merits of whether the final rule is a "logical outgrowth" with any applicable prejudice analysis.

320 F.3d at 246 (quoting *Shell Oil Co. v. EPA*, 950 F.2d 741, 752 (D.C. Cir. 1991)).

prejudicial. The Final Rule therefore must be set aside as unlawful or other-wise remanded for appropriate remediation.[59]

## V.

Plaintiffs are likely to succeed on the merits and have thus carried part of their burden to obtain a preliminary injunction. The order of the district court to the contrary is reversed.

Plaintiffs must satisfy the other preliminary injunction factors: There must be irreparable harm, and the balance of equities and the public interest must favor injunctive relief. The district court did not conduct that analysis, having erroneously found that the plaintiffs failed on the first factor.

Although plaintiffs urge this court to conduct this analysis ourselves and enter a nationwide injunction, we decline to do so now. For preliminary injunctions, "none of the . . . prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975). A preliminary injunction is an "extraordinary remedy," and the "burden of persuasion on all . . . requirements" is on the movant party. *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (quoting *Dennis Melancon, Inc., v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012)). Although plaintiffs succeed on the first factor, the others are yet to be determined.[60]

---

[59] Because plaintiffs are likely to succeed on the merits of their APA challenge, it is unnecessary to address their constitutional claims. *See, e.g.*, *Braidwood Mgmt., Inc. v EEOC*, 70 F.4th 914, 940 n.60 (5th Cir. 2023). Moreover, because this panel is hearing the case as only an appeal from the denial of a preliminary injunction, those difficult questions are better left for non-expedited briefing in a plenary proceeding on the merits.

[60] There is authority that the first factor—likelihood of success on the merits—is the most important of the preliminary injunction factors. *See Def. Distributed v. United States*

No. 23-10319

Given the nature of the remedy and the fact that in this posture, the district court has not conducted extensive fact-finding or built a record for this court, we remand for a ruling on a preliminary injunction. The paucity of the current record on appeal makes it inappropriate for this court to step in before the district court has ruled.[61]

Similarly, determining the scope of injunctive relief is better suited to the district court in the first instance. "American courts of equity did not provide relief beyond the parties to the case . . . [although] an injunction could benefit non-parties as long as that benefit was merely incidental." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (cleaned up). For that reason, "nationwide injunctions are [not] required or even the norm." *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam).

Still, in certain circumstances, nationwide relief is appropriate and may be necessary for the benefit of all parties. In *Feds for Medical Freedom*, for example, the en banc court permitted a nationwide injunction because the organization's membership numbered thousands, and the members were scattered nationwide. 63 F.4th at 387–89. In those circumstances, we reasoned that "limiting the relief to only those before [the court] would prove unwieldy and would only cause more confusion." *Id.* at 388. Moreover, injunctions should be crafted to "provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

---

*Dep't of State*, 838 F.3d 451, 463 (5th Cir. 2016) (Jones, J., dissenting); *cf. Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005) (Smith, J.). Still, even with a strong likelihood of success, a district court cannot give the other factors short shrift. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 21–26 (2008).

[61] *See Chavez v. Plan Benefit Servs., Inc.*, 957 F.3d 542, 547 (5th Cir. 2020) ("Appellate judges are not finders of fact, and . . . it's up to the district judge to find the facts.") (footnote omitted).

No. 23-10319

The present case is also not the only one involving a challenge to the Final Rule. Multiple judges within this circuit have already issued injunctions against the Final Rule, following the initial one issued here, enjoining enforcement against members of various gun rights organizations.[62] It is already uncertain how many persons are now subject to these injunctions or how the ATF would enforce the Final Rule against non-enjoined parties. There is a need for consistent application of the law, and this court may not have all the required facts. Accordingly, the district court is better situated to weigh the facts and fashion the most appropriate relief.

\* \* \* \* \*

For the foregoing reasons, we REVERSE the order denying a preliminary injunction and REMAND with instruction to consider that motion expeditiously. To ensure relative stability, we MAINTAIN the preliminary injunction pending appeal that the motions panel issued on May 23, 2023, as clarified by this merits panel on May 26, 2023.[63] This court's injunction will expire 60 days from the date of this decision, or once the district court rules on a preliminary injunction, whichever occurs first. We direct the district court to rule within 60 days.

We place no limitation on the matters that the conscientious district court may address on remand, and we give no indication of what decisions it should reach, regarding a preliminary injunction or any other matter.

---

[62] *See, e.g.*, *Texas v. ATF*, No. 6:23-CV-00013, 2023 WL 3763895 (S.D. Tex. May 31, 2023); Order, *Second Amend. Found., Inc. v. ATF*, No. 3:21-cv-00116 (N.D. Tex. May 31, 2023), ECF No. 65.

[63] *See, e.g.*, *In re JPMorgan Chase & Co.*, 916 F.3d 494, 498 (5th Cir. 2019) (Smith, J.) ("We continue the stay of the district court's . . . order for thirty days to give the court full opportunity to reconsider that order.").

No. 23-10319

Don R. Willett, *Circuit Judge*, concurring:

I join the majority's careful opinion in full measure. I write separately because I suspect that the Final Rule would likely fail constitutional muster even if it were a logical outgrowth of the worksheet idea that preceded it.

Rearward attachments, besides making a pistol less concealable, improve a pistol's stability, and thus a user's accuracy. Accuracy, in turn, promotes safety. Even for attachments that convert a pistol into a rifle under the statutes, ATF has not identified any historical tradition of requiring ordinary citizens to endure a lengthy, costly, and discretionary approval process just to use accessories that make an otherwise lawful weapon *safer*. Instead, the NFA tends to regulate weapons that inflict indiscriminate destruction: "machinegun[s]", short-barreled "shotgun[s]," and "smooth bore" weapons (and for that matter, "explosive[s]", "grenade[s]", and "poison gas").[1] Weapons that begin as rifles, too, are more difficult to keep accurate once the barrel starts shrinking.

In my view, protected Second Amendment "conduct" likely includes making common, safety-improving modifications to otherwise lawfully bearable arms.[2] Remember: ATF agrees that the weapons here are lawfully bearable *pistols* absent a rearward attachment. Congress might someday try to add heavy pistols to the NFA and the GCA, but it hasn't yet. These pistols are therefore lawful. Adding a rearward attachment—whether as a brace or a stock—makes the pistol more stable and the user more accurate. I believe these distinctions likely have constitutional significance under *Bruen*.

_____

[1] 26 U.S.C. § 5845.

[2] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

No. 23-10319

Still, at this early stage, I agree that the majority's APA analysis is enough for today, even if the constitutional questions may soon return.

No. 23-10319

Stephen A. Higginson, *Circuit Judge*, dissenting:

Almost ninety years ago, Congress passed the National Firearms Act ("NFA") as a registration regime for uniquely dangerous weapons. By congressional delegation, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") must "take Care" that this legislation is enforced. U.S. Const. art. II, § 3. To carry out this responsibility, ATF has tried to close a loophole[1] in its enforcement of Congress's century-old regulation— not ban—of particularly dangerous firearms. Judge Reed O'Connor upheld ATF's clarifying rule, concluding that these plaintiffs' arguments against it lacked merit. I would affirm.

---

[1] *See* Factoring Criteria for Firearms With Attached "Stabilizing Braces," 88 Fed. Reg. 6,478, 6,495, 6,497 (Jan. 31, 2023) [hereinafter, "Final Rule"] (citing media commentary that the Dayton, Ohio mass shooter's modified gun "May have Exploited a Legal Loophole," and broadly agreeing with commenters that the proposed role would "close the 'Arm Brace Loophole'" and prevent gun companies from "circumvent[ing] the law through the use of 'braces'"). To illustrate the "Arm Brace Loophole" in the context of this case, consider the below photographs taken from the parties' briefs. The guns on the top are equipped with a "stabilizing brace." The guns on the bottom are equipped with a stock. It is undisputed that *stocks* convert the guns into NFA-regulated short-barreled rifles ("SBRs"). It was confirmed at oral argument that one of the individual plaintiffs in this case owns the "braced pistol" depicted on the top left.



No. 23-10319

## I.

As we have explained before, "[o]nly under extraordinary circumstances will we reverse the denial of a preliminary injunction." *Future Proof Brands, LLC v. Molson Coors Beverage Co.*, 982 F.3d 280, 288 (5th Cir. 2020) (citation omitted). Unlike the majority, I would not reverse Judge O'Connor's determination that the plaintiffs have failed to demonstrate a substantial likelihood of success on their claim under the Administrative Procedure Act ("APA"). In my view, ATF did not violate the APA's notice-and-comment requirements when it: (i) on June 10, 2021, published a notice of proposed rulemaking on "Factoring Criteria for Firearms With Attached 'Stabilizing Braces,'" 86 Fed. Reg. 30,826 (June 10, 2021); (ii) received and reviewed over 237,000 comments on that proposal from "individuals, lawyers, government officials, and various interest groups," Final Rule at 6,497; and (iii) on January 31, 2023, responded to those comments with its Final Rule on the subject. *Id.* at 6,478.

## A.

The plaintiffs' APA argument is that ATF failed to provide notice and invite comment on its Final Rule. This argument gets off the ground only if the Final Rule is legislative, rather than interpretive, in nature. This is because interpretive rules, like some other types of agency action, are not subject to the APA's notice-and-comment requirements. *See* 5 U.S.C. § 553(b)(A).

In their fifty-four-page brief, the plaintiffs dedicate a portion of one paragraph—spanning about half a page—to the proposition that the Rule is legislative rather than interpretive. In that short section, the plaintiffs contend that the legislative-interpretive distinction is governed by "two criteria" enumerated in our decision in *Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015). As the majority acknowledges, this is wrong. The

No. 23-10319

elements cited by the plaintiffs distinguish legislative rules from *policy statements*, not interpretive rules, and ATF has not argued that its Rule is a policy statement. After attempting to apply these two inapposite criteria to ATF's Final Rule, the plaintiffs conclude their discussion of the legislative-interpretive divide and move on.

The majority forgives this misfire and attempts to fill the gap itself. I would not do so. While we might defensibly remedy a mistaken movant's legal error if the error is small or readily correctable, that is not our situation. Discerning whether a rule is interpretive rather than legislative is difficult. Courts have described the distinction between interpretive and legislative rules as "'fuzzy,' 'tenuous,' 'blurred,' 'baffling,' and 'enshrouded in considerable smog.'" Richard J. Pierce, Jr., *Distinguishing Legislative Rules from Interpretative Rules*, 52 ADMIN. L. REV. 547, 547–48 (2000) (citing circuit-court cases). And the issue is not an obscure one. As one scholar recently observed, "the question of whether a supposedly informal pronouncement of an administrative agency is actually a rule that should have been adopted through notice-and-comment procedure may well be the single most frequently litigated and important issue of rulemaking procedure before the federal courts today." Ronald M. Levin, *Rulemaking and the Guidance Exemption*, 70 ADMIN. L. REV. 263, 265 (2018). The legislative-interpretive distinction is both complicated and significant.

Indeed, as the majority observes, our court has not "laid out a clear test appropriate to resolve the question." *Ante*, at 25. Nor would I use this case to establish such a test. Again, the plaintiffs' briefing on the matter is a half-page discussion consisting entirely of legal error.[2] Predictably, at oral

---

[2] ATF's response brief is hardly better, reciting a generic definition of interpretive rules to assert that its Final Rule is interpretive.

No. 23-10319

argument there was little, if any, discussion of the "factors" the majority now adopts as the law of our circuit.  Judicial restraint strongly counsels against the creation and application of a new test, in an infamously difficult area of administrative law, in an expedited matter, without the benefit of meaningful adversarial briefing.

Reflective of these difficulties, the test crafted and applied by the majority creates more problems than solutions.  Most significantly, the last of the majority's five factors, which it describes as "primary," *ante*, at 29, is misplaced.  The majority writes that, "in the Fifth Circuit, courts scrutinize 'whether the rule will produce significant effects on private interests.'" *Ante*, at 26 (cleaned up).  This "substantial-impact test," the majority says, is the "primary means" to "determine whether a rule is the type Congress thought appropriate for public participation." *Ante*, at 28-29 (cleaned up) (quoting *Texas v. United States*, 787 F.3d 733, 765 (5th Cir. 2015)).  The majority then concludes that this factor "strongly favors determining the Final Rule to be legislative, not interpretive" because ATF estimates that the annualized cost of the Rule will exceed $240 million. *Ante*, at 29.

On its own terms, factually, that assessment is plausible—$240 million is a lot.  The problem is that the "substantial-impact test" is not instructive in the interpretive-legislative analysis.  The majority borrows its five factors from a district court's analysis in another case against ATF.  That district court, and this majority, find support for this fifth factor in *Gulf Restoration Network v. McCarthy*, 783 F.3d 227 (5th Cir. 2015).  But *Gulf Restoration* did not involve the distinction between interpretive and legislative rules.  It instead asked, for the purpose of judicial reviewability, whether an agency's action was best understood as a nonenforcement decision or a denial of a rulemaking petition. *Id.* at 235. *Gulf Restoration* does not support the majority's assertion that courts in this circuit "scrutinize"

No. 23-10319

the "effects on private interests" to distinguish legislative from interpretive rules.[3]

The majority's later citation to *Texas v. United States* for its "substantial-impact test" further reveals that this factor does not belong. *See* 787 F.3d at 765. In *Texas*, we explained that we use the substantial-impact test to "look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Id.* (alteration in original) (quoting *U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984)). But there is the crux: the substantial-impact test is instructive in assessing purportedly *procedural* rules—not interpretive rules. Procedural rules are enumerated separately in the APA as a type of agency action not subject to notice and comment. *See* 5 U.S.C. § 553(b)(A) (exempting from notice and comment "interpretative rules, general statements of policy, or *rules of agency organization, procedure, or practice*" (emphasis added)). Here, ATF has not asserted that the Final Rule is

---

[3] While the court in *Gulf Restoration* did note that it is an "essential feature[] of substantive rules" to "grant rights, impose obligations, or produce other significant effects on private interests," 783 F.3d at 236, the court did not apply this rubric to determine whether a rule was interpretive. And a run-down of that language indicates that it has no relevance to interpretive rules. In observing that "significant effects on private interests" is a feature of substantive rules, the court in *Gulf Restoration* cited the D.C. Circuit's decision in *American Hospital Ass'n v. Bowen*, 834 F.2d 1037, 1045 (D.C. Cir. 1987). *Bowen* in turn sources this language from *Batterton v. Marshall*, 648 F.2d 694, 702 (D.C. Cir. 1980). And in *Batterton*, the D.C. Circuit introduced the language in describing positive features of legislative rules without reference to those rules' specific, and distinct, non-legislative counterparts: interpretive rules, policy statements, and procedural rules. *See* 5 U.S.C. § 553(b)(A). The remainder of its opinion makes clear that a rule's substantial effect on private interests bears on the distinction between legislative and *procedural* rules. Tellingly, the court does not refer again to "private rights and interests" until it assesses whether the challenged action is a rule of "agency organization, procedure, or practice." *Batterton*, 648 F.2d at 707-08. The test features nowhere in the court's separate analysis of whether the agency's action is an interpretive rule. *See id.* at 705-06.

No. 23-10319

procedural.[4] The substantial-impact test, "primary" for the majority, is not germane.

We have said as much before, including in *Kast Metals*, from which the court in *Texas* derived its rule. There, we agreeingly quoted the D.C. Circuit that "the substantial impact test has *no utility* in distinguishing between [interpretive and substantive rules]." *Kast Metals*, 744 F.2d at 1155 n.19 (5th Cir. 1984) (first emphasis added) (second alteration in original) (quoting *Cabais v. Egger*, 690 F.2d 234, 238 (D.C. Cir. 1982)). Six months later, we rejected a plaintiff's APA argument that the challenged regulation's "'substantial impact' on affected parties nonetheless required notice and comment rulemaking," because the "substantial impact test is not a vehicle for imposing judicial notions of procedural propriety over and above what the APA mandates." *Baylor Univ. Med. Ctr. v. Heckler*, 758 F.2d 1052, 1061 (5th Cir. 1985).

Other courts similarly confirm that a rule's "substantial impact" tells us little about whether it is legislative rather than interpretive. *E.g.*, *Energy Rsrvs. Grp., Inc. v. Dep't of Energy*, 589 F.2d 1082, 1094–95 (Temp. Emer. Ct. App. 1978) (explaining that "under the 'substantial impact' test every

---

[4] Instead, ATF has consistently argued—and the district court agreed—that the Final Rule is an interpretive rule, which "clarifies, rather than creates, law." *Flight Training Int'l, Inc. v. FAA*, 58 F.4th 234, 240 (5th Cir. 2023) (citation omitted). Interpretive rules "advise the public of the agency's construction of the statutes and rules which it administers." *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 97 (2015) (citation omitted). That is what ATF has repeatedly explained that it is doing, both in the Final Rule and in its briefing to us. *E.g.*, Final Rule at 6,478. Accordingly, as ATF further asserts, in any enforcement proceeding involving a firearm whose regulatory status is contested, courts would apply the *statutory* language, not the interpretative criteria embodied in ATF's Final Rule. The loophole confounding citizens and ATF alike therefore should be ours to sort out, affording no *Chevron* deference to ATF's interpretive input as laid out in the Rule. *See United States v. Mead Corp.*, 533 U.S. 218, 232 (2001). Vitally, in such an enforcement proceeding, the court would have the benefit of assessing a particular firearm.

significant interpretative rule automatically becomes a legislative rule by virtue of its effect," and that "[t]here is nothing in the APA to warrant employment of the 'substantial impact' test to classify interpretative and legislative rules"); *Brit. Caledonian Airways, Ltd. v. C.A.B.*, 584 F.2d 982, 989 (D.C. Cir. 1978) ("Merely because a Rule has a wide-ranging effect does not mean that it is 'legislative' rather than 'interpretative.'" (citation omitted)).

To summarize, the substantial-impact test, utilized by the majority, ill fits—indeed, inexorably answers[5]—the question this case presents. That leaves the majority's other four factors, which may or may not prove a workable means of distinguishing between legislative and interpretive rules. We cannot know. No party in the case has briefed the factors—their wisdom in general or their specific application to this Rule. The district court had no such opportunity either.

In any event, these plaintiffs have rested a critical component of their APA claim on an analysis that is both cursory and incorrect. I would accordingly hold that, in this preliminary-injunction posture, they have failed to demonstrate that they are substantially likely to succeed on the merits of that claim,[6] as they have not shown that ATF's Final Rule is legislative rather than interpretive and therefore subject to the APA's notice-and-comment requirements.

---

[5] *See Energy Rsrvs. Grp.*, 589 F.2d at 1094–95.

[6] *Future Proof Brands*, 982 F.3d at 288 ("A preliminary injunction is 'an extraordinary remedy which should not be granted unless the party seeking it has *clearly carried* its burden of persuasion.'" (cleaned up) (emphasis added) (citation omitted)).

No. 23-10319

## B.

But even if they had, their APA claim would still fail. That's because, even assuming that ATF's Final Rule *is* legislative in nature, the plaintiffs have not shown that the APA's procedural requirements were not met.

Plaintiffs contend that ATF's Final Rule does not sufficiently resemble the proposed rule, thereby depriving them of notice and an opportunity to comment. In a recent opinion, our court reiterated what the APA requires in this respect. *See Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 447-49 (5th Cir. 2021). We explained that an agency's notice suffices if the final rule "is a 'logical outgrowth' of the proposed rule, meaning the notice must 'adequately frame the subjects for discussion' such that 'the affected party "should have anticipated" the agency's final course in light of the initial notice.'" *Id.* at 447 (quoting *Nat'l Lifeline Ass'n v. FCC*, 921 F.3d 1102, 1115 (D.C. Cir. 2019)); *see Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). The notice need not "specifically identify every precise proposal which the agency might ultimately adopt." *Huawei*, 2 F.4th at 448 (cleaned up) (quoting *Chem. Mfrs. Ass'n v. EPA*, 870 F.2d 177, 203 (5th Cir. 1989)). To the contrary, "[t]he APA notice requirement is satisfied if the notice fairly apprises interested persons of the subjects and issues the agency is considering." *Chem. Mfrs. Ass'n*, 870 F.2d at 203.

We are bound by our court's *Huawei* standard, and ATF's notice of the proposed rule easily meets it.

While the plaintiffs complain that the Final Rule "scrap[ped]" the proposed Worksheet and its point system, this objection rings hollow in light of the overwhelmingly negative response to the Worksheet. ATF explained in its publication of the Final Rule that, "[a]fter careful consideration of the comments received regarding the complexity in understanding the proposed Worksheet," as well as the "methodology used in the Worksheet," the Final

Rule would not use the Worksheet and its point system. Final Rule at 6,480. This is a straightforward case, then, where "the changes reflected in the final rule were instigated by industry comments," indicating that "the final rule was a logical outgrowth of the comments received." *Chem. Mfrs. Ass'n*, 870 F.2d at 203.

Indeed, to find an example of the severe criticisms ATF received from persons fully "apprise[d] of the issues at stake," *id.* at 217, we need look no further than a comment submitted by plaintiffs' counsel on behalf of a gun-rights center. The center protested that ATF's Worksheet was "incomprehensible," and "ill-defined," and that, in practice, states will be "forc[ed] . . . to guess how the ATF may apply the Worksheet to a particular firearm." Letter to Denise Brown from Cody J. Wisniewski, at 2, 15, Mountain States Legal Foundation, Center to Keep and Bear Arms (Sept. 8, 2021). The center speculated that the classification process may be so "tedious and incomprehensible" that state agencies may "simply not cooperate with the ATF out of sheer inability." *Id.* at 15. Far from an unanticipated change in course, the possible elimination of the Worksheet was the subject of extensive comment.[7] *See Huawei*, 2 F.4th at 448–49 (explaining that an APA petitioner's comments on the agency's proposed

---

[7] Other commenters criticized the point-based rigidity of the Worksheet system. *E.g.*, Comment ID ATF-2021-0002-97129 (June 21, 2021) (criticizing ATF's "hard-to-follow points system" under which, "if [a] gun scores four points or more in either of two separate sections, it would be automatically considered an SBR"); Comment ID ATF-2021-0002-133210 (Aug. 18, 2021) (criticizing "the use of . . . a rigid points system" because most "modern firearms" can "be easily modified in form and function"); Comment ID ATF-2021-0002-146180 (Aug. 30, 2021) ("disagree[ing] with the points scoring proposed" because, "[f]or example, the ability to use sights and stabilize a firearm off body should not automatically qualify the firearm as being designed for shoulder usage").

rule undermined the petitioner's assertion that it lacked fair notice of the final rule's contents).

The plaintiffs also broadly complain that the Final Rule replaced the proposed rule's "objective" factors with "subjective" factors. They assert that the Worksheet used "objective measurement criteria," while the Final Rule uses an "indeterminate multi-factor test" based on "subjective criteria," with no explanation of "how these factors are to be weighed against each other." But again, the plaintiffs' own response to the proposed rule contradicts their argument. Most notably, the Firearms Policy Coalition—a plaintiff in this case—submitted a ten-page comment opposing the proposed rule. *See* Comment on Proposed Rule no. ATF 2021R-08, Firearms Policy Coalition (Sept. 8, 2021) [hereinafter, "Coalition Comment"]. In its comment, the Coalition complained that the proposed rule's factors were "highly subjective," "malleable," and "indeterminate." *Id.* at 3. It further protested that ATF proposed to "preserve *ad hoc* discretion" to classify a braced pistol as a short-barreled rifle irrespective of its Worksheet score, and that "such open-ended discretion renders the proposed criteria/factors meaningless." *Id.* at 4. The Coalition characterized ATF's discretion as "un-check-able," "free-ranging," and "unpredictable." *Id.* It asserted that ATF's discretion leaves "no meaningful objective criteria against which to measure its conduct." *Id.* Again, then, plaintiffs' own comments reveal that the proposed rule "should have enabled—and in fact, did enable—[them] to anticipate those aspects of the final rule [they] claim[] were not properly noticed." *Huawei*, 2 F.4th at 448. And even if the Final Rule is, as the plaintiffs contend, "*more* subjective and . . . *less* consistent" than the Worksheet, that does not mean that the proposed rule did not provide adequate notice under the APA. It may be that ATF did not respond to the public's comments as the plaintiffs would have liked, but the alleged "rug-pull" is difficult to square with the record.

No. 23-10319

Finally, plaintiffs protest that the Worksheet, unlike the Final Rule, had an "emphasis on the design of the firearm rather than possible uses." But this line of argument is contradicted by the Final Rule itself, as well as—again—plaintiffs' own comments. On the Rule itself, the design features of the firearm remain the overwhelming focus. ATF first asks whether the weapon is "equipped with an accessory, component, or other rearward attachment . . . that provides surface area that allows the weapon to be fired from the shoulder." Final Rule at 6,480. *Only if so*, ATF proceeds to assess six factors, four of which pertain exclusively to the design of the firearm. *Id.* The other two factors—marketing materials and information about the device's likely use—do, in a sense, look beyond the physical features of the device to perceive shoulder use, but the proposed rule provided notice of that pragmatic, objective likelihood as well. Tellingly, the Coalition complained about precisely this issue, writing that the proposed criteria "go beyond the design and manufacture of the weapon and seek to divine some heretofore unknowable intent."[8] Coalition Comment at 3. Yet again, the complaints raised in this litigation were fully aired in comments to the agency. This is a meaningful indicator that the notice-and-comment requirement was satisfied. *See Huawei*, 2 F.4th at 448-49 (finding no notice-and-comment

---

[8] Objections to ATF's assessment of intent make little sense in light of the statute's plain focus on "inten[t] to be fired from the shoulder." 26 U.S.C. § 5845(c). As the First Circuit explained in upholding an ATF rule about silencers, "it is hard to believe that Congress intended to invite manufacturers to evade the NFA's carefully constructed regulatory regime simply by asserting an intended use for a part that objective evidence in the record . . . indicates is not actually an intended one." *Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 602 (1st Cir. 2016). And while the court in *Sig Sauer* was focused on "objective evidence" in the form of physical design features, the same holds true for any and all objective evidence that is probative of intent—including, for example, how a device is *actually used* in the community. *See Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring) ("Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor.")

No. 23-10319

violation where the complaining litigant's comments to the agency revealed that the agency's "initial notice and subsequent comments alerted [the litigant] to the issues it flags" in court).

ATF has candidly acknowledged the preexisting uncertainty as to its classification of braced pistols, above all because manufacturers have increasingly commercialized "braces" that appear indistinguishable from stocks. *See supra* note 1; Final Rule at 6,479. This is why ATF proposed its rule—to explain its approach to classification of these devices, a task necessary for its constitutionally mandated enforcement of Congress's laws. *See* 86 Fed. Reg. at 30,826. Hundreds of thousands of commenters responded, many critical of the point system embodied in the proposed Worksheet. Responsively, ATF revisited its proposed approach, eliminating the point system but retaining its best effort to identify design, manufacture, and usage criteria that give meaning to the congressional focus on whether a firearm is shoulder-fired. Under our case law, I can find nothing objectionable in this process.

For these reasons, I respectfully disagree with my colleagues that ATF violated the APA's procedural requirements.[9] ATF's proposed rule set out to "clarify when a rifle is 'intended to be fired from the shoulder.'" 86 Fed. Reg. at 30,826. The proposal "fairly acquainted [the public] with the subject

---

[9] My colleagues embrace the plaintiffs' account of ATF's supposed rug-pull, but in so doing—as with their interpretive-rule gloss—they perilously heighten the burden to a near-impossible one for executive enforcement of federal law. For example, the majority says that, to satisfy the logical-outgrowth standard, a proposed and final rule "must be alike in kind." *Ante*, at 33. The majority cites no authority for this proposition. More importantly, an "alike in kind" requirement is at odds with our decades-old rule that the APA's "notice requirement is satisfied if the notice *fairly apprises* interested persons of the *subjects and issues* the agency is considering." *Chem. Mfrs. Ass'n*, 870 F.2d at 203 (emphases added).

No. 23-10319

and issues" central to the Final Rule. *Huawei*, 2 F.4th at 449. That is "all § 553 demands." *Id.* (citing *Chem Mfrs. Ass'n*, 870 F.2d at 203).

## C.

Moreover, as the majority observes, APA deficiencies are subject to a harmless-error rule. *United States v. Johnson*, 632 F.3d 912, 930 (5th Cir. 2011). The need to show prejudice is yet another obstacle to plaintiffs' APA claim. *Even if* ATF's Final Rule is legislative, and *even if* the Final Rule is not a logical outgrowth of the proposed rule, these plaintiffs were not prejudiced by any notice-and-comment deficiency. Plaintiffs fail to explain what it is they would have liked to say regarding the Final Rule that they were unable to say in response to the proposed rule. Because ATF's "process addressed the same issues raised by [the plaintiffs] and because [they] 'make[] no showing that the outcome of the process would have differed . . . had notice been at its meticulous best,'" *id.* at 933 (citation omitted), any APA deficiency on ATF's part was harmless.

\*    \*    \*

I would affirm Judge O'Connor's conclusion that the plaintiffs have failed to demonstrate a likelihood of success on the merits of their APA claim.

## II.

The majority's finding on the APA claim has obviated any need to assess the plaintiffs' Second Amendment challenge. But Judge Willett's succinct concurring views may benefit from an equally succinct counterpoint.

No. 23-10319

## A.

Judge Willett says that braces on pistols improve accuracy, and that "[a]ccuracy, in turn, promotes safety." *Ante*, at 41 (Willett, J.). In his view, "making common, safety-improving modifications" to guns is Second-Amendment-protected conduct. *Id.*

I disagree that these braces are, in relevant regard, "safety-improving modifications." After all, as a plurality of the Supreme Court has observed, it is "clear from the face of the [NFA] that [its] object was to regulate certain weapons likely to be used for criminal purposes," and "the regulation of short-barreled rifles . . . addresses a concealable weapon *likely to be so used*." *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517 (1992) (plurality opinion) (emphasis added). Indeed, as some commenters observed in response to ATF's proposed rule, "short-barreled rifles are uniquely dangerous because they 'combine the power of shoulder-mounted rifles with the concealability of handguns' and . . . 'stabilizing braces' are functionally equivalent to shoulder stocks." Final Rule at 6,498. Other commenters, "including former law enforcement officers," favored the proposed rule because braced pistols, "as evidenced by their use in the Boulder[, Colorado] and Dayton[, Ohio] mass shootings, 'are unusually dangerous because they can be *easily concealed* like a handgun but have the *firepower and accuracy* of a rifle.'" *Id.* (emphases added). Increased concealability and accuracy, at least in the hands of killers, is not "safe"—it is lethal.

## B.

Relatedly, I agree with the district court that these plaintiffs are far from demonstrating a substantial likelihood of success on their challenge under *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

No. 23-10319

First, until told otherwise by the Supreme Court, I am persuaded that uniquely dangerous weapons, including short-barreled rifles, are not covered by the Second Amendment. As the Supreme Court recognized in *Heller*, "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). That's because there is a "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Id.* at 627 (citing, *inter alia*, 4 COMMENTARIES ON THE LAWS OF ENGLAND 148-49 (1769)). And the Supreme Court's more recent decision in *Bruen* left *Heller*'s dangerous-and-unusual carveout intact. *See Bruen*, 142 S. Ct. at 2128, 2143. Accepting, as the plaintiffs do,[10] that "short-barred rifles" are constitutionally regulated under the NFA, I fail to see how ATF's Final Rule, which merely identifies criteria for classifying materially indistinguishable devices alike—that is, as SBRs—implicates the text of the Second Amendment.

Second, it bears emphasizing that ATF's Final Rule, like the NFA itself, does not ban anything. The NFA is instead a registration law, akin to a licensing regime, which the plurality in *Bruen* was careful to point out as requiring fact-specific assessment. *See id.* at 2138 n.9. The plurality told us that some licensing regimes pose no constitutional problem because they do not necessarily burden the Second Amendment right. *Id.*; *cf. United States v. McNulty*, No. 22-10037, ___ F. Supp. 3d ___, 2023 WL 4826950, at *5 (D. Mass. July 27, 2023) ("[I]t is incorrect to posit that *Bruen* has upended the presumptive constitutionality of measures seeking to regulate firearms commerce."). In this case, these plaintiffs have failed to demonstrate that the NFA's century-old registration scheme for uniquely dangerous

---

[10] Plaintiffs do not lodge a constitutional attack against the NFA itself.

No. 23-10319

devices—upheld long ago by the Supreme Court in *United States v. Miller*, 307 U.S. 174, 178 (1939)—is more like New York's licensing system struck down in *Bruen*, rather than the permissible regimes accepted as constitutional in the plurality's footnote 9.

## III.

While I dissent from the reversal of Judge O'Connor's denial of a preliminary injunction, I note that the majority has remanded to the district court with no restrictions. I join the majority to emphasize that Judge O'Connor is free to go in any direction, including limiting any injunctive relief to an appropriately narrow scope, or finding that the balance of equities favors issuing no injunction at all. As the majority acknowledges, a district court is best positioned to make these determinations in the first instance.